

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE (202) 458 1534 | FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

August 22, 2017

By courier (*advance copy by email*)

**Karkey Karadeniz Elektrik Uretim A.S.**
c/o Mr. Orhan Remzi Karadeniz
Ms. Nazli Dereli Oba
 and
c/o Mr. Paolo Di Rosa
Mr. Lawrence Schneider
Mr. José Antonio Rivas
Arnold & Porter LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
United States of America
 and
c/o Mr. Anton Ware
Ms. Amy V. Endicott
Mr. John Muse-Fisher
Arnold & Porter LLP
7th Floor
Three Embarcadero Center
San Francisco, CA 94111
United States of America
 and
c/o Mr. David Reed
Mr. Monty Taylor
Ms. Bridie McAsey
Arnold & Porter LLP
Tower 42
25 Old Broad Street
London EC2N 1HQ
United Kingdom
 and
c/o Ms. Maria Chedid
Mr. Carson Thomas
Baker & McKenzie LLP
Two Embarcadero Center
11th Floor
San Francisco, CA 94111
United States of America
 and
Mr. Nicholas Kennedy
1601 Bryan Street, Suite 800
Dallas, TX 75201
United States of America

c/o Mr. Syed Ahmad Hassan Shah
Hassan Kaunain Nafees
Legal Practitioners and Advisors
207, Second Floor, Block 8
Shoukat Complex, Markaz F-6
Islamabad
Pakistan

**Islamic Republic of Pakistan**
c/o Mr. Ahmad I. Aslam
Office of the Attorney General for Pakistan
Supreme Court Building
Constitution Avenue
Islamabad
Pakistan
 and
c/o Mr. Mark Levy
Ms. Kate Davies
Ms. Louise Fisher
Mr. Guled Yusuf
Mr. Alastair Campbell
Ms. Olga Owczarek
Allen & Overy LLP
One Bishops Square
London E1 6AD
United Kingdom
 and
c/o Ms. Judith Gill QC
Allen & Overy LLP
50 Collyer Quay
#09-01 OUE Bayfront
Singapore, 049321
 and
c/o Mr. Matthew Hodgson
Allen & Overy LLP
9th Floor
Three Exchange Square Central
Hong Kong

**Re:  Karkey Karadeniz Elektrik Uretim A.S. v. Islamic Republic of Pakistan**
(ICSID Case No. ARB/13/1)

Dear Mesdames and Sirs,

Please find enclosed a certified copy of the Tribunal's Award dated August 22, 2017.

Pursuant to Arbitration Rule 48, I have authenticated the original text of the Award and deposited it in ICSID's archives. In accordance with Arbitration Rule 48, the Award is deemed to have been rendered on the date of dispatch, which is indicated on the original text of the Award and on all copies.

In accordance with Section 25.1 of Procedural Order No. 1, "[t]he ICSID Secretariat shall not publish any ruling issued in the present proceeding without the consent of the parties, unless it has been previously published by any other source." Further to the parties' correspondence of April 25, 2017, I note the parties' agreement "to maintain the confidentiality of the Award upon its issuance, pending discussions between the parties."

Yours sincerely,

Martina Polasek
Acting Secretary-General

Enclosure

cc (with enclosure): Members of the Tribunal

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

## KARKEY KARADENIZ ELEKTRIK URETIM A.S.

Claimant

and

## ISLAMIC REPUBLIC OF PAKISTAN

Respondent

**ICSID Case No. ARB/13/1**

---

# AWARD

---

*Members of the Tribunal*
Mr. Yves Derains, President
Sir David A.O. Edward
Dr. Horacio A. Grigera Naón

*Secretary of the Tribunal*
Ms. Geraldine R. Fischer

*Assisting Legal Counsel*
Ms. Celeste Mowatt

*Assistant to the Tribunal*
Ms. Ana Paula Montans

*Date of dispatch to the Parties:* 22 August 2017

REPRESENTATION OF THE PARTIES

Representing **Karkey Karadeniz Elektrik Uretim A.S.**:

**Karkey Karadeniz Elektrik Uretim A.S.**
Mr. Orhan Remzi Karadeniz
Ms. Nazli Dereli Oba

and

**Arnold & Porter LLP**
Mr. Paolo Di Rosa
Mr. Lawrence Schneider
Mr. José Antonio Rivas
601 Massachusetts Avenue NW
Washington, DC 20001-3743
United States of America

Mr. Anton Ware
Ms. Amy V. Endicott
Mr. John Muse-Fisher
7th Floor
Three Embarcadero Center
San Francisco, CA 94111
United States of America

Mr. David Reed
Mr. Monty Taylor
Ms. Bridie McAsey
Tower 42
25 Old Broad Street
London EC2N 1HQ
United Kingdom

and

Representing the **Islamic Republic of Pakistan**:

**Allen & Overy LLP**
Mr. Mark Levy
Ms. Kate Davies
Ms. Louise Fisher
Mr. Guled Yusuf
Mr. Alastair Campbell
Ms. Olga Owczarek
One Bishops Square
London E1 6AD
United Kingdom

Ms. Judith Gill QC
50 Collyer Quay
#09-01 OUE Bayfront
Singapore, 049321

Mr. Matthew Hodgson
9th Floor
Three Exchange Square Central
Hong Kong

and

**Office of the Attorney General for Pakistan**
Mr. Ahmad I. Aslam
Supreme Court Building
Constitution Avenue
Islamabad
Pakistan

**Baker & McKenzie LLP**

Ms. Maria Chedid

Mr. Carson Thomas

Two Embarcadero Center

11th Floor

San Francisco, CA 94111

United States of America

Mr. Nicholas Kennedy

1601 Bryan Street, Suite 800

Dallas, TX 75201

United States of America

and

**Hassan Kaunain Nafees**
**Legal Practitioners and Advisors**

Mr. Syed Ahmad Hassan Shah

207, Second Floor, Block 8

Shoukat Complex, Markaz F-6

Islamabad

Pakistan

TABLE OF CONTENTS

I.  INTRODUCTION AND PARTIES ....................................................................... 1

II. PROCEDURAL HISTORY ................................................................................. 1

    A.  Registration of the Request for Arbitration ................................................. 1

    B.  Tribunal Constitution ................................................................................... 2

    C.  The Written and Oral Procedure .................................................................. 3

        (1)  The Claimant's Request for Provisional Measures............................... 3

        (2)  The Written Phase on Jurisdiction and the Merits ............................... 8

    D.  The Hearing on Jurisdiction and the Merits ............................................... 14

III. FACTUAL BACKGROUND ............................................................................... 17

IV. SUMMARY OF THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF ................ 36

    A.  The Claimant's Position .............................................................................. 36

        (1)  Jurisdiction ........................................................................................ 36

        (2)  Attribution ......................................................................................... 44

        (3)  Merits ................................................................................................ 45

        (4)  Damages............................................................................................. 56

        (5)  Counterclaim...................................................................................... 74

        (6)  The Claimant's Request for Relief ..................................................... 76

    B.  The Respondent's Position .......................................................................... 77

        (1)  Jurisdiction ........................................................................................ 77

        (2)  Attribution ......................................................................................... 100

        (3)  Merits of Karkey's Claims under the Express Terms of the Treaty ................. 101

        (4)  Merits of Karkey's Additional Claims Brought under the MFN Clause............ 107

        (5)  Damages............................................................................................. 115

        (6)  Pakistan's Counterclaims................................................................... 131

        (7)  The Respondent's Request for Relief ................................................. 135

V.  THE TRIBUNAL'S DECISION ........................................................................... 136

    A.  Is Karkey's "Investment" Tainted by Corruption?...................................... 136

        (1)  Applicable Standard of Proof and Burden of Proof............................ 136

        (2)  Requirements for a Finding of Corruption under Pakistani Law........................ 138

        (3)  Analysis of the Evidence regarding Allegations of Corruption.......................... 140

    B.  The Effect of the Supreme Court's Judgment ............................................. 154

C.   Attribution ................................................................................................ 159

(1)  Are the Acts of Lakhra attributable to Pakistan? ............................... 159

(2)  Are the Acts of PEPCO attributable to Pakistan? ............................... 167

D.   Jurisdiction .............................................................................................. 168

(1)  Was Karkey's Alleged Investment Established By Way of Fraud or
     Misrepresentation in Breach of Article I(2) of the Treaty? ................ 168

(2)  Was Karkey's Alleged Investment Established By Way of Misprocurement in
     Breach of Article I(2) of the Treaty? .................................................. 173

(3)  Does Karkey's Alleged Investment Meet the Jurisdictional Requirements of
     Article 25(1) of the ICSID Convention and Article I of the BIT? ...... 175

E.   Did Pakistan Expropriate Karkey's Investment in Breach of Article III of the
     Treaty? ..................................................................................................... 178

F.   Did Pakistan Breach Article IV of the Treaty (Free Transfer)? ................. 180

G.   The Claimant's Additional Claims ............................................................ 182

H.   Damages ................................................................................................... 182

(1)  Legal Standard ................................................................................... 182

(2)  Karkey's Request for Post-Termination Contractual Rights: (a) Termination
     Charges; (b) Unpaid invoices; and (c) Mobilization and Transport Charges ..... 187

(3)  Damages related to the Kaya Bey ...................................................... 209

(4)  Damages related to the Alican Bey .................................................... 237

(5)  Other Detained Vessels: Enis Bey and the Iraq ................................. 243

(6)  Delay Damages .................................................................................. 245

(7)  Costs increases ................................................................................... 257

(8)  Wasted Costs ...................................................................................... 264

(9)  Interest Rate ....................................................................................... 265

(10) Summary of the Amounts due to Karkey and Application of Interest .............. 269

I.   Pakistan's Counterclaims: Does the Tribunal have Jurisdiction to hear the
     Counterclaims? ......................................................................................... 271

VI.  COSTS ............................................................................................................ 274

A.   Summary of the Parties' Positions ............................................................ 274

(1)  Summary of the Claimant's Position .................................................. 274

(2)  Summary of the Respondent's Position .............................................. 281

B.   The Tribunal's Decision on Costs ............................................................. 288

VII. AWARD .......................................................................................................... 295

LIST OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| ADB | Asian Development Bank |
| ADB Report | Asian Development Bank, Final Report, Pakistan: Rental Power Review (January 2010) |
| Additional Claims | Karkey's claims in this arbitration brought under the MFN clause: (i) fair and equitable treatment; (ii) full protection and security; (iii) prohibition of unreasonable or discriminatory measures; and (iv) the benefit of the umbrella clause. |
| Advance Payment Guarantee | Bank guarantee to be provided by Karkey as security for the Down Payment amounting to US $80 million.  Defined at Section 4.5(a) of the Contract |
| *Alican Bey* or KPS 1 | *Karadeniz Powership Alican Bey* |
| Bid | Karkey's bid document dated 11 July 2008 |
| Pakistan-Turkey BIT, BIT or Treaty | Agreement Between the Islamic Republic of Pakistan and the Republic of Turkey Concerning the Reciprocal Promotion and Protection of Investments |
| Chief Justice | Chief Justice of the Supreme Court of Pakistan, Iftikhar Muhammad Chaudhry |
| COD | Commercial Operations Date |
| Counter-Memorial | Pakistan's Counter-Memorial, dated 23 January 2015 |
| Contract or 2009 RSC | Amended and Restated Rental Services Contract between Karkey Karadeniz Elektrik Uretim A.S. and Lakhra Power Generation Company Ltd., dated 23 April 2009 |
| DCF | Discounted cash flow |
| December 2008 Contract or 2008 RSC | Rental Services Contract between Karkey Karadeniz Elektrik Uretim A.S. and Lakhra Power Generation Company Ltd., dated 5 December 2008 |
| Decision on Provisional Measures | Decision on Provisional Measures, dated 16 October 2013 |
| Deed | Deed entered into between Karkey, the NAB and Lakhra, dated 7 September 2012 |
| *Doğan Bey* or KPS 3 | *Karadeniz Powership Doğan Bey* |
| Draft RSC | The draft contract appended to the RFP for Package B as Exhibit V |

| | |
|---|---|
| ECC | Economic Coordination Committee of the Cabinet of Pakistan |
| ECL | Exit Control List |
| EIA | Environmental Impact Assessment |
| Equipment | The *Kaya Bey*, the *Alican Bey*, the *Iraq*, and the *Enis Bey*, including all generating equipment and all other power plant equipment.  Defined on p. 1 of the Contract |
| Evaluation Committee | The Bid Evaluation Committee, comprised of representatives of the Ministry of Finance, PPIB, PEPCO, and NEPRA |
| *Fatmagül Sultan* or KPS 9 | *Karadeniz Powership Fatmagül Sultan* |
| FET | Fair and equitable treatment |
| First Iraq Contract or Iraq I | Contract between the Ministry of Electricity of the Republic of Iraq and Karkey Karadeniz Elektrik Uretim A.S., dated December 2008; Amendment dated May 2010 and Addendum dated 29 March 2011 |
| FPLC | Fuel Payment Letter of Credit, as defined at Section 4.5(m) of the Contract |
| FPS | Full protection and security |
| GENCO | A State-owned Generation Company |
| GoP | Government of Pakistan |
| HFO | Heavy Fuel Oil |
| ICSID or Centre | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings (2006) |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered in force on 14 October 1966 |
| ILC Articles or ILC Articles on State Responsibility | The International Law Commission's Articles on State Responsibility |
| *Iraq* and *Enis Bey* | Two support vessels located in Pakistan |
| *Irem Sultan* or KPS 6 | *Karadeniz Powership Irem Sultan* |
| IPP | Independent Power Producer |

| | |
|---|---|
| Judgment or RPP Judgment | Judgment of the Supreme Court of Pakistan in the Rental Power Case, dated 30 March 2012 |
| Karkey | Karkey Karadeniz Elektrik Uretim A.S. |
| Karpak | Karpak (Pvt.) Ltd., a wholly-owned subsidiary of Karkey |
| Karpower | Karpower International B.V. |
| *Kaya Bey* or KPS 5 | *Karadeniz Powership Kaya Bey* |
| KPS | Karadeniz Powership |
| KEMA | KEMA International B.V. |
| KESC | Karachi Electric Supply Company |
| Korangi Site | Project Site located in the Korangi Creek area, near the Korangi Thermal Power Station |
| KW | Kilowatts |
| kWh | Kilowatt hour |
| Lakhra | Lakhra Power Generation Company Ltd. |
| Lebanon contract | Contract between the Republic of Lebanon, Ministry of Energy and Water and Karpower, dated 13 July 2012 |
| LCIA | London Court of International Arbitration |
| LoA | The Letter of Award issued to Karkey on 7 November 2008 |
| Mauripur Site | Proposed Project Site near the Mauripur Grid Station, Mauripur Substation |
| Measures | Karkey's description of Pakistan's collective alleged breaches of the Treaty, as defined in paragraph 610 of the Karkey's Updated Memorial of 10 October 2014. |
| Memorial | Karkey's Updated Memorial on Jurisdiction and the Merits, dated 10 October 2014 |
| MoWP | Ministry of Water & Power of Pakistan |
| MW | Megawatts |
| NAB | National Accountability Bureau |
| NAO | National Accountability Ordinance (1999) |

| | |
|---|---|
| NEPRA | National Electric Power Regulatory Authority of Pakistan |
| NESPAK | National Engineering Services Pakistan (PVT) Ltd. |
| NOC | No Objection Certificate issued by the NAB on 11 October 2012 |
| NTDC | National Transmission and Despatch Company |
| *Orhan Bey* or KPS 7 | *Karadeniz Powership Orhan Bey* |
| PPIB | Private Power and Infrastructure Board of Pakistan |
| PEPCO | Pakistan Electric Power Company Limited |
| PMSA | Pakistan Maritime Security Agency |
| PQA | Port Qasim Authority |
| PPRA Rules | Pakistan Public Procurement Rules 2004 (made under the Public Procurement Regulatory Authority Ordinance 2002 (XXII of 2002)) |
| Project | The Rental Power Project near Karachi that is the subject of the Contract |
| Project Schedule or Proposed Project Schedule | The Project Schedule Karkey committed to meeting in its Bid |
| Provisional Measures Decision | Decision on Provision Measure in *Karkey Karadeniz Elektrik S.A. v. The Islamic Republic of Pakistan* (ICSID Case No. ARB/13/1), dated 16 October 2013 |
| *Rauf Bey* or KPS 4 | *Karadeniz Powership Rauf Bey* |
| Rental Power Case | Human Rights Case Nos. 7734-G/2009 & 1003-G/2010, as consolidated with Human Rights Case No. 56712/2010, in the Supreme Court of Pakistan |
| Reply | Karkey's Reply on Jurisdiction and the Merits, dated 5 August 2015 |
| Rejoinder | Pakistan's Rejoinder on Jurisdiction and the Merits, dated 29 October 2015 |
| RFA | Request for Arbitration in *Karkey Karadeniz Elektrik S.A. v. The Islamic Republic of Pakistan* (ICSID Case No. ARB/13/1), dated 16 January 2013 |
| RFP | Request for Proposal |
| RPPs | Rental Power Projects |

| | |
|---|---|
| Second Iraq Contract or Iraq II | Second contract between the Ministry of Electricity of the Republic of Iraq and Karkey Karadeniz Elektrik Uretim A.S., dated 29 March 2011 |
| Site or Project Site | The site of the Project, *i.e.*, the mooring location of Karkey's Powerships, near Korangi Thermal Power Station |
| Sovereign Guarantee | Guarantee of the Islamic Republic of Pakistan, dated as of 24 April 2009 (as reissued from time to time) |
| Supreme Court | Supreme Court of Pakistan |
| Sur-Rejoinder | Karkey's Sur-Rejoinder on Counterclaims, dated 21 December 2015 |
| Tower-1 | KPS Tower No. 1, a transmission tower built by Karkey for the Project |
| Vessels | Karkey's vessels in Pakistan, *i.e.*, the *Kaya Bey*, the *Alican Bey*, the *Iraq*, and the *Enis Bey* |
| WACC | Weighted Average Cost of Capital |
| Walters | Walters Power International |
| WAPDA | Water and Power Development Authority of Pakistan |
| WHT | Withholding tax |
| WPPO | WAPDA Power Privatisation Organization |

## I.  INTRODUCTION AND PARTIES

1.  This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") on the basis of the Agreement Between the Islamic Republic of Pakistan and the Republic of Turkey concerning the Reciprocal Promotion and Protection of Investments (the "Pakistan-Turkey BIT", "BIT" or "Treaty", *see* C-001), which entered into force on 3 September 1997, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "ICSID Convention"). The dispute relates to power generation equipment.

2.  The Claimant is Karkey Karadeniz Elektrik Uretim A.S. ("Karkey" or the "Claimant"), a power generation company organized under the laws of Turkey with its principal place of business in Istanbul.[1]

3.  The Respondent is the Islamic Republic of Pakistan ("Pakistan" or the "Respondent").

4.  The Claimant and the Respondent are hereinafter collectively referred to as the "Parties."

## II.  PROCEDURAL HISTORY

A.      Registration of the Request for Arbitration

5.  On 16 January 2013, ICSID received a request for arbitration submitted by Karkey Karadeniz Elektrik Uretim A.S. against the Islamic Republic of Pakistan together with Exhibits C-001 to C-012 ("Request" or "RFA"), which included a request for provisional measures ("Provisional Measures Request") made pursuant to Article 47 of the ICSID Convention and Rule 39(1) of the ICSID Rules of Procedure for Arbitration Proceedings ("ICSID Arbitration Rules").

6.  On 8 February 2013, the Secretary-General of ICSID ("Secretary-General") registered the Request, as supplemented by the Claimant's letter of 6 February 2013, in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration.  In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an Arbitral Tribunal as soon as possible in accordance with Rule 7(d) of the Centre's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

---

[1] RFA, ¶¶ 2, 18-19.

B.      Tribunal Constitution

7.      On 29 April 2013, in the absence of an agreement between the Parties, the Claimant elected to submit the arbitration to a tribunal of three arbitrators as provided in Article 37(2)(b) of the ICSID Convention.

8.      On 30 April 2013, Dr. Horacio A. Grigera Naón, a national of Argentina, accepted his appointment by the Claimant.

9.      On 9 May 2013, the Claimant requested that the Chairman of the Administrative Council appoint the remaining arbitrators, pursuant to Article 38 of the ICSID Convention and ICSID Arbitration Rule 4.

10.     On 19 June 2013, Sir David A.O. Edward, a British national, accepted his appointment by the Chairman of the ICSID Administrative Council, in accordance with Article 38 of the ICSID Convention, as arbitrator.[2]

11.     On 25 July 2013, Mr. Yves Derains, a national of France, accepted his appointment by the Chairman of the ICSID Administrative Council, in accordance with Article 38 of the ICSID Convention, as President of the Tribunal.

12.     On 25 July 2013, the Secretary-General, in accordance with Rule 6(1) of the ICSID Arbitration Rules notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Geraldine Fischer, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal. Ms. Ana Paula Montans was subsequently appointed as the Assistant to the Tribunal.[3]

---

[2] On 1 July 2013, the Secretariat received a letter by mail from Pakistan indicating that it forwarded "*vide mail dated 10th June, 2013 the proposal of the appointment of Co-Arbitrator and the Presiding Arbitrator as Mr. Rashidin Nawaz Qasuri, Advocate, Supreme Court and Mr. Justice (R) Khalil-Ur-Rehman Ramday, former Judge of the Supreme Court of Pakistan respectively.*" On 2 July 2013, the Secretary-General acknowledged receipt of the 1 July 2013 letter and notified the Parties that it never received any such communication prior to 1 July 2013. In the Secretary-General's 2 July 2013 letter, she also noted that the Secretariat had sent multiple communications in June 2013 to the Parties regarding the appointment of the remaining arbitrators. As there was no response to the June 2013 letters, the Secretariat proceeded with the appointments of the missing arbitrators by the Chairman of the Administrative Council in accordance with Article 38 of the ICSID Convention. On 8 July 2013, the Claimant sent a letter informing the Secretary-General that it did not agree to the replacement of Sir David A.O. Edward pursuant to ICSID Arbitration Rule 7, and it did not concur in the appointment of Mr. Justice (R) Khalil-Ur-Rehman Ramday nor the naming a Pakistani national as a Member of the Tribunal.

[3] A confidentiality undertaking signed by Ms. Montans was provided to the Parties on 28 March 2014. Prior to Ms. Montans, Ms. Diana Correa acted as Assistant to the Tribunal. Ms. Correa's signed confidentiality undertaking was provided to the Parties on 3 October 2017.

C.      The Written and Oral Procedure

   **(1) The Claimant's Request for Provisional Measures**

13.    On 8 February 2013, together with the Notice of Registration, the Secretary-General set out the following briefing schedule for the Claimant's Request for Provisional Measures ("Provisional Measures Request"):

- The Claimant was to submit its full briefing on its Request for Provisional Measures by 11 March 2013;
- The Respondent was to present its observations on the request for Provisional Measures by 10 April 2013;
- The Claimant was to file its reply by 24 April 2013; and
- The Respondent was to file its rejoinder by 8 May 2013.

14.    On 11 March 2013, in accordance with the Secretary-General's briefing schedule, the Claimant submitted its Observations on its Request for Provisional Measures together with Exhibits C-013 to C-089, Legal Authorities CA-001 to CA-036, Mr. Yasin El Suudi's Witness Statement dated 11 March 2013 and Mr. David Nickerson's Expert Report dated 11 March 2013.

15.    On 24 April 2013, the Claimant submitted a further letter in support of its Provisional Measures Request.

16.    The Respondent did not file any of the submissions provided for in the Secretary-General's briefing schedule.

17.    On 2 August 2013, shortly after the Tribunal was constituted, the Tribunal invited the Respondent again to present its observations on the Claimant's Provisional Measures Request.  The Tribunal, furthermore, informed the Parties that the First Session and Hearing on Provisional Measures would take place at the seat of the Centre on 16 September 2013.

18.    On 21 August 2013, the Tribunal granted the Respondent's request for an extension to submit its observations on the Provisional Measures Request until 29 September 2013 and confirmed that the First Session and Hearing on Provisional Measures would still take place as scheduled, on 16 September 2013.

19.   On 16 September 2013, the Tribunal held a First Session with the Parties in Washington, D.C. and heard the Parties arguments on the Provisional Measures Request. In addition to the Members of the Tribunal and the Secretary of the Tribunal, the following individuals were present at the First Session:

    For the Claimant:

    Mr. Paolo Di Rosa                    Arnold & Porter LLP
    Mr. Lawrence Schneider               Arnold & Porter LLP
    Ms. Maria Chedid                     Arnold & Porter LLP
    Mr. José Antonio Rivas               Arnold & Porter LLP
    Mr. Alejandro Leáñez                 Arnold & Porter LLP
    Ms. Ana Sofia Martinez               Arnold & Porter LLP
    Ms. Amy Endicott                     Arnold & Porter LLP
    Mr. Kelby Ballena                    Arnold & Porter LLP
    Mr. Syed Ahmad Hassan Shah           Hassan Kaunain Nafees
    Mr. Orhan Remzi Karadeniz            Karkey Karadeniz Elektrik Uretim A.S.
    Ms. Ayse Nazli Dereli Oba            Karkey Karadeniz Elektrik Uretim A.S.

    For the Respondent:

    Mr. Michael Polonsky                 Berwin Leighton Paisner LLP
    Ms. Carol Mulcahy                    Berwin Leighton Paisner LLP

20.   During the First Session, the Parties confirmed that the Members of the Tribunal had been validly appointed.  It was agreed, *inter alia,* that the applicable Arbitration Rules would be those in effect from 10 April 2006 ("ICSID Arbitration Rules"), the procedural language would be English and the place of the proceedings would be the seat of the Centre, unless the Parties and the Tribunal agreed on another location.

21.   On 30 September 2013, the Tribunal issued Procedural Order No. 1, regarding procedural matters.

22.   On 30 September 2013, in response to the Tribunal's 16 September 2013 instructions, the Respondent submitted its Observations in Response to the Claimant's Request for Provisional Measures, which was accompanied by Exhibits R-001 to R-028 and Legal Authorities RA-001 to RA-037.

23.　On 8 October 2013, a second hearing on provisional measures took place in Washington, D.C. In addition to the Members of the Tribunal and the Secretary of the Tribunal, present at the hearing were:

For the Claimant:

| | |
|---|---|
| Mr. Paolo Di Rosa | Arnold & Porter LLP |
| Mr. Lawrence Schneider | Arnold & Porter LLP |
| Ms. Maria Chedid | Arnold & Porter LLP |
| Mr. Anton Ware | Arnold & Porter LLP |
| Mr. José Antonio Rivas | Arnold & Porter LLP |
| Ms. Amy Endicott | Arnold & Porter LLP |
| Mr. Kelby Ballena | Arnold & Porter LLP |
| Ms. Ana Sofia Martinez | Arnold & Porter LLP |
| Mr. Syed Ahmad Hassan Shah | Hassan Kaunain Nafees |
| Mr. Orhan Remzi Karadeniz | Karkey Karadeniz Elektrik Uretim A.S. |
| Ms. Ayse Nazli Dereli Oba | Karkey Karadeniz Elektrik Uretim A.S. |

For the Respondent:

| | |
|---|---|
| Mr. Stuart Isaacs QC | Berwin Leighton Paisner LLP |
| Mr. Michael Polonsky | Berwin Leighton Paisner LLP |
| Mr. Zahid Ebrahim | Ebrahim Hosain |

The following persons were examined:

| | |
|---|---|
| Mr. Yasin El Suudi (Witness) | Karkey Karadeniz Elektrik Uretim A.S. |
| Mr. David Nickerson (Expert) | Power Barge Corporation |

24.　At the 8 October 2013 hearing, the Claimant introduced several new exhibits, and the Respondent submitted a "Memorandum to the Tribunal in relation to the basis for the detention of the Vessels" ("Memorandum").  The Claimant subsequently withdrew the new exhibits that were presented at the hearing.[4]

25.　On 10 October 2013, the Tribunal decided not to admit the Memorandum as it should have been included in the Respondent's observations of 30 September 2013.

---

[4] Second Hearing on Provisional Measures, Tr. 307:3-12.

26.   On 16 October 2013, the Tribunal issued its Decision on the Claimant's Request for Provisional
Measures ("Decision on Provisional Measures"). The Tribunal's Decision states at paragraph
187:

> 1.   *The State of Pakistan shall take all steps necessary to allow the vessel, Karadeniz Powership Kaya Bey ('the vessel'), to depart into international waters and reach, before 1 November 2013, the dry dock in Dubai for inspection and repairs as determined by the Bureau Veritas (or other equivalent agency) to maintain the vessel's flag-registry and class certification.*
>
> 2.   *To that effect, the State of Pakistan shall, in particular:*
>
> a.   *Cause Lakhra Power Generation Company Limited to take all steps necessary to obtain the temporary suspension of the order of the High Court of Sindh at Karachi dated 29 of May 2013 in the Admiralty Suit No. 07 of 2013, which arrested the vessel, as long as the Arbitral Tribunal shall not have informed the State of Pakistan that the suspension is no longer necessary for the purposes of enabling the vessel to obtain the vessel's flag-registry and class certification.*
>
> b.   *Grant the Claimant all authorizations and clearance required for the vessel's departure including:*
>
> i.   *Clearance Certificates from Pakistan Customs;*
> ii.  *Clearance of crew members of the vessel by the immigration authorities at Port Qasim;*
> iii. *Clearance from NAB, to be forwarded to all relevant authorities, including the Pakistan Maritime Security Agency, Ministry of Defense, Ministry of Ports and Shipping, Ministry of Water and Power and others necessary under the law and procedure of Pakistan; and*
> iv.  *Clearance and facilitation from Lakhra, as Lakhra is the 'importer for record' in terms of the Amended Contract.*
>
> c.   *Take any other action necessary or required to allow the vessel to depart lawfully into international waters.*
>
> 3.   *Claimant shall proceed diligently and as rapidly as reasonably possible to obtain the necessary certificates referred to, as stated above.*
>
> 4.   *Claimant shall: (i) inform the Tribunal of the date of departure of the vessel from Pakistan, its date of arrival in Dubai, and (ii) keep the Tribunal informed of the progress of the dry docking inspection and repair and of the flag-registry and class certification process.*

6

> 5. *Claimant should be prepared to promptly comply with such further orders as the Tribunal may consider necessary for the return of the vessel to safe anchorage in Karachi.*
>
> 6. *All other requests not granted herein are dismissed.*
>
> 7. *The Tribunal will decide on the costs related to the Request at a later stage of the arbitral proceedings.*[5]

27.   Between 30 October and 9 December 2013, the Parties exchanged correspondence regarding the Respondent's failure to implement the Tribunal's Decision on Provisional Measures. On 25 November 2013, the Tribunal noted that the Respondent had not complied with its Decision on Provisional Measures and explained that, "*unless it is immediately complied with, the Tribunal [would] draw all the consequences of that breach under International law.*" On 11 December 2013, the Tribunal sent a further letter to the Parties to the same effect.

28.   On 14 May 2014, the Respondent informed the Tribunal that the Sindh High Court had ordered the release of the *Karadeniz Powership Kaya Bey* ("*Kaya Bey*"). The Claimant confirmed on 29 May 2014 that the *Kaya Bey* had arrived in Dubai on 21 May 2014 and that the dry-dock inspection would begin on 2 June 2014.

29.   On 8 July 2014, the Claimant submitted an application to modify the Decision on Provisional Measures of 16 October 2013, together with Exhibits C-405 to C-411.  In the application, the Claimant requested that the Tribunal modify the Decision on Provisional Measures to provide that the *Kaya Bey* "*need not return to Pakistan once inspection and repairs in Dubai are complete.*"

30.   By letter of 25 July 2014, the Respondent filed its response to the Claimant's application to modify the Decision on Provisional Measures, and stated that it neither consented to nor opposed the application for the permanent release of the *Kaya Bey*.

31.   On 1 August 2014, the Tribunal issued its Procedural Order No. 4, which: (i) modified the Tribunal's Decision on Provisional Measures such that the return of the *Kaya Bey* was no longer mandatory; (ii) permitted the Claimant the opportunity to modify its Memorial on Jurisdiction and the Merits of 13 January 2014 in order to take into account the permanent release of the *Kaya Bey*; and (iii) confirmed that the Respondent would have an opportunity to inspect the *Kaya Bey*

---

[5] Decision on Request for Provisional Measures, 16 October 2013, ¶187.

in order to evaluate the damages claimed by Karkey in this respect, before any additional repair was carried out.

### (2) The Written Phase on Jurisdiction and the Merits

32. On 31 January 2014, the Claimant filed its Memorial on Jurisdiction and the Merits, which was corrected on 4 February 2014,[6] with the following documents:

- Exhibits C-131 to C-387;
- Legal Authorities CA-053 to CA-171;
- Witness Statement of Orhan Remzi Karadeniz dated 31 January 2014;
- Witness Statement of Ibrahim Selami Colak dated 30 January 2014;
- Second Witness Statement of Yasin El Suudi dated 31 January 2014.
- Second Expert Report of David Nickerson dated 29 January 2014;
- Expert Report of Brent C. Kaczmarek, CFA dated 31 January 2014 (with annexes); and
- Expert Report of Sami Zafar dated 31 January 2014.

33. On 3 February 2014, the Tribunal was advised that Berwin Leighton Paisner LLP ceased to act on behalf of Pakistan, and shortly thereafter ICSID was notified that Allen & Overy was representing the Respondent.

34. On 26 February 2014, the Tribunal issued Procedural Order No. 2 concerning the confidentiality of documents ("Confidentiality Order") further to the Claimant's request.

35. On 28 February 2014, counsel for the Respondent notified the Tribunal that it had two more objections to the Tribunal's jurisdiction, in addition to the objections previously raised by the Respondent during the Provisional Measures proceeding.

36. On 17 March 2014, the Respondent submitted its Notice of Jurisdictional Objections and Request for Bifurcation, which was accompanied by Legal Authorities RA-038 to RA-052.

---

[6] All references to "Karkey's Memorial" are to the updated Memorial which was filed on 10 October 2014, unless otherwise noted.

37.   On 11 April 2014, the Claimant filed its Response to the Respondent's Notice of Jurisdictional Objections and Request for Bifurcation, which was accompanied by Exhibits C-388 to C-390 and Legal Authorities CA-172 to CA-189.

38.   On 14 April 2014, the Respondent requested an opportunity to respond to the Claimant's Opposition to Bifurcation, which was opposed by the Claimant in its letter of 16 April 2014. On 17 April 2015, the Tribunal denied the Respondent's request for an additional round of submissions in relation to the Request for Bifurcation. On 13 May 2014, the Tribunal issued its Decision on the Respondent's Request for Bifurcation dismissing the Respondent's Request for Bifurcation in relation to all of its jurisdictional objections.

39.   Following correspondence related to the dry-dock inspection of the *Kaya Bey*, on 6 June 2014, the Respondent submitted an application "*seeking the urgent assistance of the Tribunal confirming its right to appoint an industry expert and to allow that expert to conduct an inspection of the* Kaya Bey *while at dry dock in Dubai.*" The application was accompanied by:

- Exhibits R-044 to R-053; and
- Legal Authorities RA-053 to RA-057.

The Respondent indicated that it had appointed Mr. David Waller of Waller Marine as its industry expert in these proceedings.

40.   On 9 June 2014, the Claimant filed its Opposition to the Respondent's 6 June 2014 application that was accompanied by:

- Exhibits C-391 to C-393; and
- Legal Authority CA-172.

41.   On 12 June 2014, the Tribunal issued its Procedural Order No. 3, which decided that the Respondent did not have an urgent need to inspect the *Kaya Bey* and directed the Claimant to file its response to the Respondent's Application for an Order Confirming Mr. Waller as an Expert.

42.   On 13 June 2014, a conference call was held between the Parties and the Tribunal to discuss the procedural calendar.

43.    On 17 June 2014, in accordance with Procedural Order No. 3, the Claimant submitted its Opposition to the Respondent's Application for an Order Confirming Mr. Waller as an Expert, which was accompanied by:

- Exhibits C-394 to C-399;
- Legal Authorities CA-173 to CA-179;
- Second Witness Statement of Orhan Remzi Karadeniz dated 17 June 2014; and
- Statement of David Nickerson regarding Waller Marine dated 17 June 2014.

44.    On 27 June 2014, the Respondent filed a Response to Karkey's Opposition to Pakistan's Industry Expert, which was accompanied by:

- Exhibits R-057 to R-068; and

- Expert Report of David Waller dated 27 June 2014.

45.    On 3 July 2014, the Claimant filed its Rejoinder to the Respondent's Application for an Order Confirming Mr. Waller as an expert, which was accompanied by:

- Exhibits C-400 to C-404;
- Rejoinder Witness Statement of Orhan Remzi Karadeniz regarding Waller Marine dated 3 July 2014; and
- Rejoinder Statement of David Nickerson regarding Waller Marine dated 3 July 2014.

46.    On 18 August 2014, the Tribunal issued Procedural Order No. 5, which fixed the procedural calendar for the Parties' written submissions (including the resubmission of the Claimant's Memorial in accordance with Procedural Order No. 4), a document production phase and the Hearing on Jurisdiction and Merits.

47.    On 28 August 2014, the Tribunal issued its Procedural Order No. 6 that: (i) confirmed the Respondent's ability to appoint Mr. Waller as its industry expert, subject to certain restrictions, including a requirement that the Parties agree on additional confidentiality obligations to be signed by Mr. Waller; and (ii) instructed the Parties to agree on the terms of the inspection of the *Kaya Bey* by Mr. Waller and his team.

10

48.  On 11 September 2014, the Parties informed the Tribunal that they had agreed to commence the inspection of the *Kaya Bey* in Dubai on 17 September 2014, but an agreement on the terms of a confidentiality agreement to be signed by Mr. Waller had not been reached. The Claimant therefore requested that the Tribunal order Mr. Waller to adopt its confidentiality agreement.

49.  On 16 September 2014, the Tribunal issued Procedural Order No. 7, which contained additional confidentiality obligations to be executed in connection with the inspection of the *Kaya Bey*.

50.  On 10 October 2014, the Claimant filed its updated Memorial ("Memorial") in accordance with Procedural Order Nos. 4 and 5, which was accompanied by:

- Legal Authorities CA-001 to CA-206 (updated);[7]
- Witness Statement of Orhan Remzi Karadeniz (updated) dated 10 October 2014;
- Witness Statement of Ibrahim Selami Colak dated 30 January 2014;
- Second Witness Statement of Yasin El Suudi dated 31 January 2014;
- Expert Report of Brent C. Kaczmarek (updated) dated 10 October 2014, and Exhibits NAV-001 to NAV-202;
- Second Expert Report and Third Expert Report of David Nickerson, dated 29 January 2014 and 10 October 2014 and Exhibits DN-001 to DN-081; and
- Expert Report of Sami Zafar dated 31 January 2014.

51.  On 23 January 2015, the Respondent filed its Objections to Jurisdiction and Counter-Memorial ("Counter-Memorial"), which was accompanied by:

- Exhibits R-054 to R-337;
- Legal Authorities RA-058 to RA-188;
- Witness Statement of Faizullah Dahri dated 22 January 2015;
- Witness Statement of Muhammad Zargham Eshaq Khan dated 21 January 2015;
- Expert Report of Justice (R) Fazal Karim dated 21 January 2015;

---

[7] This included certain legal authorities that were previously filed with its submissions concerning the Respondent's Industry Expert and the dry-dock inspection of the *Kaya Bey*.

- Expert Report of Philip Haberman dated 23 January 2015 and Exhibits HAB-001 to HAB-046; and

- Second Expert Report of David Waller dated 19 January 2015 and Exhibits WMI-001 to WMI-008.

52. On 24 April 2015, the Tribunal issued Procedural Order No. 8 which contained its decision on the Parties' requests for the production of documents.

53. On 10 July 2015, the Tribunal issued Procedural Order No. 9 ordering the Claimant to produce a Settlement Agreement to the Respondent, which was designated as confidential pursuant to the Confidentiality Order.

54. On 5 August 2015, the Claimant filed its Reply on Jurisdiction and the Merits ("Reply"), which was accompanied by:

- Exhibits C-221 (revised) and C-430 to C-672;

- Legal Authorities CA-214 to CA-333;

- Second Witness Statement of Ibrahim Selami Colak dated 3 August 2015;

- Third Witness Statement of Yasin El Suudi dated 3 August 2015;

- Third Witness Statement of Orhan Remzi Karadeniz dated 3 August 2015;

- Expert Report of Jerome Grand d'Esnon dated 3 August 2015 and Exhibits JG-1 to JG-21;

- Second Expert Report of Brent C. Kaczmarek (Navigant) dated 4 August 2015 and Exhibits NAV-99 and NAV-203 to NAV-246;

- Fourth Expert Report of David Nickerson dated 3 August 2015 and Exhibits DN-35 to DN-37; and

- Second Expert Report of Sami Zafar dated August 4, 2015 and Exhibits Z-1 to Z-99.

55. On 31 August 2015, the Tribunal issued Procedural Order No. 10 regarding document production.

56. On 9 September 2015, the Tribunal issued Procedural Order No. 11 ordering the Respondent to produce to the Claimant full, un-redacted copies of certain exhibits.

57. On 29 October 2015, the Respondent filed its Rejoinder on Jurisdiction and the Merits ("Rejoinder"), which was accompanied by:

- Exhibits R-338 to R-419;[8]
- Legal Authorities RA-077 (resubmitted) and RA-189 to RA-287;
- Witness Statement of Zarar Aslam dated 17 September 2015;
- Second Witness Statement of Faizullah Dahri dated 29 October 2015;
- Second Witness Statement of Muhammad Zargham Eshaq Khan dated 27 October 2015;
- Second Expert Report of Justice (R) Fazal Karim dated 29 October 2015;
- Second Expert Report of Philip Haberman dated 29 October 2015 and Exhibits HAB-047 to HAB-113; and
- Third Expert Report of David Waller dated 29 October 2015 and Exhibits WMI-009 to WMI-035.

58. On 11 December 2015, the Respondent submitted an application seeking disclosure of certain documents (or categories of documents), which should have been disclosed by the Claimant ("New Evidence") that go to the issue of corruption. The Respondent averred that Pakistan and its counsel had seen certain documents (evidencing a scheme by Karkey) and received information in this regard, but that the evidence sought was only in the Claimant's possession.

59. Following the Tribunal's 14 December 2015 invitation, on 18 December 2015, the Claimant submitted its comments on the Respondent's application and noted that it had complied with its disclosure obligations, preserved all evidence and not engaged in any scheme to improperly secure the Pakistan project.

60. On 21 December 2015, the Claimant filed its Sur-Rejoinder on Counterclaims ("Sur-Rejoinder"), which was accompanied by:

- Exhibit C-693; and
- Legal Authorities CA-338 to CA-347.

61. On 24 December 2015, the Respondent submitted a letter responding to the Claimant's 18 December 2015 observations, requesting that the Tribunal order the production of the New Evidence. The Respondent's letter was accompanied by the Witness Statement of Mr. Mark Levy

---

[8] This includes R-342 and R-353, which were intentionally left blank.

dated 24 December 2015 and the Witness Statement of Mr. Shahid Rafi dated 22 December 2015 and Exhibits R-423 to R-425.

62. On 30 December 2015, the Claimant submitted its Rejoinder to Pakistan's Application of 11 December 2015 together with the Fourth Witness Statement of Mr. Orhan Remzi Karadeniz dated 30 December 2015.

63. On 12 January 2016, the Tribunal issued Procedural Order No. 12, which instructed that argument on the production of the New Evidence would be heard at the hearing and that no further written representations on this topic would be accepted in advance of the hearing.

D.    The Hearing on Jurisdiction and the Merits

64. On 5 February 2016, the Tribunal held a pre-hearing organizational meeting with the Parties by telephone conference.

65. On 10 February 2016, the Tribunal issued Procedural Order No. 13 concerning the organization of the hearing. On 17 February 2016, the Tribunal issued a document summarizing the Parties' agreements and the Tribunal's decisions concerning the Organization of the Hearing.

66. Further to the Parties' prior agreement, on 22 February 2016 each of the Parties filed new Exhibits with the approval of the opposing Party.  In addition, each Party requested that the Tribunal admit certain additional documents that had been objected to by the opposing Party.

67. A hearing on Jurisdiction and Merits took place at the International Dispute Resolution Centre in London from 29 February to 12 March 2016[9] (the "Hearing" or "Evidentiary Hearing").  In addition to the Members of the Tribunal and Ms. Celeste Mowatt, the Acting Secretary of the Tribunal, present at the hearing were:

   For the Claimant:

   Mr. Paolo Di Rosa                    Arnold & Porter LLP
   Mr. Lawrence Schneider               Arnold & Porter LLP
   Mr. Anton A. Ware                    Arnold & Porter LLP
   Ms. Amy Endicott                     Arnold & Porter LLP
   Mr. John Muse-Fisher                 Arnold & Porter LLP
   Mr. David Reed                       Arnold & Porter (UK) LLP

---

[9] Excluding Tuesday, March 8, 2016.

| | |
|---|---|
| Mr. Monty Taylor | Arnold & Porter (UK) LLP |
| Ms. Bridie McAsey | Arnold & Porter (UK) LLP |
| Mr. Bart Wasiak | Arnold & Porter (UK) LLP |
| Ms. Maria Chedid | Baker & McKenzie |
| Mr. Nicholas Kennedy | Baker & McKenzie |
| Mr. Carson Thomas | Baker & McKenzie |
| Ms. Nadine Ramaswamy | Baker & McKenzie |
| Ms. Hesa Alaseeri | Baker & McKenzie |
| Mr. Ahmad Hassan Shah | Hassan Kaunain Nafees Legal Practitioners and Advisers |
| Mr. Kelby Ballena | Arnold & Porter LLP |
| Ms. Aimee Reilert | Arnold & Porter LLP |
| Ms. Dara Wachsman | Arnold & Porter (UK) LLP |
| Mr. Arthur Dedels | Arnold & Porter (UK) LLP |
| Ms. Sila Uysal | Arnold & Porter (UK) LLP |
| Mr. Scott Johnson | Legal Images, on behalf of Arnold & Porter LLP |
| Mr. Orhan Karadeniz | Karkey Karadeniz Elektrik Uretim A.S. |
| Mr. Yasin El Suudi | Karkey Karadeniz Elektrik Uretim A.S. |
| Mr. Ibrahim Colak | Karkey Karadeniz Elektrik Uretim A.S. |
| Ms. Nazli Dereli Oba | Karkey Karadeniz Elektrik Uretim A.S. |
| Mr. Jerome Grand d'Esnon | Carbonnier Lamaze Rasle & Associés |
| Mr. Brent Kaczmarek | Navigant Consulting |
| Mr. Garrett Rush | Navigant Consulting |
| Mr. Gabriel Perkinson | Navigant Consulting |
| Mr. David Nickerson | Power Barge Corp. |
| Mr. Sami Zafar | Sami Zafar & Co. |

For the Respondent:

| | |
|---|---|
| Ms. Judith Gill QC | Allen & Overy LLP |
| Mr. Mark Levy | Allen & Overy LLP |
| Ms. Kate Davies | Allen & Overy LLP |
| Mr. Matthew Hodgson | Allen & Overy LLP |
| Mr. James Neill | Allen & Overy LLP |
| Ms. Louise Fisher | Allen & Overy LLP |
| Mr. Guled Yusuf | Allen & Overy LLP |
| Ms. Elizabeth Staves | Allen & Overy LLP |
| Mr. Alastair Campbell | Allen & Overy LLP |
| Ms. Olga Owczarek | Allen & Overy LLP |
| Mr. Jack Busby | Allen & Overy LLP |
| Mr. Anshu Wijeyeratne | Allen & Overy LLP |
| Mr. Khawaja Muhammad Asif | Minister of Water and Power and Minister of Defense of Pakistan |
| Mr. Salman Aslam Butt | Attorney General of Pakistan |
| Mr. Dilnawaz Cheema | Assistant to the Attorney General of Pakistan |
| Justice (R) Fazal Karim | Former Judge of the Lahore High Court and former Judge of the Supreme Court of Pakistan |

15

| | |
|---|---|
| Mr. David Waller | Waller Marine, Inc. |
| Mr. Philip Haberman | Haberman Ilett LLP |
| Ms. Liz Perks | Haberman Ilett LLP |
| Ms. Kate Lillyman | Haberman Ilett LLP |
| Mr. Faizullah Dahri | Finance Director of Lakhra Power Generation Company Limited |
| Mr. Muhammad Zargham Eshaq Khan | Joint Secretary of the Government of Pakistan's Ministry of Water and Power |
| Mr. Shahid Rafi | Former Secretary to the Government of Pakistan's Ministry of Water and Power |

68.  The following persons were examined:

On behalf of the Claimant:

| | |
|---|---|
| Mr. Orhan Karadeniz | Karkey Karadeniz Elektrik Uretim A.S. |
| Mr. Yasin El Suudi | Karkey Karadeniz Elektrik Uretim A.S. |
| Mr. Ibrahim Colak | Karkey Karadeniz Elektrik Uretim A.S. |
| Mr. Brent Kaczmarek | Navigant Consulting |
| Mr. David Nickerson | Power Barge Corp. |
| Mr. Sami Zafar | Sami Zafar & Co. |

On behalf of the Respondent:

| | |
|---|---|
| Justice (R) Fazal Karim | Former Judge of the Lahore High Court and former Judge of the Supreme Court of Pakistan |
| Mr. David Waller | Waller Marine, Inc. |
| Mr. Philip Haberman | Haberman Ilett LLP |
| Mr. Faizullah Dahri | Finance Director of Lakhra Power Generation Company Limited |
| Mr. Muhammad Zargham Eshaq Khan | Joint Secretary of the Government of Pakistan's Ministry of Water and Power |
| Mr. Zarar Aslam[10] | Former Additional Secretary to the Government of Pakistan's Ministry of Water and Power |
| Mr. Shahid Rafi | Former Secretary to the Government of Pakistan's Ministry of Water and Power |

---

[10] Mr. Zarar Aslam was not present at the International Dispute Resolution Centre in London, but he provided testimony by videoconference from the World Bank Office in Islamabad, Pakistan. In addition to Mr. Aslam, the following persons were in attendance at the video conference location in Islamabad: Mr. Jaffar Sibtain and Syed Mudassar Ali Rizvi on behalf of the Claimant, and Mr. Faisal Khan on behalf of the Respondent.

69. During the hearing on 1 March 2016, the Respondent filed an application requesting various orders in support of its 11 December 2015 application concerning the New Evidence. The Parties presented arguments on the Respondent's requests concerning the New Evidence and arguments on the Parties' requests of 22 February 2016 for the admission of new documents. These requests were decided by the Tribunal following the Parties' opening arguments. During the Hearing, the Claimant was permitted leave to file Exhibits C-737 and C-738.

70. On 17 March 2016, the Tribunal issued Procedural Order No. 14 concerning the procedural calendar.

71. The Parties filed simultaneous Post-Hearing Briefs on 29 April 2016. As previously agreed by the Claimant and confirmed by the Tribunal, the Respondent's Post-Hearing Brief was accompanied by Legal Authority RA-291.

72. On 25 May 2016, the Parties filed their Submissions on Costs. The Claimant's submission was accompanied by the declarations of Ms. Maria Chedid at Baker & McKenzie LLP, Mr. Paolo Di Rosa at Arnold & Porter LLP, Mr. Syed Ahmad Hassan Shah at Hassan Kaunain Nafees Legal Practitioners & Advisers, Mr. Peter Knight at Bird & Bird LLP, and Ms. Ayse Nazli Dereli Oba, the Legal Director of Karkey, and by Legal Authorities CA-025 (revised) and CA-349 to CA-359.

73. On 8 June 2016, the Parties filed their observations on the other Party's submission on costs. The Claimant's submission was accompanied by Legal Authorities CA-360 to CA-363.

74. On 6 June 2017, the Tribunal declared the proceedings closed in accordance with Rule 38(1) of the ICSID Arbitration Rules.

## III. FACTUAL BACKGROUND

75. Between 2006 and 2007, Pakistan faced one of the worst energy crises in its history with the country, being without electricity at times from twelve to sixteen hours daily.[11]

76. In order to overcome the power crisis, in 2006 the Government of Pakistan ("GoP") adopted the policy of power generation through Rental Power Projects ("RPPs") as a fast track solution.[12]

---

[11] Zafar, First Expert Report, ¶ 9.

[12] Zafar, First Expert Report, ¶ 10.

77.    In late 2007 and early 2008, Karkey began developing powership fleets for rental power projects. Karkey developed its powership fleet in two phases. It began construction and engineering work on the Phase I Powership in early 2008. The Phase I Powerships are:

   i.    *Karadeniz Powership Dogan Bey* (the "*Dogan Bey*" or "KPS 3"), which is a self-propelled Powership of handymax size (188 meters long and 37 meters wide), housing 12 installed medium speed diesel engines, with a combined power generation capacity of 126 MW;

   ii.   *Karadeniz Powership Rauf Bey* (the "*Rauf Bey*" or "KPS 4"), a self-propelled Powership of panamax size (242 meters long and 32 meters wide), housing 15 installed medium speed diesel engines, with a combined power generation capacity of 179 WM;

   iii.  *Karadeniz Powership Kaya Bey* (the "*Kaya Bey*" or "KPS 5"), a self-propelled Powership of panamax size (242 meters long and 32 meters wide), housing 19 installed medium speed diesel engines, with a combined power generation capacity of more than 216 MW.

   iv.   *Karadeniz Powership Alican Bey* (the "*Alican Bey*" or "KPS 1"), a non-self-propelled power barge, 91 meters long and 30 meters wide, housing 10 installed medium speed diesel engines, with a combined power generation capacity of more than 104 MW.[13]

78.    In order to implement its Phase II plan, Karkey acquired five additional ship hulls in 2010 and 2011. In October 2011, Karkey deployed the first of its Phase II Powerships, the *Karadeniz Powership Irem Sultan* ("*Irem Sultan*" or "KPS 6") a self-propelled ship housing six installed medium speed diesel engines, with a combined power generation capacity of 108.6 MW.[14]

79.    Karkey was not able to deploy the second of its Phase II Powerships until February 2013 — the *Karadeniz Powership Fatmagül Sultan* ("*Fatmagül Sultan*" or "KPS 9"), a large power barge housing, with a combined power generation capacity of 203 MW.

80.    Karkey deployed the third of its Phase II Powerships, the *Karadeniz Powership Orhan Bey* ("*Orhan Bey*" or "KPS 7"), in September 2013. The *Orhan Bey* has the same design as the

---

[13] Pakistan's Memorial, ¶ 55.

[14] Pakistan's Memorial, ¶ 57

*Fatmagül Sultan* and has a power generation capacity of only approximately 135 MW. Karkey has four other Phase II Powerships (KPS 10, KPS 11, KPS 12, and KPS 2), the construction of which was delayed.

81. In May 2009, the Private Power and Infrastructure Board of Pakistan ("PPIB") published an Invitation for Bids for 1,200 MW fast-track private power projects in local and international newspapers (the "Invitation for Bids").[15] An Information Brochure was also released onto the PPIB website and made available at Government offices.[16] The Invitation for Bids comprised two packages, *i.e.* Package A and Package B.

82. Parties that were interested in submitting a bid were required to pay US$100 to register as a bidder for each package and US$2,000 to purchase a Request for Proposal (a "RFP") for each project.[17] In total, 42 RFPs were issued to prospective bidders – 29 RFPs for Package A and 13 RFPs for Package B.[18]

83. The RFP for Package B is a lengthy document containing information for bidders, including, *inter alia*:

    i. An "important notice" regarding the need for bidders' own due diligence (Disclaimers);

    ii. The basis on which bids would be "rejected" and the requirements for them to be considered "responsive";

    iii. Instructions to bidders; and

    iv. A number of exhibits, including a pro forma letter of award and a draft rental services contract (a "Draft RSC").[19]

---

[15] C-136.

[16] C-138.

[17] C-136.

[18] R-127.

[19] C-137.

84. By letter of 4 June 2008, Karkey wrote to PPIB expressing its intention to register as a Package B bidder.[20] According to the Claimant, Mr. Raja Babar Ali Zulqarnain was engaged as Karkey's local representative in Pakistan shortly thereafter.

85. On 12 June 2008, the Ministry of Water and Power (the "MoWP") published a corrigendum to the Invitation Bids in local and international newspapers. The corrigendum increased the generation capacity that was solicited for bidding for Package B Projects from 200 MW to 500 MW.[21]

86. On 14 July 2008, Karkey submitted its bid to PPIB ("Bid").[22] Karkey represented in Proforma X of its Bid documents that commercial operations could be achieved 180 days (six months) from issuance of the letter of award (the "Project Schedule"):[23]

|   | Activity | Period |
|---|---|---|
| 1 | Assumption: Issuance of LOA | 0 |
| 2 | Finalizing of Rental Services Contract | 20 days |
| 3 | Construction Start | 60 days |
| 4 | Testing | 165 days |
| 5 | Commercial Operation | 180 days |

87. Karkey's Bid identified certain "Additional Technical Information" about 'KARADENIZ POWER SHIP' (the "Additional Information"). The Additional Information explained that the "Barge Facility" to be provided "consists of two barges" and associated onshore facilities, as follows:

- one with 10 Sülzer engines (referred to as "Karadeniz Power Ship-1" or "KPS-1"); and

- the other with 12 MAN engines (referred to as "Karadeniz Power Ship-2" or "KPS-2").[24]

---

[20] C-138

[21] C-140.

[22] *See* R-120 and C-146 (CONFIDENTIAL).

[23] C-146 (CONFIDENTIAL), Karkey-00723.

[24] C-146 (CONFIDENTIAL), Karkey-00715.

88. Other details were also provided including information on the design basis, diesel engine generator, cooling water system, steam generation system, fuel oil system, instrumentation and controls and substructures (*i.e.* the barges themselves) of the "Barge Facility".

89. On 27 August 2008, Karkey confirmed in writing to the Managing Director of PPIB (Mr. Fayyaz Elahi) that: "*[a]s it stands today, we are ready to launch the project as we have already made the necessary investments so that we can meet the Proposed Project Schedule*".[25]

90. On 28 August 2008, the Committee constituted by the Cabinet to address all matters relating to the Package A and B fast-track power generation projects met (the "Committee"). That meeting was attended by (among others) Mr. Ashraf and Mr. Qureshi (from the MoWP), and Mr. Elahi (Managing Director of the PPIB), who confirmed to the Committee that the two Package B bidders who were declared responsive – *i.e.* Walters and Karkey – could meet the Target COD "*of February 2009*".[26]

91. On 10 September 2008, the Economic Coordination Committee of the Cabinet of Pakistan ("ECC") approved Karkey and Walters as qualified to receive a letter of award.[27]

92. Two days after the ECC approval, Mr. Fayyaz Elahi (PPIB) confirmed to Karkey that its bid to set up a barge-mounted rental power project near Karachi had been approved "*as per [the] following details*", including that the Site would be Karachi and that "*Commercial Operation Date from issuance of LOA*" would be 180 days as promised in Karkey's Bid.[28]

93. On 7 November 2008, the Letter of Award ("LoA") was issued to Karkey.[29]

94. In November 2008, the Legal Division of the PPIB noted in an inter-office memorandum sent to Mr. Zuberi of the PPIB that Karkey and Walters "*during negotiations proposed substantial amendments and modifications to the standard terms and conditions of the Rental Services Contract which are likely to affect the risk allocation between [the parties] and is deviation of*

---

[25] C-148.

[26] R-129, ¶ 3.

[27] R-132, ¶ ii.

[28] C-149.

[29] C-155.

21

*Rental Services Contract negotiated, agreed and executed in other rental power projects undertaken by PEPCO.*"[30]

95. On 5 December 2008, Karkey signed a contract with Lakhra Power Generation Company Ltd. ("Lakhra") for the provision of 231.8 MW of barge-mounted rental power ("2008 RSC").[31] It is undisputed that Lakhra was unable to secure a letter of credit as contemplated in the Draft RSC, which prompted the Parties to revisit that provision. The Advance Payment was increased from 7% (as in the Draft RSC appended to the RFP) to 14.16% on 5 December 2008, immediately before the signing of the 2008 RSC.[32]

96. As summarized under Pakistan's position below, Pakistan submits that the 2008 RSC was procured in breach of Pakistani law. In a nutshell, the alleged breaches arose because of material changes introduced to the contract after Karkey was issued with the Letter of Award, in alleged breach of Rule 40 of Pakistan Public Procurement Rules ("PPRA Rules").[33]

97. On 12 December 2008, Mr. Jamil (Lakhra) wrote to the General Manager of WAPDA Power Privatisation Organization ("WPPO") (copied to the Managing Directors of the Pakistan Electric Power Company Limited ("PEPCO") and the PPIB (Mr. Khan and Mr. Zuberi), amongst others), setting out its concerns that the 2008 RSC had been signed with "*material changes under the instructions of Managing Director PEPCO*", which included the increase in the Advance Payment, and requested the ECC approval.[34]

98. On 18 December 2008, WPPO re-directed the enquiry to Mr. Zuberi (PPIB) and stated "*Chief Executive Office GENCO IV…requires ECC approval for the said changes in the Contract which may please be obtained and conveyed to [the] concerned office […]*".[35]

99. The following day, Mr. Zuberi (PPIB) responded to WPPO that ECC approval was unnecessary on the basis that the ECC had not approved the terms of the Draft RSC in the first place. Instead,

---

[30] R-136, ¶¶ 1-2.

[31] C-159 (CONFIDENTIAL).

[32] *See* R-317, p. 10234 (numbered item 1); R-138.

[33] Pakistan's Counter-Memorial, ¶ 276.

[34] R-140.

[35] R-141.

he stated that the PEPCO Board should be the entity approving the changes.[36] PEPCO in turn, noted that "*[Lakhra] may obtain approval from their own BOD for the changes to the draft RSC. In turn [Lakhra] BOD may seek approval from PEPCO BOD for their comfort*".[37]

100. On 7 February 2009, the Lakhra Board (chaired by Mr. Fazal Ahmed Khan) granted *ex post facto* approval to the 2008 RSC subject to the concurrence of the Legal Advisor of PEPCO and approval of PEPCO.[38]

101. On 23 April 2009, Lakhra and Karkey subsequently signed a new contract ("2009 RSC" or "Contract") together with provision for a Sovereign Guarantee. The 2009 RSC replaced the 2008 RSC in its entirety, and provides, *inter alia*, that:

> *WHEREAS, the PARTIES entered into a Rental Services Contract on 5th December 2008, in terms whereof the BUYER [Lakhra] contracted with the SELLER [Karkey] to provide Rental Services in relation to a 231.8MW ('Rental Services Contract'). The Rental Services Contract did not come to effect and no obligations or rights accrued to either PARTY there under.*
>
> *WHEREAS, the Parties are now desirous of amending and restating the Rental Services Contract.*[39]

102. Under the 2009 RSC, Karkey was required to achieve the commercial operations date ("COD") within six months from the latest of the date of the Letter of Award, Advance Payment (referred to in the 2009 RSC as the "Down Payment") and execution of the Sovereign Guarantee (defined as the "Target COD").[40]

103. Clause 4.5 of the 2009 RSC provided (and was satisfied as follows) *inter alia*:

(a)     The Sovereign Guarantee:

i.   Within 30 days of the date on which the 2009 RSC was signed, Lakhra was to procure and deliver to Karkey a guarantee issued by Pakistan, securing the payment

---

[36] R-142, ¶¶ 2 and 3.

[37] R-147.

[38] R-146, Agenda item No. 4.

[39] C-010 (CONFIDENTIAL), p. 1.

[40] C-010 (CONFIDENTIAL), clause 4.4(b).

of all Monthly Rental Services Fees and Termination Charges ("Sovereign Guarantee").[41]

ii.  The Sovereign Guarantee was executed by the Managing Director of the PPIB on behalf of the President of Pakistan, for and on behalf of Pakistan, on 24 April 2009.[42]

(b)  The Advance Payment Guarantee:

i.  Within 10 business days of the date of execution of the Sovereign Guarantee, Karkey was to submit a bank guarantee to Lakhra, securing the payment of US$80 million (14.16% of the Lump Sum Contract Price) (the "Advance Payment") for performance of Karkey's obligations under the 2009 RSC ("Advance Payment Guarantee").

ii.  The Advance Payment Guarantee – issued by Citibank N.A. (acting through its place of business in Lahore) – was an on-demand guarantee for payment "not exceeding" US$80 million, should Karkey default any of its obligations under the 2009 RSC.

iii.  The Advance Payment Guarantee was delivered to Lakhra on 6 May 2009.[43]

(c)  The Advance Payment

i.  Following submission of the Advance Payment Guarantee, Lakhra was to release the Advance Payment to Karkey within five days.

ii.  Pursuant to an invoice issued by Karkey on 11 May 2009, the National Bank of Pakistan released the Advance Payment (less the 6% withholding tax[44]) to Karkey on Lakhra's behalf on 12 May 2009.[45]

104.  On 24 July 2009, Mr. Ashraf (the MoWP Minister and Chairman of the PPIB) received a letter from the Pakistan chapter of the international anti-corruption agency, Transparency International ("TI"), requesting that he "*review the awards of RPP, which in TI Pakistan's opinion were not complying with the PPRA Public Procurement Rules 2004*", to which Mr. Ashraf did not

---

[41] C-010 (CONFIDENTIAL), Clause 4.5(c).

[42] C-011 (CONFIDENTIAL).

[43] C-245.

[44] The tax withholding was objected by Karkey. *See* Karkey's Memorial, ¶ 119-120.

[45] R-158; R-154.

respond.[46] Transparency International also requested copies of various documents relating to the RPP programme, including the RPP contracts, the tender documents, evaluation reports and evidence of compliance with Rules 7 and 35 of the PPRA Rules.[47]

105.  In September 2009, the Pakistani parliamentarian, Mr. Makhdoom Syed Faisal Saleh Hayat, wrote an open letter to the Chief Justice of the Supreme Court of Pakistan, Iftikhar Muhammad Chaudhry ("Chief Justice" or "Chief Justice Chaudhry"), stating that he "*had raised the issue of corruption in the award of RPPs before every forum, including the National Assembly of Pakistan, but his voice was not attended to*".[48] Chief Justice Chaudhry opened a case the following day, 9 September 2009, directing Mr. Hayat to furnish evidence in support of his allegations of Government corruption in connection with the RPPs.[49]

106.  On 26 September 2009, Mr. Hayat produced a nine-page letter highlighting a number of areas of concern and making allegations that certain individuals involved in the RPP programme were receiving "kick-backs".[50] On 7 October 2009, the Chief Justice ordered the Chairman of the Water and Power Development Authority of Pakistan ("WAPDA") to respond thereto.[51]

107.  In November 2009, WAPDA submitted comments on behalf of PEPCO and requested that the Court dismiss the case.[52]  The Chief Justice decided to press forward, ordering that notices be issued to various Ministries to appear and defend the Government's rental power policy. Exercising his prerogative as Chief Justice, Mr. Chaudhry constituted a bench of three Supreme Court justices to hear the case, which he consolidated with another case, also styled as a "human rights" case, relating to electricity prices (together, the "Rental Power Case").[53]

---

[46] R-217, p. 3.

[47] R-180, p. 2.

[48] C-029, ¶ 2.

[49] C-262, p. 4.

[50] C-262, p. 7.

[51] C-263.

[52] C-264.

[53] C-029.

108.  Pursuant to the Court's orders, the Ministry of Water & Power submitted a reply to Mr. Hayat's petition on behalf of the executive branch of Pakistan.[54]

109.  On 25 November 2009, the Federal Bureau of Revenue ("FBR") ordered the Lahore tax office to refund Karkey the 6% withholding tax from the US$80 million Advance Payment which had been deducted.[55]

110.  On 8 December 2009 Lakhra and Karkey entered into Amendment No.1 to the 2009 RSC, which recorded the substitution of the Project Site from Mauripur to Korangi and further extended the deadline for the Target COD to 7 April 2010.[56]

111.  On 2 January 2010, Karkey established a wholly-owned Pakistani subsidiary, Karpak (Pvt.) Ltd. ("Karpak"), to handle activities related to the Powership project in Pakistan. With the express prior consent of the PPIB. Karkey subsequently assigned to Karpak certain rights and obligations under the Contract relating to operation and maintenance of the Powerships and fuel purchase operations.[57]

112.  In January 2010, the Asian Development Bank ("ADB") published the findings of its independent third-party audit of the RPP programme ("ADB Report"). The ADB Report concluded that there had been "*many inconsistencies*"[58] in the RPP contracts, noting that changes to the RFP had "*diluted the transparency, competition and equal treatment that an ICB [International Competitive Bidding] process is intended to ensure*",[59] and that a re-tendering "*could have resulted in better response and more competitive bids*".[60]

113.  On 20 January 2010, Transparency International again wrote to Mr. Ashraf (the MoWP Minister and chairman of the PPIB), noting that previously requested documents had not been provided and highlighting the findings of the ADB Report.[61]

---

[54] C-266.

[55] R-211.

[56] C-012 (CONFIDENTIAL).

[57] Karkey's Memorial, ¶118.

[58] C-275, ¶ 11.

[59] C-275, ¶ 7.

[60] C-275, ¶ 34.

[61] R-217, p. 4.

114. On 30 January 2010, Transparency International wrote to Chief Justice Chaudhry, echoing the concerns expressed by Mr. Hayat in September 2009 and enclosing one of its previous letters to Mr. Ashraf.[62] Transparency International urged Chief Justice Chaudhry to take *suo motu* notice of the RPP case and "*save the country from the biggest corruption fraud in the history of Pakistan*".[63]

115. There is no dispute that Karkey failed to achieve the Target COD of 7 April 2010.

116. In September 2010, more than a year after the Supreme Court's *suo motu* proceedings had commenced, the Supreme Court ordered PEPCO to issue notice of the proceedings to the CEOs of all the RPP sponsors. After receiving such a notice, Karkey entered an appearance through counsel on 4 October 2010, as an interested non-party to the case.[64]

117. In December 2010, Mr. Brohi (Lakhra's CEO) issued a work order to KEMA International B.V. ("KEMA"), a Dutch company, as an independent engineer to certify the equipment and witness, review and certify the results of the Operational Tests for the 231.8 MW Karkey Rental Power Project, Korangi, Karachi.[65]

118. The Equipment was assessed via KEMA's site inspections of the *Kaya Bey*, the *Alican Bey* and the work platform and fuel storage barge on 22 December 2010, 15 March 2011 and 8 April 2011.[66]

119. On 8 April 2011, KEMA issued the Certificate of Acceptance of the Equipment,[67] and on 9 April 2011, it issued the Certificate of Guaranteed Electrical Output.[68] The Reliability Run Test, which was to demonstrate "*uninterrupted reliable operation of the Equipment at the Guaranteed Electrical Output for two (2) two hours without overloading the individual equipment beyond its*

---

[62] R-217, ¶¶ 1 and 3.

[63] R-217, p. 2.

[64] Pakistan's Counter-Memorial, ¶¶ 632-633; Karkey's Memorial, ¶ 189.

[65] R-237.

[66] R-255, p. 14.

[67] R-255, pp. 8, 25 and 26.

[68] R-255, p. 9.

*safe operating limits*" [69] was not completed.[70] KEMA concluded in its report dated 5 May 2011 that "*the requirements of successful reliability run test were not met.*" [71]

120. On 12 April 2011, the Commercial Operation Achievement Certificate was issued by Lakhra, notifying Karkey that COD would occur the following day, as follows:

> *Upon successful completion of the two hours operational test on 9th April 2011, in which Net Electrical output remained more than Guaranteed Electrical output [231.8 MW], this is to certify that commercial operation of 231.8 MW Karkey Rental Power plant is achieved, as per provisions of clause 4.4 of RSC. The undersign as per clause 3.1 (m) of RSC hereby issues the 'COMMERCIAL OPERATION ACHIEVMENT CERTIFICATE'.*
>
> *Now it is notified that, as per clause 4.4 of RSC Commercial operation date shall occur at 00:01 AM on 13th day of April 2011.* [72]

121. Following achievement of COD on 13 April 2011, Karkey wrote to Lakhra stating that pursuant to Section 4.5(m) of the Contract, Lakhra had until 23 April 2011 to establish the Fuel Payment Letter of Credit ("FPLC"), after which time Karkey would no longer continue financing fuel purchases out of its own funds.[73] Karkey reiterated this message on 21 April 2011, stating that it would have to discontinue electricity generation if the FPLC was not established by 23 April, and noting also that the Fuel Payment Invoices for January and February 2011 remained unpaid and were overdue.[74]

122. By 23 April 2011, Lakhra had still not established the FPLC, and still not paid the outstanding Fuel Payment Invoices. On 24 April 2011, Karkey ceased electricity generation.[75]

123. On 6 May 2011, Karkey re-commenced power generation using Karkey's own funds to purchase fuel as an alleged gesture of goodwill and in hopes of saving the Project.[76]

---

[69] R-255, p. 29, item 4.2.

[70] R-255, p. 29.

[71] R-255, p. 29, item 4.2.

[72] C-017 (CONFIDENTIAL).

[73] C-223.

[74] C-224.

[75] C-217.

[76] C-215 (CONFIDENTIAL); C-225; C-233.

28

124. On 8 February 2012, Karkey served on Lakhra a Final Notice of Default for failure to establish the FPLC.[77]

125. On 30 March 2012, Karkey served Lakhra a "*Notice of Termination effective immediately*" regarding the 2009 RSC. In such Notice, Karkey requested payment of the following amounts:[78]

- US$161.856.018 as termination charges pursuant to Clause 4.6(d);

- US$12.000.000 as mobilization and transport charges to return the Equipment to SELLER's designated depot as per Clause 4.6(b); and of

- All receivables including but not limited all Monthly Rental Services Fees and all Monthly Operation and Maintenance Services Fees and fuel invoices to date as per the 2009 RSC.

126. On the same date, after more than two years of proceedings, the Supreme Court rendered its judgment in the Rental Power Case ("RPP Judgment", "30 March 2012 Judgment" or "Judgment"), concluding that the RPP contracts of 2008 had been procured in breach of the PPRA Rules. Accordingly, the Judgment declared void *ab initio* all RPP contracts (including the 2009 RSC), ordered that they be rescinded and ordered an investigation by the National Accountability Bureau ("NAB") into possible corruption by the RPP sponsors and by various public officials.[79] It is undisputed that the Supreme Court made no explicit finding of corruption anywhere in the Judgment, nor any specific finding of corruption against, or involving, Karkey.[80]

127. Pursuant to the Supreme Court's directions, the NAB began an inquiry into the RPP programme immediately following the 30 March 2012 Judgment.

128. On 2 April 2012, on the basis of Section 23(1)[81] of the National Accountability Ordinance ("NAO"), the NAB notified the relevant authorities, including the Pakistan Maritime Security

---

[77] C-230.

[78] C-327.

[79] C-029.

[80] Pakistan's Counter-Memorial, ¶ 642.

[81] Section 23 of the NAO provides as follows: "*(a) Notwithstanding anything contained in any other law for the time being in force after the Chairman NAB has initiated [an inquiry of] investigation into [any offence] under this Ordinance, alleged to have been committed by an accused person, [accused] person or any relative or associate of [accused] person or any other person on his behalf, shall not transfer by any means whatsoever, [or] create a charge on any property owned by him or in his possession, while the inquiry, investigation proceedings are pending before*

Agency ("PMSA"), that an investigation into Karkey had been launched under the NAO and that Section 23(1) NAO was therefore operative.[82] At the same time, certain individuals connected to the RPP Programme (including Mr. Karadeniz) were placed on the Exit Control List (a list of persons prohibited from departing from Pakistan),[83] and Karkey's bank accounts were frozen.[84]

129. Between 30 March and 2 April 2012, the state-owned National Transmission & Despatch Company Ltd. and Lakhra, respectively, instructed Karkey to cease electricity dispatch from the Powerships. At the same time, Karachi Electric Supply Company ("KESC") stopped supplying lifeline power to the Powerships, leaving the crew on the Vessels without power.[85]

130. On 3 April 2012, Karkey received a notification issued by Port Qasim Authority stating that, further to the inquiry initiated by NAB, a "caution" had been placed on the Vessels under NAO Section 23. Purportedly relying on such "caution", the Pakistani port authorities directed that the Vessels not be moved from their moored position until the completion of the NAB inquiry and/or clearance from NAB.[86]

131. Karkey's *Kaya Bey* Vessel remained forcibly idle from April 2012 through May 2014, when Pakistan complied with this Arbitral Tribunal's Decision on Provisional Measures dated 16 October 2013 to allow the Vessel to depart Pakistani waters. For the *Alican Bey* Vessel and the two support Vessels (the *Iraq* and the *Enis Bey*), the detention that began in April 2012 continues to the present day.

132. For the entire period of this detention, because Pakistan cut off lifeline power to the Powerships, the Vessels were (and still are) without power needed for operation and maintenance.

---

the NAB or the Court; and any transfer of any right, title or interest or creation of a charge on such property shall be void". (square brackets in original); *See* C-279.

[82] C-019.

[83] C-037.

[84] C-089.

[85] *See* C-240; C-241; C-272.

[86] C-019.

133. On 24 April 2012, the MoWP, on behalf of Pakistan, PEPCO, NEPRA, and the former Ministry of Finance, filed a Civil Review Petition[87] before the Supreme Court in order to try to reverse the RPP Judgment. These proceedings remain pending.

134. On 24 April 2012, and purportedly pursuant to the RPP Judgment, NAB demanded that Karkey appear at NAB Headquarters and that, within 48 hours, it pay an alleged outstanding amount of US$183.5 million to the Chairman of the NAB.[88] NAB's demand for payment of US$183.5 million was reiterated on 9 May 2012.[89]

135. On 19 May 2012, Karkey delivered to Pakistan a notice of dispute under the BIT.[90]

136. On 7 September 2012, NAB, Lakhra and Karkey entered into a "Deed", which provided for payment by Karkey of US$17.2 million and declared that the parties had reached a resolution of all the matters arising from the Contract, the Judgment, and the NAB inquiry.[91] The Deed, which was signed by the Director General NAB, also declared that "*KARKEY has no liability, and there remains no basis or evidence for proceeding(s) by NAB or any of the other Parties or GoP entities against KARKEY and/or its project/investment and that NAB has completed and closed its enquiry in respect of KARKEY*" and that, upon payment of the agreed amount, NAB would remove the "caution" against the Vessels (which had been detained since 2 April 2012); would rescind the freezing order against Karkey's bank accounts; and would allow free passage of Karkey's assets and personnel by withdrawing the forcible detention it had imposed on them.[92]

137. In accordance with the Deed, Karkey tendered payment of the agreed US$17.2 million through the Embassy of the Republic of Turkey in Islamabad, which acted as an escrow agent and duly notified the Foreign Office of Pakistan.[93]

138. On 11 October 2012, NAB issued a "No Objection Certificate" ("NOC") declaring that it was satisfied that Karkey had reconciled and agreed account with Lakhra, and that Karkey had no

---

[87] C-018.

[88] C-021 (CONFIDENTIAL).

[89] C-022.

[90] C-007 (CONFIDENTIAL).

[91] C-013 (CONFIDENTIAL).

[92] C-013 (CONFIDENTIAL), ¶ 5.

[93] C-290.

liability under the NAO.[94] The same document stated that NAB had "*completed and closed inquiry*" in respect of Karkey.[95]

139. On 11 October 2012, pursuant to the terms of the Deed and the No Objection Certificate, NAB lifted the caution on Karkey's Vessels.[96] The Vessels, however, remained detained and under the control of the GoP pending compliance with the directions of NAB.

140. On 1 November 2012, Mr. Hayat, the Parliamentarian acting as the petitioner in the Rental Power Case, wrote a letter to the Chief Justice Chaudhry requesting that the Supreme Court prevent NAB from allowing Karkey's Vessels to sail outside of Pakistan before recovering the "*full amount*" Karkey purportedly owned, which Mr. Hayat claimed to be US$227 million.[97]

141. On 2 November 2012, NAB reactivated the "caution" on Karkey's Vessels, on the basis of NAO Section 23. NAB once again instructed the port authority and PMSA to prevent the Vessels from departing Pakistani territorial waters.[98]

142. By order dated 26 November 2012, the Supreme Court directed NAB to recover from Karkey US$120 million, which according to the Court was the amount "*re-calculated*" by NAB at the Court's direction and in coordination with Petitioner Hayat, subject to "*all just and legal exceptions*".[99]

143. On 29 November 2012, NAB notified Karpak that, pursuant to the Supreme Court's direction, Karkey was required to pay US$120 million to NAB within seven days.[100]

144. Karpak informed NAB that it had no authority to accept service of process on behalf of Karkey. Therefore, on 3 December 2012, NAB notified Karkey that pursuant to the Supreme Court's directions, Karkey was required to make a payment – this time for US$128 million – to the GoP,

---

[94] C-014.

[95] C-014.

[96] *See* C-023.

[97] C-025.

[98] C-026.

[99] C-030.

[100] C-031.

via NAB, and that it was for this reason that the Vessels "*have been detained as security for payment*".[101]

145. On 11 January 2013, the Supreme Court in a written order directed NAB to pursue criminal liability and to arrest persons involved in the RPPs.[102]

146. On 16 January 2013, Karkey filed its Request for Arbitration in this case.

147. On 27 January 2013, the NAB Chairman (Mr. Bokhari) wrote to the President of the Pakistan, *inter alia*, as follows:

> *The clear line between the recognized authority of the Supreme Court to monitor NAB investigations to the limited extent of ensuring fair investigation, and itself becoming involved in guiding investigations, appears to be becoming breached as a norm as the elections near. Contempt notices, verbal orders that differ from written orders, and insufficient time to prepare numerous progress reports, are placing extreme pressure on NAB personnel who appear before the Honorable Judges. There is even a danger that NAB personnel could lose their independence and are unable to carry out their investigations in an independent manner due to the pressure being exerted on them by the Honorable Supreme Court to proceed along lines which seem to be desired by the SC [Supreme Court]. In revealing this pressure, to safeguard their jobs, and so as not to displease the Honorable Court, there is danger of unfair investigation being resorted to [...]. I fear that in the current direction that the Honorable Supreme Court appears to be taking, I will not be able to perform my independent statutory role [...].*[103]

148. On 31 January 2013, the Supreme Court issued a Contempt of Court order accusing the Chairman of NAB of "*causing interference with and obstruction in the process of the Court and [...] the administration of justice*".[104]

149. On 23 May 2013, Lakhra filed an admiralty suit against Karkey in the Sindh High Court seeking recovery of US$128 million plus interest allegedly owed by Karkey.[105] At the same time, Lakhra made an *ex parte* application for an interim order for the arrest of Karkey's Vessels as "security" for the alleged claim, and seeking a further order that, if Karkey were to fail to pay such amount,

---

[101] C-039, ¶ 5.

[102] C-059.

[103] C-015, p.1 (emphasis added).

[104] C-046, p. 7.

[105] R-018.

33

Karkey's Vessels would be sold and the proceeds paid to Lakhra.[106] On 29 May 2013, the Singh High Court issued an arrest order for Karkey's Vessels.[107]

150. On 16 October 2013, this Arbitral Tribunal issued its Provisional Measures Decision, in which the Tribunal ordered the State of Pakistan, *inter alia*, to

> '*take all steps necessary to allow the vessel, Karadeniz Powership Kaya Bey [...], to depart into international waters and reach, before 1 November 2013, the dry dock in Dubai for inspection and repairs as determined by the Bureau Veritas (or other equivalent agency) to maintain the vessel's flag-registry and class certification*', and to that effect, to '[c]ause Lakhra [...] to take all steps necessary to obtain the temporary suspension of the order of the High Court of Sindh at Karachi dated 29 May 2013 in the Admiralty Suit No. 07 of 2013, which arrested the vessel [Kaya Bey].'[108]

151. Lakhra made an application to the Sindh High Court seeking a temporary modification of the arrest order it had procured, to allow the *Kaya Bey* to sail to Dubai for dry dock inspection and repairs, which Lakhra filed on 26 October 2013.[109]

152. The Sindh High Court issued a notice to NAB, a non-party to the proceedings, to appear and state its position with respect to Lakhra's application.[110] NAB appeared in the admiralty proceeding to oppose Lakhra's application for modification of the order unless Karkey were to post a bank guarantee in favour of the Chairman of NAB in the amount of US$128 million.[111]

153. On 30 October 2013, a new admiralty lawsuit was filed against Karkey before the Sindh High Court, this time by Karkey's Pakistani shipping agent, Bulk Shipping & Trading Limited ("Bulk Shipping"). In its petition, Bulk Shipping made an *ex parte* application for the immediate arrest of all four of Karkey's Vessels on account of a purported claim of unpaid docking charges in the amount of approximately US$1.1 million. Bulk Shipping further claimed that it had suffered "*mental agony torture and loss of health, loss of business and loss of reputation, which has been*

---

[106] R-019.

[107] R-021.

[108] Decision on Claimant's Request for Provisional Measures, ¶ 138.

[109] R-031.

[110] C-287.

[111] C-128.

*caused to the Plaintiff [Bulk Shipping] being an agent of the Defendant [Karkey]*" and claimed approximately US$949,000 as damages.[112]

154. On 5 November 2013, the Singh High Court granted Bulk Shipping's application and ordered the arrest of all four Karkey Vessels.[113]

155. By Order dated 23 December 2013, the Sindh High Court declined to grant Lakhra's application for temporary modification of the arrest order.[114]

156. On 6 January 2014, Lakhra appealed the decision of the Sindh High Court.

157. On 7 May 2014, the Sindh High Court Appellate Bench Division issued an order permitting the release of the *Kaya Bey*.[115]

158. On 15 May 2014, the Singh High Court indicated that it would lift its arrest of Karkey's Vessels upon submission by Karkey of a pay order for the amount Karkey allegedly owed to Bulk Shipping (approximately US$1,137,234). Karkey furnished the required pay order to the Sindh High Court.[116] Noting receipt of the pay order, the Sindh High Court revoked the arrest of Karkey's four detained Vessels in the Bulk Shipping case on 15 May 2014.[117] The proceedings in the Sindh High Court are still ongoing.

159. On 1 August 2014, upon a request by Karkey and absent any objection from Pakistan, the Tribunal modified its Decision on Provisional Measures to relieve Karkey of any obligation to return the *Kaya Bey* to Pakistan following completion of it dry-docking inspection and repairs in Dubai.

160. The *Kaya Bey* departed Dubai in the first week of October 2014 and has since arrived in Basra, Iraq.[118]

---

[112] C-383, ¶ 24.

[113] C-384.

[114] C-287.

[115] C-405.

[116] C-416.

[117] C-416.

[118] Karadeniz, First Witness Statement (Updated), ¶ 109.

**IV.SUMMARY OF THE PARTIES' CLAIMS AND REQUESTS FOR RELIEF**

161.  The following provides an overview of the Parties' respective claims and defences. This summary has been prepared to set in context the decisions made by the Tribunal in this Award, and is not an exhaustive description of the arguments presented during this arbitration through the written and oral submissions of the Parties. The fact that a particular submission is not expressly referenced below should not be taken as any indication that it has not been considered by the Tribunal.

A.     The Claimant's Position

  **(1) Jurisdiction**

   a.  *The Supreme Court Judgment does not Deprive the Tribunal of Jurisdiction*

162.  The Claimant submits that the Supreme Court's holding that the contracts are void *ab initio* and must be rescinded have no impact whatsoever on the jurisdiction of this Tribunal. Such decision came in any event after the Contract had already been performed and terminated by Karkey.[119]

163.  According to the Claimant, the Tribunal is required to assess the scope of Pakistan's consent to arbitration under international law.  Accordingly, a Pakistani court holding regarding the status of Karkey's Contract under national law cannot be dispositive of – or even relevant to – the Tribunal's jurisdictional inquiry. Rather, it is the Tribunal's obligation and prerogative to conduct its own independent assessment of whether Karkey's investment was made "*in conformity with the hosting Party's laws and regulations*" as required by Article I(2) of the BIT.[120]

164.  The Claimant notes that despite acknowledging that the Tribunal "*shall be the judge of its own competence*" to determine the scope of BIT jurisdiction over Karkey's claims, Pakistan insists that it would be inappropriate for the Tribunal to undertake an independent jurisdictional analysis in this case. Instead, Pakistan demands that the Tribunal defers to the Supreme Court's Judgment, unless the Tribunal finds that the Judgment constituted a denial of justice.[121]

---

[119] Karkey's Post-Hearing Brief, ¶ 8.

[120] Karkey's Post-Hearing Brief, ¶ 9.  *See generally* Karkey's Reply, ¶¶ 494–504.

[121] Karkey's Post-Hearing Brief, ¶ 10.

165.  However, according to the Claimant, Pakistan provides no basis for this asserted limitation on the Tribunal's authority. Pakistan's heavy reliance on the award in *Helnan v. Egypt*[122] is misplaced, as the tribunal in that case explicitly rejected the notion that a national court decision on the legality of an investment could be determinative of a tribunal's jurisdiction to entertain BIT claims. The Claimant asserts that Pakistan actually fails to cite any authority that requires a tribunal assessing jurisdiction over BIT claims to defer to the findings of a national court on the legality of the claimant's investment. According to the Claimant, the weight of authority instead confirms that national court decisions of illegality cannot substitute for an ICSID tribunal's independent assessment under international law. The foregoing is also consistent with the basic principle of international law expressed in Article 27 of the Vienna Convention on the Law of Treaties, that *"[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."* Similarly, under Article 3 of the ILC Articles on State Responsibility, *"[t]he characterization of an act of a State as internationally wrongful is governed by international law. Such characterization is not affected by the characterization of the same act as lawful by internal law."*[123]

166.  In any event, the Claimant submits that its investment consisted of many elements other than the Contract itself. Most notably, Karkey constructed permanent infrastructure to improve Pakistan's electricity grid; transported its Vessels into Pakistani waters; established a local subsidiary; set up local offices; and employed local personnel. Karkey argues that there is no "domestic law" magic wand that Pakistan can wave to make Karkey's investment in Pakistan disappear: that investment happened, and the reality of it is incontrovertible.[124]

  b.  *Karkey Made its Investment in Conformity with Pakistani Law*

167.  The Claimant submits that Karkey's investment was made in good faith and in conformity with Pakistani law. Karkey asserts that, under international law, non-conformity with the host State's law will vitiate jurisdiction only where it (i) constitutes a material breach of a fundamental principle of host-State law, (ii) occurs in the making of the investment, and (iii) is committed knowingly by the investor. Investment tribunals have applied this "serious illegality" standard.

---

[122] Karkey's Post-Hearing Brief, ¶ 11, referencing Tr. Day 1, 222:21-223:15. *See* RA-055, *Helnan International Hotels A/S v. Arab Republic of Egypt* (ICSID Case No. ARB/05/19), Award, 3 July 2008 ("*Helnan v. Egypt"), ¶ 124.

[123] Karkey's Post-Hearing Brief, ¶¶ 11-12.

[124] Karkey's Post-Hearing Brief, ¶ 15.

The Claimant argues that, even if Pakistan could meet this standard (which is denied), having endorsed Karkey's investment despite knowing of the alleged illegalities, Pakistan is estopped from objecting to jurisdiction on this ground.[125]

168. According to the Claimant, Pakistan mischaracterized the legality requirement in Article I(2) of the BIT, asserting that "*it's only if [Karkey's] investment was in conformity with Pakistani law that it qualifies as an investment entitled to protection under the Treaty*." Under Pakistan's proposed test, it would be enough for the State to claim that the investor "should have known" of a legal non-conformity, whether or not the investor knowingly engaged in any wrongful conduct in the making of the investment. However, the Claimant asserts that negligence based violations do not rise to the standard of "serious illegality" under international law. Therefore, any such alleged failures of due diligence by Karkey would be insufficient to deprive the Tribunal of jurisdiction.[126]

169. Moreover, the Claimant argues that, as investment tribunals have explained, for purposes of jurisdiction, illegality is assessed at the moment in which the investment is first established. According to the Claimant, the purpose of this inquiry is to determine whether an investor has unfairly gained access to the protection of the BIT. Because an investor gains that BIT protection the moment it establishes its investment, any subsequent illegality in the operation of the investment cannot vitiate BIT jurisdiction. Since the various alleged illegalities (which are denied) would have occurred after the issuance of Karkey's Letter of Award, countersigned by Karkey on 7 November 2008, they could not in any event result in the loss of jurisdiction over Karkey's claims.[127]

170. The Claimant further submits that Pakistan is estopped from raising objections to the legality of Karkey's Project given the fact that for years Pakistan has fully ratified the legality of that very investment, encouraged Karkey first to make and then to maintain the investment, and issued a No Objection Certificate[128] clearing Karkey of any liability for corruption. Karkey argues that

---

[125] Karkey's Post-Hearing Brief, ¶ 16. *See* Karkey's Reply, §§ II.B.1, II.B.2.

[126] Karkey's Post-Hearing Brief, ¶ 17.

[127] Karkey's Post-Hearing Brief, ¶ 18.

[128] C-014.

international law does not countenance this type of *volte face* by a State to the detriment of the investor.[129]

171. Karkey's position on each of Pakistan's objections to the legality of Karkey's investment is summarized below and relates to the fact that (b.1) Karkey did not secure its investment through misrepresentation and fraud; (b.2) Karkey did not breach Pakistan's procurement laws or international procurement norms; (b.3) Karkey did not secure its investment through corruption; and (b.4) Pakistan's disregard of its obligations under the Contract and Sovereign Guarantee constitute breaches of the BIT.

*(b.1) Karkey did not Secure Its Investment through Misrepresentation and Fraud*

172. Karkey rejects Pakistan's argument that it has obtained its investment through fraud. In order to succeed on a claim for fraud under international law, Pakistan must show (i) an intent by Karkey to conceal; (ii) a material fact; and (iii) detrimental reliance by Pakistan on the facts as presented. According to Karkey, Pakistan cannot demonstrate any of these elements.[130]

173. The Claimant asserts that Pakistan's fraud claim fails to meet even the first element of the above-referenced standard, as Pakistan has presented no evidence that Karkey acted with an intent to deceive Pakistan. As Mr. Karadeniz explained at the Hearing, at the time of submission of its Bid, Karkey believed it could in fact achieve commercial operations within 180 days of issuance of the Letter of Award, as it had indicated in its Proposed Project Schedule.[131]

174. The Claimant submits that Pakistan also fails to meet the second element of fraud: a demonstration that Karkey concealed a "material fact." In submitting its Proposed Project Schedule, Karkey merely made a commitment to meet a target or, failing that, to pay the contractual penalty for its delays. Karkey argues that this was not a representation of fact that Karkey would achieve the target irrespective of Pakistan's actions or of delays beyond Karkey's control. It simply was an acknowledgment by Karkey that there was an agreed target date for achievement of commercial operations and an acceptance by Karkey of the contractual consequences for failing to meet that target. Those consequences included (1) the encashment of the performance guarantee, (2) liquidated damages, and (3) a reduction of the contract terms. The Claimant asserts that the

---

[129] Karkey's Post-Hearing Brief, ¶ 19.

[130] Karkey's Post-Hearing Brief, ¶¶ 21-22.  *See also* Karkey's Reply, ¶ 521.

[131] Karkey's Post-Hearing Brief, ¶ 26.

inclusion of these contractual remedies for delay underscores the fact that Pakistan and Karkey had a mutual understanding of the commercial operations date as a mere target.[132] Karkey's commitment thus was not an assurance of a particular outcome, but rather simply an acknowledgment that it would either meet the target COD, or pay the relevant contractual penalty.[133]

175. The Claimant submits that Pakistan also fails to satisfy the third element required for its fraud claim: detrimental reliance. Pakistan does not dispute that to succeed on its misrepresentation objection it must demonstrate that it reasonably relied to its detriment on Karkey's commitment to meet the target COD. However, Pakistan insists that such detrimental reliance can be inferred because Pakistan awarded Karkey the Contract on the basis of Karkey's commitment. According to Karkey, this fails because Pakistan does not explain how awarding Karkey a contract on this basis was detrimental to Pakistan. There were no other bidders who would have received contracts had Karkey been disqualified.[134] Nor can mere delay in achievement of COD be considered a detriment flowing from reliance on Karkey's commitment to the target schedule, given that the Contract expressly provided for penalties in case of delay.[135]

*(b.2) Karkey did not breach Pakistan's procurement laws or international procurement norms*

176. Karkey rejects Pakistan's allegation that by adopting certain changes to the tendered contract, Karkey and Lakhra (and various Pakistani government agencies) materially breached Pakistani procurement law and that the Tribunal therefore lacks jurisdiction.[136]

177. According to the Claimant, the first among numerous defects in this argument is that Pakistan has taken – and continues to take –the opposite position before its own Supreme Court. There

---

[132] Karkey's Post-Hearing Brief, ¶ 34.

[133] Karkey's Post-Hearing Brief, ¶ 35.

[134] According to the Claimant, Pakistan notes that aside from Karkey and Walters, the only other bidder in the RFP was Cavalier Energy, which submitted a bid that was declared non-responsive. The Claimant submits that, although Pakistan contends that Cavalier Energy was disqualified because, unlike Karkey, it did not pledge Target COD within six months, in fact, a contemporaneously signed document on the record shows that as of 2 August 2008, Cavalier did commit to achieving COD within 6 months. *See* C-127. Further, the Claimant submits that Pakistan ignores the fact that the evaluation committee rejected Cavalier's bid for other reasons, including Cavalier's proposed fuel cost component, tariff, and output all impermissibly exceeded project terms (C-127, p. 7). *See* footnote 76 of Karkey's Post-Hearing Brief.

[135] Karkey's Post-Hearing Brief, ¶ 36.

[136] Karkey's Post-Hearing Brief, ¶ 41.

Pakistan continuously maintained that Karkey's contract was procured in compliance with Pakistani procurement law.[137]

178. Pakistan argues that Karkey's investment in Pakistan was established in breach of the PPRA Rules. However, as explained by Karkey's Pakistani law expert, Mr. Zafar, negotiations that take place after a Letter of Award is issued are not governed by the PPRA Rules, since the procurement process is complete upon the issuance of the Letter of Award. Therefore, there is no question of Karkey's non-compliance with the PPRA Rules, because the allegedly offending contractual changes occurred after the Letter of Award. Even if the PPRA Rules were deemed applicable to the contractual changes alleged by Pakistan, such changes are in fact permissible unless they materially shift the transactional balance in favour of the private party. This standard is consistent with international procurement custom and norms. None of the contractual changes alleged by Pakistan offend either Pakistani or international procurement standards.[138]

179. According to the Claimant, during negotiations, Pakistan informed Karkey that it was unable to open a confirmed letter of credit. As a result, a package of changes was introduced into the Draft RSC to provide alternate forms of security to Karkey. Specifically, the requirement for confirmation of the Letter of Credit was eliminated, the amount of the Letter of Credit was reduced from an amount equivalent to five years of rental services fees to an amount equivalent to only three years and the terms of the Letter of Credit was reduced correspondingly. In exchange for this less advantageous form of security for Karkey, the down payment was increased from 7% to 14.16% and a fuel payment letter of credit was introduced.[139] Accordingly to the Claimant, overall, these changes were to Karkey's detriment. In accordance with Pakistani and international procurement norms, such changes were permissible because they did not shift the transactional balance in favour of the seller, and would not have altered the outcome of the procurement.[140]

---

[137] Karkey's Post-Hearing Brief, ¶ 42.

[138] Karkey's Post-Hearing Brief, ¶ 45.

[139] Karkey's Post-Hearing Brief, ¶ 63.  *See also* Karkey's Memorial, ¶ 83.

[140] Karkey's Post-Hearing Brief, ¶ 64.

*(b.3) Karkey did not secure its investment through corruption*

180. The Claimant submits that like Pakistan's allegations of fraud and misprocurement, Pakistan's claim that Karkey secured its investment through corruption is unsupported by either the factual record or the law. Karkey argues that the standard of proof for allegations of corruption is high. Specifically, an allegation must be proven by clear and convincing evidence, as that standard is defined under international law.[141]

181. According to Pakistan, because "*corruption is endemic*" in Pakistan's political system, the Tribunal, in balancing the probabilities, should start from an assumption that it is more likely than not that Karkey was engaged in some form of corruption. Karkey argues that such proposition is perverse, as Pakistan in essence is proposing that the well-accepted "clear and convincing" evidence standard be supplanted by new standard of "presumptive corruption."[142] The Claimant asserts that this shift in the standard of proof is unacceptable.[143]

182. The Claimant states that Pakistan has repeatedly and consistently admitted that it has no evidence of bribery by Karkey but it insists that Karkey must have paid bribes to secure benefits under the Contract. The Claimant notes that at the Hearing, Pakistan's only witness on this subject, Mr. Aslam, confirmed that he did not know of any bribes having been paid by, or on behalf of, Karkey.[144] Despite Pakistan's assertion that Mr. Aslam's testimony proves that Karkey engaged in corruption, under cross-examination he failed to substantiate any of Pakistan's speculative allegations. This is unsurprising given that neither the Supreme Court nor the NAB found any evidence of corruption by Karkey in the course of their investigation of those same allegations.[145]

183. The Claimant notes that the NAB itself concluded that there was no evidence of wrongdoing by Karkey under the NAO, and entered into a Deed settling Karkey's account and explicitly concluding that Karkey had no liability under the NAO.  In addition to signing the Deed with

---

[141] Karkey's Post-Hearing Brief, ¶ 81.

[142] Karkey's Post-Hearing Brief, ¶ 82.

[143] Karkey's Post-Hearing Brief, ¶ 83.

[144] Karkey's Post-Hearing Brief, ¶ 84.

[145] Karkey's Post-Hearing Brief, ¶ 87.

Lakhra and Karkey, NAB issued a NOC, clearing Karkey from any and all liability under the NAO (the very law which Pakistan now alleges that Karkey breached).[146]

184. Karkey argues that Pakistan attempts to elide the importance of the Deed and the NOC by asserting that the Deed was later rejected by the Supreme Court because the value of the settlement was too low. However, it points out to no ruling from the Supreme Court questioning NAB's clearance Karkey of any liability under the NAO.[147]

185. Moreover, the Claimant maintains that Pakistan's assertion that Karkey has not adequately explained Mr. Zulqarnain's role in the Project is false. According to the Claimant, both the documentary and testimonial evidence demonstrate that Mr. Zulqarnain played a legitimate role as Karkey's representative in Pakistan and there is no evidence that he engaged in corruption.[148]

186. The Claimant argues that, attempting to make up with legal argumentation what it lacked in evidence, Pakistan in its pleadings had invoked a single investment tribunal decision, *Metal-Tech v. Uzbekistan*, which it insisted was analogous to the present case. According to Pakistan, Mr. Zulqarnain's role at Karkey was akin to that of two of the consultants in *Metal-Tech*, to whom the claimant in *Metal-Tech* had paid millions of dollars via an offshore company in return for their services of "lobbying" government officials. However, the Claimant asserts that, by the close of the Hearing, even Pakistan itself admitted that the comparison was inapt: "*Pakistan accepts we are not in* Metal-Tech *territory*".[149]

*(b.4) Pakistan's disregard of its obligations under the Contract and Sovereign Guarantee constitute breaches of the BIT*

187. The Claimant submits that the claims that Pakistan mischaracterizes as "purely contractual" – including for example, Pakistan's nullification of the Contract, failure to pay outstanding invoices for rental services and fuel payments, refusal to honour the Sovereign Guarantee, and failure to honour Karkey's post-termination Contract rights – in fact amount to breaches of the BIT.[150]

---

[146] Karkey's Post-Hearing Brief, ¶ 90.

[147] Karkey's Post-Hearing Brief, ¶ 91.

[148] Karkey's Post-Hearing Brief, ¶ 93.

[149] Karkey's Post-Hearing Brief, ¶ 98 referencing RA-134, *Metal-Tech Ltd. v. Republic of Uzbekistan* (ICSID Case No. ARB/10/3) Award dated 4 October 2013 ("*Metal-Tech")*, ¶ 86. *See* Tr. Day 10, 2954:21.

[150] Karkey's Post-Hearing Brief, ¶ 115.

188. The Claimant argues that Pakistan's characterization of these claims as outside the scope of the BIT – and in particular, the Umbrella Clause – is inconsistent with the weight of investment jurisprudence. Nor does the forum selection clauses in the Contract and Sovereign Guarantee deprive Karkey of recourse to ICSID for resolving its contract-related BIT claims. Because ICSID Convention Article 26 establishes ICSID as the exclusive forum for such claims, an LCIA tribunal would have no jurisdiction to hear Karkey's claims for breach of the BIT. In any event, both the Contract and the Sovereign Guarantee are governed by Pakistani law. Applying that law, the Sindh High Court determined that Karkey's choice to pursue ICSID arbitration rendered the LCIA arbitration clause "incapable of being performed" during the pendency of these ICSID proceedings. Further, having objected to LCIA arbitration in the Sindh High Court proceedings, Pakistan is estopped from claiming in these proceedings that LCIA arbitration is mandatory. The Claimant therefore assets that this ICSID arbitration is therefore the only forum in which Karkey can seek redress for its BIT claims relating to the Contract and Sovereign Guarantee.[151]

### (2) Attribution

189. According to Karkey, the acts of the Ministry of Water, NAB, the Supreme Court of Pakistan and other organs of the State of Pakistan, as well as Lakhra's acts, in breach of the BIT are attributable to Pakistan.[152]

190. As set out under Section IV(A)(3)(c) below, Karkey rejects Pakistan's attempts to avoid BIT liability by disclaiming responsibility for the acts of Lakhra and PEPCO. According to Karkey, the record and Pakistan's own witnesses confirm that these entities were squarely under the direction and control of Pakistan's MoWP.[153]

191. It is Karkey's position that Lakhra's acts are attributable to Pakistan, as there can be no dispute that Lakhra acted at the behest and whim of MoWP, in the exercise of the latter's sovereign powers. Although Pakistan denied responsibility for the acts of PEPCO at the Hearing, it had already conceded in its Counter-Memorial that PEPCO is a "Government department," and it failed to offer any rebuttal of the evidence on that point in Karkey's Reply.[154]

---

[151] Karkey's Post-Hearing Brief, ¶ 117.

[152] Karkey's Memorial (updated), Section IV.A.

[153] Karkey's Post-Hearing Brief, ¶ 143.

[154] Karkey's Post-Hearing Brief, ¶¶ 144-145.

### (3) Merits

    a.   *The Supreme Court Judgment Does Not Insulate Pakistan from Liability for Breaches of the BIT*

192.  According to Karkey, the Supreme Court's holding that the contracts are void *ab initio* and must be rescinded only impacts the merits of the case insofar as the Judgment itself violates the BIT. In any event, the Judgment does not preclude a finding of liability by Pakistan for its numerous other breaches of the BIT.[155]

193.  Even if the Tribunal were to conclude that the Judgment was not deficient from the viewpoint of international law, *i.e.* that the Judgment itself did not constitute a BIT violation, the Tribunal would only owe a duty of deference to the specific findings of national law that the Judgment actually reached. Under no circumstance could the Judgment, deciding liability under national law, insulate Pakistan from responsibility for breaches of international law in the alleged implementation (by executive authorities) of that Judgment, nor could it validate subsequent directives from the Supreme Court.[156]

    b.   *Pakistan's has breached its BIT obligations, including those incorporated through the MFN clause*

194.  According to the Claimant, Pakistan has unlawfully expropriated Karkey's investment in breach of Article III of the Pakistan-Turkey BIT, which provides as follows:[157]

> *Investments shall not be expropriated, nationalized or subject, directly or indirectly to measures of similar effects except for a public purpose, in a non-discriminatory manner, upon payment of prompt, adequate and effective compensation, and in accordance with due process of law….*

195.  Karkey maintains that expropriation occurs where the State substantially deprives an investor of the use and enjoyment of its investment, and such deprivation need not affect the Claimant's legal title. Accordingly, a State's action may be considered tantamount to expropriation where they interfere significantly with the use or reasonably expected benefit of the investment. According to the Claimant, in the present case, Pakistan's arrest and detention of Karkey's Vessels, seizure of Karkey's bank accounts, and purported invalidation of Karkey's contractual

---

[155] Karkey's Post-Hearing Brief, ¶ 118.

[156] Karkey's Post-Hearing Brief, ¶ 122.

[157] Karkey's Memorial, ¶ 515.

rights under the Contract all have severely interfered with Karkey's use and enjoyment of its investment in Pakistan.[158] Pakistan's purported invalidation of the Contract and subsequent seizure of Karkey's Vessels and bank accounts in Pakistan have effectively expropriated Karkey's entire investment.[159]

196. Moreover, the Claimant submits that Pakistan's mistreatment of Karkey's investment has breached several of Pakistan's BIT obligations, including obligations incorporated through Article II(2) (the "MFN clause"), which requires Pakistan to accord to "*investments, once established, treatment no less favorable than that accorded in similar situations to investments of its investors or to investments of investors of any third country, whichever is most favorable.*" The Claimant asserts that, by virtue of the MFN clause, Pakistan must afford Karkey the same treatment it accords investors under Pakistan's other BITs.[160]

197. According to the Claimant, Pakistan attempts to prevent the importation of obligations from its other BITs by asserting that the phrase in "in similar situations" requires the investor to demonstrate a direct violation of the MFN clause before the favourable protection of other treaties can apply. The Claimant argues that Pakistan attempts to bolster its restrictive interpretation of the MFN clause by relying on the newly issued *Içkale v. Turkmenistan* award, which held that unless the term "in similar situations" was read to require the investor to point to an actual comparator, the term would lack *effet utile*.[161] Karkey submits that this reading is contrary to the weight of prior investment jurisprudence, and Pakistan itself admits that the *Içkale* award "*is the only investment treaty award*" that has adopted Pakistan's restrictive reading of the MFN clause.[162]

---

[158] Karkey's Memorial, ¶¶ 517-518.

[159] Karkey's Memorial, ¶ 519.

[160] Karkey's Post-Hearing Brief, ¶ 123.

[161] Karkey's Post-Hearing Brief, ¶ 124, referencing RA-291, *Içkale İnşaat Limited Şirketi v. Turkmenistan* , (ICSID Case No. ARB/10/24), Award, 8 March 2016 ("*Içkale v. Turkmenistan")*, para, 329

[162] Karkey's Post-Hearing Brief, ¶ 124. *See also* Karkey's Reply, ¶¶ 683–700.

198. According to the Claimant, other tribunals, including that in *Bayindir v. Pakistan* (which analysed the same BIT at issue in this case) have concluded that the MFN clause does allow importation of protection from other treaties – even in the absence of an actual comparator investment.[163]

    c.  *Pakistan's Failure to Perform its Contractual Obligations Violated the BIT (Umbrella Clause)*

199. According to Karkey, Pakistan failed to observe the commitments it made to Karkey in the Contract and the Sovereign Guarantee, and has thus violated Article 9 of the Lebanon-Pakistan BIT, which, as incorporated by reference pursuant to the MFN Clause of the Turkey-Pakistan BIT, requires Pakistan to "*observe any other obligation it has assumed with regard to investments*" made in Pakistan by Karkey. The purpose of this type of clause – also known as an "umbrella" clause – is to incorporate compliance with contracts and other agreements related to investments into the scope of the treaty protections for investors and investments, regardless of whether the host State has violated the other substantive provisions of the treaty at issue.[164]

200. Karkey points out that a State's obligation to observe commitments with respect to its contracts is not limited to avoiding a breach of those contracts. The umbrella clause also imposes a broader obligation on the State "*to 'ensure' that state-owned entities conduct activities which, in general terms of governance, management and organization, make them capable of observing [their contractual] obligations.*" In this sense, a State is obligated not only to perform its contractual duties, but also to "*respect specific undertakings*" and in order to "*protect[] the investor's contractual rights against any interference which might be caused by either a simple breach of contract or by administrative or legislative acts. . . .*" Thus, even a State entity that is not a party to a contract with an investor may violate the umbrella clause by failing to observe commitments made by the State under that contract.[165]

201. According to Karkey, Pakistan failed to observe the obligations it incurred pursuant to the Contract and the Sovereign Guarantee in its capacity not only as a commercial party, but also as a sovereign, and actively interfered with and frustrated the ability of Lakhra to perform its

---

[163] Karkey's Post-Hearing Brief, ¶ 125 referencing CA-020, *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/03/29), Award, 27 August 2009, ¶¶ 416, 418. *See also* Karkey's Reply, ¶¶ 683–85.

[164] Karkey's Memorial, ¶ 552.

[165] Karkey's Memorial, ¶ 553.

obligations under the Contract. This conduct violated Pakistan's obligation to observe the obligations it has entered into with respect to Karkey.[166]

202. Karkey submits that it has duly performed its own obligations under the Contract and rejects Pakistan's attempts to question Karkey's contractual performance. It is not disputed that, on 12 April 2011, Lakhra certified that Karkey had achieved Commercial Operations under the Contract, following a successful Operational Test certified by an independent engineer. In the ensuing months, Karkey performed its obligations under the Contract – including its obligation to make available to Lakhra 231.8 MW of power generation capacity. At all times prior to termination of the Contract, Karkey's Powerships stood ready to meet the Guaranteed Availability required by the Contract. [167]

203. Moreover, according to Karkey, Pakistan frustrated its legitimate expectation that the RFP and resulting contracts were legal and binding on Pakistan. From the very first advertisement for the Rental Power Projects, and through various subsequent oral and formal written representations, Pakistan assured Karkey that the Contract would be and ultimately was awarded in accordance with law and was legally binding and valid. Indeed, Karkey was forced to rely on these representations as the Contract was issued by Pakistan's "one-window" procurement agency established to provide just such assurance. Karkey relied on these representations when it entered into the contract and then mobilized its Powerships to Pakistan. Pakistan's subsequent repudiation of these representations to avoid its obligations to Karkey has thus frustrated Karkey's legitimate expectations, in violation of Pakistan's obligation to afford fair and equitable treatment to Karkey.[168] As Pakistan concedes, Karkey's expectations must be evaluated at the time Karkey made its investment, which means that the Supreme Court's (incorrect) declaration in March 2012 that the Contract was void *ab initio* and must be rescinded cannot negate the legitimate expectations formed by Karkey at the time the investment was made in 2008.[169]

204. Karkey further submits that Pakistan's failure to honour the Sovereign Guarantee breached Pakistan's obligations under the BIT, including the obligation of fair and equitable treatment, the umbrella clause commitment, and the obligation of full protection and security. Contrary to

---

[166] Karkey's Memorial, ¶ 554.

[167] Karkey's Post-Hearing Brief, ¶¶ 126-127.

[168] Karkey's Post-Hearing Brief, ¶ 132.

[169] Karkey's Post-Hearing Brief, ¶ 137.

Pakistan's arguments, the claims arising from these Sovereign Guarantee-related breaches are not purely contractual. Far from a simple commercial contract, the Sovereign Guarantee was provided to Karkey by Pakistan as security in place of a letter of credit precisely because it put the weight of the State behind Lakhra's financial obligation (and thus served as a higher form of security). It is nonsensical to assert that a sovereign guarantee is purely contractual: by definition, a sovereign guarantee is an exercise of sovereign power. No private company can issue a sovereign guarantee.[170]

205.  Karkey also rejects Pakistan's attempts to avoid BIT liability by disclaiming responsibility for the acts of Lakhra and PEPCO. According to Karkey, the record and Pakistan's own witnesses confirm that these entities were squarely under the direction and control of Pakistan's MoWP. In addition to owning approximately 99.99% of the shares in Lakhra, MoWP *inter alia*:[171]

- Advertised the terms of Lakhra's Contract and approved Karkey's Bid;

- Directed Lakhra to enter into the Contract, even though it was apparent that Lakhra lacked the financial resources or financial standing to fulfil the obligations;

- Determined Lakhra's obligations under the Contract;

- Through PEPCO, deputized Lakhra with authority to sign the Contract with Karkey;

- Through PEPCO and the Ministry of Finance, released the Advance Payment to Karkey;

- Controlled Lakhra's board throughout the life of the Contract; etc.

206.  Karkey concludes that Lakhra's acts are attributable to Pakistan, as there can be no dispute that Lakhra acted at the behest and whim of MOWP, in the exercise of the latter's sovereign powers. Although Pakistan denied responsibility for the acts of PEPCO at the Hearing, it had already conceded in its Counter-Memorial that PEPCO is a "Government department," and it failed to offer any rebuttal of the evidence on that point in Karkey's Reply.[172]

---

[170] Karkey's Post-Hearing Brief, ¶ 139.

[171] Karkey's Post-Hearing Brief, ¶ 143.

[172] Karkey's Post-Hearing Brief, ¶¶ 144-145.

d.   *The Supreme Court Judgment Violated Pakistan's BIT Obligations*

207.   Karkey submits that it has established the following in relation to the Supreme Court's RPP proceedings and RPP Judgment:

- The Supreme Court disregarded its own procedural rules, which require allegations to be supported by a sworn affidavit, to protect due process and prevent unfounded accusations;[173]

- The Supreme Court unconstitutionally usurped Executive authority in reversing the RPP policy;[174]

- The proceedings were driven by the political agenda of Mr. Hayat and Mr. Asif, who were afforded over half a dozen[175] opportunities to present oral argument, while Karkey was limited to one (spread over parts of two hearings);[176]

- The Court accepted Mr. Hayat's plainly erroneous conclusion that Pakistan had sufficient generation capacity, despite PEPCO's demonstration that Mr. Hayat had mistakenly "*compar[ed] Power (MW) with Energy (MkWh), which are two different things;*"[177]

- The Court misunderstood the structure of the RPP Contracts — pursuant to which the RPP sponsor guaranteed it would make available a certain generation capacity, not a certain output — in finding that Karkey was not producing at the contractual rate;[178]

- The Court imposed the arbitrary requirement of a reserve price on the procurement of electricity, a requirement entirely unsupported by Pakistani law;[179]

---

[173] RA-177, Supreme Court Rules, Order XXV ¶ 6, Order XVII, ¶ 4.

[174] C-029, ¶¶ 13, 80.

[175] R-448.

[176] C-029, ¶¶ 2–3, 11–12, 85.

[177] C-264, ¶ G.

[178] C-029, ¶ 59.

[179] C-029, ¶ 19

- The Court imposed the same liability on all the RPP sponsors, despite material differences between the procurement, financing, and operational statuses of the different RPP programs;[180]

- The Court declared all RPP contracts to be both "*void* ab initio" and "*rescinded forthwith*," even though such holdings are mutually inconsistent under Pakistani law;[181]

- Destroying any presumption of innocence, the Court held that Karkey, like all other RPP sponsors, was "prima facie*, involved in corruption and corrupt practices,*" and subject to prosecution by NAB, despite the lack of any evidence of corruption by Karkey;[182]

- The Court eviscerated Karkey's rights without any right to appeal.[183]  Lower courts in Pakistan comply with the Supreme Court's orders, no matter how defective — as the decisions of the Sindh High Court have demonstrated; and

- Karkey's position regarding the foregoing is supported by Pakistan's own submissions to the Supreme Court — not only those filed during the RPP proceedings, but also the Civil Review Petitions that were filed after the Judgment was rendered. Such petitions demonstrate the unlawfulness of the Judgment, and confirm the validity of Karkey's RSC.

208. Karkey submits that the Supreme Court's arbitrary, unreasonable, and politically-driven factual findings and legal conclusions, together with its failure to follow its own procedural rules, violated Karkey's BIT rights (as did Pakistan's subsequent actions purportedly taken to enforce such judgment).[184]

209. Moreover, according to Karkey, ICSID tribunals have recognized that "*the substance of a decision may be relevant in the sense that a breach of the standard [for denial of justice] can*

---

[180] C-029, ¶ 84

[181] C-029, ¶ 84; Zafar, First Expert Report, ¶ 177; Zafar, Second Expert Report, ¶ 152.

[182] C-029, ¶ 84.

[183] Karim, First Expert Report, ¶ 218 ("*Karkey also knew or ought to have known that a decision under Article 184(3) is not subject to appeal*").

[184] Karkey's Post-Hearing Brief, ¶ 148.  *See also* Karkey's Reply, ¶¶ 288, 779.

*also be found when the decision is so patently arbitrary, unjust or idiosyncratic that it demonstrates bad faith.*"[185] Similarly, States may breach a BIT when their courts administer justice in a seriously inadequate way and when there is a clear and malicious misapplication of the law.[186]

210. Karkey contends that the Pakistan Contract Act establishes a clear distinction between an agreement that was never enforceable under the law, and is therefore void *ab initio*, and an enforceable contract that becomes void and may therefore be rescinded. According to Karkey, only an agreement which is unenforceable from its inception may be declared void *ab initio*. Only a contract which is recognized as validly formed and enforceable by law is capable of rescission. A judgment may not in the same breath declare an agreement to be unenforceable from inception and find it to be a valid contract capable of being rescinded. The Supreme Court's decision to declare Karkey's RSC an unenforceable nullity, but at the same time recognize the RSC as a valid contract capable of rescission, constitutes arbitrary and unreasonable State action and a denial of justice under the BIT.[187]

211. Karkey submits that the Supreme Court purported to invalidate Karkey's RSC on the basis of Pakistan's procurement laws but failed to give effect to one of the most fundamental principles embodied in the PPRA Rules: the principle that investment treaties and international law do not allow a State to preclude an investor from seeking protection under the BIT on the ground that its own actions are illegal under its own law.[188] The Supreme Court based its holdings on the purported failure of Pakistan's own officials to conduct sufficient preliminary studies and to obtain the necessary internal approvals, as well as the changes made to the RSCs once Pakistan determined that it would be unable to secure the promised letters of credit.[189]

212. According to Karkey, Pakistan sought to rely on what it claimed to be an absence of any documented record of objection by Karkey to the procedures of the Supreme Court, asking "*when you consider the evidence you have before you from Karkey about the alleged denial of due*

---

[185] Karkey's Post-Hearing Brief, ¶ 151, quoting RA-004, *Rumeli Telekom A.S. and Telsim Mobil Telekomik A.S.Y.O.N Hizmetleri A.S. v Republic of Kazakhstan*, (ICSID Case No. ARB/05/16), Award, 29 July 2008, ¶ 653

[186] Karkey's Post-Hearing Brief, ¶ 151.

[187] Karkey's Post-Hearing Brief, ¶ 153.

[188] Karkey's Post-Hearing Brief, ¶ 155.

[189] Karkey's Post-Hearing Brief, ¶ 155.

*process in the courts, [ask] if Karkey truly believed that these were serious due process failings, why did it never raise them before the Supreme Court itself?*" However, any expectation that Karkey would have voiced such complaints before the Supreme Court is unreasonable in view of the well-documented threats of arrest, prosecution, and contempt of court by the Supreme Court.[190]

> e. *Pakistan's Actions in Alleged Implementation of the Judgment Also Breached Pakistan's BIT Obligations*

213. Karkey submits that the majority of Pakistan's actions giving rise to its BIT violations are undisputed. Thus, Pakistan does not dispute that NAB forcibly detained Karkey's Vessels despite lacking any evidence of corruption, and despite its prior agreement to release the Vessels. Nor does Pakistan dispute that the Supreme Court openly controlled NAB's purportedly independent corruption investigation and allowed the politician Mr. Hayat to intervene in NAB's inquiry to re-calculate Pakistan's payment demands. It is similarly undisputed that the GoP instructed Lakhra to initiate an admiralty action in the Sindh High Court seeking the same US$128 million payment by Karkey that had been demanded by Mr. Hayat. It is also undisputed that it took Pakistan over seven months to comply with this Tribunal's provisional measures order to release the *Kaya Bey*.[191]

214. Karkey rejects Pakistan's only defence of its actions that it is excused from responsibility for any action taken in furtherance of the Judgment. However, a State cannot avoid liability under a BIT by claiming its actions were lawful under domestic law, especially given that, here, the Judgment was itself a violation of international law.[192]

215. According to Karkey, NAB's detention of the Vessels violated Pakistan's obligations under the BIT. First, NAB had no authority to detain the Vessels. The only statutory authority ever invoked by NAB to justify its physical detention of Karkey's Vessels is Section 23 of the NAO. But Section 23 does not authorize physical detention, as admitted by Pakistan's own expert Mr. Karim. In *Deutsche Bank AG v. Sri Lanka*, a State organ issued an order to suspend an investor's contract, without providing a legal basis for doing so. The State's *ex post* attempts at justification were rejected by the tribunal because domestic law did not give the State organ this authority.

---

[190] Karkey's Post-Hearing Brief, ¶¶ 161-162.

[191] Karkey's Post-Hearing Brief, ¶ 171. *See also*, Karkey's Counter-Memorial, ¶ 750.

[192] Karkey's Post-Hearing Brief, ¶ 172.

As in *Deutsche Bank*, the relevant State entity (here, NAB) acted in excess of its powers. Accordingly, NAB violated Karkey's rights under the BIT. This violation was all the more egregious because NAB's lack of authority to detain the ships was brought to the attention of both NAB and the Supreme Court by Pakistan's Attorney General and NAB's own Prosecutor General.[193]

216.   Karkey further submits that NAB acted arbitrarily in repudiating the Deed. When Pakistan, through NAB and Lakhra, entered into the Deed with Karkey and agreed to release the Vessels, it represented that "*all actions contemplated herein have been duly authorized by all requisite corporate, governmental or legal action,*" and that the "*Deed constitutes valid and legally binding obligations of each Party, enforceable against it.*" In accordance with the express terms of the Deed, NAB proceeded to issue the No Objection Certificate, which concluded NAB's inquiry into Karkey's project and affirmed that "*Karkey has no liability under the National Accountability Ordinance, 1999 and there remains no basis or evidence for proceedings by NAB or any other entity against Karkey and/or its project investment [...].*"[194] At the Hearing, Mr. Karim agreed that NAB has exclusive authority for the investigation and enforcement of the NAO but he could not explain why the Supreme Court had allowed Mr. Hayat to overrule NAB's conclusions in the Deed and No Objection Certificate. The Supreme Court likewise gave no explanation for its repudiation of the Deed, nor did it explain pursuant to what authority Mr. Hayat was permitted to recalculate the amount purportedly owed by Karkey. Rather than provide any legal reasoning to support its repudiation of the Deed – which was a fully enforceable obligation entered into by Pakistan – and its implicit rejection of the No Objection Certificate, the Supreme Court instead threatened personal liability by the NAB Chairman in the event that NAB were unable to effect recovery of the amount demanded by Mr. Hayat.[195] Karkey concludes that the repudiation of the Deed on the "application" of Mr. Hayat was part of a pattern of arbitrary and unreasonable demands by Pakistan for payment by Karkey.[196]

217.   In addition, according to Karkey, Pakistan's initiation of proceedings in the Sindh High Court, through Lakhra, violated Pakistan's obligations under the BIT. Karkey submits that, apparently recognizing the illegitimacy of its actions in relation to the Supreme Court Judgment, NAB

---

[193] Karkey's Post-Hearing Brief, ¶ 178.

[194] Karkey's Post-Hearing Brief, ¶ 181.

[195] Karkey's Post-Hearing Brief, ¶ 186.

[196] Karkey's Post-Hearing Brief, ¶ 187.

resorted to a new tactic: it instructed Lakhra to file an admiralty suit to secure an unlawful *ex parte* arrest of Karkey's Vessels.  Pakistan, through Lakhra, asked that the Sindh High Court "*refer to and rely upon the judgment of the Hon'ble Supreme Court of Pakistan*." The Sindh High Court obliged, and proceeded to treat the Lakhra's suit as an action to enforce the Judgment, not as a new case based on allegations that would need to be proven. Given that the Judgment was not subject to appeal and that neither the Sindh High Court nor the Accountability Court has authority to reject the Supreme Court's holdings, as a practical matter Pakistan's assertion that "*local proceedings remain ongoing*" is meaningless. Pakistan therefore cannot argue that there is no denial of justice by invoking the pending proceedings. The Sindh High Court's *ex parte* arrest order – based on an admittedly false affidavit filed by Lakhra – and its disregard of the RSC's mandatory LCIA arbitration clause also violated Karkey's right to fair and equitable treatment, and its right to freedom from arbitrary and unreasonable measures under the BIT.[197]

f.   *Pakistan's Obstruction of the Tribunal's Provisional Measures Order Violated Pakistan's Obligations under the BIT*

218.   According to Karkey, the gravity of the Supreme Court's influence and intimidation is further demonstrated by Pakistan's failure to abide by this Tribunal's Order on Provisional Measures for seven months after its issuance, despite the Sindh High Court's recognition of the consequences of doing so. NAB told the Sindh High Court that it must comply with the Supreme Court's order rather than with the order of this Tribunal, and Pakistan's arbitration counsel openly acknowledged that government officials would not implement this Tribunal's decision out of fear of retaliation by the Supreme Court. As a result, Pakistan and the Sindh High Court ignored this Tribunal's order to release the *Kaya Bey*, with the Sindh High Court even recognizing that its order to continue the detention would expose Pakistan to liability under international law.[198]

219.   From the Supreme Court's RPP proceedings to the Sindh High Court proceedings and from the Accountability Court proceedings to the ICSID proceedings, Karkey argues that Pakistan has consistently denied Karkey justice and fair and equitable treatment, and has engaged in a concerted and calculated effort to deny Karkey any forum in which to vindicate its rights under

---

[197] Karkey's Post-Hearing Brief, ¶¶ 190-193.

[198] Karkey's Post-Hearing Brief, ¶¶ 194-195.

the BIT. That, in itself and independently, constitutes a violation of Pakistan's fair and equitable treatment and full protection and security obligations.[199]

**(4) Damages**

220. In this arbitration, Karkey claims for damages resulting from the Measures, which are defined at paragraph 610 of its Memorial as follows:

> *[...] the injuries suffered by Karkey were caused by the internationally wrongful acts of Pakistan (the 'Measures'), which include, inter alia:[i] Lakhra's failure to comply with the terms of the Contract (including its obligations to pay Rental Service Fees, to cover confirmation charges, to pay for fuel payments, and to pay termination charges and expenses upon termination of the Contract on 30 March 2012); [ii] Pakistan's failure to honor the Sovereign Guarantee; [iii] the Supreme Court's arbitrary and unfounded presumption that Karkey participated in corruption; [iv] the denial of justice committed by the Supreme Court in purporting to invalidate the Contract on the basis of nothing more than a presumption of wrongdoing, which was contrary to the evidence before the Court; [v]    NAB's investigation of Karkey, its arbitrary demands for payment from Karkey, and its commencement of criminal proceedings against Karkey; [vi] Pakistan's detention and expropriation of Karkey's ships; [vii] Pakistan's harassment of Karkey and its personnel, including through actions by Lakhra, NAB, and the Sindh High Court in connection with proceedings before the latter court.*

a.   *Key Legal Issues and Standards*

*(a.1) Ex Post Approach*

221. Karkey submits that there are two aspects of its damages claim with respect to which the Tribunal should adopt an *ex post* approach: (1) the valuation date, and (2) the various inputs required for modelling Karkey's loss. The consequence of an *ex post* valuation date of 30 June 2015 (as a proxy for present day) is that Karkey's historical losses are not discounted prior to that date; and the consequence of using *ex post* information for the inputs into the Discounted cash flow ("DCF") models used to calculate Karkey's damages is, simply put, that such inputs are rendered more accurate.[200]

222. According to Karkey, the use of an *ex post* analysis turns on whether or not such approach is required in the circumstances by the applicable standard of compensation. Pakistan does not dispute that the applicable standard is that set out in the seminal *Chorzow Factory* judgment. In

---

[199] Karkey's Post-Hearing Brief, ¶ 195.

[200] Karkey's Post-Hearing Brief, ¶ 197.

this regard, it is notable that *Chorzow Factory* itself recognized that an *ex post* approach might be required to fulfil the standard, stating that in the case of unlawful expropriation, compensation is not necessarily limited to the value of the undertaking at the moment of dispossession, plus interest to the day of payment.[201]

223. The Claimant states that the *Chorzow Factory* standard was also important in the *ADC v. Hungary* tribunal's analysis, leading the tribunal in that case to choose the date of the award for valuation. It is Karkey's position that the circumstances that justified an *ex post* analysis in *ADC* are clearly present here.[202] Further, *ex post* information provides the Tribunal with the best possible opportunity to award damages that are reasonably certain. In the present case, if *ex ante* information were used in preference to *ex post* information that presents the most accurate picture of the damages resulting from the Measures, the quantum of loss would be less. The Claimant argues that the Tribunal should therefore rely on the *ex post* information rather than the *ex ante* information; otherwise, it would not be compensating Karkey in accordance with the *Chorzow Factory* standard.[203]

224. Karkey also relies on the *Yukos* decision, in which the tribunal assessed damages as of the date of the award and held that investors must enjoy the benefit of unanticipated events that increase the value of an asset. The *Yukos* tribunal also emphasized the link between restitution and compensation under the *Chorzow Factory* standard, explaining that if restitution were possible, it would occur at the date of the award. Accordingly, compensation in lieu of restitution must also be assessed at the date of the award.[204]

225. The *Kaya Bey* and *Alican Bey* damages claims are distinct, and they will therefore be dealt separately below.

226. Karkey submits that its claim in relation to the *Kaya Bey* is for lost profits, and is not at all an expropriation claim. The Claimant states that Pakistan's arguments that rely upon expropriation

---

[201] Karkey's Post-Hearing Brief, ¶ 198, referencing CA-070, Chorzow Factory, Judgment of 13 September 1928, PCIJ, ser. A, No. 17, ("*Chorzow Factory*").

[202] Karkey's Post-Hearing Brief, ¶ 199.

[203] Karkey's Post-Hearing Brief, ¶ 200.

[204] Karkey's Post-Hearing Brief, ¶ 202 referencing CA-205, *Yukos Universal Ltd. (Isle of Man) v. Russia*, UNCITRAL, PCA Case No. AA 227, Final Award, 18 July 2014, ("*Yukos*").

jurisprudence are therefore simply inapposite.[205] Moreover, Pakistan's damage expert accepted that Iraq suffered from an electricity supply shortage, and thus, "*when the* Kaya Bey *became available, Iraq was happy to take it.*" Accordingly, there is no need to discount for uncertainty and risk, and using an *ex ante* valuation would be inappropriate.[206]

227.    Moreover, the Claimant asserts that because Karkey's claim in relation to the *Alican Bey* is one that depends on projecting lost profits, the same principles discussed in relation to the *Kaya Bey* above are applicable. The rationale for using an earlier valuation date based on the need to discount for uncertainty has dissipated with respect to the historical lost profits. As Mr. Haberman accepted in cross-examination, it is clear that both *Alican Bey* and *Kaya Bey* would have been deployed to Iraq, where there has been an ever-increasing demand for rental power. Karkey accepts that future lost profits must be discounted. However, no discount at all is warranted in relation to historical cash flows and, thus, neither is an *ex ante* valuation date.[207]

*(a.2) The Termination Charge is Enforceable*

228.    Karkey submits, relying on the United Kingdom Supreme Court decision in *Cavendish*,[208] that a Termination Charge of US$165,200,000 to protect Karkey's legitimate interest/expectation that it would earn almost US$565,000,000 during the course of the RSC cannot be unreasonable, particularly given that Pakistan itself proposed the Termination Charge provision, and that the agreement was entered into by informed and legally advised parties at arm's length. Moreover, Section 74 of the Pakistani Contract Act permits contractual penalties.[209]

*(a.3) Karkey's Right to Claim on Behalf of its Subsidiaries*

229.    Karkey submits that it is entitled to damages arising from Pakistan's treatment of Karkey's subsidiaries, including Karpak and Karpowership. Pakistan does not dispute that "*[a]s a matter of international law, Karkey is entitled to make a claim in relation to its shareholding in*

---

[205] Karkey's Post-Hearing Brief, ¶ 206.

[206] Karkey's Post-Hearing Brief, ¶ 207 quoting Tr. Day 6, 1605:19-20.

[207] Karkey's Post-Hearing Brief, ¶ 210.

[208] CA-348, *Cavendish Square Holding BV (Appellant) v. Talal El Makdessi (Respondent); ParkingEye Limited (respondent) v. Beavis (Appellant)* [2015] UKSC 67 *("Cavendish")*.

[209] Karkey's Post-Hearing Brief, ¶¶ 215-217.

*Karpak.*"[210] The same must apply to claims implicating Karkey's other subsidiaries, such as Karpower International B.V. As the *Siemens v. Argentina* tribunal noted in its Decision on Jurisdiction, "*as regards ICSID case law dealing with the issue of the right of shareholders to bring a claim before an arbitral tribunal, the decisions of arbitral tribunals have been consistent in deciding in favor of such right of shareholders.*"[211]

230.   Instead, Pakistan argues that Karkey "*...is not entitled to do so in relation to the contractual rights of Karpak.*"[212] Karkey contends that on Pakistan's interpretation, a foreign investor (such as Karkey) may "invest" in shares of a local company (Karpak or Karpowership), and has a right to present claims in relation to such shareholding, but if the local company's *contractual* rights — which, depending on the particular company, may constitute its only valuable "assets" — are impaired, the investor may *not* claim damages for the impairment. The Claimant argues that Pakistan's argument is untenable as a matter of logic, and is also contradicted by its own assertion that "*[a]s a matter of international law, a shareholder: [...] may assert claims based on the host-State's treatment of the contracts and assets of the company in which it holds shares, but 'only to the extent that those claims are related to the effect that the measures taken against the company's assets have on the value of the claimant's shares in such company.'*"[213] Pakistan is arguing against a tide of investment treaty jurisprudence that takes a flexible approach to the claims of shareholders.[214]

   *(a.4) Causation*

231.   According to Karkey, Pakistan sought to argue at the Hearing that foreseeability is a necessary element of causation. The Claimant argues that the source that Pakistan's counsel relied upon in doing so, the ILC's Draft Articles on State Responsibility and their commentary, make clear that it is not a necessary element. In any event, the Tribunal is not constrained by a strict formulation or standard of causation. Karkey does not dispute that there must be a causal link between the Measures and its loss; however, it argues that if the Tribunal were to impose causation

---

[210] Karkey's Post-Hearing Brief, ¶ 218 quoting Pakistan's Rejoinder, ¶ 1369. According to Karkey, Pakistan does not address the issue as to other subsidiaries, such as Karpowership, but the issues apply equally to all of Karkey's subsidiaries.

[211] Karkey's Post-Hearing Brief, ¶ 218 quoting RA-016, *Siemens AG v Argentine Republic*, (ICSID Case No. ARB/02/8), Decision on Jurisdiction, 3 August 2004, ¶ 142.

[212] Pakistan's Rejoinder, ¶ 1369 (emphasis added).

[213] Pakistan's Rejoinder, ¶ 1370 (emphasis in original; internal citations omitted).

[214] Karkey's Post-Hearing Brief, ¶ 219.

requirements that are unnecessarily inflexible or onerous, it would run the risk identified in the *Naulilaa Case* that the victim would "*bear the burden of damage.*"[215]

*(a.5) Reasonable Certainty and Differentiated Standard for Existence vs. Extent of Loss*

232. Karkey submits that the reasonable certainty standard is the predominant standard for hypothetical losses (e.g. the projection of lost profits that would have been earned but for the breach) and has been applied in that context again and again by tribunals.[216]

233. Moreover, Karkey asserts that tribunals and adjudicators have recognized that a lesser standard applies with respect to the extent of loss, once the existence of loss has been established. Pakistan disputes this, mistakenly citing the award in *SPP v. Egypt*, where the tribunal explicitly stated that "*it is well settled that the fact that damages cannot be assessed with certainty is no reason not to award damages when a loss has been incurred.*" Karkey submits that this principle has been recognized by several other tribunals (*i.e.* in *Vivendi v. Argentina*, *Tecmed v. Mexico* and in *Petrobart v. the Kyrgyz Republic*).[217]

b. *Karkey's Heads of Loss, and Key Factual and Quantum Issues*

234. Karkey's damages claim, updated to reflect its submissions at the Hearing and in its Post-Hearing Brief, is reflected in the table below (with the figures expressed in US$ million).[218]

---

[215] Karkey's Post-Hearing Brief, ¶¶ 221-222; CA-300, *Naulilaa Case*, Collection of Arbitral Awards (*Portugal v. Germany*) (31 July 1928)

[216] Karkey's Post-Hearing Brief, ¶ 223 citing RA-136, *Mobil Investments Canada Inc. and Murphy Oil Corporation v. Canada* (ICSID Case No. ARB(AF)/07/4), Decision on Liability and on Principles of Quantum, 22 May 2012 ("*Mobil v. Canada*"), ¶ 474. Karkey submits that the standard for damages resulting from *actual* costs and losses, for example the *Kaya Bey* repair costs; and the cost increase claims (insurance, shipyard costs and liquidated damages payable under the Lebanon contract (NAV-050)) is typically held to be the "preponderance of the evidence" or "balance of probabilities" (*see, e.g.*, RA-113, *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, (ICSID Case No. ARB(AF)/09/1),Award, 22 September 2014, ¶ 685). However, it is Karkey's position that all of its losses are in fact reasonably certain. Karkey's Post-Hearing Brief, footnote 580.

[217] Karkey's Post-Hearing Brief, ¶ 225.

[218] Karkey's Post-Hearing Brief, ¶ 263. *See* also Tr. Day 10, 2905; *See* also Tables 1 to 7 in the presentation accompanying Karkey's damages closing (CX-009).

| No.* | Category Name | Damages (not including interest) | Interest Option A (Sovereign Spread) | Interest Option B (NAB Rates) |
|------|---------------|----------------------------------|--------------------------------------|-------------------------------|
| | | | *Interest to  30 June 2015* | |
| 1.a. | Broadly Agreed Damages - Termination Charges & Unpaid Invoices | 224.6 | 105.9 | 98.4 |
| 1.b. | Broadly Agreed Damages - Other | 33.5 | 5.4 | 6.8 |
| 2. | Kaya Bey Damages | 240.1 | 16.9 | 23.5 |
| 3. | Alican Bey Expropriation** | 445.7 | 26.6 | 37.6 |
| 4. | Construction Delays | 308.7 | 0 | 0 |
| 5.a. | Miscellaneous - Wasted Costs | 23.9 | 6.1 | 7.0 |
| 5.b. | Miscellaneous - Actual and Expected Repairs to Kaya Bey*** | 27.3 | 0 | 0 |
| 5.c. | Miscellaneous - Geothermal | 178.4 | 0 | 0 |
| | **TOTAL** | **1,482.2** | **160.9** | **173.3** |

*Corresponding to the amounts in Claimant's closing presentation.

**Assuming a 10% WACC and 3 months of time for transfer between contracts reduces Damages by US$ 25.9 million but does not affect interest on this loss.

***Only includes amounts incurred after 30 June 2015 that are not already included in the "Kaya Bey Damages" category. Therefore no interest is applied to these costs.

*Source:* Karkey's Post-Hearing Brief, ¶ 263

235. The Claimant's damages claim is summarized below.

### (b.1) Unpaid Invoices and Termination Charges

236. Karkey submits that it is owed US$57,400,000 in unpaid invoices under the RSC (US$47,702,505 in outstanding Monthly Services Fees, and US$9,736,297 in unpaid fuel invoices). Pakistan and Mr. Haberman seek to reduce that amount to US$28,923,000.[219] A large portion of the difference between the Parties' experts — US$18,000,000 — is attributable to Mr. Haberman's exclusion of amounts owing to Karpak.[220] According to Karkey, for the reasons summarized under Section IV(A)(4)(a.3) above, this deduction is unwarranted as a matter of law.[221]

237. Karkey claims US$165.2 million in Termination Charges pursuant to Clause 4.6(b) of the RSC.

### (b.2) Transport and Mobilization Costs under Clause 4.6(b) of the Contract

238. At the Hearing, Karkey submitted that a reasonable approximation of the transport and mobilization costs under Clause 4.6(b) of the Contract is US$2,000,000.[222] Clause 4.6(b) of the RSC provided:

---

[219] Haberman, Second Expert Report, ¶ 3.16.

[220] Karkey's Post-Hearing Brief, ¶ 226 citing Haberman, Second Expert Report, ¶ 3.16.

[221] Karkey's Post-Hearing Brief, ¶ 226.

[222] CX-009, Table 1, p. 4. Karkey's Post-Hearing Brief, ¶ 230.

> *In the event the Contract is terminated by SELLER before the Contract designated expiry date, due to BUYER default, the BUYER shall pay … mobilization and transport charges to return the Equipment to SELLER's designated depot and also will be responsible for the exportation of the aforementioned Equipment from Pakistan, for which time shall be of the essence.*

239. Karkey submits that it was never afforded the opportunity to designate a depot in accordance with Clause 4.6(b), and thus the US$566,000 in transport costs that Mr. Haberman has identified — which are the cost of transporting the *Kaya Bey* to Dubai (which likely would not have been Karkey's "designated depot") — do not necessarily reflect the costs that Clause 4.6(b) was designed to cover. Similarly, much of Karkey's "Equipment"[223] has never been returned to it. In the circumstances, Karkey's claim of US$2,000,000 is entirely reasonable, and even conservative.[224]

### (b.3) The Appropriate WACC

240. Karkey's expert, Mr. Kaczmarek, calculates a Weighted Average Cost of Capital (WACC) of 9% for Karkey's Powerships.[225]

241. According to Karkey, Mr. Haberman, the Respondent's Expert, made several important concessions under cross examination that reveal the flaws in his calculation of WACC.[226]  Mr. Haberman's WACC is also contradicted by the WACC calculated for Karkey by Fichtner Management Consulting, a third party engaged by Karkey's lenders, which was 10.7% (consistent with Mr. Kaczmarek's WACC and other benchmarks introduced in this case).[227] Karkey argues that Mr. Haberman's attempts to deflect this were unavailing. At the Hearing, Mr. Haberman attempted to confuse the issue by suggesting that the mix of debt and equity in the capital structure, or gearing, assumed by Fichtner were wrong.[228]  Karkey submits that Mr. Haberman's conclusion and calculation are simply erroneous. He starts with the unconvincing premise that Fichtner miscalculated the WACC by more than 50%. On re-direct, Mr. Haberman

---

[223] The term "Equipment" is defined under Clause 2.A(d) of the RSC.  The "Equipment" was on the Powerships and thus much of it remains in Pakistan on the *Alican Bey*. Karkey's Post-Hearing Brief, footnote 597.

[224] Karkey's Post-Hearing Brief, ¶ 231.

[225] Kaczmarek, Second Expert Report, ¶ 153.

[226] Karkey's Post-Hearing Brief, ¶ 232.

[227] *See, e.g.*, HAB-100.

[228] Tr. Day 6, 1750:8.

further exacerbated the confusion by purporting to recalculate Fichtner's WACC using a different gearing.[229] This was miscalculated, however, as Mr. Haberman's earlier testimony indicated that one cannot simply change the mix of debt and equity without simultaneously changing the cost of equity.[230] Performing the recalculation properly would require reducing the beta, which in turn would reduce the cost of equity — a significantly more involved calculation than that which Mr. Haberman performed on re-direct.[231] Mr. Haberman's calculation on re-direct therefore overstated the resulting WACC. Karkey states that, performed correctly,[232] Mr. Haberman's re-calculation would have validated the Fichtner WACC.[233]

### (b.4) The Kaya Bey and Alican Bey Losses

242.   Karkey submits that it is owed US$240.1 million for losses related to the *Kaya Bey* and US$445.7 million for losses related to the *Alican Bey*.[234]

243.   With respect to the *Kaya Bey*, Karkey submits that Mr. Haberman had earlier identified several adjustments to be made to Mr. Kaczmarek's modelling. According to Karkey, as it explained at the Hearing and as summarized in a table accompanying its closing statement,[235] several of those adjustments were shown to be unwarranted in light of the concessions Mr. Haberman made at the hearing. Specifically, Karkey asserts that Mr. Haberman conceded that:[236]

---

[229] Karkey's Post-Hearing Brief ¶ 233, citing Tr. Day 6, 1827.

[230] Karkey's Post-Hearing Brief ¶ 233. Mr. Haberman recognizes that reducing the proportion of debt would reduce the cost of equity.  *See* Tr. Day 6, 1735:1.

[231] These calculations are explained in detail in both Mr. Kaczmarek's and Mr. Haberman's reports (*see* Kaczmarek, First Expert Report, ¶ 199 and Haberman, First Expert Report, Appendix M).

[232] *I.e.* Taking the following steps: (1) calculating the unlevered beta implied by Fichtner's cost of equity and Mr. Haberman's assumptions (Unlevered Beta = 1); (2) recalculating a levered beta using Mr. Haberman's assumed mix of debt and equity (25% / 75%) (Levered Beta = 1.27); (3) recalculating a new cost of equity using the Levered Beta implied by Haberman's debt / equity split (Cost of equity = 9.3%); (4) recalculating a WACC using the 9.3% cost of equity (WACC = 8.9%). Karkey's Post-Hearing Brief, ¶ 233 and footnote 607.

[233] Karkey's Post-Hearing Brief, ¶ 233.

[234] *See* tables 2 and 3 in the presentation accompanying Karkey's damages closing (CX-009).

[235] CX-009, Table 2, p.19 (explaining that none of the adjustments that Mr. Haberman had originally proposed are justified); Tr. Day 10, 2894:3–2898:1.

[236] Karkey's Post-Hearing Brief, ¶ 235.

- it was reasonable to assume, based on the available evidence,[237] that the *Kaya Bey* would take only *one month* to redeploy to Iraq[238] (rather than the eight months that he had modelled);

- the site installation costs of US$15,000,000 that he had used in his calculations were too high;[239] and

- because he had incorrectly calculated the unit price under the Iraq I contract, his criticism that Mr. Kaczmarek had cherry-picked the highest priced contract was wrong.[240]

244.    Karkey submits that Mr. Haberman's remaining complaints regarding Mr. Kaczmarek's modelling relate to the retrofitting of turbochargers and tax optimization, both of which are addressed separately below.[241]

245.    With respect to the *Alican Bey*, Karkey argues that replacement value has no role to play in the valuation of the *Alican Bey*, and that the Tribunal should instead apply Mr. Kaczmarek's method of valuation, which uses only projected revenue. The validity of Mr. Haberman's model was called into question by his concession that *ex post* information indicating market growth means that the *Alican Bey* is "*more valuable today.*" The Claimant states that this concession implicitly recognizes that a static replacement value will not adequately compensate Karkey for the increased value of the *Alican Bey*.[242]

246.    According to Karkey, in the event that the Tribunal were to prefer Mr. Haberman's proposed method, a crucial adjustment would be required.[243] It argues that Mr. Haberman unrealistically assumes that Karkey will have monetized an award (in order to purchase a replacement ship for the *Alican Bey*) by August 2016. Several factors make that date unrealistic. The Claimant states, for example, that if an award favourable to Karkey were issued, Pakistan could seek annulment

---

[237] *See, e.g.*, C-050 (CONFIDENTIAL), C-052 (CONFIDENTIAL).

[238] Tr. 1619:22. As already noted, Mr. Haberman also conceded that "*Iraq was prepared to take these ships or wanted these ships in October 2012.*" (Tr. Day 6, 1612:5).

[239] Tr. Day 6, 1801:10.

[240] Tr. Day 6, 1690:7.

[241] Karkey's Post-Hearing Brief, ¶ 236.

[242] Karkey's Post-Hearing Brief, ¶ 237, citing Tr. Day 6, 1654:3.

[243] Karkey's Post-Hearing Brief, ¶ 237.

of the award, which could signify a delay of over two years in the collection of the relevant Award proceeds.[244] The Tribunal must take into account this factor, as well as the myriad other contingencies that could delay receipt by Karkey of the relevant funds.[245]

247.  Karkey accepts that one adjustment to Mr. Kaczmarek's modelling regarding the *Alican Bey* is required: that the Sri Lanka contract originally used as an input should be replaced with Mr. Kaczmarek's "New Country" contract, as it more accurately matches the terms of Karkey's current contracts.[246] As with the *Kaya Bey*, two inputs remain in dispute — retrofitting of turbochargers and tax optimization.[247]

*(b.5) Cash Flow Impairment and Financial Constraint*

248.  According to Karkey, at the Hearing, Mr. Haberman accepted that the loss of revenue under the RSC had a substantial impact on Karkey's operations, agreeing that such impact was approximately 60% of Karkey's operating income.[248] Mr. Haberman further accepted that for a company with Karkey's business model, it could reasonably be expected that operating income would be reinvested into growth, such as ship-building.[249] Mr. Colak, Karkey's Chief Financial Officer,[250] gave a detailed account of the negative impact of the Measures on Karkey's relationship with its lenders,[251] explaining that the drastic loss of assets via the detention of the Vessels, as well as its loss of the revenue under the RSC, severely impacted its ability to provide security for financing.[252]

---

[244] Karkey's Post-Hearing Brief, ¶ 237.

[245] Karkey's Post-Hearing Brief, ¶ 238.

[246] *I.e.*, the Ghana contracts (C-419, C-711, C-420 and C-710), the Indonesian contract (C-715, C-716). The impact of this substitution has been calculated for the Tribunal in table 3 of Karkey's closing presentation on damages (*see* p.22 of CX-009, the impact is $11,500,000). Karkey's Post-Hearing Brief, ¶ 239 and footnote 618.

[247] Karkey's Post-Hearing Brief, ¶¶ 239-240.

[248] Karkey's Post-Hearing Brief, ¶ 241, citing Tr. Day 6, 1808:2.

[249] Karkey's Post-Hearing Brief, ¶ 241, citing Tr. Day 6, 1811:17–1812:3.

[250] Karkey's Post-Hearing Brief, ¶ 241.

[251] Tr. Day 6, 1843:4–1852:20.

[252] *See, e.g.*, Tr. Day 6, 1844:8–21: "*At that time, the Pakistani assets was about one-third of our total assets, and the cash flow kept coming from Pakistan was almost half of our revenues, and the amount the Pakistan assets were half of our equity at that time and ratio, so making an impairment on those assets means that we are losing half our equity and one-third of our all assets, and that it was a very bad impact financially for our group, actually*". *See also,* Karkey's Post-Hearing Brief, ¶ 244.

249. Karkey submits that, to the extent it remains necessary given Mr. Haberman's concessions, the authorities on which Pakistan relies in this context can be distinguished. Pakistan highlights the NAFTA case of *S.D. Myers v. Canada*[253] as "*perhaps one of the most relevant cases,*"[254] but the situation addressed in that case was very different from that here. Karkey has provided detailed evidence of the specific projects that were thwarted by the financial constraint imposed by the Measures. By contrast, in *S.D. Myers*, the claimant had failed to make "*clear what SDMI would have done with the money if it were to have been earned. It had a number of options.*"[255]

> *(b.6) The Delayed Construction and Rehabilitation of Karkey's Powerships*

> - *The Construction Program*

250. Karkey submits that the loss of expected cash flows from the operation of the *Kaya Bey* and *Alican Bey* in Pakistan hampered Karkey's ability to enlarge its operational fleet, causing it damages.[256]

251. According to Karkey, at the hearing, Pakistan complained that Mr. Kaczmarek had not modelled Karkey's construction program delay damages on the basis of the contracts under which the vessels ultimately commenced operating.[257] In response to that complaint, and in light of Mr. Haberman's concession in his second report that "prima facie *there may have been a period of approximately 15 months when no new vessels could be constructed,*" Karkey has prepared the sensitivity analysis shown in the table below. According to Karkey, that analysis (which excludes KPS 2[258]) demonstrates the conservative nature of Karkey's construction delay claim. Excluding KPS 2, that claim is US$309,000,000 (*see* the "Original Claim" column). Recalculated on the bases that Pakistan suggests (or that its expert concedes) may be reasonable (*i.e.*, using actual contracts, and a 15-month delay period), that claim is actually higher by an amount between US$87,000,000 and US$100,000,000.[259]

---

[253] RA-166, *S.D. Myers, Inc. v. Government of Canada*, UNCITRAL, Second Partial Award, 21 October 2012) ("*S.D. Myers*").

[254] Karkey's Post-Hearing Brief, ¶ 245 quoting Tr. Day 5, 1300:12.

[255] Karkey's Post-Hearing Brief, ¶ 245, quoting RA-166, S.D. *Myers*, ¶ 162. Karkey's Post-Hearing Brief, ¶ 245.

[256] Karkey's Memorial, ¶ 642 et seq.

[257] Tr. Day 5, 1479–1480.

[258] Tr. Day 10, 2904:7.

[259] Karkey's Post-Hearing Brief, ¶ 246.

252. The sensitivity analysis in the table that follows models (1) the period of delay which each ship actually experienced (based on the expected operation date[260] compared with the actual operation date, and earnings under the contract under which it eventually commenced operations[261]), indicated in the section labelled "Actual Delay Under Actual Contracts;" and (2) 15 months of delay for each vessel (which, as noted, Pakistan's expert concedes is the possible period of delay), again using the terms of the contract under which it eventually commenced operations.[262]

| US$ millions | | 15 Month Delay Under Actual Contracts | Actual Delay Under Actual Contracts | |
| --- | --- | --- | --- | --- |
| Vessel | Original Claim* | | Months Delay | Damages |
| KPS 7 | 66.7 | 65.5 | 2 | 8.7 |
| KPS 9 | 21.0 | 94.6 | 3 | 18.9 |
| KPS 10 | 125.3 | 133.8 | 24 | 214.1 |
| KPS 11 | 71.9 | 53.8 | 33 | 118.4 |
| KPS 12 | 23.7 | 49.1 | 15 | 49.1 |
| Total | 308.6 | 396.9 | | 409.3 |

*See Table 24 of Second Kaczmarek Report.

*Source:* Karkey's Post-Hearing Brief, ¶ 247

253. The Claimant argues that the sensitivity analysis set out above demonstrates the untenable nature of Pakistan's complaints — Pakistan cannot maintain that Karkey's construction delay damages claim is unreasonable, when it would be even higher if calculated on the basis that Pakistan suggests.[263]

---

[260] *I.e.*, the expected operation dates included in Mr. Kaczmarek's original analysis, based on Mr. Karadeniz's evidence. *See* Kaczmarek, Second Expert Report, ¶ 227, Table 24.

[261] For commencement dates, *see* NAV-094 (Lebanon, 4 September 2013); C-717 (Ghana, 18 December 2015); C-718 (Indonesia, 27 January 2016). As KPS 12 has not yet commenced operations, the "New Country" contract is used. Earnings are calculated on the basis of monthly earnings before interest, taxes, depreciation and amortization ("EBITDA"), a common proxy for cash flow. The assumptions used (installed capacity, capacity factors, and projected operating costs) are specific to each ship, and are drawn from Kaczmarek, Second Expert Report, Appendix 4.2. This calculation of damages differs from the calculation of loss that Mr. Kaczmarek originally undertook for the construction delay claim, which had calculated the reduction in value of the vessels based on lost profits. EBITDA differs in that it does not take into account, for example, capital expenditure, taxation on future revenue, or interest on historical cash flows. However, although it is not an "apples to apples" comparison (since the premise for the original claim was based on lost profits), EBITDA can validly be used as a reasonableness test.

[262] Karkey's Post-Hearing Brief, ¶ 247.

[263] Karkey's Post-Hearing Brief, ¶ 247.

- *Karkey's Iraq Vessel Rehabilitation Program*

254. Karkey claims US$44.5 million as damages related to the delay in the Iraq Powership rehabilitation program.[264]

255. Karkey submits that Mr. Nickerson confirmed at the Hearing that the retrofit of turbochargers increases engine efficiency by 15–20%.[265] Karkey states that Mr. Nickerson's testimony also addressed several of Mr. Haberman's and Mr. Waller's complaints about the rehabilitation program. Mr. Nickerson explained, for example, that the rehabilitation could take place with the powerships *in situ*, thereby avoiding impact on available dispatch.[266]

256. The Claimant notes that Mr. Haberman also complains that he can see no causal link between the Measures and the suspension of the rehabilitation. According to Karkey, the causal link is the impact of the Measures on Karkey's financing.[267] Mr. Haberman, fixed in his *ex ante* world, also asserts that there is inadequate evidence of how the rehabilitation program would proceed. Karkey asserts that *ex post* information answers this question unequivocally: as Mr. Karadeniz explained in his third witness statement, following the release of the *Kaya Bey*, Karkey recommended the rehabilitation program at a slowed pace.[268] This demonstrates not only the causal link (once the *Kaya Bey* was released, the financial constraint that had halted the program was alleviated, and the program could continue), but also that there is no uncertainty that the rehabilitation program was always slated to take place.[269]

---

[264] Kaczmarek, Second Expert Report, ¶ 229. *See* Karkey's Memorial, ¶¶ 650-651.

[265] Tr. Day 8, 2331:16.

[266] Karkey's Post-Hearing Brief, ¶ 248. Additionally, Mr. Karadeniz explained in his second witness statement that the rehabilitation work would not impact delivery of contracted capacity, as generators would be rehabilitated one by one (*see* Karadeniz, Third Witness Statement, ¶ 101).

[267] Karkey's Post-Hearing Brief, ¶ 249 referencing. Karadeniz, First Witness Statement, ¶ 97: "*[w]e have not been able to place the orders for all the ABB TPL Turbochargers we need for this project due to our lack of financing.*" *See also*, ¶ 102 of Karadeniz, Third Witness Statement.

[268] Karadeniz, Third Witness Statement, ¶ 103: "*After the release of the* Kaya Bey, *Karkey was able to resume the Engine Rehabilitation Program at a slowed pace by finally placing orders for critical parts in October and November 2014. That program is currently roughly 36% complete, and expected to be finished by mid-2016, roughly 4 years behind schedule*".

[269] Karkey's Post-Hearing Brief, ¶ 249.

68

*(b.7) The Delay to the Geothermal Project*

257.  Karkey claims US$178,400,164 in relation to its delayed geothermal project in Turkey.[270]

258.  According to the Claimant, Mr. Haberman's own analysis of documents relating to the geothermal project indicates that, except for the delay it experienced due to the Measures, it was an active and ongoing project.[271] The project is underpinned by a 30-year concession,[272] and as explained by Mr. Karadeniz, it is "*not exposed to market fluctuation but is instead a regulated and secured cash flow project based on a guaranteed feed in tariff by the renewable power generation legislation in Turkey.*"[273] Thus, there were no other external factors that could have delayed the project, aside from the financial constraint that Karkey experienced due to the Measures, which impacted the financing for the project (there is no dispute that the project was financed by debt[274]).[275]

259.  The Claimant notes that Mr. Haberman's complaints regarding Mr. Kaczmarek's calculation of the losses resulting from the delay to the geothermal project were raised only in his second report (despite the fact that calculations for the geothermal project delay were fully set out in Mr. Kaczmarek's first report). Mr. Haberman has offered no alternative calculations. Karkey asserts that those criticisms are invalid for, *inter alia*, the following reasons:[276]

   a.  Mr. Haberman criticizes the evidence upon which Mr. Kaczmarek's calculations are based, including a feasibility study that Karkey provided to Turkey IS Bank for obtaining financing.[277] This document, used by a lender to assess the geothermal project, is in fact an ideal source of contemporaneous information about the project.[278]

---

[270] *See* Karkey's Memorial, ¶¶ 642-643; Kaczmarek, Second Expert Report, ¶ 228.

[271] Karkey's Post-Hearing Brief, ¶ 250, citing Haberman, Second Expert Report, ¶¶ 9.64–9.65.

[272] NAV-082; Karadeniz, First Witness Statement, ¶ 102.

[273] Karadeniz, Third Witness Statement, ¶ 105.

[274] Haberman, Second Expert Report, ¶¶ 9.65–9.67.

[275] Karkey's Post-Hearing Brief, ¶ 250.

[276] Karkey's Post-Hearing Brief, ¶ 251.

[277] NAV-163.

[278] Karkey's Post-Hearing Brief, footnote 648 states that Mr. Haberman's complaint that the provenance of this document is unclear is also misplaced, given that Karkey also disclosed the predecessor plan, which was attached to internal Karkey correspondence (clearly demonstrating its provenance (*see*, NAV-084).

    b. Mr. Haberman has misunderstood how Mr. Kaczmarek's modelling accounts for tax, which leads him to assume that an error has been made. There is no error. Mr. Kaczmarek has simply not applied taxes to historical cash flows, an approach he made quite clear.[279]

### (b.8) Cost Increases

- *Insurance*

260. Karkey claims US$7.8 million for increased insurance costs.[280]

261. According to Karkey, Pakistan has devoted considerable time to causation in its pleadings, asserting that it was a disclosure issue that led to the cancellation of Karkey's insurance policies.[281] The Claimant submits that, even if such were the case (which it is not[282]), it is irrelevant for present purposes. Karkey made a claim under its insurance policy as a result of the Measures.[283] Following an attempt by the insurer to avoid coverage, there was a dispute, which was ultimately settled with the insurer agreeing to pay Karkey US$55,000,000.[284] Unsurprisingly, Karkey's policy with the insurer was not renewed and Karkey was forced to obtain new insurance, at a higher cost. The Claimant states that these circumstances would not have arisen had Karkey not been forced to make a claim as a result of the Measures. As Mr. Karadeniz explained, Karkey's risk profile has otherwise remained static;[285] there is no explanation for the increased premia other than the Measures, which forced Karkey to claim under its insurance policy. Karkey asserts that the pages of discussion that Pakistan devotes to the purported disclosure issue are beside the point.[286]

---

[279] *See* Kaczmarek, Second Expert Report, ¶¶ 167–77.

[280] *See* table 1 in the presentation accompanying Karkey's damages closing (CX-009).

[281] Pakistan's Rejoinder, ¶¶ 1243–54.

[282] The relevant policy was not, in fact, cancelled. Rather, the policy expired and the claim in relation to it was settled, as demonstrated by the relevant settlement agreement, which is in the record in this arbitration. *See* C-477 (CONFIDENTIAL).

[283] Karkey's Post-Hearing Brief, ¶ 252.

[284] Karkey's Post-Hearing Brief, ¶ 252 citing C-477 (CONFIDENTIAL).

[285] Karadeniz, Third Witness Statement, ¶ 110.

[286] Karkey's Post-Hearing Brief, ¶ 252.

262. Karkey states that Mr. Haberman does not dispute that Karkey's insurance costs were in fact higher after the Measures.[287] His complaints regarding Mr. Kaczmarek's calculations appear to be based in part on his inability to replicate them.[288] According to Karkey, this criticism is not a valid one, as Mr. Kaczmarek's reports were accompanied by Excel spreadsheets setting out his calculations.[289]

-   *Shipyard Costs*

263. The Claimant submits that the damages experts are not in dispute over the amount of US$12.5 million claimed in relation to the increased shipyard costs that Karkey incurred because of its inability to pay the contractor SEDEF GEM INSAATI A.S. ("SEDEF"). These costs are causally derived from the financial constraint detailed above. Karkey contracted with SEDEF for repair and conversion work on KPS 7, KPS 9, KPS 10 and KPS 11. As a result of the Measures and the resulting financial constraint, payment to SEDEF was delayed. SEDEF agreed to complete the conversion of KPS 7 and KPS 9, but doing so meant that the vessels would be in dry dock for longer than expected. The costs claimed reflect the additional dry docking costs.[290]

264. Pakistan maintains that there is no evidence that the shipyard costs were caused by the Measures. In this regard, the Claimant maintains that the Tribunal need look no further than the SEDEF protocol submitted as Exhibit NAV-093. Karkey argues that this document, signed by a third party with no interest in these proceedings, clearly states that "*the Owner notified the Contractor of its dispute with the Islamic Republic of Pakistan, and the payment difficulties that the Owner faces as a result of lack of financing from its lenders and its increased costs…*" and "*[t]he Contractor's works for the conversion and repair of KPS 9 and KPS 7 were delayed because of the Owner's delay in Owner's Supply and the Owner's Works as a result of the Owner's dispute with Pakistan as detailed in the Preamble. Therefore, additional costs were incurred by the Contractor.*"[291] Pakistan also complains that this document cannot serve as evidence of the payment difficulties by Karkey to which it refers.[292] Karkey submits that this is not a valid

---

[287] Karkey's Post-Hearing Brief, ¶ 253 citing Haberman, Second Expert Report, ¶ 10.3.

[288] Karkey's Post-Hearing Brief, ¶ 253 citing Haberman, Second Expert Report, ¶¶ 10.13, 10.20, 10.24.

[289] Karkey's Post-Hearing Brief, ¶ 253 citing Kaczmarek, First Expert Report, Appendix 7; Kaczmarek, Second Expert Report, Appendix 7.

[290] Karkey's Post-Hearing Brief, ¶ 254.

[291] NAV-093.

[292] Karkey's Post-Hearing Brief, ¶ 256 citing Pakistan's Rejoinder, ¶ 1263.

criticism, since the document shows precisely the dynamic that evolved — directly as a result of the Measures — between Karkey and its contractor.  In any event, the record contains ample additional evidence of the financial constraint caused by the Measures.[293]

- *Lebanon Contract*

265.    The Claimant submits that it intended to deploy KPS 7 and KPS 9 under the Lebanon contract.[294] As detailed above, SEDEF's work on the vessels to prepare them for that deployment was interrupted and the deployment was in turn delayed. Karkey was therefore forced to pay liquidated damages per the terms of the Lebanon contract in an amount (US$5,668,350) that was clearly set out in a letter from the Lebanese Ministry of Water and Power to Karkey of 5 November 2013.[295] This amount is not in dispute between the experts.[296]

### *(b.9) Kaya Bey Repair Costs*

266.    According to the Claimant, Mr. Kaczmarek included in his actual scenario for the *Kaya Bey* US$43,000,000 in repair costs, consisting of US$29,600,000 in costs incurred to date, and US$14,000,000 in estimated future costs (based on evidence from Mr. Nickerson[297]). Although the estimated costs have not yet been incurred, the loss which gives rise to them (the damage to the *Kaya Bey*) has crystallized.[298]

### *(b.10) Wasted Costs*

267.    According to Karkey, the essence of Mr. Haberman's complaint regarding Karkey's wasted costs claim in the amount of US$23.9 million is that it is based on trial balances. Karkey argues that this complaint is unreasonable given that (1) trial balances are output from Karkey's SAP accounting system, which is audited by a reputable international accounting firm;[299] and (2) the only way that Mr. Haberman's complaint could be addressed would be to undertake the unreasonably onerous task of reviewing hundreds of thousands of pages of invoices. As Mr.

---

[293] Karkey's Post-Hearing Brief, ¶ 255.

[294] Karkey's Post-Hearing Brief, ¶ 256 citing NAV-050.

[295] Karkey's Post-Hearing Brief, ¶ 256, citing NAV-094.

[296] Karkey's Post-Hearing Brief, ¶ 256.

[297] *See, e.g.*, Tr. Day 8, 2310:10.

[298] Karkey's Post-Hearing Brief, ¶ 257.

[299] Karkey's Post-Hearing Brief, ¶ 259 citing Tr. Day 6, 1839:3–1839:8 ("*All the books are audited annually by PriceWaterhouse*").

Kaczmarek explained, this would effectively entail a technical and financial audit that would take at least a year.[300]

*(b.11) Interest*

268. The Claimant submits that the most appropriate rate of interest is that proposed by Pakistan and agreed by the Parties in the RSC for delayed payments in the event of a "Dispute," which was 12%.[301] This rate is particularly appropriate concerning the damages that relate to Pakistan's specific contractual obligations (namely, the Termination Charge, the transport and mobilization costs under Clause 4.6(b) of the RSC, and unpaid invoices), since a 12% interest rate for those damages is required by the terms of the RSC.[302] The same rate also should apply to the remainder of Karkey's damages.[303]

269. According to Karkey, if the Tribunal were to disagree that the "Delayed Payment" rate should be used, or were to conclude that it should only be used for part of Karkey's damages, the appropriate rate would be one that reflects Pakistan's cost of borrowing. Mr. Kaczmarek has calculated this to be 8.9%, and Mr. Haberman does not appear to disagree with how Mr. Kaczmarek arrived at the figure of 8.9% (although he disagrees this is the appropriate rate). Such rate takes into account the fact that Karkey in effect has been rendered an unwilling lender to Pakistan. Karkey asserts that this should guide the Tribunal's consideration of an appropriate interest rate (rather than Karkey's cost of borrowing (7%), which Mr. Haberman advocates,[304] but which Pakistan itself does not appear to agree is appropriate).[305]

---

[300] Karkey's Post-Hearing Brief, ¶ 259 citing Tr. Day 5, 1499:19.

[301] Karkey's Post-Hearing Brief, ¶ 260 refencing Clause 4.5(i) of the RSC (C-010 CONFIDENTIAL):"*Upon the resolution of the Dispute, any amounts determined to be owing to BUYER, which have been paid to SELLER shall be paid to BUYER together with interest charges based upon Delayed Payment Interest Rate from the date the payment under the applicable invoice was made through the date of repayment*". The term "Dispute" is defined broadly as "*any and all disputes or disagreements of any kind whatsoever between SELLER and BUYER in connection with or arising out of this Contract.*"

[302] Karkey's Post-Hearing Brief, ¶ 260. Karkey notes that the sovereign guarantee that Pakistan provided in connection with the RSC (C-011 (CONFIDENTIAL)) covers interest payments with its broad wording in Clause 1.1(iii) ("*all present and future financial obligations of the BUYER to the SELLER in respect of the Monthly Rental Services Fees and the Termination Charges payable by the BUYER in terms of the Rental Services Contract*" (emphasis added)).

[303] *See* Karkey's Reply, ¶¶ 1080–83. Karkey's Post-Hearing Brief, ¶ 260.

[304] *See*, Haberman, Second Expert Report, ¶ 11.6.

[305] Karkey's Post-Hearing Brief, ¶ 261.

270. Karkey argues that, in any event, the Tribunal should not apply the "investments alternative" rate that Pakistan argues for in extremely brief terms (but which is not supported by Mr. Haberman).[306] According to the Claimant, the sole basis that Pakistan advances for the use of a US Treasury bond rate as an "investments alternative" is that it was applied in *Yukos*.[307] Without more, this is neither a sound nor adequate basis for the Tribunal to apply the same rate here. The Claimant notes that the *Yukos* tribunal itself highlighted that "*the practice of past tribunals is varied and inconsistent and does not provide clear guidance. Thus, as is well established, the Tribunal has a wide margin of discretion to determine the rate of interest applicable.*"[308] Moreover, the award in *Yukos* turned on the particular facts and circumstances of that case.[309] Karkey states that it is insufficient for Pakistan simply to point to the fact that the *Yukos* tribunal applied a US Treasury bond rate, as a purported justification for having such rate apply in the present case.[310]

### (5) Counterclaim

271. In a nutshell, the Claimant submits that the Tribunal cannot exercise jurisdiction over any of Pakistani's counterclaims. The Turkey-Pakistan BIT does not extend the Tribunal's jurisdiction to the arbitration of counterclaims, or for that matter, to any claims brought by the respondent-State. Consequently, according to Karkey, the submission of its claims to arbitration cannot be construed as an expression of consent to the arbitration of counterclaims; nor has Karkey otherwise expressed such consent. The Claimant argues that Pakistan has no persuasive answer. Instead, it reiterates its reliance on the so-called *ipso facto* theory of consent to counterclaim jurisdiction, even though Karkey has demonstrated that such a theory (a) is contrary to the overwhelming weight of the jurisprudence; (b) impermissibly ignores the *effet utile* of Article 46

---

[306] Karkey's Post-Hearing Brief, ¶ 262 citing Pakistan's Counter-Memorial, ¶ 1581; Pakistan's Rejoinder, ¶ 1288.

[307] Karkey's Post-Hearing Brief, ¶ 262 citing Pakistan's Counter-Memorial, ¶ 1581; Pakistan's Rejoinder, ¶ 1288.

[308] Karkey's Post-Hearing Brief, ¶ 262 quoting CA-205, *Yukos*, ¶ 1678.

[309] Karkey's Post-Hearing Brief, ¶ 262 citing CA-205, *Yukos*, ¶ 1681 ("*The Tribunal has concluded however that this method should also be rejected.  It is not an appropriate basis for the assessment of the damages <u>in this case. There is no evidence that Claimants had to borrow money because they were not compensated at the time of the expropriation</u>*") (emphasis added).

[310] Karkey's Post-Hearing Brief, ¶ 262.

of the ICSID Convention, which articulates the requirements for a tribunal's exercise of jurisdiction over counterclaims; and (c) in any event, fails under its own logic.[311]

272.   Furthermore, Karkey argues that the Tribunal lacks competence to hear Pakistan's counterclaims, which seek, in essence, recognition and enforcement of the Judgment and orders of the Pakistani Supreme Court. According to Karkey, an ICSID tribunal is not competent to recognize domestic court judgments and is also not competent to enforce – through vague notions of unjust enrichment – a domestic court judgment. Unjust enrichment is not a recognized "general principle of law", lacks concrete contours, and is not a claim suitable for adjudication by an international tribunal.[312]

273.   Finally, and in any event, Karkey submits that Pakistan's counterclaims fail on their merits. The Tribunal cannot recognize the Supreme Court Judgment because it resulted from a grossly unjust procedure, in which the court ignored material evidence and committed numerous other procedural improprieties. Karkey states that Pakistan itself argued as much in its formal submissions to the Supreme Court seeking reconsideration of the Judgment, and it should not be heard to argue otherwise now. According to the Claimant, these gross procedural deficiencies are underscored by the fact that in these ICSID proceedings Pakistan has failed – without adequate explanation, and in breach of its disclosure obligations – to locate and produce the very same material evidence that Pakistan had submitted to the Supreme Court during the RPP Case (but that is not publicly available, or otherwise accessible to Karkey) and later faulted the Supreme Court for failing to consider.[313]

274.   With respect to Pakistan's claim for unjust enrichment, Pakistan altogether failed to establish that Karkey was in fact enriched, or that any enrichment – to the extent there were any, which is denied – could be deemed unjust.[314]

275.   In view of the above, Karkey requests the Tribunal to decline jurisdiction over Pakistan's counterclaims, or alternatively, dismiss such counterclaims on the merits.

---

[311] Karkey's Sur-Rejoinder on Counterclaim, ¶ 4. *See also* Section IV of Karkey's Sur-Rejoinder on Counterclaim.

[312] Karkey's Sur-Rejoinder on Counterclaim, ¶ 5. *See also* Section V of Karkey's Sur-Rejoinder on Counterclaim.

[313] Karkey's Sur-Rejoinder on Counterclaim, ¶ 6. *See also* Section VI of Karkey's Sur-Rejoinder on Counterclaim.

[314] Karkey's Sur-Rejoinder on Counterclaim, ¶ 7.

### (6) The Claimant's Request for Relief

276. The Claimant's latest request for relief was set forth at paragraph 264 of its Post-Hearing Brief, and read as follows:

> [...] Karkey respectfully requests that the Tribunal:
>
> c. Declare that it has jurisdiction to address all of Karkey's claims;
>
> d. Declare that Pakistan, through the various wrongful acts and omissions described above and in Karkey's Submissions, has violated its obligations under the BIT with respect to Karkey and its investment in Pakistan, including, as described in the Reply, Pakistan's obligations to abstain from expropriation of Karkey's property; to afford Karkey's investment fair and equitable treatment and full protection and security; to refrain from arbitrary or unreasonable treatment of Karkey's investment; to observe the commitments and obligations it entered into with respect to Karkey and its investments in Pakistan; and to 'permit in good faith all transfers related to an investment to be made freely and without unreasonable delay.'[315]
>
> e. Award compensation to Karkey for the harm that Karkey has suffered as a result of Pakistan's violations of the BIT with respect to Karkey and its investments in Pakistan, in an amount of no less than **US$1,482,200,000** plus interest, compounded annually at either
>
> > i. the monthly interest rate applied by NAB in its October 2012 calculation, which was 1 percent per month or 12 percent per year, until the date of payment of the Award, or
> >
> > ii. the Pakistani sovereign bond yield (which has averaged 8.9% per year from the beginning of April 2012 until the end of June 2015), until the date of payment of the Award
>
> f. Decline jurisdiction over Pakistan's counterclaims, or alternatively, dismiss such counterclaims on their merits;
>
> g. Issue an award in Karkey's favor of all fees and costs of this arbitration, including all fees and expenses of Karkey's attorneys and external advisers; and
>
> h. Grant such other relief to Karkey as the Tribunal may deem fair and proper.

---

[315] See Karkey's Reply, Section XIII, Request for Relief (listing the BIT obligations Pakistan has breached).

B.    The Respondent's Position

   **(1) Jurisdiction**

   a.   *Issue 1: Was Karkey's investment established in accordance with Pakistani law, as required by Article I(2) of the Treaty?*

   *(a.1) Issue 1.1: What is the correct legal standard for determining the Tribunal's jurisdiction pursuant to Article I(2) of the Treaty?*

277.   According to Pakistan, illegality in the making of the investment will deprive the Tribunal of jurisdiction pursuant to Article I(2) of the Treaty, which requires that Karkey's investment was established "in conformity with" Pakistani law. Karkey's investment was not established "in conformity with" Pakistani law as a result of: (a) breaches of Pakistani procurement and other laws; (b) fraud; and (c) corruption and corrupt practices (including as defined in Section 9 of the NAO).[316]

278.   Pakistan submits that its principal claim relates to material changes to contract terms post-bid which favoured Karkey in breach of any or all of the following fundamental principles of Pakistani law:[317]

   (i)   Rule 40 of the PPRA Rules prohibits negotiations in a public tender;

   (ii)  Section 9(a)(ii) of the NAO, which defines what constitutes "*corruption and corrupt practices*" as the obtaining of any valuable thing without consideration or for inadequate consideration. This goes beyond the payment of bribe and captures many if not all of the changes that occurred to Karkey's contract because, as Karkey's Pakistani law expert explained, even if material changes are not captured by the PPRA Rules, "*there will be other laws which would take care of it. Q. What other laws? A. Generally, corruption laws;*"

   (iii) Article 9 of the Constitution. The *Khawaja* case demonstrates by reference to earlier case law that material changes to public procurement contracts post-bid (and post contract signature) are a breach not just of Pakistani procurement laws but also of

---

[316] Pakistan's Post-Hearing Brief, ¶¶ 22-23.

[317] Pakistan's Post-Hearing Brief, ¶ 26.

Article 9 of the Constitution, which is a fundamental right pursuant to which "*the national wealth/resources must remain fully protected;*" and

(iv) General principles of fairness and transparency, which are enforced pursuant to the Supreme Court's jurisdiction under Article 184(3) of the Constitution.

279. Each of the breaches of Pakistani law relied on by Pakistan occurred in the making of the investment (which included the 2008 RSC, the 2009 RSC and Amendment No. 1 entered into in December 2009), including at its inception:[318]

(i) The alleged fraud occurred between July 2008 (when Karkey submitted its Bid) and September 2008 (when Karkey was notified that it was the successful bidder and would be issued with a Letter of Award);

(ii) The alleged misprocurement occurred between 6 November 2008 (following the issue of the Letter of Award to Karkey) and 9 December 2009 (when Karkey and Lakhra entered into the First Amendment to the 2009 RSC, which contained further extension of the Target COD in breach of Pakistani procurement laws); and

(iii) The alleged corruption and corruption practices (as defined by Pakistani law) occurred from at least 7 June 2008 (when Mr. Zulqarnain first held himself out as being the authorized representative of Karkey, notwithstanding that he had no agreement in place at the time), and throughout the lifetime of Karkey's 2008 and 2009 RSCs (as many if not all of the changes secured by Karkey prior to and after the 2008 RSC constitute not just a misprocurement but a breach of Section 9(a)(ii) of the NAO because they were a "*valuable thing*" that was "*obtain[ed]...without consideration, or for consideration which he knows to be inadequate*").

280. Moreover, according to Pakistan, each of the breaches of Pakistani law (i) occurred as a result of an act or omission by Karkey (fraud and corruption, including under Section 9 of the NAO, were necessarily acts committed by Karkey); and/or (ii) was within Karkey's knowledge or should have been, had Karkey conducted the due diligence which it represented that it had when it submitted its Bid.[319] The Respondent states that Karkey cannot rely on ignorance of those laws

---

[318] Pakistan's Post-Hearing Brief, ¶ 28.

[319] Pakistan's Post-Hearing Brief, ¶ 29. *See also* Pakistan's Rejoinder, ¶¶ 109-117.

(or on the PPIB's involvement in the bidding process) to avoid a finding that its investment was established in breach of Article I(2). Wilful or negligent ignorance of the law is not a defence.[320]

### (a.2) Issue 1.2: In determining jurisdiction under Article 41(1) of the ICSID Convention, what role does Pakistani law play?

281.  According to Pakistan, jurisdiction should be assessed by reference to the ICSID Convention and the Treaty. However, the Parties' consent to arbitration under (and the object and purpose of) the Treaty is limited to (the promotion of) an "investment" within the definition provided in Article I(2). The wording of Article I(2) requires a consideration of Pakistani law in order to determine conformity with it.[321]

282.  The Respondent states that the Supreme Court of Pakistan is the ultimate source of Pakistani law. Thus, according to Pakistan, when conducting its jurisdictional investigation, the Tribunal should treat the Judgment on the issues of Pakistani law relevant to Karkey's investment as authoritative, *i.e.* only if the Tribunal finds that there has been a denial of justice can the Judgment be ignored.[322] It follows that Karkey's contract is void *ab initio* under Pakistani law in accordance with the Judgment and its investment was established in material breach of fundamental principles of Pakistani law and contrary to Article I(2) of the Treaty. As held in the Judgment:[323]

> *The contracts of all the RPPs…were entered into in contravention of law/PPRA Rules, which, besides suffering from other irregularities, violated the principle of transparency and fair and open competition, therefore, the same are declared to be non-transparent, illegal and void ab initio.*[324]

283.  Pakistan notes that, among the factors relied on by the Supreme Court in reaching its conclusion, were the increase in the Advance Payment of 14%, the deferral of the 6% withholding tax and the delay in achieving Target COD (in the case of Karkey, that delay was nearly two years). The Supreme Court relied on the independent review by and conclusions of the Asia Development

---

[320] Pakistan's Post-Hearing Brief, ¶ 32.

[321] Pakistan's Post-Hearing Brief, ¶ 33.

[322] Pakistan's Post-Hearing Brief, ¶ 34.

[323] Pakistan's Post-Hearing Brief, ¶ 36. *See also* Pakistan's Counter-Memorial, ¶¶ 641-642; Pakistan's Rejoinder, ¶¶ 704-706.

[324] C-029, p. 87, ¶ 84 (underlined in the original).

Bank (ADB), appointed by the Ministry of Water and Power in response to concerns about misprocurement that had already been voiced in 2009.[325]

> *(a.3) Issue 1.3: Was Karkey's investment established in breach of Pakistani procurement laws in breach of Article I(2) of the Treaty?*

284. Pakistan submits that Issue 1.3 only arises if the Tribunal considers it necessary to determine the issues already decided by the Supreme Court. The issues in this section relate to the period after Karkey was issued with the Letter of Award (on 6 November 2008) and up to the signing of the 2008 RSC, the 2009 RSC and Amendment No. 1 in December 2009. Pakistan's position on the issue of fraud, which deals with the earlier period when Karkey submitted its Bid (July 2008) and was declared the successful bidder (September 2009) is dealt with at Section IV(B)(1)(a.4(1)) below.[326]

285. Pakistan states that the changes to Karkey's contract (which includes the 2008 RSC, 2009 RSC and Amendment No. 1) must be assessed by reference to the PPRA Rules (including Rule 40) and by reference to Pakistani corruption laws, including Section 9(a)(ii) of the NAO. Moreover, the Respondent asserts that the relevant test under Pakistani law for assessing whether a change to the terms of a contract procured by way of public tender violates Pakistani law is summarized in the *Khawaja* case, in which the contract in question was set aside and the relevant corruption agency ordered to investigate on the following basis:[327]

> (i) "*if material changes are brought about…subsequent to the bidding, this will in fact negate the notion of a fair and open competitive bidding process…all such changes as have been discussed below were material in nature and had been made to benefit JJVL. These changes were never available to other pre-qualified parties*" which Karkey appears to agree with; and

> (ii) If a "*material change…represents a significant loss to the State…and thus ultimately to the People of Pakistan*".

---

[325] Pakistan's Post-Hearing Brief, ¶ 37.

[326] Pakistan's Post-Hearing Brief, ¶ 39.

[327] Pakistan's Post-Hearing Brief, ¶ 42 and 44, citing RA-235, *Khawaja v. Pakistan*.

286.  Pakistan notes that Karkey's witnesses have claimed that they were ready to sign the Draft RSC in the form provided for in the RFP. This is disputed by Pakistan, as demonstrated below.[328]

 -  *Letter of Credit*

287.  According to Pakistan, there is no dispute that the letter of credit provided for in the 2008 RSC was changed to a Sovereign Guarantee in the 2009 RSC. The issue for the Tribunal is whether the beneficial changes that were introduced in Karkey's 2008 RSC were prompted by allegedly detrimental changes to the Letter of Credit provision in Clause 4.5 of the 2008 RSC (Karkey's case) or whether a straightforward review of the changes to Clause 4.5 as between the Draft RSC and 2008 RSC (and the track change versions in between) demonstrates that they were not (Pakistan's case). The Respondent asserts that it is for the Tribunal to determine under Issue 1.3 whether, as a matter of Pakistani law, the Draft RSC that went out to tender provided for a confirmed letter of credit (*i.e.* bank guarantee, counter-guarantee by an international bank) or just an irrevocable letter of credit.[329]

288.  It is Pakistan's position that, since there was no requirement for a confirmed letter of credit in the Draft RSC, there is no justification for these or any other crucial changes to the 2008 RSC. The alleged downgrading from a confirmed letter of credit to a letter of credit was, according to Karkey, the "*one critical change*" from which "*[a]ll of the other Contract revisions that Pakistan discusses flowed…and can only be understood in relation to that change.*" According to Pakistan, it follows that, in the absence of any requirement for a confirmed letter of credit in the first place, the changes to the 2008 RSC were to the material benefit of Karkey (including in particular the doubling of the Advance Payment) and corresponding detriment to Pakistan. Moreover, and contrary to Karkey's assertion that they were in return for the downgrading of the letter of credit from confirmed to unconfirmed, they were conferred in the absence of any consideration flowing from Karkey.[330]

---

[328] Pakistan's Post-Hearing Brief, ¶ 50.

[329] Pakistan's Post-Hearing Brief, ¶ 51.

[330] Pakistan's Post-Hearing Brief, ¶ 63. *See also* Pakistan's Rejoinder, ¶¶ 180-185.

- *Advance Payment*

289. The 2008 RSC provided for a 14.16% Advance Payment, in place of a 7% Advance Payment provided for in the Draft RSC contained in the tender documents. Pakistan submits that this change was proposed by Karkey and that there is no contemporaneous documentary support for Karkey's claim that the increase was first proposed by Pakistan and no evidence of who is alleged to have proposed it or when.[331]

290. As the ADB Report makes clear, there was and is no justification for the increase from 7% to 14.16% in the Advance Payment, regardless of whether Karkey was ever entitled to a confirmed letter of credit: "*[t]he increase in down payment and provision of a sovereign guarantee changed the financing cost and risk profile, particularly equity risk in favour of the potential Sellers [i.e. Karkey]…[and was] contrary to good procurement practices.*"[332]

- *FPLC (Fuel Payment Letter of Credit)*

291. The Draft RSC did not provide for a FPLC (or the sharing of any associated confirmation charges) and the letter of credit in draft Clause 4.5(c) referred only to the Monthly Rental Service Fees. The FPLC (and related provisions) was a new term introduced to the 2008 RSC.[333] Pakistan submits that the FPLC was a benefit to Karkey (as Mr. Zafar accepts in his Second Report), as it removed a risk that Karkey knew from the outset it was required to bear (the risk of supplying and paying for fuel in the first instance). It was a detriment to Lakhra, which had to fund 50% of the costs of providing the FPLC, as well as to Pakistan if and when Karkey decided to cease generating electricity for non-payment of fuel and/or for failing to establish the FPLC, regardless of whether Lakhra was in fact paying for fuel.[334]

- *Interconnection*

292. According to Pakistan, Clause 2(d)(IX) of the Draft RSC provided that responsibility for interconnection lay with Karkey. Clause 2(d)(IX) was removed from the 2008 RSC. The change was a benefit to Karkey which avoided the majority of the cost of interconnection (it paid only

---

[331] Pakistan's Post-Hearing Brief, ¶¶ 64-65.

[332] Pakistan's Post-Hearing Brief, ¶ 66, citing C-275.

[333] Pakistan's Post-Hearing Brief, ¶ 69.

[334] Pakistan's Post-Hearing Brief, ¶ 73. *See* Pakistan's Rejoinder, ¶¶ 244-257.

US$500,000) and, importantly, never reduced its tariff which was agreed before Clause 2(d)(IX) was removed and which must have included a US$10 million assumption for the cost of interconnection. Not to do so would have made no commercial sense in light of Clause 2(d)(IX), as it would represent a cost recoverable through the tariff which was omitted or overlooked.[335]

293.  Karkey's own case is that its contribution to the cost of interconnection was only US$500,000. The Respondent asserts that, judged at the time of the 2008 RSC (when misprocurement occurred), Karkey therefore benefitted by providing for recovery of an additional US$9.5 million through its tariff in relation to a cost that it never bore – while Lakhra (whose obligations were guaranteed by Pakistan) was charged a higher tariff than it otherwise should have done.[336]

*- Definition of and extensions to Target COD*

294.  Pakistan submits that the RFP was clear, as was Clause 4.4(b) of the Draft RSC, that Karkey was to achieve Target COD within 6 months from issuance of the LOA. Karkey understood this at the time and it was the basis on which its Bid was declared responsive. Clause 4.4(b) of the 2008 RSC changed the definition of the Target COD, which was then extended further in 2009 RSC and Amendment No. 1 in December 2009. Pakistan maintains that this was a change to the benefit of Karkey (who had longer to achieve Target COD and whose third-party funding arrangements were conditional on receipt of the Advance Payment from Lakhra). Pakistan further argues that it was to the detriment of Pakistan, which urgently needed emergency power and which had rejected Cavalier's bid on the basis that it could not achieve the Target COD, thus reducing competition.[337]

*- Withholding Tax ("WHT")*

295.  Pakistan submits that Lakhra was entitled (and obligated) to deduct 6% WHT from all payments to Karkey, including the Advance Payment as per Clause 4.5(1) of the Draft RSC, Clause 4.5(o) of the 2008 RSC, and Clause 4.5(o) of the 2009 RSC. Pakistan asserts that Lakhra, PEPCO and the Federal Board of Revenue all confirmed that this was the correct legal position. The approval of the ECC was therefore sought and obtained to this change, and payment was ultimately deferred (although only after the FBR had been persuaded to change its mind that the ECC

---

[335] Pakistan's Post-Hearing Brief, ¶¶ 74 and 76.

[336] Pakistan's Post-Hearing Brief, ¶ 79.

[337] Pakistan's Post-Hearing Brief, ¶¶ 80 and 82. *See* Pakistan's Rejoinder, ¶ 283.

decision even applied to Karkey – the reason why it did so is unexplained). According to the Respondent, this change was to Karkey's benefit, since it increased the cash amount Karkey received. Further, receipt of the full Advance Payment is alleged by Karkey to have been critical to its ability to draw down on third party funding for the construction of its ships. Yet the funding for construction of Karkey's ships was a matter entirely for Karkey and was not covered by the contract with Lakhra.[338]

*- Conclusion*

296. According to Pakistan, the changes introduced to the Draft RSC altered the transactional balance in Karkey's favour, were severely detrimental to Pakistan, were unsupported by consideration flowing from Karkey and were a breach of Pakistani procurement and other laws.[339]

(a.4.(1)) Issue 1.4(1): *Was Karkey's investment established by way of fraud in breach of Article I(2) of the Treaty?*

297. According to Pakistan, Karkey investment in Pakistan exists only as a result of its participation in, and the issue of a letter of award and contract as a result of, a public tender. In other words, Karkey could only ever have qualified as an investor if its Bid was responsive to the PPIB's bid documents – including the RFP. Any fraud committed during the tender process and which induced the PPIB to issue Karkey with its Letter of Award would therefore deny the Tribunal jurisdiction because Karkey's investment would not be established "*in conformity with*" Pakistani law.[340]

298. In order for a bid to be considered responsive and even potentially qualify for a letter of award, bidders were required to confirm that they could meet a Target COD of "*180 days from issuance of Letter of Award*" (Milestone A). Any bids indicating a completion period later than the Target COD would be rejected and the bidder could never become an investor.[341]

---

[338] Pakistan's Post-Hearing Brief, ¶¶ 83 and 85.

[339] Pakistan's Post-Hearing Brief, ¶ 86. For a summary of these and all other changes and their benefit/detriment, see Appendix A to the Counter-Memorial, and Tables 1 and 2 to the Rejoinder (reproduced with minor updates at Appendix A to Pakistan's Post-Hearing Brief.

[340] Pakistan's Post-Hearing Brief, ¶ 87.

[341] Pakistan's Post-Hearing Brief, ¶ 88.

299. Knowing this, Karkey represented that it could comply with Milestone A in Proforma X of its Bid, its "Proposed Project Schedule". Pakistan asserts that the evidence shows that Karkey's representation was knowingly untrue and/or that Karkey was reckless as to its truth because it had no reasonable basis for believing in good faith that it could achieve Milestone A. Pakistan concludes that the Tribunal therefore has no jurisdiction under Article I(2) of the Treaty.[342]

300. Moreover, Pakistan submits that the relevant standard of proof which the Tribunal should apply to Pakistan's claim of fraud (and corruption) is the balance of probabilities (*i.e.* whether it is "more likely than not"). Numerous tribunals have applied this standard specifically to claims of fraud.[343]

301. The Respondent asserts that the transgressions by Karkey in this case are on all fours with those highlighted in the *Inceysa v. El Salvador* case. According to Pakistan, Karkey not only obfuscated the facts relevant to assessing its Net Worth, it also misrepresented its ability to meet the Target COD, which was the essential criteria on the basis of which a bid would be accepted or rejected as non-responsive. This was a violation of the obligation of good faith (which was also expressly imposed on all parties in connection with the RFP) as well as being fraudulent under Pakistani law.[344]

302. Pakistan submits that at the time of submitting its Bid and making the representation in Proforma X regarding its ability to achieve Milestone A, Karkey's ship were not built. In order for Karkey to satisfy the Tribunal that its representation was true, Karkey must therefore show that, at the time of submitting its Bid, it believed in good faith that it could build, deliver and commission its ships within "*180 days from issuance of Letter of Award*" in order to achieve the Target COD referred to in Clauses 2.2.1 and 6.3.2 of the RFP and to which Karkey committed in its Bid.[345]

303. Pakistan argues that Karkey makes no attempt in its written evidence to explain that it believed in the truth of its ability to achieve Milestone A. The Respondent asserts that, in his third witness statement, Mr. Karadeniz was clear that Karkey believed it could achieve only Milestone B

---

[342] Pakistan's Post-Hearing Brief, ¶ 89.

[343] Pakistan's Post-Hearing Brief, ¶ 90.

[344] Pakistan's Post-Hearing Brief, ¶ 91 citing CA-94, *Inceysa Vallisoletana S.L. v. Republic of El Salvador*, (ICSID Case No. ARB/03/26), Award of 2 August 2006. *See also* Pakistan's Rejoinder, ¶¶ 282-286.

[345] Pakistan's Post-Hearing Brief, ¶ 99.

(further, that Milestone B was the deadline Karkey considered it had to meet).[346] Pakistan respectfully requests that the Tribunal accept Mr. Karadeniz's evidence in his third witness statement and find, in respect of both the Bid and the 27 August 2008 letter,[347] that:[348]

    (i)  the undisputed statements of fact that Karkey could achieve Milestone A were false;

    (ii)  Karkey had no belief that it could and would achieve Milestone A; and

    (iii) Karkey had no intention to perform the promises it gave to meet Milestone A.

304.  Alternatively, Pakistan submits that Karkey was reckless as to the truth of its representation.[349] According to Pakistan, the evidence shows that an ordinary timeframe for construction, delivery and commissioning of a powership is between 18 to 29 months. Bearing in mind that its ships were not built at the time of submitting its Bid, Karkey could have had no good faith belief in its ability to achieve Milestone A following an ordinary time frame for construction.[350]

305.  Pakistan concludes that Karkey committed fraud under at least three heads of Pakistani law:[351]

    (i)    A false statement of fact, without belief (or reasonable belief) in its truth, with the intent to deceive or induce another to enter into a contract;

    (ii)    A promise made without any intention of performing it, with the intent to deceive or induce another to enter into a contract; and

    (iii)    A false statement of fact, in order to influence a procurement process or the execution of a contract.

---

[346] Pakistan's Post-Hearing Brief, ¶ 100. *See* Karadeniz, Third Witness Statement, ¶¶ 10 and 24; Rejoinder, ¶¶ 414-417.

[347] *See* C-148. By way of reminder, on 27 August 2008, Karkey confirmed in writing to the Managing Director of PPIB (Mr. Fayyaz Elahi) that: "[a]*s it stands today, we are ready to launch the project as we have already made the necessary investments so that we can meet the Proposed Project Schedule*".

[348] Pakistan's Post-Hearing Brief, ¶ 102.

[349] Pakistan's Post-Hearing Brief, ¶ 103.

[350] Pakistan's Post-Hearing Brief, ¶ 110.

[351] Pakistan's Post-Hearing Brief, ¶ 130.

306. Moreover, to the extent the Tribunal determines it to be relevant, as a matter of international law (on which Karkey relies), Karkey is required to act in good faith and without fraud or deceit.[352] Karkey committed fraud under international law, through its representations in its Bid and the 27 August 2008 letter: [353]

    (i)    By misrepresenting a material fact (its ability to achieve Milestone A, or even Milestone B);

    (ii)    Because Pakistan relied on a material fact (as evidenced by the contemporaneous correspondence);[354] and/or

    (iii)    Because Karkey intended to deceive Pakistan, or was at least reckless, as to its ability to achieve Milestone A (or even Milestone B) through its false representations.

307. In its closing submissions at the Evidentiary Hearing, Karkey's counsel suggested that (i) Pakistan had not established any detrimental reliance on Karkey's proposed Project Schedule and, conversely, that (ii) any delays in achieving the target schedule would have been remedied through the contractual mechanism that was explicitly established for that scenario.[355]

308. In light of the contemporaneous evidence, the Respondent argues that there can be little doubt that Pakistan relied on Karkey's representations in issuing Karkey with the Letter of Award. As to "detrimental" reliance, Pakistan maintains that is not an aspect of the test for fraud under international law and that Karkey has not put forward any persuasive evidence that it is. In any event, according to Pakistan, it has suffered detriment as a consequence of its reliance on Karkey's representations:[356]

    (i)    The delays in achieving the target schedule, which Karkey's counsel pointed to, deprived Pakistan of the short-term emergency power it was seeking as the primary rationale for the RPP and which Karkey had promised. In view of the lack of available power from elsewhere, the "contractual mechanism" to which Karkey

---

[352] Pakistan's Post-Hearing Brief, ¶ 133.

[353] *See* footnote no. 347.

[354] *See* Pakistan's Post-Hearing Brief, ¶¶ 97-98.

[355] Pakistan's Post-Hearing Brief, ¶ 135.

[356] Pakistan's Post-Hearing Brief, ¶ 136.

refers, which provides only for damages, does not address the consequences for, nor adequately compensate, Pakistan.

(ii) Pakistan will also suffer loss if Karkey is found to be an investor in accordance with Article I(2) of the Treaty, despite Karkey's investment having been established in breach of Pakistani law.

*(a.4.(2)) Issue 1.4(2): Was Karkey's investment established by way of corruption in breach of Article I(2) of the Treaty?*

309. Pakistan admits that it bears the burden of proof in relation to its claim of corruption. However, given the bilateral nature of corruption, it is practically impossible for Pakistan to have all the relevant evidence. Accordingly, tribunals and commentators support the principle that the responsibility to rebut specific allegations of corruption should be borne by the party possessing the relevant information. In the words of one respected commentator, "*plausible evidence of corruption, offered by the party alleging illegality, should require an adequate evidentiary showing by the party denying the allegation.*"[357] As already noted above, the standard of proof for corruption is the ordinary balance of probabilities – in other words, whether it is "more likely than not" that corruption has occurred.[358] Moreover, given the difficulties with obtaining direct evidence of corruption, it is widely accepted that circumstantial or direct evidence may be sufficient for a finding of corruption on the basis of inference.[359]

310. The requirements for a finding of corruption under Pakistani law are set out at paragraphs 482 to 487 of the Rejoinder. The Respondent maintains that the payment of bribe is not a prerequisite for a finding of corruption under Pakistani law. Rather, Pakistani corruption laws are wider and, as confirmed at the Hearing by Karkey's expert Mr. Zafar, cover, *inter alia*, irregularities arising in a public procurement. Pakistan argues that a person (including Karkey and/or its directors) has "*committed the offence of corruption and corrupt practices*" under Section 9(a) of the NAO, *inter alia* if he accepts, obtains or offers any valuable thing for inadequate consideration to or

---

[357] Pakistan's Post-Hearing Brief, ¶ 138, citing RA-89, Constantine Partasides, *Proving Corruption in International Arbitration: A Balanced Standard for the Real World*, ICSID Review 25, No. 1 (2010) 51, ¶ 66.

[358] Pakistan's Post-Hearing Brief, ¶ 140. *See also* Pakistan's Rejoinder, ¶¶ 311-312.

[359] Pakistan's Post-Hearing Brief, ¶ 146.

from a person he knows is (or is likely to be) concerned in a business transaction with him (Section 9(a)(ii)).[360]

311. Pakistan submits that Karkey's alleged explanations for the employment of and scope of services provided by Mr. Zulqarnain are unsupported by any contemporaneous evidence; and much of the evidence there is contradicts Karkey's claims. Karkey has also failed to provide any satisfactory evidence justifying the sums paid to Mr. Zulqarnain. According to Pakistan, this all leads to the inference that Mr. Zulqarnain was retained for purposes other than those described in his engagement letter, namely the illegal lobbying and influencing of government officials in order to secure (and ensure favourable treatment of) Karkey's RPP in Pakistan. The evidence of Mr. Zafar supports that the scope of Pakistani corruption laws extends to misprocurement. Pakistan submits that other evidence relevant to this issue was excluded by the Tribunal.[361]

312. The evidence concerning Mr. Zulqarnain relevant to the question of corruption broadly falls into four categories: (a) the circumstances of this employment; (b) the services he is said to have performed; (c) his alleged compensation; and (d) his alleged expenses.[362]

313. Pakistan emphasizes that Karkey agreed to pay US$100,000 (later US$115,000) to someone it contends was a part-time, administrative/logistics man in a country where the average annual wage is less than US$1,000. The evidence available of Mr. Zulqarnain's experience goes only to his political connections.[363] The engagement of a third party related to, or closely associated with a foreign official is recognized as a common "red flag" of corruption by the FCPA, Woolf Committee Report, and the TRACE Due Diligence Guidelines. That is relevant because there is evidence that Mr. Zulqarnain was using his connections to secure favourable treatment for Karkey.[364]

314. Pakistan submits that it is highly improbable that an individual not previously known to Karkey would be hired as its country representative in the context of a Bid for a contract worth over half a billion US dollars, without anyone checking whether he was experienced or suitable for the

---

[360] Pakistan's Post-Hearing Brief, ¶ 150.

[361] Pakistan's Post-Hearing Brief, ¶ 151.

[362] Pakistan's Post-Hearing Brief, ¶ 152.

[363] Pakistan's Post-Hearing Brief, ¶¶ 152 and 157.

[364] Pakistan's Post-Hearing Brief, ¶ 158.

role. Pakistan asserts that if he were experienced in the temporary power sector, Karkey would have produced documents demonstrating this, as it was ordered to do (Request 9(a)). Alternatively, Karkey could have tendered witness evidence from Mr. Karadeniz's brother (who he says "must have been" the one who met Mr. Zulqarnain) to explain why he was engaged. Yet it has not. Nor has Karkey produced Mr. Zulqarnain, or indeed investigate his family connections itself.[365]

315. Pursuant to Article 9(5) of the IBA Rules on the Taking of Evidence in International Arbitration, it should therefore be inferred either that (a) any documents that do exist would be adverse to Karkey's interests; or (b) that such documents do not exist (because his sector experience was irrelevant), and Mr. Zulqarnain was hired not for his alleged "*business experience and background managing construction projects,*" but because of his political and/or family connections.[366]

316. According to Pakistan, the absence of any documents evidencing the services actually provided by Mr. Zulqarnain and the mechanism for his payment are further "red flags" of corruption. Moreover, what evidence there is suggests that Mr. Zulqarnain was fulfilling a quite different role – including using his political connections to influence public officials.[367]

317. Pakistan argues that the payments of US$300,000 (by Karkey) and US$11,111 (by Karpak) allegedly made in respect of Mr. Zulqarnain's purported expenses raise further "red flags" of corruption. Karkey has produced no evidence to demonstrate that any expenses were actually incurred by Mr. Zulqarnain – let alone over US$300,000 worth.[368]

318. In sum, Pakistan submits that the dearth of evidence produced by Karkey, and the inconsistency of what little evidence there is, renders it inherently more probable that Mr. Zulqarnain was being paid for something other than the services outlined in his engagement letter, and that he was in fact engaged for the reason described by Mr. Aslam – to use his influence with government

---

[365] Pakistan's Post-Hearing Brief, ¶ 160.

[366] Pakistan's Post-Hearing Brief, ¶ 161.

[367] Pakistan's Post-Hearing Brief, ¶¶ 162 and 170.

[368] Pakistan's Post-Hearing Brief, ¶ 177.

officials to obtain special treatment for Karkey, amounting to "*corruption and corrupt practices*" under Pakistani law.[369]

319.  Furthermore, Pakistan submits that while there is no evidence on the record linking Mr. Zulqarnain with the Scheme (as described below), the evidence regarding Mr. Zulqarnain should inform the Tribunal's decision as to whether it is more probable than not that Karkey was engaged in the Scheme, which is described below.[370]

320.  According to Pakistan, following the filing of Pakistan's Rejoinder but at least two months prior to the Hearing, Pakistan was informed by two previously unknown individuals, Mr. Samir Tannous and Mr. Tarek Nahas (working with Mr. Mustafa Ramday, a lawyer in Pakistan), of the existence of a sophisticated scheme implemented by Karkey, involving significant payments by Karkey to secure Karkey's contract in Pakistan (the "Scheme"). Pakistan and its counsel were shown copies of the following documents (the contents of which were recorded in the Attendance Note[371] taken immediately following the meeting by Allen & Overy):[372]

(i)  a copy of a document in the form of a consultancy agreement between Karkey and a consultant (the Consultant), whose name was redacted (the Consultancy Agreement);

(ii)  a copy of a document in the form of a consultancy agreement, the date of which was redacted, between the Consultant and a local consultant (the Local Consultant), whose name was also redacted (the Local Consultancy Agreement).

321.  These two documents were, according to their terms, directly linked to and for the purpose of securing Karkey's investment in Pakistan.[373]

322.  The copy of the Consultancy Agreement (with date only redacted) stated, *inter alia*, that the Consultant was responsible for appointing a local agent at its own costs and expense to assist Karkey in securing the operation of the Contract in relation to matters related with certain local

---

[369] Pakistan's Post-Hearing Brief, ¶ 188.

[370] Pakistan's Post-Hearing Brief, ¶ 191.

[371] *See* R-424.

[372] Pakistan's Post-Hearing Brief, ¶ 192.

[373] Pakistan's Post-Hearing Brief, ¶ 193.

authorities for the duration of the Contract. In return for securing the RSC, Karkey would pay the Consultant 6% of the contract price under the RSC (over US$33 million) which was payable in tranches linked to payments due to Karkey under the RSC.[374]

323.   According to Pakistan, the copy of the Local Consultancy Agreement (with date and names only redacted) stated, *inter alia*, that the Consultant would pay over US$4.8 million (equal to 6% of the Advance Payment under the 2009 RSC) to the Local Consultant, in return for successfully facilitating the execution of the RSC. This amount was payable in two tranches, the size of which depended on certain trigger events under the 2009 RSC and the Consultancy Agreement, including whether the Advance Payment under the RSC would be paid inclusive or net of withholding tax.[375]

324.   At the same time, Mr. Tannous told Pakistan and its counsel of reams of emails confirming the existence of the Scheme. Pakistan states that as a sovereign state it had no choice but to pursue all available options for establishing the legitimacy of the Scheme suggested by the Consultancy and Local Consultancy Agreements. If genuine, those documents evidence that Pakistan has been the victim of a large-scale fraud by Karkey (and others) which goes to the very heart of this Tribunal's jurisdiction. No state in Pakistan's position could ignore what it was shown and being told.[376]

325.   It was for this reason that Pakistan, reluctant to pay the millions of dollars requested by Messrs. Tannous and Nahas for documentary and other evidence of the Scheme and because of timing issues in these proceedings, sought the assistance of the Tribunal and made its application dated 11 December 2015 (just two weeks after the Scheme came to light), together with the witness statement of Mark Levy (a partner at Allen & Overy LLP) and supporting documents, seeking disclosure by Karkey. In particular, Pakistan sought disclosure of 70 backup tapes on which Karkey had claimed that its electronic records were stored for the period up to April 2010 (the "Backup Tapes") – *i.e.* the exact period to which the Consultancy Agreement and the Local Consultancy Agreement indicate the Scheme relate. Karkey had previously relied on these Backup Tapes in resisting certain of Pakistan's requests for disclosure. Pakistan's previous

---

[374] Pakistan's Post-Hearing Brief, ¶ 193.

[375] Pakistan's Post-Hearing Brief, ¶ 194.

[376] Pakistan's Post-Hearing Brief, ¶ 197.

requests for disclosure of relevant documents on the Backup Tapes had been rejected by the Tribunal.[377]

326. Pakistan states that Karkey simply denied the existence of the Scheme and argued that the Scheme had been fabricated by a Pakistani government insider.[378] In Procedural Order No. 12, the Tribunal declined to order any disclosure "*[s]ince Karkey declares that the documents requested in Pakistan's Application do not exist*".[379]

327. During its Opening Statement at the Evidentiary Hearing, Pakistan renewed for a third time its application for disclosure of the Backup Tapes by Karkey on the basis that the Tribunal had accepted Karkey's bare denial of existence of the documents as truthful without having given Pakistan an opportunity to test it by requiring restoration and review of the Backup Tapes which Karkey acknowledged it had not even reviewed. The costs of disclosing the Backup Tapes had been estimated by an independent expert retained by Pakistan at £27,600, and they were costs that Pakistan agreed to bear.[380]

328. The Tribunal dealt with the application on Day 2 of the Evidentiary Hearing. The Tribunal decided to admit the Nahas Document and Exhibit R-425 – the Attendance Note – but it did not admit the witness statement from Mr. Rafi, on the basis that the Tribunal considered it could have been submitted earlier. The Tribunal also refused all of Pakistan's applications made during the Opening Statement.[381]

329. Pakistan noted at the closing of the Hearing that it is concerned by the Tribunal's decision to exclude what it believes to be relevant evidence. Pakistan is further concerned by the Tribunal's (a) rejection of Pakistan's application regarding (and its apparent unwillingness to investigate the veracity of) the alleged Scheme including the rejection of Mr. Khan's statement (which also went to the activities of Mr. Zulqarnain), as well as (b) the standards applied to requests for the introduction of new evidence by Karkey, which differed from those applied to Pakistan.[382]

---

[377] Pakistan's Post-Hearing Brief, ¶ 198.

[378] Pakistan's Post-Hearing Brief, ¶ 201.

[379] Pakistan's Post-Hearing Brief, ¶ 203.

[380] Pakistan's Post-Hearing Brief, ¶ 204.

[381] Pakistan's Post-Hearing Brief, ¶ 205.

[382] Pakistan's Post-Hearing Brief, ¶ 206.

330. In doing so Pakistan has not been able to test Karkey's bare assertion that no documents relating to the Scheme exist. Moreover, the Tribunal has excluded evidence that goes to the issue of corruption and therefore to the Tribunal's jurisdiction.[383]

331. As Karkey accepts, this is a matter of public policy. Pakistan argues that, as the matters stand, the Tribunal will be issuing an award on the basis of an incomplete factual record as regards its jurisdiction.[384]

332. Pakistan submits that the Tribunal should nevertheless still infer from Karkey's objections to the admission of the Backup Tapes, the Witness Statement of Mr. Rafi and the other applications made by Pakistan, as well as the available evidence on the record, that Karkey's investment was, more probably than not, procured by way of corruption.[385]

333. Furthermore, Pakistan makes the following submissions regarding the evidence on the basis of which Pakistan invites the Tribunal otherwise to make a finding that it is more likely than not that Karkey was engaged in "*corruption and corruption practices*" in the establishment of its investment (other than as a result of the activities of Mr. Zulqarnain and/or the Scheme).

334. *Shipyard visit in September 2010*: In September 210, Karkey paid for flights for a delegation of Pakistani government officials. Pakistan argues that payment for these flights is a "*valuable thing*" offered by Karkey for inadequate consideration, to persons concerned in a business transaction with Karkey (the RPP) in breach of Section 9(a)(ii) of the NAO. The fact that Pakistan requested the visit and/or that it was for a valid purpose is irrelevant. There is no evidence that Pakistan requested Karkey to pay for the visit, which was a breach of Section 9 of the NAO (and in violation of the Establishment Code).[386]

335. *Misprocurement*: Material changes were made to Karkey's contract after the issuance of the Letter of Award in circumstances where the MoWP pushed through approval of the RPPs put out to tender in May 2008 ("*including barge mounted*") in haste and without proper consultation. Pakistan argues that each of these material changes is a "*valuable thing*", accepted or obtained by Karkey, without adequate compensation, from a person concerned in a business transaction

---

[383] Pakistan's Post-Hearing Brief, ¶ 207.

[384] Pakistan's Post-Hearing Brief, ¶ 208. *See also* Pakistan's Rejoinder, ¶¶ 479-480.

[385] Pakistan's Post-Hearing Brief, ¶ 209.

[386] Pakistan's Post-Hearing Brief, ¶ 211.

with Karkey, in breach of Section 9(a)(ii) of the NAO, as well as Section 9(a)(iv) (as each of these material changes occurred in breach of Pakistani procurement laws). Any aid, assistance or conspiracy by Karkey with holders of public office in their misuse of authority, or the issuance of a directive or order granting an undue concession or benefit to Karkey in a taxation matter, would also be a breach of Section 9(a)(iv), (vii) and/or (xii) of the NAO.[387]

*Fraud:* Pakistan argues that Karkey procured and was awarded the RSC as a result of fraud in relation to Karkey's readiness to meet the Proposed Project Schedule set out in Proforma X of its Bid, which breached Section 9(a)(ii) and (iv) of the NAO.[388]

### (a.5) Issue 1.5: Is Pakistan estopped from raising its jurisdictional objections?

336.  Pakistan submits that the concept of estoppel prevents a party from exercising a valid legal right in circumstances where it has clearly and unequivocally stated that it would not exercise that right, and its counterparty has – in good faith – relied on this statement to its detriment.[389]

337.  Pakistan rejects Karkey claims that Pakistan would be estopped from exercising its valid legal right to claim fraud in connection with the delay to the Target COD because (i) "*Karkey disclosed the status of its Powership construction to Pakistan from the very beginning*"[390] and (ii) "*because for years Pakistan has had in its possession the same information on which it now bases its allegation of misrepresentation concerning the Target COD.*"[391] This argument fails for a number of reasons, *inter alia*, because Pakistan cannot be estopped from raising objections to the Tribunal's jurisdiction on the basis of fraud and corruption because, as a matter of logic, Karkey cannot have relied on a statement or course of conduct by Pakistan in good faith (as required by *Pope & Talbot*) if it is guilty of fraud or corruption. Similarly, any statement by Pakistan was not "*voluntary, unconditional, and authorized*" if such statement was induced in that manner.[392]

338.  Pakistan rejects Karkey's claim that "*the principle of estoppel bars Pakistan from asserting that any alleged inconsistencies with Pakistani procurement rules in the bidding process deprives the*

---

[387] Pakistan's Post-Hearing Brief, ¶ 212.

[388] Pakistan's Post-Hearing Brief, ¶ 213.

[389] Pakistan's Post-Hearing Brief, ¶ 217.

[390] Karkey's Reply, ¶ 196.

[391] Tr. Day 1, 55:2-14. *See also*, Tr. Day 10, 2843:6 - 2844:14. Pakistan's Post-Hearing Brief, ¶ 220.

[392] Pakistan's Post-Hearing Brief, ¶¶ 220-221 referencing *Pope & Talbot Inc. v. Canada*, UNCITRAL, Interim Award, 26 June 2000, ¶ 111.

*tribunal of jurisdiction of Karkey's claim*".[393] According to the Respondent, Karkey's claim fails, *inter alia*, because none of the documents relied upon by Karkey in this respect contain a clear and unequivocal representation that any breach of Pakistani's procurement laws by Karkey (or any bidder) would not be enforced or that the bidding process would be conducted in accordance with law and principles of transparency.[394]

339. Finally, Pakistan rejects Karkey's assertion that, having previously accepted that the Letter of Credit provided for in the RFP was a confirmed letter of credit, Pakistan would now be estopped from adopting the contrary position. According to Pakistan, Karkey is mistaken because there is no clear and unequivocal statement of fact. The only references that Pakistan has made to a confirmed letter of credit make no references to Karkey, specifically, having been entitled to a confirmed letter of credit. A general statement on what was available to the RPP sponsors generally is not sufficiently clear and unequivocal to deprive Pakistan of the valid legal right to plead its own interpretation of the RFP and subsequent contracts.[395] In any event, according to the independent ADB Report, even if Karkey was entitled to a confirmed letter of credit, the changes to its contract were "*a major change under any prudent procurement guidelines*".[396] Therefore, Pakistan maintains that in the absence of a re-tendering, these "*major*" changes were a breach of the PPRA Rules irrespective of whether the Letter of Credit was confirmed or unconfirmed.[397]

   b. *Issue 2: Does Karkey's alleged investment meet the requirements of Article 25(1) of the ICSID Convention and Article I of the Treaty?*

340. According to Pakistan, in the event the Tribunal does not accept Pakistan's overarching jurisdictional objection that Karkey's alleged investment was established in breach of Pakistani law, it must also consider whether Karkey's alleged investment meets the jurisdictional requirements of Article 25(1) of the ICSID Convention and Article I of the Treaty.[398]

---

[393] Karkey's Reply, ¶ 549.

[394] Pakistan's Post-Hearing Brief, ¶ 222. Pakistan's Rejoinder, ¶¶ 582-586.

[395] Pakistan's Post-Hearing Brief, ¶ 224.

[396] C-275, ¶¶ 6-7.

[397] Pakistan's Post-Hearing Brief, ¶ 224(d).

[398] Pakistan's Rejoinder, ¶ 590.

341. Pakistan notes that Karkey appears to disagree with Pakistan's contention that the alleged investment must undergo and pass jurisdictional examination under both the ICSID Convention and the BIT, noting that the *Salini* criteria should only be used when there are "*very strong reasons*" to set aside the State's mutually agreed definition of investment. Pakistan maintains that this is incorrect and submits that an investment must pass a "*double keyhole*" test for jurisdiction.[399]

342. Moreover, Pakistan does not disagree that the Tribunal should assess Karkey's operations in Pakistan "*globally*" or "*as a whole*", nor does Pakistan disagree that the meaning of "investment" under Article 25(1) of the ICSID Convention is potentially broad. However, as noted in the Counter Memorial, Karkey's attempt to present a tangled web of activities as a single investment is unhelpful, particularly in the context of the Treaty's expropriation clause, which applies only to the "*expropriation of 'investments', and not to each and every resource utilized in connection with an alleged investment, but which is not itself an investment*".[400] By way of example, if Pakistan is correct that the 2009 RSC cannot form the subject matter of an investment because it has been declared void *ab initio*, this has a knock-on effect on what Karkey is able to claim has been expropriated (as well as what Karkey is able to claim as damages). Pakistan argues that it is therefore necessary to analyse each aspect of Karkey's alleged investment individually.[401]

343. In any event, Pakistan maintains its argument that Karkey's activities, even when considered as a whole, are akin to a sale of goods transaction and are not covered by the ICSID Convention. Pakistan submits that Karkey does not succeed in distinguishing the rental of capacity from a more traditional sale or rental of goods contract.[402]

344. For instance, Pakistan agrees that Karkey does not rent electricity. However, this does not address Pakistan's argument that a mere rental contract – be it for electricity or capacity – falls outside the ICSID regime. Indeed, the fact that Karkey's contract is a mere rental contract rather than a sale contract supports, rather than detracts from, Pakistan's argument. In sum, Pakistan argues that Karkey has failed to distinguish its turnkey, plug-and-play business model from a simple commercial sale or rental of goods contract. Therefore, like a commercial sale or rental of goods

---

[399] Pakistan's Rejoinder, ¶ 591. *See also* Pakistan's Counter-Memorial, ¶¶ 932-934.

[400] Pakistan's Counter Memorial, ¶ 937.

[401] Pakistan's Rejoinder, ¶¶ 592-593. *See also* Pakistan's Counter-Memorial, ¶ 937.

[402] Pakistan's Rejoinder, ¶¶ 594-595.

contract, Karkey's activities do not benefit from the protection of the ICSID regime. If the Tribunal agrees, it need not go on to consider whether Karkey's activities satisfy the *Salini* criteria nor whether they fall within the definition of "investment" under the Treaty.[403]

345. Pakistan submits that it appears to be agreed between the Parties that the *Salini* criteria are not mandatory. However, they remain relevant in the sense that they represent the "*benchmarks of investment.*"[404]

346. According to Pakistan, even if one takes into account the value of the electricity actually generated by Karkey over the entire course of the project (around US$28 million), Karkey has nevertheless acted as a considerable net drain on the Pakistani economy, having procured a contract whereby it would be paid almost US$10 million every month regardless of whether it ever delivered a single kilowatt of electricity.[405]

347. Second, whilst Pakistan agreed that the fact that the majority of the investment forming Karkey's alleged contribution took place outside Pakistan may not be decisive, it is certainly relevant to the Tribunal's consideration of whether or not Karkey has made an "investment".[406]

348. Third, Pakistan maintains that Karkey took none of the financial risks normally associated with an investment.[407]

349. Finally, Karkey claims that Pakistan argues that the impermanence of a project alone can destroy its status as an "investment". According to Pakistan, this misrepresents Pakistan's argument and overstates its importance. Rather, the impermanence of Karkey's investment (which Karkey does not deny) is merely one factor indicating that the project is akin to a simple sale or rental transaction. On Karkey's case, the central asset of the project is able to constitute an "investment" despite spending only a fraction of its working life in Pakistan, before going on to become an

---

[403] Pakistan's Rejoinder, ¶ 603.

[404] Pakistan's Rejoinder, ¶ 604.

[405] Pakistan's Rejoinder, ¶ 609.

[406] Pakistan's Rejoinder, ¶ 610.

[407] Pakistan's Rejoinder, ¶ 611.

investment in Iraq, or Ghana, or elsewhere. This is what, to Pakistan's knowledge, is unprecedented in investment treaty arbitration.[408]

350.   Moreover, Pakistan's accepts that Karkey's Vessels could be considered to be a dedication of resources to Pakistan, albeit to a very limited degree. A delivery truck could also be considered to be a dedication of resources. Like a delivery truck, the Vessels were not tailored to the Pakistani market and indeed were intended to be located in Pakistan for only a short period.[409]

351.   According to Pakistan, it is also not disputed that Karkey's shareholding in Karpak is capable of being an "investment" under the Treaty. However, for the purposes of the ICSID Convention, Pakistan's position is that the present dispute is not a dispute "arising directly" out of Karkey's shareholding in Karpak. Rather, the international dispute arises from the actions taken with respect to a rental contract and the assets connected to that contract. Pakistan submits that the mere establishment of a local entity to assist with sale of goods does not affect that or change the nature of the alleged investment. Karpak had no purpose other than assisting with the execution of the 2009 RSC.[410]

352.   Pakistan further rejects Karkey's claim that the funds in its bank accounts constitute an investment for the purposes of Article 25(1) of the ICSID Convention because they entail a contribution, involve a risk, and have a significant duration of five years. Karkey does not explain why the funds in its bank accounts have taken on anything other than the ordinary commercial risk assumed by all those using Pakistani bank accounts.[411]

353.   Pakistan maintains that, even if Karkey's activities satisfy the definition of investment on a *prima facie* basis, these items are not investments "in conformity with" Pakistani law, meaning they do not truly fall within the definition of "investment" under the Treaty. Similarly, in the event that the Tribunal finds that Karkey's investment was procured through fraudulent misrepresentation and corruption, the Tribunal should decline jurisdiction over the dispute.[412]

---

[408] Pakistan's Rejoinder, ¶¶ 612-613.

[409] Pakistan's Rejoinder, ¶ 614.

[410] Pakistan's Rejoinder, ¶ 616.

[411] Pakistan's Rejoinder, ¶ 617.

[412] Pakistan's Rejoinder, ¶ 620.

**(2) Attribution**

a.  *Issue 3: Are the acts of Lakhra attributable to the State of Pakistan?*

354.  Whilst it is accepted that acts of the Supreme Court, MoWP and the NAB are attributable to the State, it is Pakistan's position that Lakhra, PEPCO and KESC are separate legal entities with autonomy from the State. As such, their acts are not attributable to the State of Pakistan unless specifically and individually directed, instructed or controlled by the State. Only Lakhra's institution of the Sindh High Court proceedings, which was done at the specific request of the NAB, is admitted as being attributable to Pakistan.[413]

355.  Karkey argues that Lakhra is both structurally and functionally controlled by Pakistan. Pakistan submits, however, that these arguments are not relevant for the purposes of Article 8 of the ILC Articles, which turns purely on whether Lakhra was acting on the instruction, or at the direction or under the control of Pakistan. Lakhra is an independent entity with legal autonomy from the State. It has an independent legal personality, it can sue and be sued in its own name, and it is owed fiduciary duties by its directors under the Companies Ordinance. Accordingly, as the commentary to Article 8 makes clear, "prima facie *[Lakhra's] conduct in carrying out [its] activities is not attributable to the State*".[414]

356.  Pakistan submits that the burden of overturning this presumption is on Karkey. To do so, Karkey must show that each specific act of Lakhra on which it relies was specifically instructed, directed or controlled by Pakistan. According to Pakistan, Karkey has failed to demonstrate that Pakistan issued any such specific instruction, direction or control to Lakhra in respect of each instance in which Lakhra is said to have acted as Pakistan. Instead, it makes generalized claims without properly linking those claims to specific instances of instruction, direction or control by Pakistan which are said to go to individual claims advanced by Karkey.[415]

357.  Pakistan also rejects Karkey's argument that Lakhra's entry into the 2009 RSC was effectively controlled by Pakistan, noting in particular a letter from the PPIB stating that "*the Competent Authority has decided that Lakhra…will be the 'Buyer'*". Pakistan submits that this argument is relevant to Karkey's Additional Claims regarding fair and equitable treatment, in particular

---

[413] Pakistan's Post-Hearing Brief, ¶ 225.

[414] Pakistan's Post-Hearing Brief, ¶ 227, quoting CA-144, ILC Articles on State Responsibility, ¶ 6.

[415] Pakistan's Post-Hearing Brief, ¶¶ 228-229.

Karkey's alleged legitimate expectations. If the entry into the 2008 and 2009 RSCs was not effectively controlled by Pakistan, then the promises in the contract are not Pakistan's, and they are not capable of forming the basis of legitimate expectations.[416]

358. Pakistan submits that the letter relied on by Karkey does not identify who the "*competent authority*" is. It is therefore not possible to say whether it is Pakistan (the ECC or the MoWP) or another, separate legal entity (like PEPCO). Moreover, the representations and warranties in the contract – which ultimately form the basis of Karkey's alleged legitimate expectations – contain a clear representation that, "*the execution, delivery and performance by [Lakhra] of this Contract to which it is a PARTY constitute private and commercial acts rather than public and governmental acts*". According to Pakistan, Karkey has said nothing about this key provision of the 2009 RSC in any of its written or oral pleadings. Karkey accepted this representation when it signed the 2008 and 2009 RSCs, and cannot now choose to ignore it.[417]

359. Moreover, Article 5 of the ILC Articles provides that the acts of entities empowered by law to exercise elements of governmental authority are attributable to the State as a matter of international law. Pakistan submit that, in arguing that Lakhra's failure to comply with the 2009 RSC and attempts to have the Vessels arrested constitute governmental actions under Article 5 of the ILC Articles, Karkey fundamentally misunderstands the distinction between a commercial and a governmental action. Any contractual counterparty can fail to comply with their contract, and any party with standing can commence an action in the admiralty courts for the arrest of a vessel. Accordingly, Lakhra's actions do not represent the exercise of governmental power, and are not attributable to Pakistan. For the same reasons, Lakhra's acts are not governmental acts or *jure imperii*.[418]

### (3) Merits of Karkey's Claims under the Express Terms of the Treaty

a. *Issue 4: What are the factual issues in dispute?*

360. Pakistan submits that there are two issues which are critical to the Tribunal's consideration of Karkey's claims under the express terms of the Treaty, namely: (a) whether the Supreme Court proceedings amounted to a denial of due process, and (b) whether the implementation of the

---

[416] Pakistan's Post-Hearing Brief, ¶ 230.

[417] Pakistan's Post-Hearing Brief, ¶ 231.

[418] Pakistan's Post-Hearing Brief, ¶ 239.

Supreme Court Judgement by the NAB, Lakhra, the Sindh High Court and the Supreme Court itself was valid and proper.[419]

361.  On the first issue, Karkey's complaints concern: (i) the procedural protections afforded to Karkey; (ii) the Supreme Court's approach to evidence; (iii) the propriety of the Supreme Court's findings; and (iv) positions adopted by the MoWP in the Supreme Court proceedings. According to Pakistan, in each case, Karkey's complaints are unfounded.[420]

362.  Pakistan submits that Karkey was accorded all the necessary procedural protections. At no point during the proceedings before the Supreme Court did Karkey raise any of the matters of which it now complains. Yet by their nature, they must have been known to Karkey. Having not done so, it is not open to Karkey to do so now.[421]

363.  Pakistan rejects Karkey's claims that the Supreme Court took an improper approach to evidence. Pakistan argues that Karkey does not present any evidence that the length of its submissions was in any way limited by the Supreme Court, nor does it present any documentary evidence to substantiate its claim that its counsel was only allowed to speak 30 minutes. On the contrary, the record shows that Karkey's counsel made submissions on two separate days (as well as an application for adjournment – which was granted).[422]

364.  Moreover, Pakistan submits that the Supreme Court's findings were all within its authority and were based on proper (as opposed to *prima facie* only) evidence. Karkey claims that the Supreme Court's finding (that the RPP contracts had been awarded in a non-transparent manner) is untenable in light of the substantial evidence of multiple breaches of Pakistani procurement laws by Karkey. For example, it cannot be denied that Karkey's RPP was delivered over two years late – hence why delay was a factor in the Supreme Court's decision. Moreover, Karkey's submissions to the Supreme Court must also be borne in mind, as Karkey failed to put before the Supreme Court the 2008 RSC and obfuscated the sequence of the reasons for the increase in the

---

[419] Pakistan's Rejoinder, ¶ 663.

[420] Pakistan's Post-Hearing Brief, ¶ 240.

[421] Pakistan's Post-Hearing Brief, ¶ 241(a).

[422] Pakistan's Post-Hearing Brief, ¶ 242(a). *See also* Pakistan's Rejoinder, ¶¶ 681-685.

Advance Payment, the change in definition of the Target COD and introduction of the FPLC. Any absence of evidence was at least in part attributable to Karkey.[423]

365.   According to the Respondent, Karkey's argument that the Supreme Court declared the RPP contracts void *ab initio* on the basis of *prima facie* evidence misconstrues the Judgment. In fact, the Supreme Court declared the RPP contracts void *ab initio* because they were procured in violation of the PPRA Rules. Pakistan maintains that this finding was based on a full consideration of the evidence tendered (which did not include the 2008 RSC). Moreover, the Supreme Court itself did not make any specific finding of corruption – as Karkey admits.[424]

366.   As regards the second issue, it is Pakistan's position that the implementation of the Supreme Court Judgement by the NAB, Lakhra, the Sindh High Court and the Supreme Court itself was valid and proper.

367.   Pakistan submits that, contrary to Karkey's allegations, the Supreme Court's direction to the NAB to investigate the RPP sponsors did not harm the presumption of innocence. In view of the finding that the RPP contracts were entered into in breach of the PPRA Rules (and other Pakistani law) and with a lack of transparency (and bearing in mind the broad definition of "*corruption and corrupt practices*" under Section 9 of the NAO), the Supreme Court was entirely within its rights to involve the NAB. According to Pakistan, it was precisely to maintain the presumption of innocence that the Supreme Court stopped short of making a finding on "*corruption and corrupt practices*" and instead indicated that the competent anti-corruption agency should pursue the matter. In any event, the NAB itself does not make any findings of guilt. Rather, like any prosecuting authority, it builds its case before presenting that case before the appropriate court. The appropriate court in this case, the Accountability Court, maintains the presumption of innocence – as required by Pakistani law – and is yet to reach its decision on the issue.[425]

368.   Pakistan maintains that, moreover, contrary to Karkey's assertions, the Vessels were validly detained under the NAO, as Section 23 NAO creates an automatic restraint on the Vessels, the practical effect of which prevents the Vessels from leaving Pakistan. Section 23 of the NAO creates the restraint, Section 12 gives the NAB the power to enforce that restraint.[426] Pakistan

---

[423] Pakistan's Post-Hearing Brief, ¶ 243(a).

[424] Pakistan's Post-Hearing Brief, ¶ 243(c).

[425] Pakistan's Post-Hearing Brief, ¶¶ 247-248.

[426] Pakistan's Post-Hearing Brief, ¶ 249(a).

also rejects Karkey's argument regarding the NAB's demands for payment. The fluctuation in the amount demanded represents an example of the State's judicial system working to correct its own errors, resulting in a demand of the amount it considered properly due of US$128 million. Karkey has suffered no loss as a result of these corrections. In addition, whilst Karkey contends that it was not present at the hearings at which these sums were calculated, the record reflects that this was Karkey's own choice.[427]

369.   Pakistan submits that there has been no denial of due process in the Sindh High Court proceedings, which are yet to reach a conclusion. Karkey argues that Lakhra should not have instituted the Sindh Court proceedings without a resolution from its board. However, no such resolution is required to be appended where the pleading is signed by a director or principal officer. In any event, a minor procedural breach like this does not amount to a denial of justice. Pakistan also rejects Karkey's argument that Lakhra's commencement of the Sindh High Court proceedings was a breach of the LCIA arbitration clause in the 2009 RSC. However, the Sindh High Court proceedings are an action enforcing the Judgment. They therefore are not in connection with or arising out of the 2009 RSC. The source of Lakhra's claim is statutory, not contractual.[428]

370.   Pakistan rejects Karkey's claims that the Accountability Court proceedings were unfair and in a violation of Karkey's due process rights because (i) a corporation cannot be a named accused in a NAB reference, (ii) the NAO does not allow the NAB to file a reference against foreigners not in Pakistan, and (iii) Karkey was not validly served with the proceedings. According to Pakistan, these arguments do not succeed not least because there can be no denial of justice in respect of proceedings that are still pending. Moreover, the NAO applies to all legal "persons" in Pakistan, and a company is necessarily represented by its directors. The NAO also applies to foreign nationals who were present in Pakistan at the time of the alleged offence. There is therefore no denial of due process in the fact that Karkey and its employees were named as accused in the Accountability Court proceedings. Finally, Pakistan submits that Karkey's complaints about service of the proceedings ring hollow in the light of the fact that it has been present through counsel throughout the Accountability Court proceedings.[429]

---

[427] Pakistan's Post-Hearing Brief, ¶ 250.

[428] Pakistan's Post-Hearing Brief, ¶¶ 254-256.

[429] Pakistan's Post-Hearing Brief, ¶¶ 259-260.

b. *Issue 5: Did Pakistan expropriate Karkey's investment in breach of Article III of the Treaty?*

371.   According to Pakistan, there are two key threshold issues in relation to Karkey's expropriation claim:[430]

-   First, Karkey is unable to show any substantial deprivation of its whole investment in circumstances where its single most valuable asset – that is the *Kaya Bey* – has been released and is now earning revenue elsewhere; and

-   Second, the 2009 RSC has been declared void *ab initio* by the highest court of Pakistan and therefore does not give rise to rights capable of being expropriated.

372.   As regards the first issue, Karkey contends (and Pakistan agrees) that, when considering expropriation, the property rights in question should be viewed "*as a whole*".[431] An investor will not be permitted to slice its investment into ever finer slivers in order to meet the substantial deprivation threshold. Yet, this is what Karkey attempts to do. In a tacit acknowledgment that it cannot successfully argue that its whole investment has been expropriated, Karkey now attempts to slice off the *Kaya Bey* and remove it from the expropriation analysis altogether. As Karkey noted on multiple occasions at the Hearing, "*there is no claim for expropriation of the* Kaya Bey"[432] and "*the ship's released, it's not actually expropriated*".[433]

373.   Pakistan submits that on Karkey's own case this cannot be permitted. The Tribunal's expropriation analysis must include the *Kaya Bey* as part of the investment "as a whole" and, in light of the fact that the vessel has been returned to Karkey and is generating a commercial return, Karkey has not been substantially deprived of its investment because it is benefiting from revenue generated by the *Kaya Bey*. Karkey's expropriation claim must therefore fail and the Tribunal need consider this Issue 5 no further.[434]

374.   As regards the second issue (in the event the Tribunal disagrees with the above), Pakistan agreed that – in the right circumstances – contractual rights are assets capable of being expropriated.

---

[430] Pakistan's Post-Hearing Brief, ¶ 262.

[431] Pakistan's Post-Hearing Brief, ¶ 263.

[432] Tr. Day 5, 1345: 8-9.

[433] Tr. Day 6, 1681: 3-4.

[434] Pakistan's Post-Hearing Brief, ¶ 266.

However, in order to validly be the subject matter of an expropriation claim, the rights in question must exist and be enforceable at law.[435]

375.  In the instant case, Karkey's post-termination contract rights do not exist and are not enforceable at law because the 2009 RSC was declared void *ab initio* by the Supreme Court on 30 March 2012. This is critical because, as noted by the tribunal in *Arif v. Moldova,* no wrongful taking results from the legitimate application of the host-State's legal system and the subsequent invalidity of the rights at stake. As that tribunal put it, "*[i]n light of the fact that the agreements have been found to be invalid under Moldovan law this Tribunal is not persuaded that there can be deprivation of invalid rights*".[436]

376.  Pakistan submits that the real question is therefore whether the Supreme Court process and/or decision itself violated international law by way of a denial of justice. If it did not, the Supreme Court's findings are legitimate and Karkey had no contractual rights capable of forming the subject matter of an expropriation claim.[437]

   c.   *Issue 6: Did Pakistan breach Article IV of the Treaty (free transfer)?*

377.  Pakistan rejects Karkey's argument that the language of Article IV providing that "*all transfers related to an investment*" necessarily encompasses the transfer of physical assets because those assets are included in the definition of "investment" under the Treaty. This is because, *inter alia*, Karkey erroneously conflates transfers related to an investment with transfers of an investment itself. Pakistan submits that, in the context of the rest of the provision, which lists examples of transfers relating only to funds, it is clear that the Treaty parties intended to obligate the free transfer of funds related to an investment only. Karkey simply ignores Article IV(2) of the Treaty which provides that "*[t]ransfers shall be made in the convertible currency in which the investment has been made or in any convertible currency at the rate of exchange in force at the date of transfer*".[438] According to Pakistan, this provision unquestionably demonstrates that the

---

[435] Pakistan's Post-Hearing Brief, ¶ 267.

[436] Pakistan's Post-Hearing Brief, ¶ 268, quoting CA-108, *Franck Charles Arif v. Republic of Moldova* (ICSID Case No. ARB/11/23), Award, 8 April 2013, ¶ 417.

[437] Pakistan's Post-Hearing Brief, ¶ 269.

[438] C-001, Article IV(2).

word "transfer" in Article IV relates only to funds. Assets cannot be transferred in a convertible currency.[439]

378.   Even in the event that the Tribunal finds that Article IV of the Treaty does obligate the free transfer of Karkey's assets, Pakistan maintains that there has nevertheless been no breach of the Treaty because Pakistan's obligation is to allow free transfer "*without unreasonable delay*". In this case, the delay in releasing the Vessels (an outcome which could be achieved at any time by paying the amounts due pursuant to the Supreme Court Judgment) is entirely reasonable given Karkey's material breaches of fundamental principles in Pakistani law.[440]

### (4) Merits of Karkey's Additional Claims Brought under the MFN Clause

a.   *Issue 7: Does the Tribunal have substantive jurisdiction over Karkey's Additional Claims?*

379.   Pakistan submits that Karkey is not entitled to rely on the MFN clause in Article II(2) of the Treaty to bring the Additional Claims within the jurisdiction of the Tribunal. Pakistan does not contend that the importation of substantive protections from other treaties via an MFN clause is generally impermissible. Rather, Article II(2) of the Treaty places certain conditions on the importation of other standards – namely, that there must be "established" investments of investors "in similar situations" to Karkey. In order to be able to bring its Additional Claims, Karkey must show that these requirements are met.[441]

380.   The Parties agree that there are no actual investments "in similar situations" to Karkey's RPP. The Parties disagree only over the scope of application of Article II(2); namely whether it permits importation of substantive protections from other treaties offered to: (i) potential investors (as Karkey contends); or (ii) by actual investors (as Pakistan contends).[442]

381.   Since the Parties agree that there are no such actual investors, it follows that, if Pakistan's contention is correct, the requirements of Article II(2) of the Treaty are not satisfied and the Tribunal does not have jurisdiction over the Additional Claims. Significantly, this was precisely

---

[439] Pakistan's Rejoinder, ¶ 857.

[440] Pakistan's Rejoinder, ¶ 861.

[441] Pakistan's Post-Hearing Brief, ¶ 273. *See also* Pakistan's Rejoinder, ¶ 868.

[442] Pakistan's Post-Hearing Brief, ¶ 274.

the position taken by the distinguished tribunal in the recently published *Içkale v. Turkmenistan* award.[443]

382. Indeed, according to Pakistan, the tribunal went further and stated that the words "treatment in similar situations" could not sensibly be interpreted to include the protection of other investment treaties. Even if the Tribunal does not also accept this second limb to the *Içkale* tribunal's analysis that is not decisive, because it is common ground that there is no investor "in similar situations" to Karkey with access to a treaty. Karkey's attempt to import substantive obligations from other treaties via the MFN clause must therefore fail.[444]

383. Pakistan submits, moreover, that it is well established that a State's breach of contract does not automatically give rise to an international wrong. Rather, a State's breach of contract does not give rise to an international wrong unless it involves a sovereign act which a private party could not commit.[445]

384. Pakistan argues that Karkey's argument that Lakhra's actions involved the exercise of public power "*such as failing to comply with the Contract, and seeking the arrest of the Vessels*"[446] represents a misunderstanding of what constitutes sovereign power. Any commercial party is capable of non-payment, and any commercial party with standing can seek an arrest order. Indeed, those are quintessentially commercial acts. Therefore, even if Lakhra's actions are attributable to Pakistan (which is denied), there has been no breach of the expropriation provision of the Treaty (or of the FET or FPS provisions of other treaties).[447]

385. According to Pakistan, the Tribunal does not have jurisdiction over Karkey's purely contractual claims by virtue of the umbrella clause. Karkey's umbrella clause claims fail for four separate threshold reasons:[448]

---

[443] Pakistan's Post-Hearing Brief, ¶ 275; RA-291, *Içkale v. Turkmenistan*.

[444] Pakistan's Post-Hearing Brief, ¶ 276.

[445] Pakistan's Post-Hearing Brief, ¶ 287.

[446] Karkey's Reply, ¶ 744.

[447] Pakistan's Post-Hearing Brief, ¶ 288.

[448] Pakistan's Post-Hearing Brief, ¶ 289.

-   First, Karkey may not rely on the umbrella clause from the Lebanon-Pakistan BIT because there are no investors "in similar situations" for the purposes of Article II(2) of the Treaty;

-   Second, the 2009 RSC was legitimately declared void *ab initio* by the Supreme Court, meaning there are no "obligations" to which an umbrella clause could attach;

-   Third, Lakhra's alleged breaches of the 2009 RSC are not attributable to Pakistan; and

-   Fourth, the 2009 RSC contained an exclusive jurisdiction clause providing for LCIA arbitration in respect of contractual disputes. Karkey expressly waived the right to other dispute resolution procedures when it signed the 2009 RSC.

386.  According to Pakistan, in arguing that each of its claims relating to the performance of the contract is properly a treaty claim, Karkey confuses the admissibility of umbrella clause (*i.e.* purely contractual) claims on the one had with broader treaty claims where an underlying contractual issue happens to be relevant on the facts, on the other. The former may not be brought in breach of an exclusive jurisdiction clause. Further, if Karkey were correct that its contractual claims were all treaty-based, it would not need to avail itself of an umbrella clause at all.[449]

   b.   *Issue 8: Has Pakistan failed to accord Karkey fair and equitable treatment?*

387.  Pakistan submits that if the Tribunal agreed with Karkey that Lakhra's actions are attributable to Pakistan, the 2009 RSC is, by virtue of the entire agreement clause therein, the only source of representations upon which Karkey can potentially found its alleged expectations.[450]

388.  If, on the other hand, the Tribunal finds that Lakhra's actions are not attributable to Pakistan, the promises in the 2009 RSC are not representations of the State and they cannot give rise to legitimate expectations. Moreover, none of the alleged non-contractual representations cited by Karkey is capable of giving rise to legitimate expectations because, *inter alia*, the RFP and bid documents contained a disclaimer, accepted by Karkey, by which Pakistan "*expressly disavow[ed] any obligation or duty…to any Bidder*".[451] Also, as the 2009 RSC was held to be void *ab initio* by the Supreme Court, Karkey's alleged Post-Termination Contract Rights do not

---

[449] Pakistan's Post-Hearing Brief, ¶ 290. *See also* Pakistan's Rejoinder, ¶ 898.

[450] Pakistan's Post-Hearing Brief, ¶ 296.

[451] C-137. Pakistan's Post-Hearing Brief, ¶ 297.

exist and the Sovereign Guarantee (which is a secondary obligation inextricably linked to the 2009 RSC) falls away.[452]

389.   If, contrary to Pakistan's arguments, the Tribunal finds that one or more of the above representations is capable of giving rise to legitimate expectations, Pakistan submits that the Tribunal must then ask whether those expectations have been breached by Pakistan. In the first instance, even if Lakhra's alleged breaches of the 2009 RSC are attributable to Pakistan, they do not represent breaches involving the exercise of sovereign power because the actions taken by Lakhra could have been taken by any private commercial party. Accordingly, they do not amount to breaches of the Treaty.[453]

390.   According to Pakistan, in order to be protected under international law, an investor's expectations must be (i) reasonable and legitimate at the time of the investment; (ii) existing and enforceable at law; and (iii) balanced against the State's right to regulate its public interest.[454]

391.   It is Pakistan's position that Karkey's alleged expectations were not reasonably and legitimately held.  Karkey's expectations are also not existing and enforceable at law because they are all based on the 2009 RSC, which was declared void *ab initio* by the Supreme Court. Whilst Karkey argues that Pakistan cannot invalidate its legitimate expectations by pointing to information that was not known to Karkey at the time of its investment, Karkey was (or should have been) aware that the key changes from the Draft RSC (which were made at Karkey's request) would result in breaches of pre-existing Pakistani law, including the PPRA Rules.[455]

392.   Furthermore, the threshold for finding a denial of justice is very high and requires evidence of the most convincing nature. An error of fact or law is not sufficient to found a denial of justice claim. Even "*the most perplexing and unconvincing national judgments are upheld on the grounds that international law does not overturn determinations of national judiciaries with respect to their own law*".[456]

---

[452] Pakistan's Post-Hearing Brief, ¶ 297.

[453] Pakistan's Post-Hearing Brief, ¶ 298.

[454] Pakistan's Post-Hearing Brief, ¶ 299.

[455] Pakistan's Post-Hearing Brief, ¶ 302. *See also* Pakistan's Rejoinder, ¶ 918.

[456] Pakistan's Post-Hearing Brief, ¶ 305, citing RA-148, Paulsson, *Denial of Justice in International Law*, 1st Ed. (2005), at p. 82.

393.  Pakistan reiterates that there was no denial of justice in the Supreme Court. Karkey's experienced lawyers did not make any complaint regarding the Supreme Court's procedure at the time. Unlike a number of the other RPP sponsors, Karkey has not attempted to file a review of the Judgment and therefore failed to exhaust the domestically available remedies and the Pakistani legal system as a whole.[457]

394.  Pakistan maintains that Karkey's claim that it was denied justice by Lakhra, the NAB, the Sindh High Court and the Accountability Court fails for a number of reasons. For instance, Karkey's allegations – even if taken at face value – amount to nothing more than complaints that there were errors of law. This is insufficient to establish a denial of justice.[458]

395.  Finally, Pakistan disputes that its actions were in any way improper, and denies that any action was taken in bad faith. In furtherance of the public interest, Pakistan has simply investigated claims that the RPP projects were tainted by improper procurement and corruption. Moreover, even taken at their highest, Karkey's allegations do not constitute examples of bad faith because Karkey has failed to show the requisite "*egregious intent*".[459]

   c.  *Issue 9: Has Pakistan acted in an arbitrary and unreasonable manner?*

396.  Pakistan submits that the Parties appears to agree that the independent standard prohibiting arbitrary and unreasonable conduct has the exact same scope and content as the prohibition under the FET standard discussed above. The point is therefore moot.[460]

   d.  *Issue 10: Has Pakistan breached its obligations under the "umbrella" clause of the Lebanon-Pakistan BIT?*

397.  Pakistan rejects Karkey's argument that Lakhra's alleged breaches of the 2009 RSC are attributable to Pakistan, and that those breaches amount to violations of Pakistan's obligation under the BIT to observe its commitments to Karkey pursuant to the umbrella clause.[461]

---

[457] Pakistan's Post-Hearing Brief, ¶¶ 307-308.

[458] Pakistan's Post-Hearing Brief, ¶ 309.

[459] Pakistan's Post-Hearing Brief, ¶ 321.

[460] Pakistan's Post-Hearing Brief, ¶ 322.

[461] Pakistan's Rejoinder, ¶ 976.

111

398. Karkey's claim for Post-Termination Contract Rights has already been addressed at Issues 5 (expropriation) and 8 (FET), above. There is no need for the Tribunal to consider it further in the context of the umbrella clause claim, for the following reasons:[462]

- <u>First,</u> if the actions of the Supreme Court and the NAB did not violate international law, it follows that Lakhra's conformity with the Supreme Court Judgment and the instructions of the NAB was not a violation of Karkey's legitimate expectations or an expropriation of its alleged contractual rights;[463]

- <u>Second,</u> if (contrary to Pakistan's position) the actions of the Supreme Court and the NAB did violate international law, Karkey's claims relating to its Post-Termination Contract Rights could and should nevertheless be heard exclusively by an LCIA tribunal, as mandated by Article 28 of the 2009 RSC;[464]

- <u>Third,</u> if (contrary to Pakistan's position) the Tribunal finds that the Supreme Court and the NAB violated international law and that Karkey's contractual claims are brought in the correct forum, then (provided that Karkey's investment "*as a whole*" has been affected) Karkey will succeed on its claim in respect of the Post-Termination Contract Rights as a result of the Supreme Court's actions. In that case, the question of whether Lakhra's alleged breaches of the 2009 RSC are also capable of amounting to a breach of the Treaty is moot because the property rights which have been expropriated in this scenario (and Karkey's corresponding losses) are exactly the same: the Post-Termination Contract Rights.[465]

399. In each of these scenarios, Karkey's claim for Post-Termination Contract Rights will have been dismissed (in which case its right to damages must fall away), considered in another forum, or will already have been established (in which case the only outstanding issue is the amount owing, which is addressed at the Damages Section below). Accordingly, there is no need for the Tribunal to consider Karkey's primary claim under the umbrella clause.[466]

---

[462] Pakistan's Rejoinder, ¶ 983.

[463] Pakistan's Rejoinder, ¶ 983(a).

[464] Pakistan's Rejoinder, ¶ 983(b).

[465] Pakistan's Rejoinder, ¶ 983(c).

[466] Pakistan's Rejoinder, ¶ 984.

400. Pakistan submits that Karkey accepts that its claim for Pre-Termination Contract Rights only falls to be considered in the event that its primary claim for Post-Termination Contract Rights fails. However, any claim for Pre-Termination Contract Rights cannot be properly advanced in the alternative.[467] Karkey will have failed in its primary claim by virtue of a finding by the Tribunal that the Supreme Court Judgment did not violate International law, in which case the 2009 RSC is void. It necessarily follows that Karkey can have no right to any of the payments claimed, pre- or post-termination. There is, therefore, no self-standing umbrella clause claim for either Karkey's Post-Termination Contract Rights or its Pre-Termination Contract Rights.[468]

401. In any event, even if the Tribunal finds that Lakhra's alleged breaches of the 2009 RSC are attributable to Pakistan (whether under domestic or international law), simple commercial breaches are not within the protection offered by an umbrella clause.[469]

   e. *Issue 11: Has Pakistan failed to accord Karkey full protection and security?*

402. Pakistan rejects Karkey's allegation that Pakistan have failed to provide Karkey with physical and legal protection and security.

403. According to Pakistan, the Tribunal must first decide the scope of the full protection and security ("FPS") standard. The FPS standard is primarily concerned with protection against physical damage and may be extended to legal security "*only exceptionally*".[470] In the event the Tribunal agrees, it need only consider the Parties' arguments regarding physical protection and security.[471]

404. Pakistan submits that the Parties appear to agree that the obligation to provide full protection and security is not one of strict liability, but one of due diligence. The Parties also agree that the scope of this obligation requires the State to take reasonable precautionary measures to minimize the risk of harm to the investor.[472]

---

[467] Pakistan's Rejoinder, ¶ 985.

[468] Pakistan's Rejoinder, ¶¶ 986-987.

[469] Pakistan's Rejoinder, ¶ 999.

[470] RA-157, *PSEG Global Inc. and Konya Ilgin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, (ICSID Case No. ARB/02/5), Award, 19 January 2007, ¶ 258.

[471] Pakistan's Rejoinder, ¶ 1004.

[472] Pakistan's Rejoinder, ¶ 1012. *See also* Pakistan's Counter-Memorial, ¶ 1324.

405. Karkey's arguments regarding physical protection and security can be distilled down to two alleged failures by Pakistan, which are rejected by Pakistan. First, Karkey alleges that "*Pakistan's termination of the power supply to the Vessels*" constituted a breach of the FPS standard because it threatened the health and safety of Karkey's crew, and prevented Karkey from conducting proper maintenance leading to "*corrosive damage*". Second, Karkey alleges that Pakistan did not permit the Vessels to sail away, out of the jurisdiction, to avoid the risk of monsoon conditions.[473]

406. As to Karkey's first argument, the Parties are in fact agreed that it was KESC – not Pakistan – that terminated the power supply to Karkey's Vessels. KESC is an independent and privately held company and, as such, its actions are not attributable to Pakistan. Karkey does not dispute this. Instead, it seeks to get around the issue by arguing that "*Karkey sought assistance from PEPCO with respect to the need for power and PEPCO undeniably ignored the request.*"[474] It is correct that Karkey wrote to PEPCO – on just two occasions in the days immediately after the Supreme Court Judgment.[475] Regardless of the reasons, the lack of response to just two letters cannot possibly amount to a breach of Pakistan's international law obligations.[476]

407. As to Karkey's second argument, aside from the fact that allowing the Vessels to leave Pakistani waters would involve releasing the only security over the money owed by Karkey pursuant to the Supreme Court Judgment, Karkey fails to allege that any damage was actually caused as a result of the monsoon, nor does it claim for any damage. Accordingly, there has been no breach of the FPS standard in this regard.[477]

408. In the event that the Tribunal finds that there are exceptional circumstances permitting the extension of the FPS standard to legal protection and security, Pakistan has nevertheless satisfied its obligation of due diligence at all times:[478]

- First, as set out at Issue 4 (merits/facts) above, Pakistan did not deny Karkey due process;

---

[473] Pakistan's Rejoinder, ¶ 1013.

[474] Karkey's Reply, ¶ 975.

[475] Pakistan's Rejoinder, ¶ 1014.

[476] Pakistan's Rejoinder, ¶ 1015.

[477] Pakistan's Rejoinder, ¶ 1018.

[478] Pakistan's Rejoinder, ¶ 1019. *See also* Pakistan's Counter-Memorial, ¶ 1327.

- Second, as set out at Issue 3 (attribution) above, Pakistan did not breach its FPS obligation by "permitting and sanctioning" Lakhra's alleged breaches of the 2009 RSC. Lakhra is an independent entity whose actions are not attributable to Pakistan; and

- Third, the Supreme Court's decision that the 2009 RSC was void *ab initio* – and the actions taken following that judgement – were legitimate and reasonable acts aimed at achieving objectively rational public policy goals.

### (5) Damages

409.   According to Pakistan, even if the Tribunal were to determine that, contrary to Pakistan's position, it does have jurisdiction and Pakistan has breached the Treaty, then Karkey is not entitled to anything like the sums claimed. This is because the losses that Karkey alleges: (a) are not owing in the sums claimed (in respect of the Contract Claims); (b) have not been caused by any alleged breach of the Treaty; (c) in respect of historic losses, are incorrect, exaggerated or entirely unsupported by the evidence; and (d) in respect of future losses, are speculative, and fall outside the categories of loss recoverable as a matter of public international law.[479]

410.   Pakistan's submissions on damages are summarized below under the following headings: (a) Issue 12 (Applicable legal standard); (b) Issue 13 (Key differences between the Parties' experts on the DCF models); (c) Issue 14 (Losses claimed in respect of the *Alican Bey*); (d) Issue 15 (Losses claimed in respect of the *Kaya Bey*); (e) Issue 16 (Consequential losses); and (f) Issue 17 (Claim for Post-Termination Contract Rights).[480]

   a.   *Issue 12: Applicable legal standards to Karkey's claim for damages*

      *(a.1) Measure of damages and causation*

411.   Pakistan submits that the Parties agree that the State responsible for an internationally wrongful act is under an obligation to make full reparation for the injury caused by the internationally wrongful act. However, they disagree on the correct test for causation and therefore the circumstances in which the obligation to make full reparation arises.[481]

---

[479] Pakistan's Post-Hearing Brief, ¶ 324.

[480] Pakistan's Post-Hearing Brief, ¶ 325.

[481] Pakistan's Post-Hearing Brief, ¶ 332.

412. According to Pakistan, causation in international law requires that: (a) on a balance of probabilities, the injury complained of has been caused by a wrongful act of the respondent-State (factual causation or the "but for" test); and (b) that the losses complained of were caused as a matter of law by the alleged breaches of the Treaty, meaning that the losses are not too remote or speculative (legal causation). These requirements are well established and are supported by the ILC Articles and their Commentary.[482]

413. Karkey has argued that a causal link may be presumed if it can demonstrate that "*in the normal course of events a certain cause [*i.e. *the alleged breaches of the Treaty] will produce a certain effect [*i.e. *Karkey's damages]*". [483] Pakistan submits that Karkey's approach to causation and remoteness is incorrect and oversimplified. There are many reasons why the construction of a vessel may be delayed or financing may be refused. It is not for Pakistan to prove what other events might have caused any alleged loss. Instead the burden of proof is on Karkey.[484]

*(a.2) The requirements for a Loss Profits Claim*

414. Pakistan submits that under customary international law, the State responsibility for an internationally wrongful act is under an obligation to compensate for the damage caused, which "*shall cover any financially assessable damage including lost profits insofar as it is established*".[485]

415. Several of Karkey's claims are for lost profits: losses claimed in respect of the *Alican Bey* and the *Kaya Bey*, losses claimed in relation to the alleged delay of the Powership Construction Programme, losses claimed in relation to the Iraq Powership Rehabilitation Programme and losses claimed in relation to the Geothermal Project.[486]

416. According to Pakistan, Karkey fails in particular to satisfy the well-established legal requirements for future lost profits: its claim in relation to the *Alican Bey* and the Powership Construction Programme, which include lost profits until even 2031, are not supported by any

---

[482] Pakistan's Post-Hearing Brief, ¶ 333.

[483] Karkey's Reply, ¶ 968.

[484] Pakistan's Post-Hearing Brief, ¶ 336.

[485] Pakistan's Post-Hearing Brief, ¶ 337, citing CA-144, ILC Articles, Article 36.

[486] Pakistan's Post-Hearing Brief, ¶ 338.

contracts nor a well-established history of dealings; and its claim for the Geothermal Project is not supported by any contracts nor any history of dealings.[487]

b. *Issue 13: Key differences between Mr. Haberman and Mr. Kaczmarek's DCF models*

417. It is Pakistan's position that if the Tribunal decides that Karkey's claims are recoverable then it must consider whether the sums claimed have been calculated based on the correct date of valuation, reasonable assumptions, accurate documentary evidence and are appropriately discounted for risk and any other uncertainties.[488]

418. This section addresses various assumptions, discounts and other inputs that differentiate Mr. Haberman and Mr. Kaczmarek's calculations, in particular their cash flow analyses. In sum, Mr. Kaczmarek has (a) vastly underestimated the level of risk inherent in Karkey's Powership business and, as a result, has applied an inappropriately low discount rate; and (b) Mr. Kaczmarek has not calculated Karkey's alleged loss on the correct valuation date.[489]

*(b.1) Appropriate Discount Rate (WACC)*

419. Pakistan submits that a major difference between the Parties' experts was the appropriate discount rate (WACC) for the purpose of calculating alleged lost profits.[490]

420. The appropriate discount rate is determined by reference to various components: the risk-free rate, beta, equity risk premium, country risk premium, size and project risk premium, cost of equity, post tax cost of debt, percent of equity and percent of debt. According to Pakistan, the most significant differences in opinion between the two experts in relation to these components are the country risk premium and the size and project risk premium. Mr. Haberman applies these premiums and Mr. Kaczmarek does not. If the Tribunal agrees with Mr. Haberman on the application of a country risk premium as well as a size and project risk premium, then it follows that it also agrees with Mr. Haberman's discount rate.[491]

---

[487] Pakistan's Post-Hearing Brief, ¶ 342.

[488] Pakistan's Post-Hearing Brief, ¶ 344. *See* Pakistan's Counter Memorial, ¶¶ 1547-1566; Pakistan's Rejoinder, ¶¶ 1220-1235.

[489] Pakistan's Post-Hearing Brief, ¶ 345.

[490] Pakistan's Post-Hearing Brief, ¶ 346.

[491] Pakistan's Post-Hearing Brief, ¶ 347.

421.  Mr. Haberman includes a country risk premium of 7.5% to 9%, which is incorporated into his discount rate. Mr. Haberman calculated his country risk premium on the basis of sovereign credit ratings, which reflect "*a government's willingness and ability to service its debt on time and in full*". It is therefore commonly used by valuers as a basis for calculating country risk premium. Given that Karkey enters into contracts with governments or government owned entities, sovereign credit ratings are directly relevant to Karkey's business.[492]

422.  Mr. Kaczmarek is of the view that this is unnecessary and therefore does not apply a country risk premium because he claims that country risk is accounted or in the cash flows by way of insurance payments and that political and legal risks are covered by investment treaties. This position is rejected by Pakistan, which claims that the inclusion of a country risk premium is an extremely common feature of investment tribunal's calculations of compensation. Also, an insurance policy does not eliminate all social, political, and legal risks. Otherwise, investors could disregard any such risks in a host-State when investing, so long as they are able to obtain insurance.[493]

423.  Moreover, in order to reflect (a) the fact that Karkey is in essence a start-up company without an established business model in the temporary floating power market, and (b) to account for Karkey's size, Mr. Haberman applies a size and project risk premium of 5% to this discount rate. Mr. Kaczmarek does not apply such a premium and therefore significantly understates the risks involved in Karkey's Powership operations.[494]

   *(b.2) Time between contracts*

424.  Pakistan points out that Mr. Kaczmarek has calculated lost cash flows for eight Vessels (the *Alican Bey*, the *Kaya Bey* and five Vessels whose construction was allegedly delayed) on the basis that there would only be a two-month gap between each contract. In other words, he assumes a constant, uninterrupted supply of contracts with no room for delays. Pakistan argues that, however, in the absence of a single precedent or an estimate from Karkey, Mr. Kaczmarek has adopted the most optimistic approach and neglected to apply a discount to reflect that it might not transpire that way.[495]

---

[492] Pakistan's Post-Hearing Brief, ¶ 348.

[493] Pakistan's Post-Hearing Brief, ¶¶ 351-352.

[494] Pakistan's Post-Hearing Brief, ¶ 354.

[495] Pakistan's Post-Hearing Brief, ¶ 358.

425.  Mr. Haberman assumes an eight-month gap between contracts, which includes transportation to a dry-docking facility (two months), transportation to the new operating site (two months) and a period of delay (two months). Pakistan submits that this approach is much more reasonable because it actually accounts for delay and maintenance. Ultimately, the Tribunal will have to take a view as to what is a reasonable assumption to make in this regard.[496]

*(b.3) The correct date of valuation*

426.  Pakistan submits that the correct date of valuation for a non-expropriatory breach or even for a lawful or unlawful expropriation is the date immediately preceding the relevant measure or the date immediately before the relevant measure became public knowledge. Since the date of valuation is the same for expropriation as well as non-expropriatory breaches, Karkey's decision to abandon its argument that the *Kaya Bey* has been expropriated does not require the use of a different valuation date. For example, in *AAPL v. Sri Lanka*, the tribunal adopted, without discussion, the date immediately preceding the non-expropriatory breach as the date of valuation. The Respondent argues that the vast majority of investment treaty cases have followed this approach for expropriation as well and have only relied on information available on that date (*ex ante*), as opposed to using information subsequent to the alleged taking (*ex post*).[497]

427.  Mr. Haberman has used the date of the alleged non-expropriatory breach (or expropriation) as his date of valuation in accordance with the overwhelming majority of cases. Mr. Kaczmarek has not relied on a fixed date of valuation. Instead, he has elected to use "convenient" dates that are close to the date of his reports. As far as Pakistan is aware, no tribunal has ever taken this approach.[498]

428.  Pakistan submits that the correct date of valuation is 30 March 2012.[499]

*(b.4) Karkey does not have a well-established history of dealings or track record*

429.  According to Pakistan, underlying Mr. Kaczmarek's approach to calculating Karkey's alleged losses are two misconceptions: (a) Karkey's purported past track record; and (b) Karkey's self-proclaimed position in the market. His misunderstanding of both leads him to fail to apply a size

---

[496] Pakistan's Post-Hearing Brief, ¶¶ 359-360.

[497] Pakistan's Post-Hearing Brief, ¶ 361, citing CA-61, *AAPL v. Sri Lanka*, 27 June 1990.

[498] Pakistan's Post-Hearing Brief, ¶¶ 363-364.

[499] Pakistan's Post-Hearing Brief, ¶ 368.

and project risk premium. It also highlights the absurdity of treating the hypothetical losses of a company without a well-established track record as historical fact.[500]

*(b.5) Mr. Kaczmarek's valuation is not supported by sufficiently reliable information*

430. Pakistan submits that it is reasonable and proportionate for a claim that was originally almost US$2 billion to be supported by reliable and accurate documentary evidence verified by an independent expert. However, Mr. Kaczmarek appears to have simply accepted any and all information provided to him by his client. His approach is fundamentally unsound.[501]

c.   *Issue 14: Losses claimed in respect of the Alican Bey*

431. Pakistan submits that before the Hearing, Karkey claimed damages related to the *Alican Bey* of US$457.2 million, which consisted of: (a) US$320 million for the alleged fair market value of the *Alican Bey* (described as the sum of future cash flows as of 30 June 2015); and (b) US$137 million for the alleged "*historical lost cash flows up to 30 June 2015*" *i.e.* lost profits. However, on the last day of the Hearing, Karkey revised its claim for damages related to the *Alican Bey* down to US$445.7 million.[502]

432. It is Pakistan's position that Karkey's claim remains severely flawed in several aspects: for example, it incorrectly quantifies the losses attributable to the detention of the *Alican Bey* and it relies on Mr. Kaczmarek's severely flawed DCF model.[503]

433. Pakistan has explained that Karkey could have avoided incurring the losses it now seeks as a result of the detention of the Vessels by paying US$128 million to the NAB, and that it would have been reasonable to pay this amount. But if the Tribunal decides to award Karkey compensation in relation to the *Alican Bey*, Karkey is in principle only entitled to the following: (i) restitution of the *Alican Bey*; (ii) if the Tribunal does not wish to grant restitution, the correct fair market value of the *Alican Bey*, which is in fact the replacement cost of the *Alican Bey* of US$120 million; and (iii) any lost profits until March 2018 when a new vessel will be operational.[504]

---

[500] Pakistan's Post-Hearing Brief, ¶ 369.

[501] Pakistan's Post-Hearing Brief, ¶ 377.

[502] Pakistan's Post-Hearing Brief, ¶ 378.

[503] Pakistan's Post-Hearing Brief, ¶ 379.

[504] Pakistan's Post-Hearing Brief, ¶ 380. *See also* Pakistan's Rejoinder, ¶ 1284.

434. Pakistan's position is that the appropriate remedy in relation to the *Alican Bey* would be restitution – the primacy of which is long established as a matter of international law – together with any costs of repairs and legally recoverable lost profits. The Tribunal may award restitution in the same manner as other ICSID Tribunals have, namely by ordering restitution by a given deadline and, in the event of non-compliance, requiring monetary compensation of a specified amount.[505]

435. If the Tribunal does not award restitution, it is relevant to the Tribunal's assessment of damages that Karkey does not seek restitution and is instead seeking exaggerated compensation.[506]

436. Pakistan rejects Karkey's argument that the fair market value of the *Alican Bey* is determined by reference to future lost cash flows because the *Alican Bey* is not an asset but an enterprise and is therefore due the "enterprise value" of the vessel. According to Pakistan, if the Tribunal finds that the *Alican Bey* was detained in breach of the Treaty, full reparation cannot exceed: (a) the replacement cost of the vessel, which the Parties agree is approximately US$115 to US$120 million; and (b) any lost profits until March 2018 when a new vessel will be operational, subject to the Tribunal deciding that those lost profits are legally recoverable. The latter approach is correct as a matter of logic, law and economics.[507]

437. Although Karkey equates the *Alican Bey*'s "future lost cash flows" to its fair market value, the amount it is claiming far exceeds the amount that a willing buyer would pay. Karkey is disguising what is in fact a future lost profits claim. By characterizing its claim as one for the fair market value of the vessel, Karkey is seeking to avoid application of the clear legal test for future lost profits, which proscribes recovery of such profits unless they arise out of a legally protected interest. Since the 2009 RSC has been terminated, future loss profits would only be recoverable if Karkey could prove that such profits arise out of another contractually protected interest which would ensure a continuous revenue stream for the duration of the *Alican Bey*'s useful life. Karkey has not provided any evidence of a contract under which the *Alican Bey* could have operated under following the termination of the RSC and up until the end of its operating life. Furthermore,

---

[505] Pakistan's Post-Hearing Brief, ¶ 381.

[506] Pakistan's Post-Hearing Brief, ¶ 382.

[507] Pakistan's Post-Hearing Brief, ¶ 384.

as demonstrated above, Karkey does not have a well-established history or dealings or track record.[508]

438. Karkey's claim for compensation of over US$445 million (excluding interest) for alleged damages arising out of the detention of the *Alican Bey* also fails as a matter of simple economics. Mr. Kaczmarek's DCF produces an absurd measure of compensation that is out of all proportion to the ship's replacement value (and other comparable transactions). Compensation of approximately US$445 million would provide Karkey with the financial resources to purchase three new identical Vessels and potentially generate three times the revenue of the *Alican Bey*.[509]

   d.   *Issue 15: Losses claimed in respect to the Kaya Bey*

439. Pakistan submits that Karkey's revised claim (as set out in its closing at the Hearing) for the *Kaya Bey* comprises two components: (i) alleged physical damage and cost of repairs in the sum of approximately US$36 million; and (ii) alleged lost cash flows under other contracts, from 31 March 2012 to December 2015, stated at the Hearing to be approximately US$240 million.[510]

   *(d.1) Alleged damage to the Kaya Bey*

440. According to Pakistan, there are four issues that need to be determined by the Tribunal in deciding whether Karkey is entitled to damages in respect of the alleged costs of repairing the *Kaya Bey* and restoring it to its pre-detention condition:[511]

   -   First, has Karkey proven as a matter of fact that the *Kaya Bey* was damaged while detained in Pakistan and the extent of any such damage?

   -   Second, has Karkey established that repairs to the *Kaya Bey* have been carried out and how much those repair cost?

   -   Third, if the Tribunal finds that Karkey has proven that the *Kaya Bey* was damaged while detained in Pakistan and that any such damage is attributable to a breach of the Treaty by Pakistan, did Karkey take reasonable steps to mitigate its loss?

---

[508] Pakistan's Post-Hearing Brief, ¶ 390.

[509] Pakistan's Post-Hearing Brief, ¶ 391.

[510] Pakistan's Post-Hearing Brief, ¶ 393.

[511] Pakistan's Post-Hearing Brief, ¶ 394. *See also* Pakistan's Rejoinder, ¶ 1076.

- Fourth, if the Tribunal finds that Karkey has proven that the *Kaya Bey* was damaged while detained in Pakistan and that any such damage is attributable to a breach of the Treaty by Pakistan, did Karkey take reasonable steps to mitigate its loss?

441. Pakistan submits that Karkey has failed to discharge its burden of proof that any "damage" to the *Kaya Bey* was caused by an action of Pakistan in breach of the Treaty. Karkey has also failed to discharge its burden of proving the cost of repairing any such damage.[512]

442. Karkey also attempts to blame Pakistan for the alleged lack of power, manpower and resources reaching the *Kaya Bey* during the 7-month period when it was at outer anchorage.  According to Pakistan, Karkey has to show: (i) that there was in fact a lack of power, manpower and resources; and (b) if there was, that Karkey's alleged inability to get all of these resources was caused by a breach of the Treaty by Pakistan. However, Karkey has failed to do so in both respects.[513]

### (d.2) Loss Profits Claim

443. In its closing submissions at the Hearing, Karkey summarized the amount claimed for lost profits arising out of the detention of the *Kaya Bey* as being US$240.1 million. Mr. Haberman assessed the quantum of this claim as US$91.2 million.[514] According to Pakistan, different assumptions used in the two different models by the experts are the primary reason for the difference between the two figures (in particular, the transition time between contracts). In addition to those different assumptions, two further issues remain between the Parties.[515]

444. First, Karkey's claim for lost profits arising out of the *Kaya Bey*'s detention for the period between the date of the vessel's release in May 2014 to December 2015 depends on whether the Tribunal accepts that the *Kaya Bey* was in fact damaged to the extent Karkey alleges and that any such damage was caused by Pakistan's alleged breaches of the Treaty. If the Tribunal does not accept this, then the element of Karkey's claim for lost profits for the period following its release from Pakistan to December 2015 should be dismissed: any loss from the date of the *Kaya Bey*'s release was not caused by Pakistan but by Karkey's failure to mitigate its losses.[516]

---

[512] Pakistan's Post-Hearing Brief, ¶ 395.

[513] Pakistan's Post-Hearing Brief, ¶ 400.

[514] Pakistan's Post-Hearing Brief, ¶ 416.

[515] Pakistan's Post-Hearing Brief, ¶ 417.

[516] Pakistan's Post-Hearing Brief, ¶ 418.

445. Second, Karkey failed to explain at the Hearing why its claim for lost profits for the *Kaya Bey* has now extended beyond the original June 2015 date (*i.e.* the date that Karkey first suggested would the date the *Kaya Bey* would be returned to full operations) to December 2015. That delay, based on Mr. Kaczmarek's estimate, has resulted in a US$14 million increase in damages. There is no evidence to support the suggestion that this delay was caused by the alleged breaches of the Treaty and Pakistan should not be held liable for further losses.[517]

    e. *Issue 16: Consequential losses*

446. Karkey's original claim for the indirect losses allegedly caused by Pakistan's alleged breaches of the Treaty comprised the following:[518]

    (i) Delays to the Powership Construction Programme: originally US$428.2 million;

    (ii) Delays to the Geothermal Project: US$178.4 million;

    (iii) Delays to the Powership Rehabilitation Programme: US$44.5 million; and

    (iv) Costs increases (including insurance, penalty charges and shipyard costs): US$26 million.

447. According to Pakistan, these claims for consequential losses fail because: (i) Karkey has not established the necessary causal link on the evidence; and (ii) they are too remote to be recoverable.[519]

448. The correct test is not in dispute: Karkey has to show that but for Pakistan's alleged breaches of the Treaty it would not have suffered these losses. Karkey has to show the fact of is loss or damage, and the necessary causal link. It has also to show that any damage is not too remote and speculative.[520]

449. In closing, Karkey downwardly revised its claim for the Powership Construction Programme by US$116 million, as a result of removing the clearly untenable claim for damages for delay to the conversion of the *Iraq* (KPS 2), based as it was on an absurd valuation of that deck barge – with

---

[517] Pakistan's Post-Hearing Brief, ¶ 419.

[518] Pakistan's Post-Hearing Brief, ¶ 420.

[519] Pakistan's Post-Hearing Brief, ¶ 421.

[520] Pakistan's Post-Hearing Brief, ¶ 422.

an accepted replacement cost of US$2 million – as being US$119 million. This retreat followed Mr. Kaczmarek's cross-examination in which he accepted that no willing buyer would pay nearly US$120 million for a US$2 million barge.[521]

450.    Pakistan argues that, even with this adjustment, the claim for the alleged delays to the Powership Construction Program is premised on the same flawed DCF calculations in respect of the various Vessels that have resulted in an absurd valuation for the *Alican Bey*. According to Pakistan, there is a further fundamental weakness in Karkey's claim for consequential losses. Those claims comprise almost a third of Karkey's total damages claim, yet there still remains a complete absence of any supporting evidence.[522]

451.    Karkey's claim is based on its contention that Pakistan's alleged breaches resulted in the financing restrictions on Karkey that then caused delay to the projects it claims it was planning. Pakistan maintains that Karkey does not get anywhere close to proving these financing restrictions. Karkey has produced only four documents in order to establish a causal link between Pakistan's detention of the Vessels and the impact on Karkey's planned projects. It therefore relies on just four documents to support a claim of over US$700 million.[523]

452.    Pakistan submits that there is no evidential basis upon which this Tribunal could make any findings that Pakistan's alleged breaches caused the consequential losses that Karkey claims. Karkey agreed to provide all documents responsive to several requests made by Pakistan in respect of these projects and in several instances failed to produce any documents at all. The Tribunal can therefore safely conclude that there is no evidence of the following:[524]

-    First, in respect of the Geothermal Project, there is no evidence showing that the actions taken by Pakistan caused negotiations with suppliers to be put on hold and/or that the delay to the Geothermal Project occurred as a result of Pakistan's actions, as alleged by Mr. Karadeniz in his written evidence;[525]

---

[521] Pakistan's Post-Hearing Brief, ¶ 424.

[522] Pakistan's Post-Hearing Brief, ¶¶ 425-426.

[523] Pakistan's Post-Hearing Brief, ¶¶ 427-428.

[524] Pakistan's Post-Hearing Brief, ¶ 432.

[525] Procedural Order No. 8, Annex 12, Request 110; Karadeniz, First Witness Statement, ¶ 102.

- Second, in respect of the Rehabilitation Programme, there is no evidence that it was Karkey's intention to rely on revenue from the Vessels in Pakistan to fund this program, or that this program was suspended as a result of the alleged breaches of the Treaty, as also alleged by Mr. Karadeniz in his written evidence.[526] There is also no evidence that Karkey was unable to obtain alternative financing.

453.  It is Pakistan position that the claims for increased insurance costs, increased shipyard costs and penalty charges arising out of the Lebanon contract are equally untenable:[527]

- First, any increase in insurance costs was caused by the cancelation of Karkey's policies arising from the failure to disclose material facts relating to the Supreme Court proceedings and a past corruption conviction. Mr. Kaczmarek accepted that this would cause an increase in premiums;

- Second, there remains a complete lack of evidence to show that the alleged breaches of the Treaty in any way contributed to the US$12.5 million in increased fees to the shipyards;

- Third, the claim for penalty charges under the Lebanon contract is premised on an alleged delay to the delivery of the *Orhan Bey*: if Karkey fails to establish the causal link between Pakistan's alleged breaches and the delay to the Powership Construction Programme (which included the *Orhan Bey*), then this claim also fails.

454.  Pakistan concludes that Karkey's claim for consequential losses should be dismissed for the lack of any evidence of causal connection to the actions of Pakistan. Even if that causal connection could be inferred (which is denied) those claims still fail because they are entirely unsubstantiated.[528]

   f. *Issue 17: Claim for Post-Termination Contract Rights*

455.  According to Pakistan, there are four amounts that Karkey claims in respect of its Post-Termination Contract Rights, which are analysed below in turn:[529]

---

[526] Karadeniz, Third Witness Statement, ¶¶ 104-105.

[527] Pakistan's Post-Hearing Brief, ¶ 434. *See also* Pakistan's Rejoinder, ¶¶ 1242-1265.

[528] Pakistan's Post-Hearing Brief, ¶ 435.

[529] Pakistan's Post-Hearing Brief, ¶ 436.

(i) Outstanding Monthly Rental Services Fees invoices, together with sums deducted by Lakhra for Karkey's failure to achieve the Target COD on time, allegedly amounting to US$47.7 million;

(ii) Outstanding fuel payment invoices, allegedly amounting to over US$9.7 million;

(iii) Mobilization and transport charges, allegedly amounting to US$12 million; and

(iv) Termination Charges, allegedly amounting to approximately US$165 million.

*(f.1) Outstanding Monthly Rental Services Fees*

456. According to Pakistan, there are four main issues between the Parties in this regard:

(i) Whether Lakhra was entitled to liquidated damages, thus reducing the amount owed, as a result of Karkey's delay in achieving the Target COD;

(ii) Whether the amount owed should be reduced due to a reduction in the contract terms;

(iii) Whether Karkey is entitled to recover amounts invoiced by Karpak; and

(iv) Whether Karkey is entitled to recover amounts even when it was not generating at full capacity.

*- Liquidated Damages*

457. The first issue relates to the sums deducted by Lakhra as liquidated damages. This sum amounts to US$3.98 million. The actual amount is not in dispute. Clause 4.4(b) of the 2009 RSC entitled Lakhra to deduct liquidated damages if Karkey failed to achieve commercial operations within 30 days of 7 April 2010. Karkey however relies on Clause 2.A(aa). It argues that this clause expressly excused Karkey from any delay (and the obligation to pay liquidated damages) arising from the change of the project site. It also argues that it was relieved of its obligation to meet the target COD due to force majeure.[530]

458. According to Pakistan, Clause 2.A(aa) properly construed can only refer to delay caused by the change in site being the responsibility of Pakistan as buyer. In this case, any change in site cannot possibly have caused the delay to the COD. This is because the ships in question had not even

---

[530] Pakistan's Post-Hearing Brief, ¶¶ 439-441.

been built. The Target COD was 10 April 2010. One was delivered in November 2010 and the other in February 2011. So Karkey was not prevented from performing its obligation to achieve COD by any change in site location. It did not perform its obligation to meet the COD because it was not ready to perform it. Pakistan submits that this is a complete answer to this claim.[531]

459.  Moreover, the only two events that Karkey relies on as a Seller Force Majeure Event as defined in Clause 14 of the 2009 RSC (rather than its original five) are monsoon conditions and obstructions discovered in the dredging area. Pakistan maintains that neither of these qualifies as a Seller Force Majeure Event as defined in Clause 14 of the 2009 RSC, not least because Karkey failed to give notice of either of these events. None of the documents relied on by Karkey meet the notice requirements under the 2009 RSC.[532]

*- Reduction in the rental term*

460.  If Pakistan is right that Lakhra was entitled to reduce the rental term of the 2009 RSC by 251 days, then Karkey is not entitled to recover the additional US$2.46 million claimed by Karkey in this regard. It is not in dispute that Clause 4.4(b) of the 2009 RSC entitled Lakhra to make this reduction, if the delay in achieving COD can be attributed to Karkey alone.[533]

*- Is Karkey entitled to recover amounts invoiced by Karpak?*

461.  Invoices for Monthly Rental Services Fees were submitted by both Karkey and Karpak, its wholly-owned Pakistani incorporated subsidiary. There is a dispute as to whether those invoices submitted by Karpak are properly recoverable by Karkey in this arbitration. Pakistan's position is that they are not.[534]

462.  According to Pakistan, the new version of the Deed of Assignment adduced in evidence by Karkey less than 2 weeks before the Hearing is still not a valid assignment of rights. In addition to seeking the original of this document, Pakistan also sought an explanation as to when this document was created, by whom and for what purpose. No such explanation has been

---

[531] Pakistan's Post-Hearing Brief, ¶¶ 442-443.

[532] Pakistan's Post-Hearing Brief, ¶ 446.

[533] Pakistan's Post-Hearing Brief, ¶¶ 447-448.

[534] Pakistan's Post-Hearing Brief, ¶ 454.

forthcoming.[535] In addition, as a matter of international law, Karkey is not entitled to make a direct claim in relation to Karpak's contractual rights.[536]

463. Deducting the sums owed to Karpak as part of the Monthly Rental Services Fees reduces Karkey's claim by US$17.86 million.[537]

### (f.2) Outstanding Fuel Payment Invoices

464. Karkey claims for outstanding fuel payment invoices, allegedly amounting to over US$9.7 million. It is Pakistan's position that the outstanding fuel payments are not owed to Karkey. Rather, they were payable to Karpak, which is not a party to this dispute. The same arguments apply to Karkey's entitlement to payment of the two outstanding fuel payment invoices, invoiced to Karpak, as applied above in respect of the Monthly Services Rental Fees.[538]

### (f.3) Mobilization and transport charges

465. Karkey originally claimed US$12 million for mobilization and transport charges. In its closing oral submissions at the Hearing, Karkey accepted that this claim is not fully made out on the evidence. According to Pakistan, that is an understatement – the claim is not made at all on the evidence.[539]

466. Pakistan argues that Clause 4.6(b) of the 2009 RSC is clear: it refers to the buyer paying mobilization and transport charges "*to return the Equipment to SELLER's designated depot*".[540] It is clear that these charges refer to actual charges incurred by the seller post-termination in moving the Vessels to a particular designated depot. The onus is on Karkey to produce sufficient evidence to justify the actual costs it claims. It has failed to do so, despite being on notice by Pakistan at the outset of these proceedings of the lack of sufficient supporting evidence.[541]

---

[535] Pakistan's Post-Hearing Brief, ¶ 455.

[536] Pakistan's Post-Hearing Brief, ¶ 456.

[537] Pakistan's Post-Hearing Brief, ¶ 458.

[538] Pakistan's Post-Hearing Brief, ¶¶ 459-460. *See also* Pakistan's Rejoinder, ¶¶ 39-42.

[539] Pakistan's Post-Hearing Brief, ¶ 475.

[540] C-010 (CONFIDENTIAL).

[541] Pakistan's Post-Hearing Brief, ¶ 476.

*(f.4) Termination Charges*

467.   Pakistan submits that there are two issues in respect of the Termination Charges: the first is its enforceability (a question of law) and the second relates to the proper amount due (essentially a question of valuation).[542]

468.   As to enforceability, Pakistan argues that it is clear that the test under Pakistani law is whether the Termination Charges represents a genuine pre-estimate of loss. The reference in Karkey's opening submissions at the Hearing to English Supreme Court judgment of *Cavendish* was entirely irrelevant: no Pakistani court has applied *Cavendish*.[543]

469.   It is also clear that the Termination Charges cannot be considered a genuine pre-estimate of loss. They are therefore unenforceable as a matter of Pakistani law.[544]

470.   The actual amount of the Termination Charges claimed by Karkey is also too high. Clause 4.6(d) of the 2009 RSC states that on termination the full, unadjusted amount of the Advance Payment should be deducted from the Termination Charges. The dispute between the Parties centers on what "unadjusted" means. It is clear that on a plain reading of this term, the unadjusted down payment means the full US$80 million should be deducted.[545]

471.   Karkey attempts to argue that the figure can in fact be adjusted, to allow for sums already recovered by Lakhra through Lakhra's own deductions to the Monthly Rental Services Fees. Mr. Kaczmarek has sought to argue that unadjusted merely means "*unadjusted with respect to deductions for any disputed amounts*" and by attempting to refer to Clause 4.5(b) – which is an entirely different clause dealing with payment terms. Pakistan argues that there is no legal basis for implying these additional works into the contract, in a way that Karkey's quantum expert has sought to do.[546]

472.   Pakistan's submits that, as a matter of Pakistani law, the Tribunal must apply the plain meaning of the work "unadjusted" – it means exactly what it says – the full figure of US$80 million, which

---

[542] Pakistan's Post-Hearing Brief, ¶ 462.

[543] Pakistan's Post-Hearing Brief, ¶ 463; *See* CA-348, *Cavendish*.

[544] Pakistan's Post-Hearing Brief, ¶ 464.

[545] Pakistan's Post-Hearing Brief, ¶¶ 467-469.

[546] Pakistan's Post-Hearing Brief, ¶ 470.

Pakistan paid as part of the Advance Payment. If Pakistan's argument above is accepted then the correct amount owing for the Termination Charge is US$149.8 million, not the US$165 million claimed by Karkey.[547]

### (6) Pakistan's Counterclaims

a. *Issue 18: Does the Tribunal have jurisdiction to hear the counterclaim?*

473. According to Pakistan, Karkey's principal argument that the Tribunal lacks jurisdiction over Pakistan's counterclaim is based on the consent of the Parties. Karkey argues that: (a) the dispute resolution clause in the Treaty "*is intended to enable arbitration only at the initiative of the investor*'"; (b) that the Treaty does not allow counterclaims for breaches of domestic law; and (c) that the Treaty does not impose any obligations on the investor.[548]

474. Karkey fails to engage with the *ipso facto* consent theory utilized by the tribunal in *Goetz v. Burundi II*, simply noting that it appears to be the only ICSID award to have adopted the theory of *ipso facto* consent. Pakistan submits that this does not detract from the validity of the theory.[549]

475. Further, Pakistan maintains that Karkey's arguments ignore the fact that the Tribunal's jurisdictional mandate is – pursuant to the plain working of the Treaty – extremely broad, and is not limited to disputes concerning the host-State's obligations under the Treaty. In the words of Article VII(1) of the Treaty, the Tribunal's mandate is to determine "*[d]isputes…in connection with [the investor's] investment*".[550] This language does not limit the Tribunal's jurisdiction to affirmative claims by the investor, and the contracting parties' use of such broad language is a strong indication that their consent to ICSID arbitration is broad enough to encompass a counterclaim by the host-State.[551]

476. Pakistan agrees that the Treaty appears to enable arbitration only at the initiative of the investor. However, having submitted this dispute to arbitration, Karkey has given the Tribunal the mandate to determine all aspects of the dispute between the Parties – including Pakistan's counterclaim.

---

[547] Pakistan's Post-Hearing Brief, ¶¶ 473-474.

[548] Pakistan's Rejoinder, ¶ 1428.

[549] Pakistan's Rejoinder, ¶ 1429; see RA-068, *Antoine Goetz and others v. Burundi [II]*, (ICSID Case No. ARB/01/2), Award, 21 June 2012 ("*Goetz v. Burundi*").

[550] Pakistan's Rejoinder, ¶ 1430.

[551] Pakistan's Rejoinder, ¶ 1431.

It has therefore *ipso facto* given its consent to the Tribunal's jurisdiction and cannot complaint that the Tribunal is now seized of the matter.[552]

    b.  *Issue 19: If the Tribunal has jurisdiction over Karkey's claims, does Karkey owe money to Pakistan as a result of its conduct in the procurement of its alleged investment?*

477.  Pakistan submits that, having procured its alleged investment through breaches of the PPRA Rules, Karkey was ordered by the Supreme Court to repay its Advance Payment plus mark-up. It has never done so, meaning it has been unlawfully (and therefore unjustly) enriched by that amount – over PKR11.632 billion.[553]

478.  Karkey's assertion that "*[b]ecause even Pakistan's most favourable damages calculation demonstrates a net investment loss suffered by Karkey, Karkey was not 'enriched'*" is demonstrably false. Pakistan's most favourable damages calculation results in zero loss by Karkey because the 2009 RSC was void *ab initio* and there has been no breach of the Treaty.[554]

479.  Further, according to Pakistan, the unjust nature of Karkey's enrichment is clear, as it has withheld those moneys in defiance of the Supreme Court and in breach of Pakistani law. Contrary to Karkey's unsupported assertions, there is no justification for this continuing breach of Pakistani law. Finally, given Karkey's refusal to pay the amounts owing pursuant to the Supreme Court judgment, it is highly unlikely that a favourable judgment in the Sindh High Court would constitute a "remedy" for Pakistan.[555]

480.  Moreover, in response to Pakistan's request that the Tribunal declare the 2009 RSC void *ab initio*, Karkey argues that this is a matter of national law which is beyond the Tribunal's jurisdiction. This is rejected by Pakistan. The Treaty specifically refers to Pakistani law in defining the scope of what constitutes an "investment". It is therefore expressly part of the applicable law on jurisdiction. Pakistan maintains that the Treaty itself requires the Tribunal to determine compliance with Pakistani law in assessing its jurisdiction – both with regard to the primary claim and with regard to the counterclaim.[556]

---

[552] Pakistan's Rejoinder, ¶ 1433.

[553] Pakistan's Rejoinder, ¶ 1442.

[554] Pakistan's Rejoinder, ¶ 1443.

[555] Pakistan's Rejoinder, ¶ 1444.

[556] Pakistan's Rejoinder, ¶¶ 1434-1435.

481. Pakistan further argues that Karkey's failure to comply with the Supreme Court Judgment represents an unjust enrichment. In response, Karkey argues that the Tribunal does not have jurisdiction to rule on Pakistan's claim for unjust enrichment because: (i) the Treaty does not enable domestic law claims; and (ii) unjust enrichment is not a general principle of international law. Pakistan rejects both of these arguments.[557]

482. First, Pakistan's argues that its counterclaim is not made under domestic law. In fact, domestic law process has (with the exception of a number of Civil Review Petitions) now reached its conclusion with the result that Karkey has been found liable to repay its Advance Payment together with mark-up. Karkey has not complied with this obligation. Pakistan now counterclaims for that amount under international law, which is within the Tribunal's jurisdiction.[558]

483. Second, Pakistan maintains that unjust enrichment is a general principle of international law, as the authorities relied on by Karkey show. Indeed, whilst Karkey notes that certain ICSID tribunals have rejected defences based on unjust enrichment, those cases are distinguishable from this case. In each such case, the defence was rejected on the basis that the alleged enrichment was not unjust – not on the basis that the principle did not exist.[559]

484. Finally, Karkey also alleges that "*Pakistan is once again estopped now from asserting counterclaims at ICSID for a simple reason, which is that their counterclaims clearly are purely contractual or purely contract-based, which is a quality that Pakistan itself has said bars jurisdiction by the Tribunal over such claims*".[560]

485. Pakistan submits that this allegation is incorrect for a number of reasons, *inter alia*, because Pakistan counterclaims are made strictly without prejudice to its position that the Tribunal does not have jurisdiction over any of the disputes between Karkey and Lakhra. The counterclaims only arise if the Tribunal does not accept this position, and Pakistan cannot be estopped from bringing counterclaims because they represent an alternative position.[561]

---

[557] Pakistan's Rejoinder, ¶ 1437.

[558] Pakistan's Rejoinder, ¶ 1438. *See also* Pakistan's Rejoinder, ¶ 1156.

[559] Pakistan's Rejoinder, ¶¶ 1439-1440.

[560] Tr. Day 1, 82: 8-18. Pakistan's Post-Hearing Brief, ¶ 486.

[561] Pakistan's Post-Hearing Brief, ¶ 487.

   c. *Issue 20: If the Tribunal has jurisdiction over Karkey's Contract Claims, and if the relevant actions of Lakhra are attributable to Pakistan, does Karkey owe money to Pakistan as a result of Karkey's misrepresentations and breaches of the 2009 RSC?*

486. Pakistan submits that Karkey's contention that Pakistan has abandoned the majority of its counterclaims under Issue 20 is incorrect. If contrary to Pakistan's arguments, the Tribunal finds that Karkey's claims in respect of its Pre-Termination Contract Rights are at issue (as Karkey contends), Pakistan will maintain its alternative counterclaim as pleaded in the Counter Memorial.[562]

487. At paragraph 1618 of its Counter-Memorial, Pakistan submits that if the Tribunal does find that it has jurisdiction in relation to any of Karkey's Contract Claims and determines that Lakhra's acts under the 2009 RSC are attributable to Pakistan, then Pakistan brings the following counterclaims:

    i. Pakistan seeks a declaration that the 2009 RSC (as amended) is void *ab initio* in accordance with the decision of the Supreme Court dated 31 March 2012;

    ii. Strictly in the alternative, Pakistan brings the following claims for damages and/or set-off arising out of Karkey's misrepresentations (fraudulent or otherwise) and Karkey's breaches of the 2009 RSC, as summarized below:

      (i) Failure to meet the Target COD in breach of Clause 4.4(b) of the 2009 RSC (as amended by Clause 3 of Amendment 1);

      (ii) Failure to pay damages to which Lakhra was entitled under the Performance Guarantee (adjusted for the amount of commission charges properly owing to Karkey) as a result of Karkey's failure to meet the Target COD, in breach of Clause 4.4(b) of the 2009 RSC;

      (iii) Failure to achieve Commercial Operations in accordance with Clause 8 of the 2009 RSC and in breach of the performance warranties given in that clause;

      (iv) Reducing and/or ceasing the generation of electricity during the Rental Term in breach of Clause 2.B(b) and 4.5(n) of the 2009 RSC.

---

[562] Pakistan's Post-Hearing Brief, ¶ 478. *See also* Pakistan's Counter-Memorial, ¶¶ 1618-1619.

### (7)  The Respondent's Request for Relief

488.  At paragraphs 498-500 of its Post-Hearing Brief, Pakistan requested the following relief:

> [¶ 498] *For all of the foregoing reasons, Pakistan respectfully requests that the Tribunal*:
>
> *(a) dismiss Karkey's claims in their entirety for lack of jurisdiction, inadmissibility, or on the merits;*
>
> *(b) if the Tribunal finds that it has jurisdiction over the dispute, award Pakistan a sum of PKR11.632 billion plus simple interest at a rate of 1-month average KIBOR plus 2.15% per annum from 29 October 2015 until the date of payment;*
>
> *(c) order Karkey to bear all costs and expenses incurred by Pakistan during the course of this proceeding, including the fees and expenses of legal counsel and expert witnesses, expenses of factual witnesses, the fees and expenses of the Tribunal and administrative charges of the Centre; and*
>
> *(d) any additional or alternative relief as the tribunal considers just and appropriate.*
>
> [¶ 499] *In the alternative, if the Tribunal finds that it does have jurisdiction over the dispute, that Karkey's claims are admissible, and that Pakistan has breached the Treaty, Pakistan respectfully requests that the Tribunal:*
>
> *(a) order Pakistan to release the Alican Bey, Iraq and Enis Bey from the territorial waters of Pakistan into international waters within 90 days (the Restitution Window) of the dispatch of the Tribunal's Award (the Restitution); and*
>
> *(b) award damages to Karkey only insofar as those damages are caused by Pakistan and reflect the temporary detention of (and actual damage to) the Vessels.*
>
> [¶500] *In the further alternative to the relief requested at paragraph 341* [sic 499] *(or if the Restitution is not made in full within the Restitution Window), Pakistan respectfully requests that the Tribunal order compensation in accordance with the methodology adopted by Mr. Haberman:*
>
> *(a) within 90 days of the dispatch of the Tribunal's Award (in the event of an order in the alternative to Restitution); or*

*(b) within 60 days of the expiry of the Restitution Window (in the event Restitution is not made).*

## V.  THE TRIBUNAL'S DECISION

489.   The Tribunal first will decide below on (**A**) Pakistan's allegations of corruption, which have an impact both on its jurisdiction and on the merits of the case, which will be followed by an analysis of (**B**) the effects of the Supreme Court Judgment, and (**C**) the issue of attribution of Lakhra's and PEPCO's acts to Pakistan. The Tribunal will then analyse (**D**) its jurisdiction in view of its findings under A, B and C as well as Pakistan's allegations of misrepresentation/fraud and misprocurement. If it upholds jurisdiction, the Tribunal will decide (**E**) whether Pakistan has expropriated Karkey's investment, (**F**) whether Pakistan breached Article IV of the BIT (free transfer), (**G**) the Claimant's additional claims brought under the MFN, FET and umbrella clauses, and (**H**) the alleged damages. The Tribunal will then decide on (**I**) Pakistan's counterclaims. Finally, under Section **VI** the Tribunal decides on the allocation of the costs of this arbitration between the Parties.

A.   Is Karkey's "Investment" Tainted by Corruption?

### (1) Applicable Standard of Proof and Burden of Proof

-   *Standard of Proof*

490.   It is Pakistan's position that the standard of proof for corruption is the ordinary balance of probabilities, *i.e.* whether it is more likely than not that corruption has occurred.[563] According to Pakistan, ICSID tribunals have routinely applied the balance of probabilities standard. It relies *inter alia*, on the tribunal's decision in *Tokios Tokeles v. Ukraine*, in which the tribunal stated that a party advancing a claim "*must show that its assertions is more likely than not to be true.*"[564]

---

[563] Pakistan's Post-Hearing Brief, ¶ 140.

[564] RA-179, *Tokios Tokeles v. Ukraine*, (ICSID Case No. ARB/02/18), Award, 26 July 2007, ¶ 124. Pakistan's Post-Hearing Brief, ¶ 144. *See also*: RA-109, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, (ICSID Case No. ARB/03/25), Award, 16 August 2007, ¶ 399; RA-128, *Libanaco v. Turkey*, ¶ 125; (RA-178, *The Rompetrol Group N.V. v. Romania*, (ICSID Case No. ARB/06/3), Award, 6 May 2013, ¶ 183.

491. According to Karkey, on the other hand, the standard of proof for allegations of corruption is high. Specifically, an allegation must be proven by clear and convincing evidence, as that standard is defined under international law.[565]

492. The Tribunal finds that the seriousness of the accusation of corruption in the present case, including the fact that it involves officials at the highest level of the Pakistani Government at the time, requires clear and convincing evidence. There is indeed a large consensus among international tribunals regarding the need for a high standard of proof of corruption.[566]

493. In any event, even if the Tribunal were to have applied the *"balance of probabilities"* standard as suggested by Pakistan, the Tribunal's conclusion would have been the same as set forth below.

- *The Burden of Proof*

494. Karkey submits that it is axiomatic that the burden of proving an assertion lies with the party presenting it. According to Karkey, the time-honoured principle *onus probandi incumbit actori* (the party that asserts must prove) is widely accepted in international arbitration. The principle applies equally to a respondent as to a claimant. In the context of a jurisdictional objection, the *Pac Rim* tribunal explained:

> As far as the burden of proof is concerned, in the Tribunal's view, it cannot here be disputed that the party which alleges something positive has ordinarily to prove it…[I]f there are positive objections to jurisdiction, the burden lies on the Party presenting those objections, in other words, here to the Respondent.[567]

495. Karkey points out that, according to Pakistan, Karkey must, in accordance with *Metal-Tech v. Uzbekistan*, bear the burden of responding to Pakistan's so-called "red flags". According to

---

[565] Karkey's Post-Hearing Brief, ¶ 81.

[566] *See, e.g.*, CA-082, *EDF (Services) Limited v. Romania*, (ICSID Case No. ARB/05/13), Award, 8 October 2009, ¶ 221 (noting that the "*seriousness of the accusation of corruption . . . demands clear and convincing evidence*" and that *"[t]here is general consensus among international tribunals and commentators regarding the need for a high standard of proof of corruption*"); CA- 262, *Oostergetel v. Slovak Republic*, UNCITRAL, Final Award, 23 April 2012, ¶ 303 ("*Mere insinuations cannot meet the burden of proof* [for allegations of corruption]"); RA-129, *Liman Caspian Oil BV and NCL Dutch Investment BV v. Kazakhstan*, (ICSID Case No. ARB/07/14), Award dated 22 June 2010, ¶¶ 422, 424 ("*The Tribunal emphasizes that corruption is a serious allegation, especially in the context of the judiciary. The Tribunal notes that both Parties agree that the standard of proof in this respect is a high one…It is not sufficient to present evidence which could possibly indicate that there might have been or even probably was corruption. Rather, Claimants have to* prove *corruption*") (emphasis in original).

[567] CA-259, *Pac Rim Cayman LLC v. El Salvador*, (ICSID Case No. ARB/09/12), Decision on Jurisdiction, 1 June 2011 ¶ 2.11; Karkey's Reply, ¶ 454.

Karkey, however, shifting to Karkey the burden of proof on the issue of corruption is in accordance neither with *Metal-Tech* nor with general evidentiary principles of international law.[568]

496.  Pakistan agrees that it bears the initial burden of proof to establish fraud and corruption vitiating this Tribunal's jurisdiction. However, its position is that the standard of proving such allegations is on the ordinary balance of probabilities as applied by previous ICSID tribunals. Further, tribunals have considered that *prima facie* evidence may be sufficient to discharge this burden where proof of a fact, such as corruption, presents extreme difficulty and there is an absence of evidence in rebuttal. According to Pakistan, it has discharged such burden by establishing a *prima facie* case of both fraud and corruption, through direct evidence for fraud and circumstantial evidence for corruption. As a result, that burden now shifts to Karkey to rebut Pakistan's *prima facie* case based on relevant evidence in its possession.[569] Pakistan argues that its position on the shifting of the burden of proof is not, as Karkey suggests, based on the case of *Metal-Tech v. Uzbekistan* alone. To the contrary, Pakistan submits that its position is supported by both commentators and case law.[570]

497.  The Tribunal finds that Respondent bears the burden of proof with respect to its allegations of corruption pursuant to the well-established principle *onus probandi incumbit actori* (the party that asserts must prove). However, the Tribunal finds that it can shift the burden of proof with respect to corruption and fraud to Karkey should the Tribunal be satisfied that there is unequivocal (or unambiguous) *prima facie* evidence in this regard.

### (2) Requirements for a Finding of Corruption under Pakistani Law

498.  According to Pakistan, Karkey's investment was not established in conformity with Pakistan's laws, as required by Article I(2) of the Treaty, because, *inter alia*, all the indications are that its investment was established by way of corruption. Pakistan submits that corruption is criminalized by a range of Federal and Provincial legislation, the most pertinent to this arbitration being the NAO and the PPRA Rules.[571]

---

[568] Karkey's Reply, ¶ 463.

[569] Pakistan's Rejoinder, ¶ 305.

[570] Pakistan's Rejoinder, ¶ 310.

[571] Pakistan's Rejoinder, ¶¶ 482-483.

499. Karkey contends that it has not violated any Pakistani laws governing corruption, pointing to a lack of evidence in this regard and to the fact that even the Supreme Court's Judgment did not make any finding that Karkey violated Pakistani laws governing corruption.[572]

500. The Tribunal cannot ignore the Respondent's allegations that Karkey's investment was obtained by way of corruption, thus not in conformity with Pakistani law, and not protected by the BIT.

501. Rule 2(1)(f) of the PPRA Rules defines "*corrupt and fraudulent practices*" to include:

> *[...] the offering, giving, receiving, or soliciting of any thing of value to influence the action of a public official or the supplier or contractor in the procurement process or in contract execution to the detriment of the procuring agencies; or misrepresentation of facts in order to influence a procurement process or the execution of a contract, collusive practice among bidders (prior to or after bid submission) designed to establish bid prices at artificial, non-competitive levels and to deprive the procuring agencies of the benefits of free and open competition [...].*[573]

502. Section 9 of the NAO provides, *inter alia*, as follows:

> *9(a) A holder of a public office, or any other person, is said to commit or to have committed the offense of corruption and corrupt practices:*
>
> *(i) if he accepts or obtains from any person or offers any gratification directly or indirectly, other than legal remuneration, as a motive or reward such as is specified in section 161 of the Pakistan Penal Code (Act XLV of 1860) for doing or for-bearing to do any official act, or for showing or for-bearing to show, in the exercise of his official functions, favour or disfavour to any person, or for rendering or attempting to render any service or disservice to any person; or*
>
> *(ii) if he accepts or obtains or offers any valuable thing without consideration, or for a consideration which he knows to be inadequate, from any person whom he knows to have been, or likely to be, concerned in any proceeding or business transacted or about to be transacted by him, or having any connection with his official functions or [from] any person whom he knows to be interested in or related to the person so concerned; or [...]*
>
> *(iv) if he by corrupt, dishonest, or illegal means, obtains or seeks to obtain for himself, or for his spouse or dependents or any other person, any property, valuable thing, or pecuniary advantage; or [...]*
>
> *(vi) [if he misuses his authority so as to gain any benefit or favour for himself or any other person, or [renders or attempts to render] [or willfully fails to*

---

[572] Karkey's Reply, ¶ 542.

[573] C-368.

> *exercise his authority to prevent the grant, or rendition of any undue benefit or favour which he could have prevented by exercising his authority];*
>
> *(vii) if he has issued any directive, policy, or any SRO (Statutory Regulatory Order) or any other order which grants or [attempts to grant] any [undue] concession or benefit in any taxation matter or law or otherwise so as to benefit himself or any relative or associate or a benamidar [or any other person]; [...].*[574]

503. The Tribunal notes that Pakistani corruption laws may also apply to irregularities arising in a public procurement. Indeed, a person (including Karkey and/or its directors) has "*committed the offence of corruption and corrupt practices*" under Section 9(a) of the NAO, *inter alia,* if such person accepts, obtains or offers any valuable thing for inadequate consideration from a person he or she knows is (or is likely to be) concerned in a business transaction within which they are involved. (Section 9(a)(ii)).

### (3) Analysis of the Evidence regarding Allegations of Corruption

504. The Tribunal analyses below in turn (**3.a**) Pakistan's allegations of corruption related to Mr. Zulqarnain; (**3.b**) the alleged "red flags"; (**3.c**) the Shipyard visit in September 2010; and (**3.d**) the alleged corruption "Scheme".

505. Pakistan's allegations of fraud and misprocurement are addressed under Sections V(D)(1) and V(D)(2) below.

#### a. *The Involvement of Mr. Zulqarnain*

506. Pakistan submits that Karkey's alleged explanations for the employment of and scope of services provided by Mr. Zulqarnain are unsupported by any contemporaneous evidence, and contradicted by much of the evidence available. Pakistan argues that Karkey has also failed to provide any satisfactory evidence justifying the sums paid to Mr. Zulqarnain. This would all lead to the inference that Mr. Zulqarnain was retained for purposes other than those described in his engagement letter, namely the illegal lobbying and influencing of government officials in order to secure (and ensure favourable treatment of) Karkey's RPP in Pakistan.[575]

---

[574] C-279, ¶ 9(a) (emphasis added).

[575] Pakistan's Post-Hearing Brief, ¶ 151.

507.  Karkey rejects all of Pakistan's allegations concerning Mr. Zulqarnain and related to the practice of corruption.

508.  The Tribunal notes that Mr. Zulqarnain was engaged as Karkey's local representative in Pakistan on 13 June 2008, which was formalized in a letter of the same date sent from Karkey to Mr. Zulqarnain, and which provides, *inter alia*, as follows:

> *[…] This letter provides the terms of your engagement by Karkey as its local representative, which shall be as under:*
>
> *1. You will provide any required local logistic and office support during the development and bidding phase of the project;*
>
> *2. You will arrange for a suitable place for setting up office and also responsible for arranging the boarding and lodging of personnel travelling from Turkey to Pakistan, including local travel arrangements;*
>
> *3. You will assist the Company in hiring of relevant resources, employees, as may be required on the condition that you will have no conflict of interest, and that you will disclose any relation with kith or kin that you may introduce;*
>
> *4. You will assist Karkey in opening bank accounts in Pakistan […] You shall forward statement of expenditures to Karkey from time to time;*
>
> *5. You will participate in official meetings with various government entities involved in the Project along with designated personnel from Karkey, Turkey (without the power to bind Karkey or its sponsors unless a specific power of attorney is executed in writing);*
>
> *6. You shall not have any legal authority to bind or enter into a contract with any person or the Government of Pakistan unless specifically authorized in writing; […]*
>
> *The Company will either make arrangements for you to be provided monies for taking care of expenses upfront or you will be reimbursed any expenses incurred by you from time to time. In addition, the Company shall pay you a lump sum of USD 100,000/- on mobilization of vessels for Pakistan. In the event our company is awarded the contract, then we will enter into a separate agreement for your continued association with our company, if mutually agreed.*[576]

509.  It is reasonable to accept that Karkey, as a foreign investor going to a new country, needed a local representative/agent at least at the outset of the project in order to assist in setting up local office facilities, hire local personnel, coordinate site preparation activities, etc. The Tribunal is

---

[576] C-468 (CONFIDENTIAL) (emphasis added).

satisfied that the evidence on the record demonstrates that the services provided by Mr. Zulqarnain were indeed within the scope of his letter of engagement.

510. For instance, the Tenancy Agreement dated 12 November 2009[577] concluded between Mr. Zulqarnain and Syed Nasir Abbas for a property in Karachi, shows that Mr. Zulqarnain was involved in setting up Karkey's local operations. There are also letters and minutes of meetings showing that Mr. Zulqarnain has scheduled and attended meetings related to the Project, [578] and assisted with preparation of the Project Site.[579]

511. Although the Claimant acknowledges that Mr. Zulqarnain's role was reduced in 2010 when Karkey recruited its own country manager and retained Berkeley Associates as a technical consultant, documents in the record show that Mr. Zulqarnain continued to play a role in the logistics and administration of the Project until his departure in August 2011.[580]

512. For his services over the course of three years, Mr. Zulqarnain was paid compensation of US$115,000,[581] which the Tribunal finds reasonable for services of the extent and nature that he provided. Although the compensation agreed between Mr. Zulqarnain under the letter of engagement was US$100,000, the additional payment of US$15,000 is justified by the fact that Mr. Zulqarnain continued to provide services after Karkey was awarded the contract. Karkey also paid US$285,655 to Mr. Zulqarnain to cover expenses incurred in connection with the Project, which primarily consisted of office rent, car and boat rental, and various other travel and

---

[577] R-367 (CONFIDENTIAL).

[578] *See, e.g.*, C-602 (CONFIDENTIAL), Meeting Invitation (15 November 2008) (meeting to negotiate and finalize the 2008 RSC) (Mr. Zulqarnain listed as an invitee); R-437, Letter from Karkey to Lakhra (17 March 2010) (letter informing Lakhra of Public Hearing for Karkey, copied to Mr. Zulqarnain and others); R-446, Meeting Minutes of Meeting held with RPP Sponsors and MoWP officials on 6 September 2010 (Mr. Zulqarnain listed as an attendee on behalf of Karkey).

[579] *See, e.g.*, C-165 (CONFIDENTIAL), Email from S. Rivzi (18 July 2009) (reporting results from site visit and noting Mr. Zulqarnain attended site visit on 17 July 2009 along with Mr. Karadeniz, Ms. Atacik, and Mr. El Suudi); C-260 (CONFIDENTIAL), Minutes of Meeting between Karkey and MoWP on 25 June 2009 (27 June 2009) (meeting to discuss progress of Project, and identify site for Project; Mr. El Suudi, Ms. Atacik, and Mr. Zulqarnain attended the meeting from Karkey); *see also* Karadeniz, Third Witness Statement, ¶ 44; R-435, MoWP Meeting re: Interconnection and Dispersal of Power from Karkey Rental Power Project (14 October 2009) (listing Mr. Zulqarnain as an attendee); C-196 (CONFIDENTIAL), Letter from Karkey to Ministry of Ports and Shipping (5 November 2009) (letter signed by Ms. Atacik requesting a hydrographic survey from the Ministry of Ports and Shipping sent by Mr. El Suudi via email copying Mr. Zulqarnain and others at Karkey).

[580] *See, e.g.*, R-440, Letter from PPIB to MoWP (12 May 2010) (letter to various individuals, copied to Mr. Zulqarnain, re: Arrival of Powerships, discussing need to relocate PAF infrastructure to accommodate Karkey infrastructure); R-441, Letter from PPIB to PEPCO (12 May 2010) (letter to various individuals, copied to Mr. Zulqarnain; re: Meeting in CRR Office, noting inability to spare any official for the meeting).

[581] C-492 (CONFIDENTIAL).

logistic expenses.[582] Karkey incurred expenses of an overall total of more than US$250 million in connection with the Project.[583] When these amounts are put in context, the Tribunal notes that the expenses incurred by Mr. Zulqarnain together with the compensation paid for his services represent only a small fraction (*i.e.* less than 1 %) of the total investment.

513.  Although not all the payments made to Mr. Zulqarnain are substantiated as pointed out by the Respondent,[584] and there are invoices missing, this lack of substantiation is not enough for a finding of corruption, in particular in view of their relatively low amount and the fact that many of them related to payments for which a receipt would not normally have been given.

514.  Also, although Pakistan initially alleged that Mr. Zulqarnain's role for Karkey was similar to that of two of the consultants in *Metal-Tech*,[585] to whom the claimant in *Metal-Tech* had paid millions of dollars via an offshore company in return for their services of "*lobbying*" government officials, at the end of the Hearing, Pakistan's counsel acknowledged that such comparison was inapposite: "*Pakistan accepts we are not in* Metal-Tech *territory where the consultants included the brother of the Prime Minister*".[586]   Although it was reported  that Mr. Zulqarnain had some family relationship with the then Prime Minister, Mr. Gilani,[587] there is no evidence in this case that they were so close to Mr. Zulqarnain as to give rise to a suspicion of corruption. In his Witness Statement, Mr. Aslam, a witness proffered by Pakistan, refers to a "*female relative*" of Mr. Zulqarnain having some relationship with the Prime Minister's wife.[588] No family ties with any other official responsible for approving the Claimant's investment were alleged.

515.  There was also no witness expressly alleging, let alone, confirming the payment of bribes. Although counsel for Pakistan repeatedly referred to "red flags" and suspicious circumstances after Mr. Karadeniz had given evidence, no question regarding fraud or corruption was ever put to Mr. Karadeniz in cross-examination.

---

[582] C-492 (CONFIDENTIAL).

[583] Colak, Second Witness Statement, ¶ 19.

[584] *See* Pakistan's Rejoinder, ¶ 533; Pakistan's Post-Hearing Brief, ¶ 171.

[585] RA-134, *Metal-Tech*.

[586] Tr. Day 7, 2054:21-22.

[587] Pakistan's Counter-Memorial, ¶ 273.

[588] Aslam, First Witness Statement, ¶ 11.

516. Mr. Aslam, who was the Additional Secretary to the MoWP between August 2008 and November 2009, has stated his concerns about Mr. Zulqarnain's conduct in his witness statement, as follows: "*[…]* _I have no knowledge of any bribes having been paid,_ *however I was aware at the time of a* _number of rumours_ *due to the favorable treatment Karkey was receiving over other projects.*"[589] At the Hearing, Mr. Aslam confirmed that he did not know of any bribes having been paid by or on behalf of Karkey in connection with Karkey's project.[590]

517. In view of the above, the Tribunal finds that the Respondent has failed to demonstrate that Mr. Zulqarnain was involved in anything that could qualify as corruption, apart from alleged suspicions and "red flags" which are not sufficient to indicate, far less prove, the occurrence of corruption.

  b. *The "Red Flags"*

518. Pakistan lists seventeen "red flags" in its Counter-Memorial[591] which would indicate that Karkey's alleged investment was procured by corruption. Pakistan submits that, in the event that Karkey fails to provide sufficient evidence to rebut the numerous "red flags" surrounding Karkey's project, this Tribunal should conclude that the 2009 RSC was procured via corruption.[592]

519. The Claimant rejects Pakistan's allegation that Karkey secured its investment through corruption which it sustains is unsupported by either the factual record or the law.

520. The Tribunal notes that the "red flags" mentioned by Pakistan consist only of questions regarding Karkey's investment that read as follows:

  *(a) Why did the Ministry to Water and Power (the MoWP) suddenly insert a new proposal for '[r]ental projects, including barge mounted with cumulative capacity of 200 MW' on the day its proposal was to be put forward for government approval before the Cabinet? Why were those words not included in the draft circulated to all other ministries for comment?*

  *(b) Why was the proposal rushed through in such haste, in a matter of just days, by the Secretary and Minister to Water and Power, without giving any time to other officials in the Ministry and PPIB to analyse the proposal?*

---

[589] Aslam, First Witness Statement, ¶ 12 (emphasis added).

[590] Tr. Day 7, 1966: 2-5.

[591] Pakistan's Counter-Memorial, ¶ 14.

[592] Pakistan's Counter-Memorial, ¶ 887(c).

*(c) What moved the MoWP suddenly to increase the proposal for rental power from 200 to 500MW with no explanation and no apparent basis or justification but creating sufficient capacity for the bids of both Karkey and Walters to proceed (the only two bids which represented they could meet the required project schedule)?*

*(d) Why was the evaluation criterion defining the basis on which a bid would be declared responsive – Net Worth – changed just three days before Karkey's bid was submitted and in circumstances where Karkey's Bid would not have met the Net Worth criteria (as originally drafted)? Why does Karkey not mention in its Updated Memorial that its Bid did not satisfy this requirement?*

*(e) Why were all decisions in relation to the RPPs taken by the Minister to Water and Power (Mr. Raja Ashraf) and the Secretary for Water and Power (either Mr. Ismail Qureshi or Mr. Shahid Rafi) – all the subject of criminal prosecution in Pakistan for their role in the corruption scandal – without consulting the other officials in the Ministry?*

*(f) Why did the Minister, Mr. Ashraf, only reconstitute the Board of the PPIB – usually responsible for approving the selection of bidders in all IPPs, but not previously involved in the public tender of RPPs – the day after Karkey was issued with the Letter of Award?*

*(g) Why were so many changes to the contract introduced, in favour of Karkey (and in breach of procurement laws) following the Letter of Award? Why did the MoWP and PPIB ignore the advice of the legal director that these changes were 'substantial' and a 'deviation' from other RPP contracts? Why does Karkey not mention that these changes included the removal of its responsibility for interconnection (which was a substantial obligation) and the imposition of an obligation on Lakhra to share in the commission charges on the Advance Payment Guarantee, regardless of termination? Why was there no corresponding reduction in the tariff when the cost of interconnection was shifted from Karkey to Lakhra? Why does Karkey not explain the content and progress of Karkey II?*

*(h) Why did Mr. Zuberi of the PPIB – of which Mr. Ashraf was Chairman – ignore Lakhra's early concerns about these 'material changes', which Lakhra thought should be approved by the ECC? Why did Mr. Zuberi suggest they did not need the approval of ECC?*

*(i) The ECC's approval of the rental power projects was conditional on the contracts being terminable if not delivered on time. This condition was confirmed by NEPRA. Why was this condition not included in Karkey's contract?*

*(j) What persuaded the MoWP to press for a waiver (or deferral) of the 6% withholding tax unquestionably due on Karkey's Advance Payment of US$80 million? Why did the MoWP remove from its summary to the ECC the opinion of the Federal Bureau of Revenue (FBR) confirming that withholding tax was due? Why did the MoWP persist in pressing for the*

*deferral, even after the FBR had confirmed it did not apply to Karkey? What persuaded the FBR to change its view?*

*(k) What is the link between Karkey's unsolicited offer to deliver a further 220MW of power in July 2009 – which was immediately placed on fast track by Mr. Ashraf – and the AED350,000, transferred just four days earlier from Dubai to the personal account of Karkey's country representative in Pakistan, Mr. Zulqarnain (a close relative of the then Prime Minister, Mr. Gilani)? Again, why does Karkey not address this proposal for Karkey II (except once, in a footnote)?*

*(l) Why did Mr. Ashraf ignore the letter from Transparency International to him personally, asking that he 'review the awards of RPP, which in TI Pakistan's opinion were not complying with the PPRA Public procurement rules 2004' – a letter he received on the same day as he approved the fast-tracking of Karkey's unsolicited offer?*

*(m) What persuaded the MoWP to substitute Karkey's site from Mauripur to Korangi? What persuaded Walters Power (at the request of the MoWP) to move – when it already owned the land at Korangi and had invested in its design at that location?*

*(n) Why did Lakhra repeatedly fail to enforce its rights arising out of Karkey's continued failure to achieve commercial operations by the required Target COD? Why did Lakhra simply keep extending the Target COD?*

*(o) Why did the CEO of Lakhra, Mr. Brohi, issue a Certificate of Achievement of Commercial Operations in circumstances where Karkey's vessels failed the key Operational Test – the 2-hour Reliability Run Test provided for in Clause 4.4 of the 2009 RSC – which was a condition of Karkey achieving commercial operations? Why did Karkey not mention this in its Updated Memorial? Why do Karkey's witnesses – including Mr. El Suudi, who, together with Mr. Brohi, signed the report in which this key failed test is unambiguously recorded – not mention this in their statements when they confirm that the Certificate of Achievement of Commercial Operations was issued by Lakhra? Mr. Brohi's suggestion at the time, that he did not think the Reliability Run Test was required, ignores the clear terms of the contract and is not remotely plausible.*

*(p) Why was this not raised before the Supreme Court by either Karkey (through its lawyer) or Mr. Brohi? Why did Karkey's lawyer produce only the two certificates that were issued – and not the report confirming that the third and crucial certificate was not because the Reliability Run Test failed?*

*(q) Why does Karkey not mention in its Updated Memorial its insurance claim (which revealed the conviction of one of Karkey's directors, Mr. Nuri Dogan Karadeniz, in Turkey in relation to the bribery of an official during an unrelated public tender in order to secure preferential treatment for Karkey)? This claim, now settled, was for the total loss of its vessels, and any sums paid in furtherance of it are clearly of potential relevance to*

146

*Karkey's damages claim in this arbitration – yet Karkey makes no mention of it.* [593]

521. The Tribunal is not satisfied that these so-called "red flags", consisting solely of questions, are of sufficient weight and credibility to shift Pakistan's burden of proving its allegations of corruption to Karkey, so as to require Karkey to exonerate itself.  Several questions raised by Pakistan are based on alleged acts or omissions by Pakistani government officials which are not proven and if such acts and omissions are established, they may have many other explanations than corruption by Karkey. For instance, what is often described as haste of the Prime Minister and of the Minister to Water and Power motivated by corruption may just as well reflect their manner of exercising power. Likewise, what are presented as advantages obtained by Karkey through contract modification may also be explained by the inability of Pakistan's administration to comply with some of its contractual obligations, such as the issuing of a guarantee, and the consequent need to offer a reciprocal benefit to Karkey. In any case, Pakistan has failed to demonstrate that Karkey would be in the possession of any evidence which could explain the real motivation of Pakistani officials. Thus, the Tribunal would not be entitled to draw adverse inferences against Karkey, such as to shift the burden of proof, and deduce that its inability to prove such motivations must necessarily be explained by corruption. Moreover, suggesting, as in question (k), that a Minister could have been corrupted by an amount of AED 350,000 (less than US$100,000) in relation to a project of a value of several hundreds of millions of US Dollars is not convincing, in particular when it has been shown that it corresponded more or less to the compensation of Mr. Zulqarnain to whom the amount was actually paid.  The Tribunal is unable to find in the elements included in Pakistan's questions "red flags" suggestive of corruption, such as to transfer the burden of proof, still less any positive proof of corruption.

   c.  *Shipyard Visit in September 2010*

522. Pakistan states that, in September 2010, Karkey paid flights for a delegation of Pakistani government officials.[594] According to Pakistan, payment for these flights is a "*valuable thing*" offered by Karkey for inadequate consideration, to persons concerned in a business transaction with Karkey (the RPP) in breach of Section 9(a)(ii) of the NAO. The fact that Pakistan requested

---

[593] Pakistan's Counter-Memorial, ¶ 14.

[594] Pakistan's Post-Hearing Brief, ¶ 211. *See* R-374 (CONFIDENTIAL); translation provided at R-374(t) (CONFIDENTIAL); R-375 (CONFIDENTIAL); translation provided R-375(t) (CONFIDENTIAL); R-376 (CONFIDENTIAL); translation provided at R-376(t) (CONFIDENTIAL); R-377 (CONFIDENTIAL); translation provided at R-377(t) (CONFIDENTIAL).

the visit and/or that it was for a valid purpose is irrelevant. Moreover, Pakistan points out that there is no evidence that it requested Karkey to pay for the visit, which was a breach of Section 9 of the NAO (and in violation of the Civil Establishment Code).[595]

523.   In September 2010, a delegation of representatives of the Government of Pakistan did indeed travel to inspect the *Kaya Bey* at the shipyard for meetings at Karkey's headquarters in Istanbul.[596]

524.   The Tribunal finds that there is nothing disproportionate in the payment of five plane tickets (in the total of approximately EUR 3,000.00) for a delegation of Pakistani government officials in the context of a visit to Karkey's headquarters to accompany the development of the Project. Such payment is not sufficient for a finding of corruption and/or as a "*valuable thing*" offered by Karkey for inadequate consideration under Section 9 of the NOA. This is particularly the case when the Pakistani Government itself requested the shipyard visit,[597] which was fully documented and reported, including with respect to Karkey's payment of the trip expenses.[598]

   d.   *The Alleged Corruption "Scheme"*

525.   According to Pakistan, following the filing of Pakistan's Rejoinder but at least two months prior to the Hearing, Pakistan was informed by two previously unknown individuals, Mr. Samir Tannous and Mr. Tarek Nahas (working with Mr. Mustafa Ramday, a lawyer in Pakistan), of the existence of a sophisticated scheme implemented by Karkey, involving significant payments by Karkey to secure Karkey's contract in Pakistan (the "Scheme"). Pakistan and its counsel were shown copies of documents (*i.e.* consultancy agreements the contents of which were recorded in

---

[595] Pakistan's Post-Hearing Brief, ¶ 211.

[596] El Suudi, Second Witness Statement ¶ 55; Karadeniz, First Witness Statement (Updated), ¶ 62; C-016 (CONFIDENTIAL).

[597] *See* R-164: "*[…] Power Plant in progress. To monitor the project activities and witness the physical progress of the Power Plant, a visit of PEPCO representatives would be most helpful and may be arranged. Furthermore, a time line activity schedule of the project may please be submitted, so that the progress achieved could be measured against set targets*." (Emphasis added)

[598] C-016 (CONFIDENTIAL).

the Attendance Note[599] taken immediately following the meeting by Allen & Overy)[600] which were allegedly linked to and for the purpose of securing Karkey's contract in Pakistan.[601]

526. According to Pakistan, the copy of a Consultancy Agreement stated, *inter alia*, that the Consultant (whose name was redacted) was responsible for appointing a local agent at its own costs and expense to assist Karkey in securing the operation of the Contract in relation to matters related to certain local authorities for the duration of the Contract. In return for securing the RSC, Karkey would pay the Consultant 6% of the contract price under the RSC (over US$33 million) which was payable in tranches linked to payments due to Karkey under the RSC.[602]

527. The copy of the Local Consultancy Agreement (the date of which was redacted) stated, *inter alia*, that the Consultant would pay over US$4.8 million (equal to 6% of the Advance Payment under the 2009 RSC) to the Local Consultant (whose name was also redacted), in return for successfully facilitating the execution of the RSC. This amount was payable in two tranches, the size of which depended on certain trigger events under the 2009 RSC and the Consultancy Agreement, including whether the Advance Payment under the RSC would be paid inclusive or net of withholding tax.[603]

528. At the same time, Mr. Tannous allegedly told Pakistan and its counsel of reams of emails confirming the existence of the Scheme. If genuine, those documents would be evidence that Pakistan has been the victim of a large-scale fraud by Karkey (and others) which goes to the very heart of this Tribunal's jurisdiction.[604] However Mr. Tannous and Mr. Nahas requested "*millions of dollars*"[605] to hand over the Consultancy Agreement and the Local Consultancy Agreement, an amount that Pakistan was not prepared to pay.

529. According to Pakistan, it was for this reason that it sought the assistance of the Tribunal and made its application dated 11 December 2015 (just two weeks after the Scheme came to light), together with the witness statement of Mr. Mark Levy (a partner at Allen & Overy LLP who had

---

[599] *See* R-424.

[600] Pakistan's Post-Hearing Brief, ¶ 192.

[601] Pakistan's Post-Hearing Brief, ¶ 193.

[602] Pakistan's Post-Hearing Brief, ¶ 193.

[603] Pakistan's Post-Hearing Brief, ¶ 194.

[604] Pakistan's Post-Hearing Brief, ¶ 197.

[605] Pakistan's Post-Hearing Brief, ¶ 198.

participated in the meeting with Mr. Tannous and Mr. Nahas) and supporting documents, seeking disclosure by Karkey. In particular, Pakistan sought disclosure of 70 backup tapes on which Karkey had claimed that its electronic records were stored for the period up to April 2010 (the Backup Tapes) – *i.e.* the exact period to which the Consultancy Agreement and the Local Consultancy Agreement indicate the Scheme relate. Karkey had previously relied on these Backup Tapes in resisting certain of Pakistan's requests for disclosure. Pakistan's previous requests for disclosure of relevant documents on the Backup Tapes had been rejected by the Tribunal.[606]

530.    In response to this, Karkey denied the existence of the Scheme and argued that the Scheme had been fabricated by a Pakistani government insider.[607] In Procedural Order No. 12, the Tribunal declined to order any disclosure "*[s]ince Karkey declares that the documents requested in Pakistan's Application do not exist*".[608]

531.    During its Opening Statement at the Evidentiary Hearing, Pakistan renewed for a third time its application for disclosure of the Backup Tapes by Karkey on the basis that the Tribunal had accepted Karkey's bare denial of existence of the documents as truthful without having given Pakistan an opportunity to test it by requiring restoration and review of the Backup Tapes which Karkey acknowledged it had not even reviewed. The costs of disclosing the Backup Tapes had been estimated by an independent expert retained by Pakistan at £27,600, and they were costs that Pakistan agreed to bear.[609]

532.    The Tribunal dealt with the application on Day 2 of the Evidentiary Hearing,[610] and decided to admit several of the documents that Pakistan wanted to introduce in the record, including Exhibit R-425 (*i.e.* the Attendance Note), but did not admit a witness statement of Mr. Rafi, on the basis that the Tribunal considered it could have been submitted earlier.[611]

---

[606] Pakistan's Post-Hearing Brief, ¶ 198.

[607] Pakistan's Post-Hearing Brief, ¶ 201.

[608] Pakistan's Post-Hearing Brief, ¶ 203.

[609] Pakistan's Post-Hearing Brief, ¶ 204.

[610] Tr. Day 2, 500-501.

[611] Pakistan's Post-Hearing Brief, ¶ 205.

533.   As noted at the closing of the Evidentiary Hearing, Pakistan raised its concern at the Tribunal's decision to exclude what it believes to be relevant evidence. Pakistan is further concerned by the Tribunal's (a) rejection of Pakistan's application regarding (and its apparent unwillingness to investigate the veracity of) the alleged Scheme including the rejection of Mr. Khan's statement (which also went to the activities of Mr. Zulqarnain), as well as (b) the standards applied to requests for the introduction of new evidence by Karkey, which differed from those applied to Pakistan.[612]

534.   The Tribunal has duly considered all the allegations made by Pakistan with respect to the purported Scheme and its expressions of "concern", which amount to a thinly veiled accusation of lack of impartiality and of failure in the Tribunal's "*clear duty to address issues of bribery, money laundering or serious fraud whenever they arise in the arbitration.*"[613]  The Tribunal notes that, in the article from which this quotation was taken by Pakistan, the authors also say that "*[t]he Tribunal must guard against the tactical use of allegations to avoid making payments as previously agreed, or otherwise deflect attention from one party's own contractual non-performance*"[614] and, again, that "*[t]he tribunal must proceed with care, and its task is not made easier by the risk that a party may reveal the corrupt purpose of a contract in order to avoid sharing its benefits with the other party or otherwise to escape the consequences of its own contractual non-performance.*"[615]  The statement as to "*the clear duty*" of a Tribunal must be read in its context.

535.   It is important to stress that Karkey's Request for Arbitration was dated 11 March 2013. Pakistan raised these allegations in an Application dated 11 December 2015, by which time a Hearing had already been provisionally fixed for the week beginning 29 February 2016.  The Tribunal had therefore to consider whether the matters raised by Pakistan were such as to justify the making of the extensive order sought by it, which would, almost certainly, have resulted in postponement of the Hearing for an unpredictable length of time.

---

[612] Pakistan's Post-Hearing Brief, ¶ 206.

[613] Citing RA-206, Cremades and Cairns, *Transnational Public Policy in International Arbitral Decision-Making*, in "Arbitration, money laundering, corruption and fraud" Dossiers ICC Institute of World Business Law, eds Karsten and Berkeley (2003), p. 16 of pdf file (actually page 86 in the original).

[614] *Ibid*, p. 15 of pdf file (or p. 84 in the original).

[615] *Ibid.* p. 15 of pdf file (or pp. 84 and 85 in the original).

536.   The basis for the Application was stated to be "new evidence of which Pakistan has only very recently been made aware through an unsolicited approach by a Lebanese individual" – in itself, a curious story. The documents allegedly newly available were themselves very suspicious. The alleged Consultancy Agreements shown to Pakistan's counsel were mere copies and had names and dates redacted, making it impossible to verify their authenticity. It can also be noted from paragraphs 10 and 11 of the Attendance Notes that Pakistan's counsel themselves had serious doubts about the authenticity of the alleged new evidence relating to the purported Scheme.[616] Moreover, Pakistan's explanation that it had continued its dialogue with Mr. Tannous but that the latter withdrew his cooperation when he found out about Pakistan's application to the Tribunal,[617] together with the fact that Pakistan's alleged informants were requesting a huge amount of money to cooperate, are such as to destroy any semblance of credibility of the new "evidence".  The submissions made by Pakistan at the hearing disclosed nothing beyond what was already contained in the Application of 11 December 2015.

537.   In reality, Pakistan was asking the Tribunal to embark upon an investigation as to the existence of corruption two months before the Hearing and then at the Hearing, after almost three years of arbitral proceedings. This request was based on allegations of suspicion of corruption and declarations of informants of highly suspect credibility, after the Pakistani authorities, with powers considerably greater than those of the Tribunal, had failed to establish the existence of such corruption after several years of investigation.

538.   It is important to note that the Supreme Court has made no specific finding of corruption in its Judgment regarding Karkey. Following the Judgment of the Supreme Court, the NAB, which is an Executive agency tasked with the authority to investigate and enforce the NAO and which has been investigating allegations of corruption related to the Project for the past four years, has not found any evidence of corruption related to Karkey.

539.   In fact, the NAB itself concluded that there was no evidence of any wrongdoing by Karkey under the NAO, "*after a detailed examination of all accounts and documents*".[618]  Indeed, it entered

---

[616] For instance, paragraph 11 of the Attendance Note (R-424) reads as follows: "*It was made clear during the meeting that Pakistan could not and would not acquire C1. Moreover, JG stated that before A&O [Allen & Overy LLP] could advise Pakistan to agree to any sort of arrangement with C1 in relation to the acquisition of any documents, A&O would need to see a more specific list of the documents that C1 would provide. The list of suggested "Escrow Documents" was not sufficient. [...]*" (emphasis added).

[617] Pakistan's Post-Hearing Brief, ¶ 200.

[618] C-013 (CONFIDENTIAL), p. 2.

152

into a Deed on 7 September 2012 settling Karkey's accounts wherein it expressly stated that Karkey had no liability under the NAO:

> *NAB confirms that after having completed its enquiry, it is satisfied that KARKEY KARADENIZ ELETRIK URETIM A.S., its wholly owned subsidiaries and their respective affiliates [...] have settled the agreed account between Karkey and Lakhra [...]. Resultantly, KARKEY has no liability under the National Accountability Ordinance, 1999, and there remains no basis or evidence for proceeding(s) by NAB or any other entity against KARKEY and/or its project/investment and that NAB has completed and closed its enquiry in respect of KARKEY.[619]*

540. In addition to signing the Deed with Lakhra and Karkey, NAB issued a NOC in October 2012, clearing Karkey of any and all liability under the NAO and reiterating its conclusion as stated in the above paragraph.[620]

541. The Tribunal is aware that Pakistan has tried to diminish the importance of the Deed and the NOC based on the fact that these documents were later rejected by the Supreme Court because the value of the settlement concluded was allegedly too low. However, as stated by the Claimant, Pakistan points to no ruling from the Supreme Court questioning NAB's clearing Karkey of any liability under the NAO.

542. Moreover, the Tribunal cannot ignore the fact that the Civil Review Petition of the Judgement of the Supreme Court filed by the Ministry of Water and Power on 24 April 2012[621] is still pending. In this Petition the Ministry of Water and Power raises, *inter alia*, the following:

> *That the findings of the honorable Court that functionaries are prima facie involved in corruption and corrupt practice is not supported by evidence or material submitted either by the petitioner or by any other person and such observations undermine the fundamental rights of the functionaries, in particular Article IO-A of the Constitution.[622]*

543. In view of the foregoing, the Tribunal finds that there is no evidence of corruption on the record related to Karkey's alleged investment and that Pakistan's last minute allegations related to the "Scheme" are based on manoeuvres by persons who may or may not have been identified which were more probably aimed at extorting money from Pakistan or at derailing the arbitration

---

[619] C-013 (CONFIDENTIAL), p. 6 (emphasis added).

[620] *See* C-014.

[621] C-018.

[622] C-018, p. 9.

proceedings than at genuinely allowing corruption to be established. This cannot lead to a finding of corruption or even a shifting of the burden of proof. Even if the Tribunal were to apply the "balance of probabilities" standard as proposed by Pakistan, the Tribunal finds that there is insufficient evidence to demonstrate that it was more likely than not that Karkey was involved in the practice of corruption.

B.      The Effect of the Supreme Court's Judgment

544.   The Parties agree that the Tribunal shall be the judge of its own competence in this arbitration. As pointed out by Pakistan "*the Parties further agree that the Supreme Court Judgment is not binding upon the Tribunal's determination of jurisdiction in this arbitration*".[623]

545.   However, the Parties disagree as to the weight and effect that the Tribunal should give to the Supreme Court's Judgment that declared the 2009 RSC void *ab initio*.

546.   It is Pakistan's position that the Supreme Court of Pakistan is the ultimate source of Pakistani law. Thus, when conducting its jurisdictional investigation, the Tribunal should treat the Judgment on the issues of Pakistani law relevant to Karkey's investment as authoritative, *i.e.* only if the Tribunal finds that there has been a denial of justice can the Judgment be ignored.[624] According to Pakistan there has been no denial of justice in this case. It follows that Karkey's contract is void *ab initio* under Pakistani law in accordance with the Judgment and its investment was established in material breach of fundamental principles of Pakistani law and contrary to Article I(2) of the Treaty.[625]

547.   Karkey submits that the Supreme Court's Judgment impacts the merits of this case only insofar as the Judgment itself violates the BIT. The Judgment does not preclude the Tribunal possibly finding liability by Pakistan for its numerous other breaches of the BIT.[626] According to Karkey, Pakistan's argument rests on the false premise that unless the Tribunal finds (i) a denial of justice that (ii) arose from a procedural defect in the Judgment, the Tribunal is bound by the Court's finding that the Contract is void *ab initio*.  Karkey submits that the Tribunal is not bound to defer to a national court judgment made in violation of international law – regardless of whether that

---

[623] Pakistan's Rejoinder, ¶ 130; Karkey's Reply, ¶¶ 496 and 498.

[624] Pakistan's Post-Hearing Brief, ¶ 34.

[625] Pakistan's Post-Hearing Brief, ¶ 36.

[626] Karkey's Post-Hearing Brief, ¶ 118.

violation takes the form of a denial of justice or of some other breach of Pakistan's BIT obligations. In any event, under no circumstances could the Judgment, deciding liability under national law, inoculate Pakistan from responsibility for breaches of international law in the alleged implementation (by executive authorities) of that Judgment, nor could it validate subsequent directives from the Supreme Court.[627]

548.  By way of reminder, the Supreme Court held in its Judgment of 30 March 2012, *inter alia*, that:

> *[para. 84(iii)] The contracts of all the RPPs [...] were entered into in contravention of law/PPRA Rules, which, besides suffering from other irregularities, violated the principle of transparency and fair and open competition, therefore, the same are declared to be non-transparent, illegal and void ab initio. Consequently, the contracts of RPPs are ordered to be rescinded forthwith and all the persons responsible for the same are liable to be dealt with for civil and criminal action in accordance with law.[628]*

549.  As stated by the tribunal in *Helnan v. Egypt*:

> *An ICSID Tribunal will not act as an instance to review matters of domestic law in the manner of a court of higher instance. Instead, the Tribunal will accept the findings of local courts as long as no deficiencies, in procedure or substance, are shown in regard to the local proceedings which are of a nature of rendering these deficiencies unacceptable from the viewpoint of international law, such as in the case of a denial of justice.[629]*

550.  Indeed, in order to decide whether the Tribunal may rely on the Judgment, the Tribunal must analyse whether the Judgment presents deficiencies which are unacceptable from the viewpoint of international law. However, contrary to what is alleged by Pakistan, there is no need that such deficiencies amount to a denial of justice which, as pointed out by the *Helnan* award on which both parties rely albeit from different points of views,[630] is only one of the possible breaches of international law to be taken into consideration. Deficiencies relating to the substance of the Judgment, in certain circumstances, may amount to a breach of international law. In particular, an international tribunal may decide not to defer to an arbitrary judicial decision which is, as such, incompatible with international law.

---

[627] Karkey's Post-Hearing Brief, ¶¶ 120-122.

[628] C-029, ¶ 84 (emphasis added).

[629] RA-055, *Helnan v. Egypt*, ¶ 106.

[630] Karkey's Post-Hearing Brief, ¶ 120; Pakistan's Counter-Memorial, ¶ 871.

551. It is noteworthy that the International Court of Justice in the *Diallo* case[631] has implicitly indicated that an international tribunal is not necessarily bound by the finding of a national jurisdiction in exceptional circumstances by pointing out: "*Exceptionally, where a State puts forward a manifestly incorrect interpretation of its domestic law, particularly for the purpose of gaining an advantage in a pending case, it is for the Court to adopt what it finds to be the proper interpretation.*" If, in such circumstances an international tribunal may substitute its own interpretation to that of a municipal court without having previously found a denial of justice, it may *a fortiori* disregard the findings under municipal law of a municipal court decision which are arbitrary and irrational.

552. It is against that background, that the Tribunal will now review the procedure and substance of the Supreme Court proceeding and decide whether it must accept as binding upon it the finding of the Supreme Court that Karkey's RPP Contract was void *ab initio.* Accepting that Karkey's RPP Contract is void *ab initio* would, according to Pakistan, have the effect of depriving the Tribunal of jurisdiction.

553. First, the Tribunal notes that the Supreme Court proceeded on the basis of Mr. Hayat's erroneous assertion that Pakistan had sufficient generation capacity, despite PEPCO's demonstration that Mr. Hayat had mistakenly "*compar[ed] Power (MW) with Energy (MkWh), which are two different things.*"[632] Given the improbability that Pakistan's authorities would enter into a Contract for the supply of energy that was, on Mr. Hayat's hypothesis, totally unnecessary, it is reasonable to expect that a court acting *ex proprio motu*, and having had the point drawn to its attention, would, at the very least, have sought independent confirmation of Mr. Hayat's assertion. This was not the case.

554. Second, the Court imposed identical liability on all the RPP sponsors, despite material differences between the procurement, financing, and operational status of the different RPP Programs.[633] It is reasonable to expect that a Judgment having such serious consequences for those concerned would have defined with some particularity the evidential and legal basis on which each of them, considered separately, was liable to suffer such consequences. The Supreme

---

[631] ICJ, Case concerning *Ahmadou Sadio Diallo*, *Republic of Guinea v. Democratic Republic of the Congo*, Judgment of 30 November 2010, ICJ Reports 2010, p. 639, ¶ 70.

[632] C-264, ¶ G.

[633] C-029, ¶ 84.

Court's Judgment does nothing of that sort. In the opinion of the Tribunal, this makes its decision arbitrary.

555.  Third, the Court declared all RPP contracts to be both "*void ab initio*" and "*rescinded forthwith*", even though such holdings are mutually inconsistent. The Tribunal understands that it is a basic principle of the common law, embodied in the Indian Contract Law 1872 (continued in force in Pakistan, as well in as India and Bangladesh), that whereas a voidable contract is enforceable (though it can in certain circumstances be rescinded), an agreement that is void is by its nature unenforceable. To say that a void agreement must be rescinded is a contradiction in terms and is irrational.[634] Such a fundamental inconsistency in the Judgment must raise a serious question as to whether the Tribunal is bound to treat it as a definitive statement of the legal status of Karkey's RPP according to Pakistan law.  In that respect, the Tribunal found unconvincing Justice Karim's explanation of this aspect of the Judgment.[635]  It is to be noted, moreover, when an agreement is discovered to be void, or when a contact becomes void, any person who has received any advantage under such agreement or contract is bound to restore it, or to make compensation for it to the person from whom he received it.[636] A finding that an agreement is void does not, by itself, end the matter as far as the rights of parties are concerned.

556.  The Tribunal notes that these criticisms as to the irrationality and arbitrariness of the Supreme Court Judgment are supported by Pakistan's own submissions (Civil Review Petitions)[637] to the Supreme Court that were filed after the Judgment was rendered in order to obtain its reconsideration.

557.  For instance, in Civil Review Petition No. 101, filed by the Federation of Pakistan through the Secretary, Ministry of Water & Power and others, dated 24 April 2012, Pakistan requested, *inter alia*, the following relief:

> *In light of the aforesaid grounds and facts, the following submissions are made:*
>
> *1. That the findings of the Hon'ble court that there was no transparency in the holding of the international competitive Bidding by PPIP & PEPCO be*

---

[634] C-029, ¶ 84; Zafar, First Expert Report, ¶ 177; Zafar, Second Expert Report, ¶ 152.  *See* Section 2 (g)-(j) [the Interpretation Clause] of the Pakistan Contract Law 1872.

[635] Karim, First Expert Report §§221-223; Karim, Second Expert Report §§98-99.

[636] Section 65 of the Pakistan Contract Law.

[637] *See* C-018; C-699; C-700; C-672 (CONFIDENTIAL).

*reconsidered and withdrawn, keeping in view the submissions made hereinabove which shows that while arriving at such conclusion <u>the Hon'ble Court did not consider the material facts that were placed on record and as such there was an error on the face of record</u>;*

*2. That the Hon'ble court be pleased to withdraw the observations relating to the non-submissions of record by PEPCO and Ministry of Water & Power as the submissions made above reveal that the complete information relating to demand, supply, cost of production of electricity by RPPs, IPPs, [...] were place before this honorable Court. The adverse inference drawn by this honorable Court is <u>misreading of facts resulting in error on face of record</u>.*

*[...]*

*4. That the conclusions drawn by this honorable Court in respect of the functionaries of Ministry of Water & Power, PPIB, PEPCO and GENCOs as being involved in corrupt practices is based on misreading of record as has been illustrated hereinabove [...].*

*5. That the directives for taking criminal action <u>is not in accordance with the principles of natural justice</u> nor in accordance with the letter and spirit of Article 10-A of the Constitution of the Islamic Republic of Pakistan.*

*6. It is <u>prayed that this honorable Court be pleased to review its Judgment</u> dated <u>30th March 2012</u> and recall/modify the same keeping in view the submissions made in the review petition.*[638]

558.   According to the principle of national and international law known as approbate and reprobate,[639] Pakistan may not at the same time both rely on the Supreme Court decision and seek to have it recalled or modified.  (As far as the Tribunal has been informed, the procedure in Pakistan's Civil Review Petition has not been concluded.)

559.   In any case, since, as the Tribunal has held, corruption has not been proven, Pakistan cannot rely on the Supreme Court Judgment in so far as it refers to the breach of procurement laws as it was Pakistan's officials who are supposed to have breached the law and/or decided not to apply the procurement laws.

---

[638] C-018, pp. 20-21 (emphasis added).

[639] *See*, for example, in the law of Pakistan, *Secretary Economic Affairs Div, Islamabad v. Ahmed and others,* Supreme Court of Pakistan *31 July 2013,* §23 : "*Even as a rule of evidence or pleading a party should not be allowed to approbate and reprobate*".  In the context of international law, Sir Ian Sinclair interpreted the reasoning of the International Court of Justice in the *Aegean Continental Shelf* case as "*a specific application of the principle of inter-temporal law, tempered by the equitable doctrine of approbation and reprobation*": Sinclair, *The Vienna Convention on the Law of Treaties*, 2nd edition, Manchester 1984, p. 126 (emphasis added). *See also* Karkey's Post Hearing Brief, ¶¶ 77, 79 and 86 on estoppel.

560. Last but not least, the Tribunal notes that the Supreme Court played an active part in several of the acts attributable to Pakistan and that are presented by Karkey as a general pattern of breaches of the BIT.

561. For the foregoing reasons, the Tribunal does not consider itself to be bound, as an international tribunal, by the finding of the Supreme Court that Karkey's RPP Contract was void *ab initio.* The Judgment, however, will not be ignored, and it will be considered by the Tribunal as a fact. The Tribunal therefore rejects Pakistan's contention that Karkey's investment was established in material breach of fundamental principles of Pakistani law and contrary to Article I(2) of the Treaty.

C.     Attribution

562. It is Karkey's position that the fact that Lakhra's actions gave rise to contract claims does not mean that they did not also give rise, separately and in parallel, to treaty claims. Lakhra's actions gave rise to treaty claims that are analytically distinct from any contract claim that Karkey could assert, and it is the former rather than the later that constitute the subject of this arbitration.[640] Karkey's principal treaty claims relating to the alleged non-performance by Lakhra of obligations under the Contract (*i.e.* not including claims relating to the non-performance by Pakistan itself of the Sovereign Guarantee), are related to Pakistan's alleged breach of fair and equitable treatment, denial of justice-based FET breaches, failure to observe obligations under the Contract pursuant to the umbrella clause, and failure to provide full protection and security.[641]

563. Before considering whether Lakhra's alleged non-performance of the Contract can give rise to Pakistan's alleged breaches of the Treaty and whether the Tribunal has jurisdiction over the Claimant's claims, it is first necessary to determine whether the acts of Lakhra complained in this regard are attributable to Pakistan as a matter of international law.

**(1) Are the Acts of Lakhra attributable to Pakistan?**

564. According to Karkey, Lakhra's alleged acts and omissions in breach of the Contract (and the BIT) were controlled and directed by the Government of Pakistan, and as such are attributable to

---

[640] Karkey's Reply, ¶ 618.

[641] Karkey's Reply, ¶ 619, letters (a) to (e).

the State.[642] Karkey submits that Lakhra's acts are clearly attributable to Pakistan under Article 5 and 8 of the ILC Articles on State Responsibility. Although Pakistan accepts that the acts of the Supreme Court, MoWP and the NAB are attributable to the State, it is Pakistan's position that the acts of Lakhra are not, as Lakhra is a separate legal entity with autonomy from the State.[643]

565.   Pakistan submits that Lakhra's acts are not attributable to the State of Pakistan unless specifically and individually directed, instructed or controlled by the State. Only Lakhra's institution of the Sindh High Court Proceedings, which was done at the specific request of the NAB is admitted by Pakistan as being attributable to the State.[644]   Pakistan contends that Karkey has failed to demonstrate that Pakistan issued any specific instruction, direction or control to Lakhra in respect of each instance in which Lakhra is said to have acted as Pakistan.[645]

566.   Article 5 of the ILC Articles on State responsibility reads as follows:

> *The conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.*[646]

567.   Article 8 of the ILC Articles on State responsibility reads as follows:

> *[…] The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the directions or control of, that State in carrying out the conduct. […]*[647]

568.   As explained by the ILC Articles, acts of a State-owned entity will be attributable to the State under Article 8 "*where there [is] evidence that the corporation was exercising public powers or*

---

[642] Karkey's Reply, ¶ 818.

[643] Pakistan's Rejoinder, ¶ 633; Pakistan's Post-Hearing Brief, ¶ 225.

[644] Pakistan's Post-Hearing Brief, ¶ 225.

[645] Pakistan's Post-Hearing Brief, ¶ 229.

[646] CA-144, ILC Articles (emphasis added).

[647] CA-144, ILC Articles, Art. 8 (emphasis added).

*that the State was using its ownership interest in or control of a corporation specifically in order to achieve a particular result.*"[648]

569. Moreover, the ILC Articles further explain that the "*three terms 'instructions', 'directions' and control' are disjunctive; it is sufficient to establish one of them*".[649]

570. Investment tribunals have recognized that sovereign instructions, directions or control in contractual relations with an investor constitute cogent evidence of sovereign interference.[650]

571. The Tribunal analyses below the entering into the Contract and its performance by Lakhra in order to verify whether the acts of Lakhra in this regard are attributable to Pakistan.

a.  *The Contract*

572. The Tribunal first notes that Lakhra itself has formally acknowledged in pleadings submitted in judicial proceedings in Pakistan that it is "*owned and controlled by the Government of Pakistan*."[651]

573. It stems from the evidence on the record that Lakhra did not enter the Contract with Karkey out of its own free will and self-interest. It was Pakistan, through its organs and agents, which selected Lakhra to be the Buyer under the Contract. This is evidenced by a letter sent from PPIB to Lakhra on 6 October 2008:

> *Please be informed that the Federal Cabinet on 14th May 2008 approved solicitation for fast-track power generation projects through International Competitive Bidding, [....]*
>
> *[...] The Projects will be issued a Letter of Award (the 'LOA') by PPIB after approval of tariff by NEPRA. Subsequently, these rental power projects were earlier to be further processed by GENCO-I. However, in view of on-going privatization process of GENCO-I, the Competent Authority has decided that Lakhra Power Generation Company Ltd. (GENCO-IV) will be the 'Buyer' for aforesaid approved projects of Karkey and Walters. [...]*[652]

---

[648] CA- 144, ILC Articles, Commentary on Art. 8, ¶ 6.

[649] CA-144, ILC Articles, p. 48.

[650] *See* RA-181, *Tulip Real Estate and Development v. Turkey*, (ICSID Case No. ARB/11/28), Award, 10 March 2014, ¶ 358.

[651] C-288, ¶ 1.

[652] C-150 (emphasis added).

574. The Tribunal notes that Pakistan, and not Lakhra, solicited the RPPs[653] and invited the RPPs to invest. Moreover, the Solicitation for Fast Track IPP and Rental Power Projects Through International Competitive Bidding, reads, *inter alia*, as follows:

> *2.1. Policy Features/Incentives*
>
> - *Customs duty at the rate of 5% on the import of plant and equipment not manufactured locally*
>
> - *No levy of sales tax on such plant, machinery and equipment as the same will be used in production of taxable electricity*
>
> - *Government Guarantees contractual obligations of power purchaser, provincial/AJK governments*
>
> - *Provide protection against specified political risk, changes in taxes and duties regimes*
>
> - *PPIB to provide one window facility for projects above 50 MW.*[654]

575. Pakistan also determined the bulk of Lakhra's eventual obligations under the Contract (by way of the Pro Forma RSC attached to the RFP). The RFP which contained the Pro Forma RSC, provides on page 2 the following:

> *This Request for Proposal ('RFP') was prepared by the Private Power and Infrastructure Board ('PPIB'), Ministry of Water and Power, and Government of the Islamic Republic of Pakistan (the 'GOP').*[655]

576. The Tribunal notes that the following provisions were set forth in the Pro Forma RSC, and were also incorporated in the 2008 RSC and 2009 RSC:

> *[Clause 11 – BUYER Obligations] BUYER hereby covenants and agrees that throughout the duration of this Contract.*
>
> *(a) no direct or indirect expropriation, confiscation, compulsory acquisition, or seizure of all or any part of the SELLER's assets, business or operations shall be done by a Governmental Entity and/or state entity or private person or entity, any act, action, delay or omission of the Governmental Entity and/ or state entity;*

---

[653] C-138, p.11 ("*To cater for the immediate power shortages, the GOP has decided to issue a solicitation for processing of fast track IPP projects through ICB as part of its Power Policy*") (emphasis added); C-136: ("[PPIB], *a one-window facility of the Government of Pakistan [...] is offering a lucrative opportunity for investment in Pakistan's Power Sector*") (emphasis added)

[654] C-138, p. 11.

[655] *See* C-137, Exhibit V (emphasis added).

*(b) BUYER shall obtain and maintain all permits and licenses required for the operation, and maintenance of the Equipment, if applicable. <u>BUYER shall not revoke or terminate any permits required by any governmental or other type of authority in Pakistan</u>, except in the case of Termination; [...]*

*(d) grant any and all the necessary permits at BUYER's cost and expense in order to import and export any and all equipment and machines necessary for the project to and from Pakistan; [...][656]*

577.  Moreover, Clause 4.5(c) of the 2009 RSC provided that:

*Within thirty days (30) Days from the date of signing of this Contract, the BUYER [Lakhra] shall ensure that the Government of Pakistan issues and the BUYER [Lakhra] delivers to the SELLER [Karkey], a duly executed, irrevocable and unconditional guarantee, guaranteeing the payment of all Monthly Rental Services Fees by the BUYER [Lakhra] to the SELLER [Karkey], and the Termination Charges payable in terms of this Contract…[657]*

578.  It stems from the above that Lakhra committed under the Contract, *inter alia*, that no State organ would expropriate Karkey's assets, and pledged to secure the issuance of the Sovereign Guarantee.[658] Such pledges could not legitimately have been made by a purely private sector entity.

579.  The Tribunal also notes the existence of the following disclaimer in the RFP:

*[...] <u>The GOP and PPIB expressly disavow any obligation or duty (whether in contract, tort or otherwise) to any Bidder. No Bidder is entitled to rely on the GOP's or PPIB's involvement in the preparation of this RFP</u> or in the solicitation process as a basis for preparing the Proposal or developing the Project.*
*[...]*
*In submitting a Proposal in response to this RFP, <u>each Bidder certifies that it understands, accepts and agrees to the disclaimers on this page</u>. Nothing contained in any other provision of the RFP nor any statements made orally or in writing by any person or party shall have the effect of negating or superseding any of the disclaimers set forth on this page.[659]*

---

[656] *See* C-137, Exhibit V; C-159 (CONFIDENTIAL); C-010 (CONFIDENTIAL) (emphasis added).

[657] C-010.

[658] The Sovereign Guarantee was executed by the Managing Director of the PPIB on behalf of the President of Pakistan, for and on behalf of Pakistan, on 24 April 2009 (C-011 (CONFIDENTIAL)).

[659] C-137, p. 2 (emphasis added).

580.  As pointed out by the Claimant, investment tribunals have found that a foreign investor is entitled to rely on a State's investment solicitation materials, even where those materials contain a disclaimer.[660]  For example, the *National Grid P.L.C. v. Argentina* tribunal explained:

> *It is disingenuous for [Argentina] now to rely on the disclaimers in the prospectus in order to distance itself from the information given therein.  The prospectus was prepared by respectable bankers on behalf of [Argentina] and key Argentine government officials participated prominently in the road show.  If information in the prospectus had been incorrect or misleading, the Tribunal has no doubt that [Argentina] would have had the prospectus changed accordingly.[661]*

581.  Tribunals have also determined that States have a "duty" to ensure that investment prospectuses do not engender a false expectation by foreign investors, and this is even where the government expressly disclaimed responsibility for the representations in the prospectus.[662]

582.  In view of the foregoing, the Tribunal concludes that Lakhra's acts related to the conclusion and execution of the Contract were directed, instructed or controlled by Pakistan, and are accordingly attributable to Pakistan, irrespective of the disclaimer contained in the RFP.

  b.  *The Performance of the Contract*

583.  Karkey submits that in the present case, compliance with the terms of the Contract – including Lakhra's obligation to pay the fees and charges that it owed to Karkey under the Contract – was impeded by governmental acts, including the failure or refusal by Pakistan's Ministry of Finance and the State Bank of Pakistan to give timely approval to the relevant payments from Lakhra to Karkey.  Similarly, upon termination of the Contract, Lakhra failed to pay post-termination charges owed contractually to Karkey because of the direct and explicit instructions from the Government of Pakistan ordering Lakhra to initiate and prosecute judicial proceedings in the Sindh High Court to collect funds from Karkey, and to detain Karkey's vessels. Further, Pakistan

---

[660] *See* CA-111, *National Grid P.L.C. v. Argentina*, UNCITRAL, Award, 3 November 2008, ¶¶ 103–108, 175–177; RA-171, *Sempra Energy v. Argentina*, (ICSID Case No. ARB/02/16), Award, 28 September 2008, ¶ 113; CA-083, *Enron v. Argentina*, (ICSID Case No. ARB/01/3), Award, 22 May 2007, ¶¶ 91, 103; *cf.* CA-075, *CMS Gas v. Argentina*, (ICSID Case No. ARB/01/8), Award, 12 May 2005, ¶¶ 55, 131, 134, 257; CA-021, *EDF v. Argentina*, (ICSID Case No. ARB/03/23), Award, 11 June 2012, ¶¶ 318, 1008, 1022.

[661] *See* CA-111, *National Grid P.L.C. v. Argentina*, UNCITRAL, Award, 3 November 2008, ¶ 177.

[662] *See* RA-171, *Sempra Energy*, ¶ 113; CA-083, *Enron v. Argentina*, ¶¶ 91, 103.

reneged on its obligations under the Sovereign Guarantee that it had issued for Karkey's benefit in connection with performance by Lakhra of the Contract.[663]

584. With respect to the specific issue of Lakhra's failures to comply with contractual payment obligations, Pakistan contends that "*[n]on payment does not involve any exercise of sovereign authority.*" [664]

585. The Tribunal finds that although that could be true in situations in which the same entity does not make a contractual payment on a commercial contract, the situation here is different, as the Claimant contends. This is so not only due to the nature of the contract itself (*i.e.* concession for a public service) and the existence of the Sovereign Guarantee, but also because the chain of causation of the non-payment by Lakhra can be traced directly to the Ministry of Finance and the State Bank of Pakistan.

586. The funds to pay Karkey under the Contract were released from PEPCO and the Ministry of Finance. Mr. Dari – the current finance director of Lakhra, and a witness proffered by Pakistan in this arbitration – described Lakhra's two-step process for paying Karkey. First, Karkey would submit an invoice to Lakhra. Second, Lakhra would request that PEPCO release the funds for payment of the invoice.[665] PEPCO was in turn dependent upon the Ministry of Finance and the State Bank of Pakistan, which are both State organs, to release funds to satisfy the payments to Karkey.

587. For instance, by letter of 19 December 2011 –  with letterhead including Lakhra's address and PEPCO's logo –  Lakhra wrote to the Pakistan Ministry of Finance, to "*inform that in spite of our repeated requests the approval [for remittances to Karkey] has not yet been accorded by the State Bank of Pakistan consequently this office is in default.*"[666]

588. By letter of 2 January 2012 –  with the same letterhead mentioned above –  Lakhra again wrote to the Pakistan Ministry of Finance:

> *[...] it is submitted that a meeting was held with [Karkey] [...] wherein they have given the dead line that if the overdue Invoices of Rental Value are not*

---

[663] Karkey's Reply, ¶¶ 633-634.

[664] Pakistan's Counter-Memorial, ¶ 1005.

[665] *See* Dahri, First Witness Statement, ¶ 33; Dahri, Second Witness Statement, ¶ 36; C-211.

[666] C-209 (emphasis added).

*paid within 10 days M/s KARKEY will call the Government of Pakistan Guarantee.*

*This office if vigorously pursuing the matter with State Bank of Pakistan and other concerned quarters for early remittance of Rental Service Fee. Whereas, a part payment is laying awaited at Director, SBP, FEOD, Karachi office for approval since long for the Rental Invoice period 13.08.2011 to 12.09.2011 as per detail given below […]*

*It is therefore, requested to kindly take up the matter with Foreign Exchange Operation Department, State Bank of Pakistan, Karachi for according approval of the above noted amount at the earliest possible to avoid any call on the GOP Sovereign Guarantee. […].*[667]

589.   Moreover, a letter sent from PPIB to Lakhra on 19 December 2012, evidences instructions by PPIB to Lakhra for the filing of "*[…] an admiralty suit against M/s Karkey Karadeniz in respect of the arrest/detaining their vessel.*"[668] This was confirmed by PPIB's letter to Lakhra of 3 May 2013, the subject of which was "*LAKHRA POWER GENERATION COMPANY, GENCO (IV) TO FILE AN ADMIRALTY SUIT AGAINST M/S KAREY KARADENIZ IN RESPECT OF THE ARREST/DETAINING THEIR VESSEL*", in which Lakhra was "*directed to institute an admiralty suit in the honourable Sindh High Court Karachi […]*".[669]

590.   The Tribunal also notes that Lakhra did not pay termination charges under the Contract to Karkey as a result of the direct and explicit instructions from the Government of Pakistan ordering Lakhra to initiate and prosecute judicial proceedings in the Sindh High Court to collect funds from Karkey.

591.   On 23 May 2013, just months after Karkey filed its Request for Arbitration, Lakhra instituted an admiralty suit in the Sindh High Court to recover amounts allegedly owed by Karkey. Pakistan admits that Lakhra's institution of the Sindh High Court Proceedings, which was done at the specific request of the NAB, is attributable to the State.[670]

592.   The Tribunal further notes that in November 2010, MoWP ordered the boards of directors for each GENCO – including Lakhra – to cease operations, further evidencing MoWP's total control

---

[667] C-235 (emphasis added).

[668] C-432 (emphasis added).

[669] C-433.

[670] Pakistan's Post-Hearing Brief, ¶ 225. *See also* C-430: ("*[Y]ou are again directed to institute an admiralty suit in the honourable Sindh High Court Karachi*") (emphasis added); C-431: ("*It is again directed to institute an admiralty suit immediately under intimation to this Ministry*") (emphasis added).

and direction over Lakhra.[671]   The NAB, in its submission before the Sindh High Court, also stated its understanding that Lakhra is under the control of the State: "*[T]he Government of Pakistan (GOP) though Ministry of Water and Power of* <u>*which Lakhra Power Generating Company (Lakhra) NAB understands is under its [i.e. MoWP's] control*</u> *also has a direct interest in this suit* […]."[672]

593.   Based on the foregoing, even if the Tribunal were to find that Lakhra was an entity independent of the State, the Tribunal concludes that Lakhra's actions and decisions with respect to the Contract (notably the decision to enter into the contract and amendments thereto, decision not to pay Karkey under the Contract, and the filing of proceedings against Karkey requesting the arrest of Karkey's Vessels) were made under the instructions, direction and control of Pakistan, and are therefore attributable to Pakistan.[673]

### (2) Are the Acts of PEPCO attributable to Pakistan?

594.   PEPCO is a company that is wholly owned by the Government of Pakistan.

595.   In the context of the RPPs, Pakistan represented from the very beginning that "*[PEPCO] has been mandated by the Government of Pakistan (GoP) for implementation and management of the Reforms and Restructuring of Pakistan's Power Sector under the GOP Policy to transform [the GENCOs, including Lakhra] into commercially operational entities*," and that "*PEPCO is responsible for overall management of the [GENCOs].*"[674]

596.   At all relevant times in its conduct with Lakhra and Karkey, PEPCO was therefore acting under its mandate to manage Lakhra and facilitate the RPPs.

597.   Although Pakistan submitted in its Post-Hearing Brief that PEPCO, as well as Lakhra, are separate legal entities with autonomy from the State,[675] for the same reasons stated above with respect to Lakhra, the Tribunal finds that PEPCO was also following Pakistan's instructions

---

[671] C-472 (CONFIDENTIAL): ("*[…] The working of the Board of Directors of GENCOs was ceased vide Ministry of Water & Power (MoW&P) letter no. Adv/Misc. (BOD)/11/2010 dated 22.11.2010* […]").

[672] C-596 (CONFIDENTIAL), ¶ 10 (emphasis added).

[673] *See* CA-060, *Amto v. Ukraine,* SCC Case No. 080/2005,Final Award, 26 March 2008, ¶¶ 107-108.

[674] C-138, p. 6.

[675] Pakistan's Post-Hearing Brief, ¶ 225.

when dealing with issues related to the Contract and its acts are therefore also attributable to Pakistan.

D.    Jurisdiction

598.  Illegality in the making of the investment would deprive the Tribunal of jurisdiction pursuant to Article I(2) of the Treaty,[676] which requires that Karkey's investment was established "*in conformity with*" Pakistani law.

599.  It is Pakistan's position that Karkey's investment was not established in conformity with Pakistani law as a result of: (a) corruption and corrupt practices; (b) fraud; and (c) breaches of Pakistani procurement and other laws.[677] Such argumentation is rejected by Karkey.

600.  Pakistan further alleges that, in the event the Tribunal does not accept Pakistan's jurisdictional objection that Karkey's alleged investment was established in breach of Pakistani law, it must also consider whether Karkey's alleged investment meets the jurisdictional requirements of Article 25(1) of the ICSID Convention and Article I of the BIT.[678]

601.  The Tribunal found under Sections V(A) and V(B) above, that Pakistan has failed to prove corruption and that the Judgment's finding that the Karkey's RPP Contract was void *ab initio* is not binding on it.  It now passes to the analyses of whether Karkey's investment was established by way of (1) fraud, and/or misrepresentation (2) in breach of Pakistani procurement and other laws. The Tribunal will then analyse (3) whether Karkey's investment meets the jurisdictional of requirements of Article 25(1) of the ICSID Convention and Article I of the BIT.

**(1) Was Karkey's Alleged Investment Established By Way of Fraud or Misrepresentation in Breach of Article I(2) of the Treaty?**

602.  Article I(2) of the Treaty reads as follows:

> *Article I - Definitions*
>
> *For the Purpose of this Agreement:* […]

---

[676] C-001, Article I(2).

[677] Pakistan's Post-Hearing Brief, ¶ 87.

[678] Pakistan's Post-Hearing Brief, ¶ 590.

> *2. The term 'investment', in conformity with the hosting Party's laws and regulations, shall include every kind of asset in particular, but not exclusively:*
>
> *(a) shares, stocks or any other form of participation in companies,*
>
> *(b) returns invested, claims to money or any other rights to legitimate performance having financial value related to an investment,*
>
> *(c) movable and immovable property, as well as any other rights in rem such as mortgages, liens, pledges and any other similar rights,*
>
> *(d) copyrights, industrial and intellectual property rights such as patents, licenses, industrial designs, technical processes, as well as trademarks, goodwill know-how and other similar rights,*
>
> *(e) business concessions conferred by law or by contract including concessions to search for, cultivate, extract or exploit natural resources on the territory of each Party as defined hereafter.*[679]

603. It is Pakistan's position that Karkey's investment in Pakistan exists only as a result of its participation in, and the issue of a letter of award and contract as a result of, a public tender. Any fraud committed during the tender process and which induced the PPIB to issue Karkey with its Letter of Award would therefore result in the Tribunal's lack of jurisdiction because Karkey's investment would not be established "*in conformity with*" Pakistani law.[680]

604. In order for a bid to be considered responsive and even potentially qualify for a letter of award, bidders were required to confirm that they could meet a Target COD of "*180 days from issuance of Letter of Award*" (Milestone A). Any bids indicating a completion period later than the Target COD would be rejected and the bidder could never become an investor.[681]

605. Knowing this, the Respondent asserts that Karkey represented that it could comply with Milestone A in Proforma X of its Bid, its Proposed Project Schedule. The Respondent contends that the evidence shows that Karkey's representation was knowingly untrue and/or that Karkey was reckless because it had no reasonable basis for believing in good faith that it could achieve

---

[679] C-001.

[680] Pakistan's Post-Hearing Brief, ¶ 87.

[681] Pakistan's Post-Hearing Brief, ¶ 88.

Milestone A. Pakistan concludes that the Tribunal therefore has no jurisdiction under Article I(2) of the Treaty.[682]

606. Moreover, Pakistan submits that the relevant standard of proof which the Tribunal should apply to Pakistan's claim of fraud is the balance of probabilities (*i.e.* whether it is "more likely than not"), and it submits that numerous tribunals have applied this standard specifically to claims of fraud.[683]

607. Karkey denies all of Pakistan's allegations related to the occurrence of fraud and/or misrepresentation. According to Karkey, in order to succeed on a claim for fraud under international law, Pakistan must show: (i) an intent by Karkey to conceal; (ii) a material fact; and (iii) detrimental reliance by Pakistan on the facts presented. Karkey submits that Pakistan cannot demonstrate any of these elements.[684]

608. The Tribunal notes that the scope, content and requirements for all bids were set out in the RFP. Clause 2.2.1 of the RFP defined the Target COD as follows:

> *The Project(s) are required to be operational within 180 days from issuance of Letter of Award (the 'Target COD')*[685]

609. In order for Karkey's Bid to be declared responsive and have an opportunity to receive a letter of award, Karkey needed to be able to represent its ability to meet this Target COD, as defined in the RFP. As set out in Clause 6.3.2 of the RFP, "*Bids indicating completion period later than the Target COD, shall not be considered and [shall be] rejected as non-responsive.*"[686]

610. It is worth noting that other documents that were part of the bid package, *e.g.* the Draft RSC, also referred to the Target COD being "*no later than <u>six months from latest of the date of Letter of Award</u>, Down Payment, handing over of the Site to SELLER <u>and establishment of the Letter of</u>*

---

[682] Pakistan's Post-Hearing Brief, ¶ 89.

[683] Pakistan's Post-Hearing Brief, ¶ 90.

[684] Karkey's Post-Hearing Brief, ¶ 22.

[685] C-137, clause 2.2.1 (emphasis added).

[686] C-137, clause 6.3.2.

_Credit_".[687] Similar terms are found in the Pro Forma Letter of Award, in the actual Letter of Award and in the 2008 RSC.[688]

611.  Karkey represented in Proforma X of its Bid documents that commercial operations would be achieved 180 days (six months) from issuance of the Letter of Award (the "Project Schedule"):[689]

|   | Activity | Period |
|---|----------|--------|
| 1 | Assumption: Issuance of LOA | 0 |
| 2 | Finalizing of Rental Services Contract | 20 days |
| 3 | Construction Start | 60 days |
| 4 | Testing | 165 days |
| 5 | Commercial Operation | 180 days |

_Source_: Exhibit C-146

612.  Under the 2009 RSC, Karkey was required to achieve the commercial operations date within six months from the latest of the date of the Letter of Award, Advance Payment (referred to in the 2009 RSC and the "Down Payment") and execution of the Sovereign Guarantee (defined as the "Target COD").[690]

613.  There is no dispute that the letter of credit provided for in the 2008 RSC was never issued and was changed to a Sovereign Guarantee in the 2009 RSC. The Sovereign Guarantee was executed by the Managing Director of the PPIB on behalf of the President of Pakistan, for and on behalf of Pakistan, on 24 April 2009.[691] Pursuant to an invoice issued by Karkey on 11 May 2009, the National Bank of Pakistan released the Advance Payment (less the 6% withholding tax[692]) to Karkey on Lakhra's behalf on 12 May 2009.[693]

614.  On 8 December 2009, Lakhra and Karkey entered into Amendment No. 1 to the 2009 RSC, which extended the deadline for the Target COD to 7 April 2010.[694]

615.  There is no dispute that Karkey failed to achieve the Target COD of 7 April 2010.

---

[687] C-137, clause 7 (emphasis added).

[688] C-137, Exhibit III (LOA), section 6. _See also_ C-159 (CONFIDENTIAL).

[689] C-146 (CONFIDENTIAL).

[690] C-10 (CONFIDENTIAL), clause 4.4(b).

[691] C-011 (CONFIDENTIAL).

[692] The tax withholding was objected by Karkey. _See_ Karkey's Updated Memorial, ¶¶ 119-120.

[693] R-158; R-154.

[694] C-012 (CONFIDENTIAL).

616. The Tribunal finds that when submitting its proposed Project Schedule, Karkey made a commitment to meet a target or, failing that, to pay the contractual penalties for its delays, subject always to reciprocal performance by Pakistan of its obligations.  Karkey did not represent as a fact that it would achieve that target irrespective of Pakistan's actions or of delays beyond Karkey's control. Karkey acknowledged that there was an agreed target date for achievement of commercial operations and agreed to the contractual consequences of failing to meet that target. Those consequences included (i) the encashment of the performance guarantee, (ii) liquidated damages, and (iii) a reduction of the contract term.[695]

617. In any case, without the issuing of letter of credit (whether confirmed or unconfirmed) by Lakhra, the Target COD fixed under the 2008 RSC could not be reached, so that Karkey's ability to have the powerships built and in place according to the timetable was not, and could not be, tested.

618. Moreover, the Parties agreed to amend the 2008 RSC that resulted from the Letter of Award to Karkey and to extend the Target COD for a date beyond the one Karkey had committed itself to in its Bid.

619. The Tribunal accepts that it would probably not have been possible for Karkey to have operational powerships in place and operational within the time table represented by Karkey during the bidding process (*i.e.* that Karkey would meet a Target COD 180 days from issuance of Letter of Award). However, it is not possible to conclude that there was fraud as there is no evidence that the Claimant's statement that it could achieve the Target COD within the time frame indicated in its Project Schedule was made in bad faith and/or that the Claimant was trying to mislead Pakistan with respect to its abilities in order to be awarded the Contract.  It is particularly the case since breaches attributable to Pakistan contributed to render impossible to test Karkey's ability to reach the contractual target.

620. For the foregoing reasons, although it seems that Karkey was overly optimistic with respect to its capabilities to achieve the Target COD, Pakistan has failed to evidence the occurrence of fraud or misrepresentation.

---

[695] C-010 (CONFIDENTIAL), Clause 4.4(b); *See* also C-137, Clause 4.4.

**(2) Was Karkey's Alleged Investment Established By Way of Misprocurement in Breach of Article I(2) of the Treaty?**

621. Pakistan submits that Karkey's contracts were procured in breach of Pakistani procurement laws (including the PPRA Rules) and international procurement standards. Each and every change to the Draft RSC resulting in the 2008 RSC and subsequently the 2009 RSC was requested by Karkey, and shifted the transactional balance substantially in favour of Karkey and/or to Pakistan's detriment. This resulted in material breaches of Pakistani procurement laws.[696] According to Pakistan, the issues related to its allegations of misprocurement concern the period after Karkey was issued with the Letter of Award (on 6 November 2008) and up to the signing of the 2008 RSC, the 2009 RSC and Amendment No. 1 in December 2009.[697]

622. Karkey rejects the occurrence of any breaches of Pakistani procurement laws and sustains, *inter alia* that, in any event the principle of estoppel bars Pakistan from asserting that any alleged inconsistencies with Pakistani procurement rules in the bidding process deprives the Tribunal of jurisdiction over Karkey's claims.[698]

623. The Tribunal has duly considered Pakistan's allegations regarding the changes to the Draft RSC that allegedly shifted the balance of the transaction to the detriment of Pakistan in breach of Pakistani procurement laws, *e.g.* (i) the increase in the Advance Payment; (ii) the responsibility for interconnection; (iii) the definition and extensions to Target COD, among others.

624. However, a host State cannot avoid jurisdiction under the BIT by invoking its own failure to comply with domestic law. All the contractual modifications that Pakistan alleges were made in breach of its procurement laws were duly agreed by the contracting parties.

625. Notably, the *Kardassopoulos* tribunal stated that:

> '*Protection of investments' under a BIT is obviously not without some limits. It does not extend, for instance, to an investor making an investment in breach of the local laws of the host State. A State thus retains a degree of control over foreign investments by denying BIT protection to those investments that do not comply with its laws.* As noted by one scholar, 'no State has taken its fervour for foreign investment to the extent of removing any controls on the flow of foreign investment into the host State'. *This*

---

[696] Pakistan's Rejoinder, ¶¶ 153-154.

[697] Pakistan's Post-Hearing Brief, ¶ 39.

[698] Karkey's Post-Hearing Brief, ¶ 45; 76 et ss.

> *control, however, relates to the investor's actions in making the investment.* <u>*It does not allow a State to preclude an investor from seeking protection under the BIT on the ground that its own actions are illegal*</u> *under its own laws. In other words,* <u>*a host State cannot avoid jurisdiction under the BIT by invoking its own failure to comply with its domestic law.*</u>[699]

626. In addition, Pakistan is actually maintaining before the Supreme Court that Karkey's Contract was procured in compliance with Pakistani procurement laws. Pakistan's own witness, Mr. Khan, admitted at the Hearing that Pakistan is defending the Contract before the highest court of Pakistan, while at the same time attacking it in this arbitration.[700]

627. Moreover, throughout the RPP bid process Pakistan represented to Karkey that the procurement was being conducted, and would continue to be conducted, in accordance with law, principles of transparency, and international bidding standards.[701] Pakistan also represented in the 2009 RSC itself that the terms thereof were legally binding and valid.[702] For instance, Clause 31 of the 2009 RSC reads as follows:

> *31. Authority and execution:*
> <u>*Each PARTY hereby represents the following:*</u> *(i) the execution, delivery, and performance of this Contract by such PARTY and the consummation of all transactions contemplated therein have been duly authorized by all requisite corporate and governmental action; (ii)* <u>*this Contract will constitute valid and legally binding obligations of the PARTY, enforceable against it in accordance with its terms*</u>*; and (iii)* <u>*the execution, delivery and performance by each PARTY of this Contract*</u>*, and any other Contracts provided for herein, and consummation of the transactions contemplated hereby and thereby,* <u>*do not as of the Effective Date and shall not at any time during the Term (a) violate the provisions of any law, rule or regulation applicable to either PARTY, (b) violate any judgment, decree, order or award of any court, or of any governmental, judicial or regulatory authority binding upon either PARTY*</u>*, or (c) conflict with, breach, or violate the terms of any other agreement or instrument by which either PARTY or its property is bound.* (Emphasis added)

628. In view of the foregoing, the Tribunal finds that Pakistan has consistently maintained that Karkey's investment was established in accordance with Pakistani laws, and it is now estopped from arguing that the investment must be deemed invalid on the basis of a breach of those laws.

---

[699] CA-291, *Ioannis Kardassopoulos v. Georgia*, (ICSID Case No. ARB/05/18), Decision on Jurisdiction, 6 July 2007 ("*Kardassopolous*"), ¶ 182 (emphasis added).

[700] Tr. Day 8, 2276:22-2277:7.

[701] *See* C-137; C-138; C-143; C-153.

[702] C-010 (CONFIDENTIAL), Clauses 18, 31.

In any event, as already pointed out, a host State cannot avoid jurisdiction under the BIT by invoking its own failure to comply with domestic law.

### (3) Does Karkey's Alleged Investment Meet the Jurisdictional Requirements of Article 25(1) of the ICSID Convention and Article I of the BIT?

629.  Pakistan does not disagree that the Tribunal should assess Karkey's operations in Pakistan "globally" or "as a whole", nor does Pakistan disagree that the meaning of "investment" under Article 25(1) of the ICSID Convention is potentially broad. However, according to Pakistan, Karkey's attempt to present a tangled web of activities as a single investment is unhelpful, particularly in the context of the BIT's expropriation clause, which applies only to the "*expropriation of 'investments', and not to each and every resource utilised in connection with an alleged investment, but which is not itself an investment*".[703] By way of example, Pakistan asserts that if Pakistan is correct that the 2009 RSC cannot form the subject matter of an investment because it has been declared void *ab initio*, this has a knock-on effect on what Karkey is able to claim has been expropriated. Pakistan contends that it is therefore necessary to analyse each aspect of Karkey's investment individually (*i.e.* the Contract, the Vessels, bank accounts, shareholding in Karpak).[704]

630.  In any event, Pakistan sustains that Karkey's activities, even when considered as a whole, are akin to a sale of goods transaction and are not covered by the ICSID Convention.[705] This argument is rejected by Karkey, according to which the Project as a whole is an investment and does satisfy the requirements of the BIT and the ICSID Convention.[706]

631.  Article 25(1) of the ICSID Convention provides as follows:

> *(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.*

---

[703] Pakistan's Counter-Memorial, ¶ 937; Pakistan's Rejoinder, ¶ 592.

[704] Pakistan's Rejoinder, ¶¶ 592-593.

[705] Pakistan's Rejoinder, ¶ 594.

[706] Karkey's Reply, ¶ 553.

632. Article 25(1) of the ICSID Convention requires the existence of a legal dispute arising directly out of an "investment." The drafters of the ICSID Convention did not define "investment," and instead purposely left the term to be defined by agreement of Contracting States when consenting to arbitration under the ICSID Convention — in this case, when entering into the BIT.

633. The Tribunal finds it appropriate to take into account the four elements set forth by the tribunal in the *Salini v. Morocco* case in order to identify an investment protected by the ICSID Convention:

> The doctrine generally considers that investment infers: contributions, a certain duration of performance of the contract and a participation in the risks of the transaction. [...] In reading the Convention's preamble, one may add the contribution to the economic development of the host State of the investment as an additional condition.[707]

634. The Tribunal takes note of Pakistan's allegation that Karkey's alleged investment is akin to a sale of goods transaction and is not covered by the ICSID Convention.  It also notes Pakistan's allegations, *inter alia*, that Karkey is a Turkish company which does not manufacture its assets in Pakistan, that those assets maintain a foreign registration and were only intended to spend a small fraction of their working lives in Pakistan.[708]

635. The Tribunal finds that Pakistan's characterization of Karkey's investment is artificial and consequently unfounded. Investment tribunals have identified an "investment" even where no permanent infrastructure remained in the host State at the conclusion of the relevant contract or investment. For instance, the *SGS v. Philippines* tribunal determined that the provision of pre-shipment inspection services (*i.e.* no permanent infrastructure) was sufficient to constitute an "investment", even where considerable aspects of the service were conducted outside of the host State.[709]

---

[707] *See* CA-016, *Salini Costruttori S.P.A y Italstrade S.P.A. v. Kingdom of Morocco*, (ICSID Case No. ARB/00/4, Decision on Jurisdiction), 16 July 2001, ¶ 52.

[708] Pakistan's Rejoinder, ¶ 599.

[709] *See* CA-127, *SGS v. Philippines*, ¶¶ 19, 103, 106. *See also*, CA-126, *SGS v. Paraguay*, (ICSID Case No. ARB/07/29), Award, 10 February 2012, ¶ 26, and CA-067, *Bureau Veritas v. Paraguay*, (ICSID Case No. ARB/07/9), Decision on Jurisdiction, 29 May 2009, ¶¶ 96, 104.

636. The Tribunal is satisfied that Karkey made an investment in Pakistan within the meaning of Article 25(1) as: (i) it contributed significant capital;[710] (ii) the Contract had a substantial duration of 5 years; (iii) Karkey took a reasonable risk on the transaction;[711] and (iv) it contributed to the economic development of Pakistan by providing electricity.[712]

637. Moreover, Article I(2) of the BIT provides as follows:

> *For the purpose of this Agreement:* […]
>
> *2. The term 'investment', in conformity with the hosting Party's laws and regulations, shall include every kind of asset in particular, but not exclusively:*
>
> *(a) shares, stocks or any other form of participation in companies,*
>
> *(b) returns reinvested, claims to money or any other rights to legitimate performance having financial value related to an investment,*
>
> *(c) movable or immovable property, as well as any other rights in rem such as mortgages, liens, pledges and any other similar rights,*
>
> *(d) copyrights, industrial and intellectual property rights such as patents, licenses, industrial designs, technical processes, as well as trademarks, goodwill know-how and other similar rights,*
>
> *(e) business concessions conferred by law or by contract including concessions to search for, cultivate, extract or exploit natural resources on the territory of each Party as defined hereafter.* (Emphasis added)

638. The Tribunal notes that the Contract is a "*business concession […] conferred by law or by contract*", and, as an investment, is therefore protected under the BIT. The same applies to the Vessels, which were necessary to the performance of the Contract by Karkey and qualify as "*movable or immovable property*" under Article I(2)(d) of the Treaty.

---

[710] The commitments and contributions specifically include Karkey's Powerships, KPS Tower-1, dredging operations, personnel, know-how, and generation capacity. As pointed by Claimant at ¶ 300 of its Memorial: "*Among other contributions, Karkey expended substantial funds to construct, prepare, and transport its Powerships to Pakistan, to erect permanent transmission infrastructure near Karachi, to undertake capital dredging works in Pakistan, to conduct a navigation study for opening the Clifton-z Channel to marine traffic, and to finance from its own funds fuel purchases for generation of electricity […]. Karkey directly and indirectly employed a large number of Pakistani residents…*")

[711] This is amply evidenced, for instance, by the fact that Karkey's ships were seized by Pakistan.

[712] Pakistan's power crisis was severe, and there is no question that Karkey's Project helped address such crisis, thereby contributing to Pakistan's economic development. *See* CA-291, *Kardassopoulos*, Decision on Jurisdiction, ¶ 117 ("*Furthermore, there is no question that Claimant's investment was intended to contribute to Georgia's economic development*").

639. As for the argument that Karkey's activities in Pakistan do not meet the conditions established in Article I(2) of the BIT to be considered as a protected investment, because the contract by which Karkey materialized its investment was allegedly obtained by corruption, the Tribunal has already ruled under Sections V(A) and V(D) above that it has not been proved that Karkey's investment was tainted by corruption or obtained in violation of Pakistani law.

640. In view of the foregoing, the Tribunal finds that it has jurisdiction over the Claimant's claims related to the Project, which are addressed below.

E.     Did Pakistan Expropriate Karkey's Investment in Breach of Article III of the Treaty?

641. According to Karkey, in the Judgment, the Supreme Court purported to invalidate the Contract and ordered it to be rescinded, following which various organs of the State (including, for example, the Sindh High Court, NAB, and Lakhra) treated the Contract as if it were invalid.[713] In this way, Pakistan – acting via its judicial, executive, and administrative branches – deprived Karkey of its post-termination rights under the Contract, including its rights to payment for outstanding invoices, termination charges, and demobilization charges, totalling more than US$237 million, excluding interest. This deprivation constitutes an expropriation of Karkey's contractual rights, in violation of Article III of the BIT.[714]

642. Pakistan submits that there are two key threshold issues in relation to Karkey's expropriation claim:[715]

-     First, Karkey is unable to show any substantial deprivation of its whole investment in circumstances where its single most valuable asset – that is the *Kaya Bey* – has been released and is now earning revenue elsewhere;

-     Second, the 2009 RSC has been declared void *ab initio* by the highest court of Pakistan and therefore does not give rise to rights capable of being expropriated.

643. Pakistan contends that Lakhra's treatment of the 2009 RSC as being void *ab initio*, the decision not to pay out under the Sovereign Guarantee, the NAB's detention of the Vessels, Lakhra's

---

[713] Karkey's Reply, ¶ 619(c). Karkey's Memorial, Statements of Facts, Parts II.D-F.

[714] Karkey's Reply, ¶ 619(c). Karkey's Memorial, ¶ 531.

[715] Pakistan's Post-Hearing Brief, ¶ 262.

initiation of the Sindh High Court proceedings, the Sindh High Court's arrest of the Vessels and freeze on Karkey's bank accounts all follow from the Supreme Court's finding that the 2009 RSC was void *ab initio*.[716] In order to succeed in its expropriation claims, Karkey must show that the Judgment itself violated international law.[717]

644. Article III(1) of the Treaty provides as follows:

> *Investments shall not be expropriated, nationalized or subject, directly, or indirectly to measures of similar effects except for a public purpose, in a non-discriminatory manner, upon payment of prompt, adequate and effective compensation, and in accordance with due process of law and the general principles of treatment provided for in Article II of this Agreement.*[718]

645. As decided by the Arbitral Tribunal under Section V(B) above, the Supreme Court Judgment which declared the Contract to be void *ab initio* was arbitrary, and therefore has no effect in international law, and the Tribunal is not bound by its finding that the Contract was void. For the Tribunal, it is nothing more than a fact, attributable to Pakistan as admitted by the Respondent,[719] which started a process leading to the deprivation of Karkey's contractual rights, the arrest of its Vessels and the seizure of its bank accounts.

646. The Tribunal notes that Pakistan agrees that contract rights, vessels, and bank accounts are property rights capable of expropriation.[720] However, in order validly to be the subject matter of an expropriation claim, the rights in question must exist and be enforceable by law. As Pakistan pointed out, and noted by the tribunal in *Emmis v. Hungary*, an investor "*must have held a property right of which they have been deprived. This follows from the ordinary meaning of the term.*"[721]

647. As it also follows from the Tribunal's decision under Sections V(A) and V(D) above, there is no evidence on the record that Karkey's Contract was tainted by corruption, fraud,

---

[716] Pakistan's Post-Hearing Brief, ¶ 270.

[717] Pakistan's Post-Hearing Brief, ¶ 272.

[718] C-001 (emphasis added).

[719] Pakistan's Post-Hearing Brief, ¶ 225.

[720] Pakistan's Rejoinder, ¶ 51. Pakistan's Post-Hearing Brief, ¶ 267.

[721] Pakistan's Post-Hearing Brief, ¶ 267 citing RA-99, *Emmis v. Hungary*, ¶ 159.

misrepresentation, or misprocurement. Thus, there is no basis for denying that Karkey's rights derived from this contract or relating to its performance were not enforceable by law.

648.  In view of the foregoing, the Tribunal finds that Pakistan has expropriated Karkey's investment through the Judgment which declared the Contract to be *void ab initio*. This is because through its Supreme Court, whose acts Pakistan accepts are attributable to it,[722] Pakistan deprived Karkey of the <u>use</u> and <u>enjoyment</u> of its <u>contractual rights</u>, including Karkey's right to terminate the Contract and, as stated below, interfered with the free transfer of Karkey's investment.

649.  The assets identified by Karkey, namely the use and enjoyment of its contractual rights, as well as the Vessels related to its investment were therefore subject to an interference of the host State (through the Judgment which declared the Contract void *ab initio* and subsequent detention of the Vessels) amounting to expropriation, as it had the effect of depriving Karkey of its investment as a whole. Such deprivation cannot be considered as a legitimate regulatory taking as it stems from the arbitrary 30 March 2012 Judgment.

650.  The fact that one of Karkey's vessels, the *Kaya Bey*, was eventually released on 1 August 2014 pursuant to the Tribunal's Decision on Provisional Measures of 16 October 2013 amended by Procedural Order No. 4, does not affect this conclusion. The arrest of the *Kaya Bey* was part of the measures of expropriation by Pakistan and its eventual release has to be considered when assessing the damages resulting of the expropriation and not in order to assess the extent of the expropriation when it took place.

F.   <u>Did Pakistan Breach Article IV of the Treaty (Free Transfer)?</u>

651.  Karkey submits that Pakistan continues to detain three of Karkey's Vessels, having released the fourth (*i.e.* the *Kaya Bey*) only after Karkey fought for and obtained an order from this Tribunal mandating its release and an appellate court in Pakistan reversed the Sindh High Court and ordered Pakistan to comply with the Tribunal's order. According to Karkey, Pakistan's past and ongoing detention of Karkey's Vessels have violated its obligations under Article IV of the Treaty to permit Karkey the free transfer of its investment.[723]

---

[722] Pakistan's Post-Hearing Brief, ¶ 225.

[723] Karkey's Reply, ¶ 934.

180

652. Pakistan contends that Article IV of the Treaty relates exclusively to the free transfer of funds, and therefore does not extend to physical assets,[724] which is rejected by Karkey.

653. Article IV(1) of the Treaty provides as follows:

> Each Party shall permit in good faith all transfers related to an investment to be made freely and without unreasonable delay into and out of its territory. Such transfers include:
> (a) returns,
> (b) proceeds from the sale or liquidation of all or any part of an investment,
> (c) compensation pursuant to Article III,
> (d) reimbursements and interest payments deriving from loans in connection with investments,
> (e) salaries, wages and other remunerations received by the nationals of one Party who have obtained in the territory of the other Party the corresponding work permits relative to an investment,
> (f) payments arising from an investment dispute. (Emphasis added)

654. Article IV(1) of the Treaty cited above requires that each Party to the treaty are to "*permit in good faith all transfers related to an investment to be made freely and without unreasonable delay into and out of its territory*" (emphasis added) The definition of "*investment*" under Article I(2) of the Treaty includes "*movable and immovable property*".[725] Moreover, the provision only lists examples of transfers in a non-exhaustive way ("*[...]. Such transfers [...] include: [...]*").

655. In view of the above, and considering that Lakhra's initiation of the Sindh High Court proceedings, the Sindh High Court's arrest of the Vessels and freeze on Karkey's bank accounts all follow from the Supreme Court's finding that the 2009 RSC was void *ab initio* – which is acknowledged by Pakistan[726] – the Tribunal finds that Pakistan has also breached its obligation under Article IV(1) of the Treaty by depriving Karkey of the free disposal of its assets (*i.e.* Vessels) part of Karkey's investment under the Contract, including by violating Karkey's right to transfer assets related to its investment "*without unreasonable delay.*"

---

[724] Pakistan's Rejoinder, ¶ 857.

[725] C-001, Art. I(2)(c).

[726] Pakistan's Post-Hearing Brief, ¶ 270.

656.  Moreover, even accepting for the sake of discussion the literal interpretation that Pakistan wants to give to Article IV(1) of the Treaty, it is not disputable that by detaining the *Kaya Bey*, Pakistan made its sale impossible and thus did not allow the transfer of any proceeds resulting thereof.

G.   The Claimant's Additional Claims

657.  In view of the Tribunal's decisions regarding expropriation and breach of Pakistan's free transfer obligations under the Treaty/BIT, the Tribunal finds that it is not necessary to address Karkey's additional claims based on the MFN, FET and umbrella clauses, as the damages resulting from these alleged breaches and from the expropriation/free transfer violation would be the same. It is the case since the acts attributable to Pakistan constituting these others breaches alleged by Karkey, are the same as those leading to the expropriation which, as stressed bellow, entitles Karkey to damages that will erase the consequences of Pakistan's wrongful acts and re-establish the situation that would have existed but for such wrongful acts.

H.   Damages

   **(1) Legal Standard**

   a.   *Standard for Compensation*

658.  Karkey submits that Pakistan has totally deprived it not only of the payment of outstanding invoices Karkey was owed under the Contract, but also all of its post-termination rights and the use and enjoyment of its revenue-generating assets (*i.e.* the Vessels). Karkey alleges that, as the expropriation of Karkey's investment was unlawful, and as the BIT does not articulate a standard for compensation for violations of the BIT, the Tribunal should apply the *Chorzow Factory* standard of reparation to compensate Karkey in order to place Karkey in the position it would have been in under for Pakistan's BIT violations.[727]

659.  According to Pakistan, as the BIT only stipulates the standard for compensation payable in case of a lawful expropriation,[728] the Tribunal is required to apply the default standard in customary international law for any breaches of the BIT, such as unlawful expropriation.  Pakistan agrees with Karkey that the customary international law standard for the assessment of damages is

---

[727] Karkey's Memorial, ¶ 608.

[728] Article III(2) of the Treaty provides as follows: "*Compensation [for expropriation] shall be equivalent to the real value of the expropriated investment before the expropriatory action was taken or became known. Compensation shall be paid without delay and be freely transferable as described in paragraph 2 Article IV.*"

described by the Permanent Court of International Justice in the *Chorzow Factory* case. The court in that case established the principal standard of reparation in case of breach of an international obligation as follows:

> *The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that <u>reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution</u> in kind, or<u>, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear</u>; the award, if need be<u>, of damages for loss sustained which would not be covered by restitution</u> in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.*[729]

660. Moreover, Article 31(1) of the ILC Articles of State Responsibility provides that "*[T]he responsible State is under an obligation to make full reparation for the injury caused by the internationally wrongful act.*"[730]

661. As pointed out by the Claimant, Articles 35 and 36 of the ILC Articles provide that reparation has two components. The first is an obligation to provide "*restitution*", which requires the State "*to re-establish the situation which existed before the wrongful act was committed [...] to the extent that restitution is not materially impossible.*"[731] Second, "*in so far that such damage is not done good by restitution,*" the ILC Articles recognize the State's obligation to provide the investor compensation for the damage caused by the State's international wrongful act.[732]

662. The compensation owed for an internationally unlawful expropriation is not calculated in the same way as for a lawful expropriation. As explained by the tribunal in the *Siemens* case:

> *They key difference between compensation [for a wrongful taking] under the [ILC] Articles and the Factory at Chorzow case formula, and Article 4(2) of the Treaty [for a lawful expropriation] is that under the former, compensation must take into account 'all financially assessable damage' or 'wipe out all the consequences of the illegal act' as opposed to compensation 'equivalent to the value of the expropriated investment' under the Treaty.*[733]

---

[729] CA-070, Chorzow Factory, Judgment of 13 September 1928, PCIJ, ser. A, No. 17, p. 47 (emphasis added).

[730] CA-144, ILC Articles on State Responsibility, Art. 31(1).

[731] CA-144, ILC Articles on State Responsibility, Art. 35.

[732] CA-144, ILC Articles on State Responsibility, Arts. 35 and 36.

[733] CA-128, *Siemens*, ¶ 352.

663.  In view of the above, Karkey is entitled to an award of damages that will erase the consequences of Pakistan's wrongful acts and re-establish the situation that would have existed but for such wrongful acts.

664.  As a consequence, the Tribunal finds that the Claimant must be compensated for the damages and lost profits which Karkey would have earned had Pakistan not breached Articles III and IV of the BIT, namely resulting from the expropriation of its contract rights and detention of the Vessels.

    b.  *Standard of proof*

665.  As pointed out in *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, "*[...] it is well settled that the fact that damages cannot be fixed with certainty is no reason not to award damages when a loss has been incurred. In such cases, <u>approximations are inevitable; the settling of damages is not an exact science</u>*."[734]  The same Tribunal stresses the "*tendency and appropriateness of international tribunals to approximate damages*."[735]

666.  Likewise, the Committee in *Rumeli Telekom v. Kazakhstan* decided that the estimation of damages is not an exact science and that it is of the essence of such an exercise that the tribunal has a measure of discretion, since the final figure must of its nature be an approximation of the claimant's loss.[736]

667.  Consequently, the Tribunal will not require that that future revenues, expenses or profits be proved with absolute certainty.[737] A sufficient degree of certainty or probability is enough and

---

[734] CA-077, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, ¶ 8.3.16 (emphasis added).

[735] Idem, footnote 421 which refers to *American International Group, Inc. et al. v. The Islamic Republic of Iran and Central Insurance of Iran (Bimeh Markazi Iran)* (Case No. 2) (Award No. 93-2-3), Award of 19 December 1983, at 109; and *Payne v. Iran* (Case No. 335) (Award 245-335-2), Award of 8 August 1986, 12 Iran-U.S. C.T.R. 3, at ¶¶ 35-37.

[736] *Rumeli Telekom A.S. and Telsim Mobil Telekomik A.S.Y.O.N Hizmetleri A.S v Republic of Kazakhstan*, (ICSID Case No. ARB/05/16), Decision of the *ad hoc* Committee, 25 March 2010, ¶¶ 144-145; 179.

[737] *See* in this respect, in Mark Kantor, *Valuation for Arbitration, International Arbitration Law Library*, Volume 17, Kluwer Law International 2008, p.71.

no strict proof of the damages is required, more specially with regards of the amount of future damages.[738]

    c.   *Should the Tribunal use an Ex post or Ex Ante Valuation date?*

668. According to Karkey, there are two aspects of Karkey's damages claim with respect to which the Tribunal should adopt an *ex post* approach: (1) the valuation date; and (2) the various inputs required for modelling Karkey's loss. The consequence of an *ex post* valuation date of 30 June 2015 (<u>as a proxy for present day</u>) is that Karkey's historical losses are not discounted prior to that date; and the consequence of using *ex post* information for the inputs into the DCF models used to calculate Karkey's damages is that such inputs are rendered more accurate.[739]

669. On the other hand, the Respondent submits that the correct date of valuation for a non-expropriatory breach or even for a lawful or unlawful expropriation is the date immediately preceding the relevant measure or the date immediately before the relevant measure became public knowledge. Since the date of valuation is the same for expropriation as well as non-expropriatory breaches, Karkey's decision to abandon its argument that the *Kaya Bey* has been expropriated does not require the use of a different valuation date. The vast majority of investment treaty tribunals have adopted the date immediately preceding the expropriatory breach as the date of valuation. In the present case, Pakistan contends that the date of valuation should be the date of the alleged expropriation, *i.e.* 30 March 2012. The vast majority of investment treaty tribunals have also only relied on information available on that date (*ex ante*), as opposed to using information subsequent to the alleged taking (*ex post*).[740]

670. The Tribunal is of the view that it does not need to enter into a theoretical debate as to the appropriateness of an *ex ante* or *ex post* valuation. Each approach may be acceptable provided it leads to full compensation of the damaged party. In this case, Mr. Kaczmarek (Karkey's expert) has opted for an *ex post* valuation and Mr. Haberman (Pakistan's expert) has preferred to rely on an *ex ante* valuation. Unfortunately, as it will be shown below, Mr. Kaczmarek's opinion is too often speculative and too often based on insufficient evidence to be retained as a basis for the Tribunal's own independent valuation. Consequently, the Tribunal has decided to assess the

---

[738]In this respect see RA-136, *Mobil Investments Canada Inc. and Murphy Oil Corporation v. Government of Canada*, (ICSID Case No. ARB(AF)/07/4), Decision on Liability and on Principles of Quantum, 22 May 2012, ¶¶ 437-439; 477.

[739] Karkey's Post-Hearing Brief, ¶ 197.

[740] Pakistan's Post-Hearing Brief, ¶ 361.

damages due to Karkey taking as a basis for its analysis Mr. Haberman's valuation, not because it is an *ex ante* valuation of the fair market value/lost cash flows of the expropriated rights at the date of the expropriation, *i.e.* 30 March 2012, but because the Tribunal found it more reliable. Obviously, Mr. Haberman's valuation is just a starting point and as explained below, the Tribunal reached its conclusion independently, after taking into consideration all the evidence on the record and, more particularly, Mr. Kaczmarek's expert evidence.

   d.   *The methodology to calculate Karkey's loss*

671.   The date of Pakistan's expropriation of Karkey's investment is 30 March 2012, namely the date of the Judgment which declared the Contract void *ab initio*.  It is also the date of Karkey's Notice of Termination of the Contract. As submitted by Karkey, Karkey's investments are to be viewed as a whole since the Judgment and Pakistan's actions that followed have deprived Karkey of the use and enjoyment of its investment as a whole.

672.   As put by Mr. Haberman (Respondent's expert), the starting point for quantifying Karkey's loss is to compare two scenarios, the difference between them representing the measure of loss:[741]

   -   First, what would have happened had the event which is being complained about not occurred (the "Hypothetical Scenario"); and

   -   Secondly, what has actually happened to date and what is expected to happen in the future (the "Actual Scenario").

673.   As explained below, the Tribunal finds that by declaring the Contract to be void *ab initio* the Supreme Court (and therefore Pakistan) *de facto* terminated the Contract through its Judgment dated 30 March 2012. However, had the Supreme Court not declared the Contract to be void *ab initio*, Karkey would in any event have terminated the Contract through its Notice of Termination dated 30 March 2012, and its Vessels would have been able to generate cash flows under new contracts after such termination had they not been detained in Pakistan.

674.   Therefore, Karkey is to be compensated for the expropriation of its contract rights (including its right to terminate the Contract) and for the cash flows it was prevented from earning under new contracts as a consequence of the detention of its Vessels in Pakistan following the Judgment.

---

[741] Haberman, First Expert Report, ¶ 3.21.

675.  Based on the above the Tribunal now proceeds to analyse Karkey's damages.

### (2) Karkey's Request for Post-Termination Contractual Rights: (a) Termination Charges; (b) Unpaid invoices; and (c) Mobilization and Transport Charges

676.  Karkey submits that it has initiated this ICSID arbitration seeking to be put back in the position in which it would have been were it not for the Supreme Court Judgment and subsequent unlawful conduct by Pakistan (*i.e.* Karkey's position on 30 March 2012, or the But For date). Karkey does not seek to be put back in the position prior to Lakhra's pre-termination breaches, because Karkey already had elected and pursued a contractual termination remedy for those earlier breaches. Nevertheless, Karkey also seeks (out of abundance of caution and without prejudice to its primary claims) to preserve pre-termination contractual breach claims by also pleading those claims as BIT violations – the legitimacy of which it asserts. However, Karkey is not independently seeking damages for those earlier violations. Rather, Karkey seeks to be compensated for such earlier violations by virtue of its termination rights, which entitle it to recover amounts due for unpaid past invoices in addition to specified termination charges.[742]

677.  It is Pakistan's position that Karkey's claims in respect of any rights under the 2009 RSC are not within the Tribunal's jurisdiction. Even if the Tribunal were to find that the Supreme Court procedure and/or Judgment amount to a denial of justice, Karkey would have rights under the 2009 RSC which are capable of being enforced in the proper contractual forum (LCIA Arbitration). There is no reason why a LCIA tribunal seated in London would not have jurisdiction.[743] If the Tribunal disagrees, then it must determine Karkey's claims for damages relating to Karkey's post-termination Contract Rights.[744]

678.  Before analysing Karkey's claims, the Tribunal first notes that Pakistan's allegation regarding the LCIA clause contained in the Contract is inapposite to the present case and does not prevent the Tribunal from deciding Karkey's claims related to the expropriation of Karkey's contract rights. Indeed, the Tribunal is not requested to deal with contract claims and to condemn Pakistan or even less Lakhra to pay damages for a breach of contractual obligations, but to assess the value of contract rights that have allegedly been expropriated. It is therefore important to identify the

---

[742] Karkey's Reply, ¶ 1060.

[743] Pakistan's Rejoinder, ¶129.

[744] Pakistan's Rejoinder, ¶ 1293.

rights duly held by the Claimant under the Contract at the moment when the expropriation occurred.

679. The Tribunal analyses below in turn Karkey's claim for (a) termination charges, (b) the alleged unpaid invoices (including the monthly rental services fees invoices and fuel payment invoices); and (c) mobilization and transport charges related to the return of its investment assets from Pakistan.

   a. *Termination Charges*

680. Karkey claims US$165,243,287 million for Termination Charges.[745]

681. According to Karkey,  pursuant to the Contract, "*[i]n the event the Contract is terminated by SELLER before the Contract designated expiry date, due to BUYER default, the BUYER [Lakhra] shall pay all Monthly Rental Services Fee to date, mobilization and transport charges*."[746] The Contract also provided that "*the BUYER [Lakhra] shall pay Termination Charges [...]*".[747] Karkey performed its obligations under the Contract but then was forced to terminate the Contract following uncured material breaches of the Contract by Lakhra. Because Karkey terminated the Contract "*due to BUYER's [Lakhra] default*", Lakhra – and therefore Pakistan – owe Karkey unpaid contractual fees and termination charges.[748]

682. Pakistan counters that, even if the Supreme Court did breach the BIT, it would not follow that Karkey is entitled to any Contract damages. It is necessary to determine precisely the position Karkey would have been in, but for the Supreme Court's declaration that the 2009 RSC was void. Pakistan submits that this position is simple, but for the Supreme Court's Judgment, Karkey would – on its own case – have terminated the 2009 RSC for Lakhra's alleged commercial breaches in relation to payment of fuel and monthly rental services invoices and a commercial dispute would then have arisen, which Karkey would have been required to pursue through LCIA arbitration in accordance with Clause 28 of the 2009 RSC.[749] In any event, Karkey would be entitled to no damages in respect of the Termination Charge which is unenforceable as a matter

---

[745] *See* Kaczmarek, Second Expert Report, ¶ 217, table 20. Karkey's Post-Hearing Brief, ¶ 216.

[746] C-010 (CONFIDENTIAL), Article 4.6(b) (emphasis added).

[747] C-010 (CONFIDENTIAL), Article 4.6(b) (emphasis added).

[748] Karkey's Memorial, ¶¶ 613-615.

[749] Pakistan's Counter-Memorial, ¶ 1453.

of Pakistani law.[750]   Also, Karkey would not be entitled to the Termination Charge and other charges because, in any event, absent the Measures (as pleaded by Karkey, which includes lack of payment under the Contract by Lakhra), Karkey would never have terminated the contract with Lakhra.[751] Moreover, Pakistan sustains that if Karkey is entitled to recover the Termination Charge (which covers the period of up to April 2014), then  Karkey is not entitled to recover any alleged lost profits for the same period (otherwise Karkey would be double counting).[752]

683.   First, as stated above, Pakistan's allegation regarding the LCIA clause contained in the Contract is inapposite to the present case and does not prevent the Tribunal from deciding Karkey's claims related to the expropriation of its contract rights.

684.   Second, the Tribunal finds that by declaring the Contract to be void *ab initio* through its Judgment dated 30 March 2012 the Supreme Court (and therefore Pakistan) expropriated the Claimant's rights under the Contract and *de facto* terminated the Contract. Had the Supreme Court not declared the Contract to be void *ab initio*, Karkey would in any event have terminated the Contract through its Notice of Termination dated 30 March 2012 due to Lakhra's default and be entitled to termination charges.  It was deprived of that right by the expropriation.

685.   Indeed, on 30 March 2012, Karkey served Lakhra a "*Notice of Termination effective immediately*" regarding the 2009 RSC. In such Notice, Karkey terminated the Contract pursuant to Clause 4.6(b) and requested payment of the following amounts:[753]

- US$161.856.018 as termination charges pursuant to Clause 4.6(d);[754]

- US$12.000.000 as mobilization and transport charges to return the Equipment to SELLER's designated depot as per Clause 4.6(b); and of

---

[750] Pakistan's Counter-Memorial, ¶ 1454.

[751] Pakistan's Counter-Memorial, ¶ 1440.

[752] Pakistan's Rejoinder, ¶ 1401.

[753] C-327.

[754] C-327: "*[...] You are requested to immediately disburse a net payable termination charge of 161.856.018USD [...], i.e. 225.856.018USD [...] for the remaining 24 months of first three years balance Lump sum less the unadjusted Down Payment of the amount 64.000.000USD [...], as applicable termination charges pursuant to Clause 4.6(d). [...]*" In this arbitration, Karkey is now claiming for US$165,243,287 as Termination Charges (*see* Kaczmarek, Second Expert Report, ¶ 217, table 20).

189

- All receivables including but not limited all Monthly Rental Services Fees and all Monthly Operation and Maintenance Services Fees and fuel invoices to date as per the 2009 RSC.

686. As the Judgment expropriated Karkey's rights under the Contract, including Karkey's right to terminate it, in order to assess the value of the contract rights which were expropriated, the Tribunal will analyse the contractual provisions related to the termination of the Contract.

687. Clause 4.6, entitled "Contract Termination", provides as follows:[755]

> [4.6(a)] *In the event the Contract is terminated by the BUYER* [Lakhra] *before the Contract designated expiry date, due to the BUYER's convenience, the BUYER shall pay all Monthly Rental Services Fee to date, mobilization and transport charges to return the Equipment to SELLER's designated depot and also will be responsible for the exportation of the Equipment from Pakistan, for which time shall be of the essence. Additionally the BUYER shall pay Termination Charges as detailed in Clause-d of this Section. In the event of BUYER's termination for convenience, sixty (60) days written notice period is required, provided, however, that notwithstanding anything to the contrary contained in this contract, the BUYER shall not exercise such termination right until expiry of one (1) year from the Commercial Operations Date.*
>
> [4.6(b)] *In the event the Contract is terminated by SELLER* [Karkey] *before the Contract designated expiry date, due to BUYER [Lakhra] default, the BUYER shall pay all Monthly Rental Services Fee to date, mobilization and transport charges to return the Equipment to SELLER's designated depot and also will be responsible for the exportation of the aforementioned Equipment from Pakistan, for which time shall be of the essence. Additionally the BUYER shall pay Termination Charges as detailed in the table stated in Clause-d below.*
>
> *[...]*
>
> [4.6.d] *The BUYER shall pay Termination Charges as detailed in the table below.*

| For Termination During | Cancellation Charge |
| --- | --- |
| *Contract Effective Date to first 12 Rental Months.* | *100% of the first three years balance Lump Sum Contract Price less the unadjusted Down Payment* |
| *13-24 Rental Months.* | *90% of the first three years balance Lump Sum Contract* |

---

[755] C-010 (emphasis added).

| | |
|---|---|
| | *Price less the unadjusted Down Payments* |
| *25-36 Rental Months.* | *85% of the first three years balance Lump Sum Contract Price less the unadjusted Down Payments* |
| *37-48 Rental Months* | *80% of the fourth rental year balance Lump Sum Contract Price less the unadjusted Down Payments* |
| *49-60 Rental Months* | *75% of the fifth rental year balance Lump Sum Contract Price less the unadjusted Down Payments* |

(Emphasis added)

688. As provided by Clause 4.6 above, if the Contract is terminated before its term by Lakhra due to convenience (Clause 4.6(a)) or by Karkey due to Lakhra's default (Clause 4.6.b), Karkey would be entitled, *inter alia*, to Termination Charges which are to be calculated pursuant to Clause 4.6(d) cited above.

689. The Tribunal notes that there are two issues to be decided in relation to the Claimant's claim for Termination Charges, namely (a.1) their enforceability under Pakistani law and (a.2) the calculation of the proper amount under Clause 4.6(d), which are analysed below in turn.

*(a.1) Are the Termination Charges enforceable under Pakistani law?*

690. According to Pakistan, the Termination Charge is a penalty and cannot be considered a genuine pre-estimate of loss, and accordingly is unenforceable under Pakistani law. Pakistan argues that Clause 4.6(d) of the Contract clearly compensates Karkey for revenue it would have earned under the Contract, not profit. The difference is significant – for the period up to April 2014, Karkey's profit under the Contract would have been approximately US$92.3 million. Yet, it claims US$161 million, almost twice what it would have received by way of profit. It is no surprise that Karkey elected to serve notice of termination of the Contract on the very same day as the Judgment.[756] These allegations are rejected by Karkey.

---

[756] Pakistan's Post-Hearing Brief, ¶ 464. *See also* Pakistan's Rejoinder, ¶ 140.

691. The Tribunal notes that, as pointed out by the Claimant, Section 74 of the Pakistani Contract Act does permit the establishment of contractual penalties:

> *When a contract has been broken, if a sum is named in the contract as the amount to be paid in case of such breach, or if the contract contains any other stipulation by way of penalty, <u>the party complaining of breach</u> is entitled, <u>whether or not actual damage or loss is proved to have been caused thereby, to receive from the party who has broken the contract reasonable compensation not exceeding the amount so named</u> or, as the case may be, <u>the penalty stipulated for</u>.*[757]

692. As noted by Justice Karim (Respondent's Expert on Pakistani law), the only limit on contractual penalties is whether the penalty is reasonable,[758] and "*it is for the court to determine whether the stipulated amount qualifies as 'reasonable compensation' in the circumstances*".[759]

693. Mr. Zafar (the Claimant's expert on Pakistani law) further explained that liquidated damages provisions are enforceable under Pakistani law under the following condition:[760]

> *Under Pakistani law, if the parties to a contract have agreed to an amount in the contract clearly specifying that the breaching party shall be liable to compensate other, the courts in Pakistan enforce such contractual obligations where the amount specified does in fact represent <u>a pre-agreed and genuine pre-estimate</u> of <u>loss or damage to be occasioned as a consequence of breach</u>.*[761]

694. The Parties' respective Experts on Pakistani law are agreed on this test, which mirrors the same test under English law.[762]

695. In view of the above considerations, the Tribunal finds that the Termination Charge provision set forth under Clause 4.6(d) the Contract is in accordance with Pakistani law, because such provision sets forth a precise and rational method for calculation of a genuine pre-estimate of the loss in case of termination of the Contract, which the Tribunal finds reasonable. This is because the formula for calculating the amount of the loss is linked directly to the expected payments under the Contract and therefore results in an amount that is foreseeable. The provision also gives

---

[757] RA-90, Contract Act 1872, Section 74 (emphasis added).

[758] Karim, Second Expert Report, ¶ 72.

[759] Karim, Second Expert Report, ¶ 72.

[760] Zafar, Second Expert Report, ¶¶105-109.

[761] Zafar, Second Expert Report, ¶108 (emphasis added).

[762] Pakistan's Rejoinder, ¶ 1404.

credit to Pakistan for the Down Payment received by Karkey. Moreover, the amount to be paid upon termination declines over time in recognition of the fact that the further into Contract performance the breach occurs, the more upfront costs Karkey will have had a chance to recoup.

696. A Termination Charge of US$165,200,000 (as calculated by Karkey) or of US$149,802,431 (as calculated by Pakistan) to protect Karkey's expectation that it would earn almost US$565,000,000 during the course of the Contract cannot be *prima facie* considered unreasonable.

697. It is worth noting that Clause 4.6 was drafted and inserted into the Contract by Pakistan itself. It originated in the initial Pro-Forma Contract attached to the RFP,[763] and was neither negotiated nor ever modified by Karkey. This is a clear indication that Pakistan also considered the Termination Charges to be reasonable.

698. For the foregoing reasons, the Tribunal finds that Pakistan has failed to demonstrate that Clause 4.6(d) operates as an improper penalty under Pakistani law and is therefore valid.

*(a.2) The amount of the Termination Charges under the Contract*

699. Pakistan submits that if the Tribunal concludes that the Termination Charge is enforceable as a matter of Pakistani law, this is in any event not recoverable in the amount claimed by Karkey.[764] It is Pakistan's position that Clause 4.6(d) provides that on termination of the Contract the <u>full unadjusted</u> amount of the Advance Payment (*i.e.* US$80 million) should be deducted from the Termination Charges.[765]

700. Karkey, on the other hand, claims that it is not appropriate to deduct the entirety of the original Advance Payment from the Termination Charges, because approximately US$16 million of that payment already had been returned to Lakhra by Karkey through monthly invoice credits as of the date of termination.[766] If adopted, Mr. Haberman's interpretation of the Contract whereby the down payment would remain fixed, and thus deducted from any Termination Charges, would

---

[763] C-137, p. 80 of the pdf file.

[764] Pakistan's Rejoinder, ¶ 1411.

[765] Pakistan's Post-Hearing Brief, ¶ 468.

[766] Karkey's Reply, ¶ 1070. Kaczmarek, First Expert Report, ¶¶ 80-82.

produce a negative Termination Charge in years four and five of the Contract – a result that could not have been intended by the Parties if that clause is to be given any meaning.[767]

701.    The Parties' experts' calculation of the Termination Charges can be summarized as follows:

**Experts' calculations of Termination Charges**

| Calculation element (US$) | Mr. Haberman[768] | Mr. Kaczmarek[769] |
|---|---|---|
| Amount relating to the first three years | 338,784,026 | 338,784,026 |
| less: Amounts invoiced to date of termination | (108,981,595) | (108,981,600) |
| First three years balance Lump Sum Contract Price | 229,802,431 | 229,802,426 |
| less: unadjusted Down Payment | (80,000,000) | (80,000,000) |
| Down payment returned by Karkey prior to 31 March 2012 | 0 | 15,440,860 |
| **Termination charges** | **149,802,431** | **165,243,287** |

702.    The only difference between the experts' calculation of the Termination Charges relates to the way they have calculated the "unadjusted Down Payment". Clause 4.6(d) of the Contract defines the Termination Charges arising for termination during the first 12 rental months as being "*100% of the first three years balance Lump Sum Contract Price less the unadjusted Down Payment*." (Emphasis added)

703.    The Tribunal finds that based on Clause 4.6(d) the full "unadjusted Down Payment" of US$80 million should therefore be deducted from the balance of the contract price to calculate the Termination Charges. The Claimant's expert, Mr. Kaczmarek wrongly deducts only US$64.6 million, having excluded from his calculation amounts of the Down Payment that had been offset against the Monthly Rental Services Fees in the first 12 months. The Tribunal finds that the word "unadjusted" in Clause 4.6(d) is very clear and cannot mean "adjusted" by any type of deductions.

---

[767] Karkey's Reply, ¶ 1070.

[768] Haberman, Second Expert Report, ¶ 3.5, p. 31.

[769] Kaczmarek, Second Expert Report, Appendix 3, Table I.

704. In view of the above, the amount of the Termination Charges due by Pakistan to Karkey is US$149,802,431.

    b. *Unpaid Invoices*

705. There are two categories of alleged unpaid invoices claimed by Karkey, namely (i) Monthly Rental Services Fees and (ii) Fuel invoices, which the Tribunal analyses below in turn.

    *(b.1) Outstanding Monthly Rental Services Fees*

706. According to Karkey, it is owed US$57,438,802[770] in unpaid invoices under the Contract (*i.e.* US$47,702,505 in outstanding Monthly Services Fees, and US$9,736,297 in unpaid fuel invoices). A large portion of the difference between the experts (*i.e.* US$18,000,000) is attributable to Mr. Haberman's exclusion of amounts owing to Karpak. For the reasons summarized below, Karkey maintains that this deduction is unwarranted as a matter of law.[771] Karkey also alleges that there is no basis for reducing the term of the Contract, for deducting liquidated damages, or for deducting withholding tax from such amount, as claimed by Pakistan.[772]

707. Pakistan submits that it is undisputed that Lakhra failed to pay the final six Monthly Rental Services Fees (*i.e.* from October 2011 to March 2012). However, there is a dispute as to whether the final six invoices, as well as the earlier invoices in respect of which <u>some</u> payment was made by Lakhra (*i.e.* from April 2011 to September 2011), are properly owing to Karkey "in full".[773] According to Pakistan, there are four main issues between the Parties in this regard, namely (1) whether Karkey is entitled to recover amounts invoiced by Karpak; (2) whether Lakhra was entitled to liquidated damages, thus reducing the amount owed, as a result of Karkey's delay in achieving the target COD; (3) whether the amount owed should be reduced due to a reduction in the Contract term; and (4) whether Karkey is entitled to recover amounts even when it was not generating at full capacity.[774] The Tribunal also notes that Pakistan alleges that (5) any payments

---

[770] *See* Kaczmarek, Second Expert Report, ¶ 217.

[771] Karkey's Post-Hearing Brief, ¶ 226.

[772] Karkey's Post-Hearing Brief, ¶¶ 227-229.

[773] Pakistan's Rejoinder, ¶¶ 1298-1299.

[774] Pakistan's Post-Hearing Brief, ¶ 438.

due to Karkey should be reduced to account for the deferral of Lakhra's entitlement (and obligation) to deduct withholding tax from the Advance Payment.[775]

708. The experts' calculation (Mr. Haberman for Pakistan and Mr. Kaczmarek for Karkey) relied upon by the Parties and their differences in this respect are summarized in the table below:[776]

| Calculation element (US$thousands) | Mr. Haberman[777] | Mr. Kaczmarek[778] |
|---|---|---|
| Gross invoice amount | 108,982 | 108,982 |
| Karpak invoice amount | (17,860) | (0) |
| Karkey invoice amount | 91,122 | 108,982 |
| Deduct Down Payment | (17,903) | (15,441) |
| Deduct 6% WHT | (5,467) | (5,467) |
| Liquidated damages | (3,985) | (0) |
| Amount payable by Lakhra | 63,767 | 88,074 |
| Paid by Lakhra | (31,118) | (40,371) |
| **Amount still due** | **32,649** | **47,703** |
| Less: WHT due on the Down Payment not already paid | (3,726) | (0) |
| **Total unpaid invoices outstanding** | **28,923** | **47,703** |
| Unpaid Karpak fuel invoices | 0 | 9,736 |
| **Total unpaid invoices outstanding** | **28,923** | **57,439** |

*Source*: Haberman, Second Expert Report, para. 3.16

709. The above differences are addressed below.

*(b.1.1) Is Karkey entitled to seek recovery for the sums invoiced by Karpak?*

710. Karkey submits that it is entitled to seek recovery for sums invoiced by its wholly-owned Pakistan subsidiary Karpak. Karpak existed solely to service the Contract in Pakistan on Karkey's behalf. It was established by Karkey on 2 January 2010 to handle Project related activities in Pakistan for Karkey, including maintaining and operating the Powerships and purchasing fuel. With the express approval and full knowledge of the PPIB, Lakhra, and PEPCO, Karkey assigned to Karpak certain rights under the Contract related to these maintenance

---

[775] Pakistan's Rejoinder, ¶¶ 1412-1413.

[776] Haberman, Second Expert Report, ¶ 3.16.

[777] Haberman, First Expert Report, ¶ 4.8.

[778] Figures taken from Kaczmarek, Second Expert Report, Appendix 2, Tables II and III.

activities on 12 April 2011.[779] On 15 March 2012, Karpak assigned all of its rights, interests, and remedies in the Contract back to Karkey.[780] This included the rights to recover any unpaid amounts from Lakhra.[781] Karkey submits that this assignment fully disposes of this issue in favour of Karkey.

711.   According to Karkey, even without the assignment, international law allows Karkey to enforce the contractual rights of its subsidiary Karpak. Tribunals have consistently rejected the argument that a foreign parent (such as Karkey) may not assert claims under a BIT for injuries to its local subsidiary (such as Karpak). Karkey's loss of the amount due to Karpak was caused by Pakistan's wrongful actions and independently harmed Karkey's investment in its subsidiary. Accordingly, this loss is recoverable by Karkey as part of the damage to its investment from Pakistan's breaches of the BIT.[782]

712.   Pakistan counters that the assignment agreement from Karpak to Karkey is not valid. Pakistan further argues that Karkey is also not entitled under international law to make claims in this arbitration with respect to contractual rights of Karpak.[783]

713.   The Tribunal notes that the Deed of Assignment[784] submitted by Karkey does not identify the specific rights which were assigned to Karkey by Karpak. The agreement makes no reference to the 2009 RSC or the Pakistan RPP, but simply refers to an assignment of "all its rights." Karkey seeks to avoid this issue by asserting that "*Karpak existed solely to service the Contract in Pakistan on Karkey's behalf*"[785] and refers to Karpak's certificate of incorporation.[786] However, this certification also fails to make any mention of the 2009 RSC or Pakistani RPP.[787] It is thus not clear from this Deed of Assignment which rights are purportedly assigned.

---

[779] C-132 (CONFIDENTIAL).

[780] C-435 (CONFIDENTIAL).

[781] Karkey's Reply, ¶¶ 1071-1072.

[782] Karkey's Reply, ¶¶ 1073-1074.

[783] Pakistan's Post-Hearing Brief, ¶¶ 455-456.

[784] C-435 (CONFIDENTIAL).

[785] Karkey's Reply, ¶ 1071.

[786] Karkey's Reply, ¶ 1071.

[787] C-274.

714.  A new version of this same Deed of Assignment[788] was submitted by Karkey less than two weeks before the Hearing. The Tribunal notes that Pakistan sought an explanation as to when this document was created, by whom and for what purpose, but no convincing explanation has been given by Karkey in this respect. This new version of the purported assignment agreement still fails to identify the specific rights which were being assigned, or the contractual relationships or third parties to which these rights relate.

715.  In view of the foregoing, the Tribunal finds that the Deed of Assignment cannot be treated as a valid assignment for the purposes of this arbitration.

716.  Moreover, the Tribunal finds that Karkey is not entitled as a matter of international law to make a direct claim in relation to Karpak's contractual rights, as Karkey does not have standing to assert claims based on the host-State's treatment of the contracts and assets of the company in which it holds shares. Investment tribunals have repeatedly found that "*shareholders do not have claims arising from or rights in the assets of the companies in which they hold shares*".[789]

717.  Based on the above, the Tribunal finds that Karkey is not entitled to recover any amounts regarding the Monthly Rental Services Fees invoiced by Karpak.

*(b.1.2) Was Lakhra entitled to liquidated damages, thus reducing the amount owed?*

718.  The Tribunal notes that Mr. Haberman, in his calculation of the unpaid invoices owed to Karkey, deducted US$3.985 million[790] relating to liquidated damages withheld from Karkey because of Karkey's delay in meeting the Target COD.[791] According to Pakistan, this deduction is justified by Clause 4.4(b) of the 2009 RSC, which entitled Lakhra to deduct liquidated damages if Karkey failed to achieve commercial operations within 30 days of 7 April 2010.[792]

---

[788] C-709 (CONFIDENTIAL).

[789] *See* RA-261, *Poštová Banka, A.S. and Istrokapital SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award dated 9 April 2015, ¶¶ 229, 231 and 245; RA-200, *Azimut-Benetti SpA v. Darrell Healey* [2010] EWHC 2234; RA-272, *ST-AD GmbH v. Republic of Bulgaria*, UNCITRAL, PCA Case No. 2011-06, Award on Jurisdiction, dated 18 July 2013, ¶ 278 ("*an investor has no enforceable right in arbitration over the assets and contracts belonging to the company in which it owns shares*") (emphasis added).

[790] Haberman, First Expert Report, ¶ 4.20.

[791] Haberman, First Expert Report, ¶ 4.20. *See* also Haberman, Second Expert Report, ¶¶ 3.25 to 3.27.

[792] Pakistan's Post-Hearing Brief, ¶ 440.

719.  Karkey, on the other hand, rejects Pakistan's argument that Lakhra would be entitled to deduct liquidated damages from the amounts due. This is because Pakistan and Lakhra, not Karkey, bear responsibility for many of the alleged Project delays, and others are attributable to force majeure events outside of Karkey's control.[793]

720.  The Tribunal first notes that there is no dispute that the Target COD indicated in the Contract, as amended by Amendment No. 1 was not met, *i.e.* 7 April 2010.[794] The Parties do dispute, however, which party bears responsibility for the delay and its consequences. This is because the Contract provides built-in remedies for delays attributable to Karkey including, *inter alia*, liquidated damages and the right to shorten the Rental Term (with a corresponding deduction in the Contract price).

721.  Clause 4.4(b) of Amendment No. 1 reads as follows:

> *The SELLER shall achieve the Commercial Operations Date within One hundred and twenty Days (120) from the date of execution of this AMENDMENT ('Target Commercial Operations Date').* […]
>
> *The SELLER has submitted a Bank Guarantee dated 27th October 2008 and numbered TSU-GL-ISD-20080012 amounting to US$1,250,000 (at the rate of US$5,000 per MW) en-cashable by the BUYER <u>in case the SELLER fails to achieve the Target Commercial Operations Date within cure period of thirty (30) days after the Target Commercial Operations Date and thereafter the SELLER will be charged at the rate of US$191 per day per MW up to a maximum amount equivalent to US$17,190 per MW for a delay of up to three (3) months (90 days) after cure period</u>.*
>
> *<u>Such amount will be charged from 1st Payment of Monthly Rental Services Fee of the SELLER</u>* […].[795]

722.  The Tribunal notes that the amount of the liquidated damages calculated by Pakistan at US$3,984,642 based on the above provision is not disputed by the Parties. However, it is Karkey's position that the delays in the achieving of the Target COD are not attributable to Karkey and therefore no liquidated damage is due.

---

[793] Karkey's Reply, ¶ 233. *See also* Karkey's Memorial, II.C.1.

[794] Karkey's Reply, ¶ 232.

[795] C-012 (CONFIDENTIAL) (emphasis added).

199

723. On 8 December 2009, pursuant to Amendment No. 1 to the RSC 2009, the site specified for the project in the 2008 RSC, *i.e.* Mauripur, was substituted with Korangi.[796] Karkey claims that this substitution was occasioned by Pakistan and that Karkey was therefore not responsible under the Contract for any delays resulting thereof.

724. Clause 2.A(c) of the 2009 RSC provides that "*[t]he selection, acquisition and foundation design requirements of the Site shall be the responsibility of the SELLER and at its sole cost and expense, however, BUYER shall provide due facilitation and assistance as may be required by the SELLER.*"[797]

725. By letter of 3 September 2009, the MoWP instructed PEPCO and WPPO to re-locate Karkey's plant from Mauripur to Korangi as follows:

> *[…] Since the Korangi site has been vacated by Walters Power International, you are advised to re-locate Karkey's Rental Power Plant Phase-I from Mauripur to Korangi as* <u>*already requested by them*</u> [*Karkey*].[798]

726. The fact that PEPCO understood this request for the substitution of site had come from Karkey is confirmed by its own letter to Karkey the following day, in which PEPCO stated that:

> *Please* <u>*refer to your numerous requests regarding the relocation of the site*</u> *for the power-ships from 132 kV Mauripur Grid Station to 132 KV Korangi Thermal Power Station (KTPS) at Karachi.[…]*[799]

727. As a result of the above, the selection of the Site was under Karkey's responsibility, and it stems from these letters that it was Karkey which prompted the request for the site change, and therefore Karkey is not excused from liability for delays to the Target COD in this regard.

728. Karkey also relies on Clause 14 of the 2009 RSC in support of its claim that it could avoid "*responsibility or liability for any failure or delay of performance […] caused by a Force Majeure Event, as defined in the contract.*"[800] Karkey further submits that two force majeure events caused delays in the Project not attributable to Karkey, namely (i) unexpectedly severe

---

[796] *See* C-012 (CONFIDENTIAL).

[797] C-010 (CONFIDENTIAL).

[798] R-198 (emphasis added).

[799] C-166. *See also* C-167 (emphasis added).

[800] Karkey's Memorial, ¶ 117.

monsoon weather conditions and (ii) unforeseeable obstructions discovered in the dredging area in Korangi Creek[801], which would prevent Lakhra from deducting liquidated damages.

729.  The Tribunal notes that Karkey is only entitled to rely on specific monsoon weather condition as excusing performance if Karkey gave proper notice, in accordance with Clause 14.3 of the 2009 RSC, which provides as follows:

> *14.3 Notice of Force Majeure Event:*
>
> *SELLER shall give written notice of the occurrence of a Force Majeure Event to BUYER, each as soon as reasonably possible, but in no event later than three (3) Days after such occurrence.*

730.  Karkey has failed to provide any written notice to Lakhra within the required three business days of the events complained. The letter dated 4 June 2010 from Karkey to WAPPDA,[802] relied on by Karkey as its written notice in this regard, does not constitute a notice of Force Majeure under the 2009 RSC. This letter makes no reference to the occurrence of a Force Majeure event. As pointed by Pakistan, such letter in fact stated that Karkey was working with "*marine experts [...] to ensure the safe arrival of the Powership(s) to the mooring area particularly during the monsoon season [...]*".[803] This actually constitutes a representation that the monsoon season would not affect the arrival of the Vessels, and cannot be considered as the written notice required under Clause 14.3 of the 2009 RSC.

731.  In respect to the delays caused by alleged unforeseeable obstructions discovered in the dredging area, Karkey submits that "*the fact that [the sub-contractor's] properly-conducted sampling did not uncover the sticky sludge and rocks in the Channel does not demonstrate an insufficiency in the survey but rather simply demonstrates Karkey's inability to foresee these obstacles despite engaging in reasonable diligence to detect them.*"[804] Karkey fails to explain how this could constitute a force majeure event under the Contract. The Tribunal also notes that Clause 14 of the Contract provides that "*Force Majeure Events shall expressly not include [...] ii) a delay in the performance of any contractor; [...]*".

---

[801] Karkey's Reply, ¶ 236.

[802] C-204 (CONFIDENTIAL).

[803] C-204 (CONFIDENTIAL), pp. 2-3.

[804] El Suudi, Third Witness Statement, ¶ 56 (emphasis added).

732.   Moreover, Karkey has also failed to serve the required notice within three business days in this respect. The two letters sent by Karkey to MoWP and PEPCO on 30 March 2010 and 27 April 2010 relied on by Karkey in this regard do not refer to the sticky sludge and obstructions discovered in the Korangi Creek Channel.[805]   The letter sent by Karkey to PEPCO on 26 April 2010 also does not constitute the required written notice. In such letter Karkey made no mention to a Force Majeure event, and although it mentioned delays caused by the "*very sticky sludge and concrete rocks in the basin*", Karkey only requested "*a full coordination and support […]to avoid any further delay in the Project schedule.*"[806]

733.   According to Karkey, Lakhra's failure to pay the full US$80 million Advance Payment (instead it withheld US$4.8 million as withholding taxes) caused delays in the Project schedule and in the construction of the Powerships for the Project,[807] and that such delays could not be attributed to Karkey under the Contract. Karkey's CEO, Mr. Karadeniz, explained in his witness statement that "*Karkey arranged third-party financing for the Project on the basis of the financial terms of the Contract, including in particular Lakhra's obligation to pay an Advance Payment of USD 80 million (against a confirmed bank guarantee in the same amount). Karkey's lenders did not accept Lakhra's remittance of US$75.2 million as satisfying this requirement.*"[808] Karkey concludes that Lakhra's failure to pay the full US$80 million frustrated Karkey's ability to draw down additional financing from its lenders, leading directly to delays in construction works for the Project.[809]

734.   Clause 4.5 of the 2009 RSC provides that "*the BUYER* [Lakhra] *shall not deduct withholding tax (so long as it is applicable)* <u>*at more than 6%*</u> *from the payments to be made to SELLER* [Karkey]." (emphasis added) Karkey has failed to demonstrate that the withholding tax amount related to the Advance Payment was not due under the Income Tax Ordinance 2001 as submitted by Pakistan. Therefore, the alleged consequences of the delay in achieving the Target COD related to the payment of US$72.2 million as Advance Payment (instead of US$80 million) due to

---

[805] *See* C-620 (CONFIDENTIAL).

[806] *See* C-622 (CONFIDENTIAL).

[807] Karkey's Reply, ¶¶ 184, 234.

[808] Karadeniz, Third Witness Statement, ¶ 32.

[809] Karadeniz, Third Witness Statement, ¶¶ 33-34.

withholding tax should have been expected by Karkey under the Contract and Lakhra cannot be held responsible for any delays arising thereof.

735.  In view of the foregoing, the Tribunal finds that Karkey has failed to demonstrate that its failure to meet the Target COD was not attributable to it, and liquidated damages in the amount of US$3.985 million must be deducted[810] from the outstanding invoices for Monthly Rental Services Fees, in accordance with Clause 4.4(b) of the 2009 RSC in order to assess the amount of the corresponding contractual right which was expropriated.

*(b.1.3) Was Lakhra entitled to reduce the rental term of the 2009 RSC, thus reducing the amount owed?*

736.  According to Pakistan, if Lakhra was entitled to reduce the rental term of the Contract by 251 days due to Karkey's delays in accordance with Clause 4.4(b) of the Contract, then Karkey was not entitled to recover the additional US$2.46 million claimed by Karkey in this regard.[811]

737.  Pakistan maintains that Clause 4.4(b) of the 2009 RSC provided that Lakhra was entitled to reduce the rental term if Karkey failed to achieve commercial operations within four months of 7 April 2010, and this further delay was caused by Karkey. Pakistan alleges that it is not disputed that Lakhra reduced the rental term by 251 days, with the corresponding gross decrease to the Monthly Rental Services Fee to approximately US$9.4 million (subject to deductions for the pro-rated Advance Payment and 6% Withholding Tax). These deductions were first applied by Lakhra to Karkey's May 2011 Monthly Rental Service Fees invoice.[812]

738.  On the other hand, Karkey submits that Lakhra was not entitled to invoke Clause 4.4(b) and reduce the rental term, because Lakhra could only do so if the delay in achieving the COD was caused solely by Karkey, which Karkey denies.

739.  The central issue for the Tribunal to decide is whether or not the delay in achieving the Target COD is attributable to Karkey alone.

---

[810] Haberman, First Expert Report, ¶ 4.20.

[811] Pakistan's Post-Hearing Brief, ¶ 447.

[812] Pakistan's Rejoinder, ¶¶ 1347-1348.

740. As decided by the Tribunal under Section V(H)(2)(b.1.2) above, the Tribunal found that Karkey has failed to demonstrate that its failure to meet the Target COD was not attributable to it. As a result, Clause 4.4(b) shall apply. According to Clause 4.4(b) of the 2009 RSC:

> *[...] if achievement of [COD] is further delayed solely due to SELLER, the BUYER shall have the right to re-negotiate the Contract and the Rental Term shall be reduced by that period of delay which occurs after the first four months (120 days) delay covered by the guarantee mentioned hereinabove and the Lump Sum Contract Price will be reduced by the corresponding number of Monthly Rental Service Fee or part thereof accordingly. [...]*[813]

741. Considering that the actual COD date was achieved by Karkey on 13 April 2011, the Tribunal finds that Lakhra has correctly reduced the Rental Term in accordance with Clause 4.4(b), as set forth in Lakhra's letter dated 9 May 2011, an extract of which is reproduced below:[814]

   o As the delay was solely due to SELLER beyond "120 days delay" covered by the guarantees discussed hereinabove, the provision of Reduced Rental Term as per Clause 4.4 (b) is hereby applied which is worked out as under:

| | | |
|---|---|---|
| A. | Target COD (8th December 2009 + 120days) $\rightarrow$ | 7th April 2010 |
| B. | Further Cure Period Days (7th April 2010 + 120 days) $\rightarrow$ | 4th August 2010 |
| C. | Actual COD date $\rightarrow$ | 13th April 2011 |
| D. | Difference in days b/w B & C | 251 days |
| E. | Reduced Term: (365 days x 5 years) − 251 days = **1,574 days** or 51 months 22 days or $\rightarrow$ | 51.748 Months |
| F. | Date of Expiry of Rental Term | 4th August 2015 |

   o Therefore, Revised Lump Sum Contract Price (CP) at Reduced Rental Term will be as under:

   US$ 564,640,043.76 CP x 51.748 months / 60 months
   = US$ 486,983,216.41 Revised CP

   o Monthly rent would be US$ 9,410,667.396 over the revised / reduced Rental Term of 51.748 months.

   o Deduction on account of Monthly Refund of Advance Down Payment would be US$ 1,545,953.467 over the Reduced Term of 51.748 months.

   o Monthly Withholding Tax deduction would be US$ 564,640.043 at 6%

*Source*: C-219, p. 2

---

[813] C-010 (CONFIDENTIAL).

[814] C-219, p. 2, item 4.

204

742. Therefore, as summarized above, Karkey's failure to meet the Target COD resulted in a reduction of the term of the Contract from 60 months to 51.784 months and the Lump Sum Contract Price was reduced proportionately from US$565 million to US$487 million.

743. As explained by Mr. Haberman, the amount of the Down Payment (*i.e.* US$80 million) that is deducted each month from the Monthly Rental Services Fees increases from US$1.3 million to US$1.5 million a month, as it is spread over a reduced number of months. The Monthly Rental Services Fees invoices issued by Karkey make no allowance for the amended term when calculating the Down Payment deduction.[815]

744. In view of the above, the Tribunal finds that Mr. Haberman has therefore correctly taken into account of the increased monthly deduction of the Down Payment and, as a consequence, Lakhra was entitled to deduct US$17,903 million from the unpaid invoices (and not US$15,441 as alleged by Mr. Kaczmarek[816]).

*(b.1.4) Was Karkey entitled to recover amounts even when it was not generating at full capacity?*

745. It is Pakistan's position that Karkey is not entitled to recover amounts for Monthly Rental Services Fees when it was not generating at full capacity.[817] According to Pakistan, invoices for Monthly Rental Fees included the periods when Karkey was generating no electricity (24 April 2011 to 5 May 2011) and when Karkey had reduced its electricity generation (October and November 2011).[818]

746. Pakistan alleges that it is not disputed that under the Contract, the Monthly Rental Services Fee was due in full, each month, irrespective of the amount of energy <u>Lakhra actually used</u>.[819] The

---

[815] Haberman, First Expert Report, ¶ 4.13.

[816] *See* Haberman, Second Expert Report, ¶ 3.22; Kaczmarek, Second Expert Report, Appendix 3, Table II, column B.

[817] Pakistan's Post-Hearing Brief, ¶ 438.

[818] *See* Pakistan's Counter-Memorial, Fact Appendix ¶¶ 295-296.

[819] Pakistan's Rejoinder, ¶ 1379; Karkey's Reply, ¶ 1140; C-010 (CONFIDENTIAL), Clause 4.2(b) provides as follows: "For the avoidance of doubt, the Monthly Rental Services Fees shall be payable irrespective of the dispatch by the BUYER".

real question is whether the Monthly Rental Services Fee was due in full, each month, irrespective of the amount of energy <u>Karkey generated</u>.[820]

747. According to Pakistan, Karkey had the right to cease generating electricity during commercial operations and still claim the Monthly Rental Services Fee under the 2009 RSC as follows:[821]

    (i) If Lakhra failed to establish the FPLC by 23 April 2011 (and regardless of whether Lakhra actually paid for fuel), under Clause 4.5(m) of the 2009 RSC; and

    (ii) Assuming the FPLC was established, and if Karkey was unable to draw down on it in relation to amounts owing by Lakhra for fuel which remained unpaid after 75 days from the due date of the invoice, pursuant to Clause 4.5(m) of the 2009 RSC.[822]

748. The Tribunal notes that Pakistan does not dispute that the FPLC was not established by Lakhra.

749. It disputes, however, that Clauses 4.5(m) and (n) of the 2009 RSC applies. Pakistan maintains that Clause 4.5(m) is an unreasonable penalty as a matter of Pakistani law. Accordingly, Karkey's purported contractual right to receive the full Monthly Rental Services Fee, despite having discontinued electricity generation, is unenforceable under Pakistani law.[823]

750. After having duly analysed Pakistan's allegations in this regard, the Tribunal finds that Pakistan has failed to substantiate that provisions in Clauses 4.5(m) and (n) of the 2009 RSC are unenforceable under Pakistani law. Accordingly, Lakhra was not entitled to make any deductions in this regard. The Tribunal notes that Mr. Haberman has not made any deductions in this regard when reaching his conclusions set out under paragraph 708 above.

    *(b.2) Outstanding Fuel Payment Invoices*

751. Karkey claims for outstanding fuel payment invoices amounting to US$9,736,297 million.[824]

---

[820] Pakistan's Rejoinder, ¶ 1379.

[821] Pakistan's Rejoinder, ¶ 1380; Karkey's Memorial, ¶ 96; Pakistan's Counter Memorial, Fact Appendix, ¶ 260; Karkey's Reply, ¶ 229.

[822] Pakistan's Rejoinder, ¶ 1380; Karkey's Memorial, ¶ 96; Pakistan's Counter Memorial, Fact Appendix, ¶ 260; Karkey's Reply, ¶ 229.

[823] Pakistan's Rejoinder, ¶ 1382.

[824] *See* Kaczmarek, Second Expert Report, Appendix 3, Table III.

752. The Tribunal notes that the fuel payments were not payable to Karkey, but to Karpak, which is not a party to this dispute. As decided under Section V(H)(2)(b.1.1), Karkey does not have standing to claim the invoices allegedly due to Karpak in this arbitration.

753. Based on the above, the Tribunal rejects Karkey's claims for alleged outstanding fuel payment invoices.

### (b.3) The Tribunal's conclusion

754. In view of the foregoing, the Tribunal finds that Pakistan shall pay Karkey the total of US$28,923,000 for outstanding unpaid invoices under the Contract, as calculated by Mr. Haberman and summarized in the table below:[825]

| Calculation element (US$thousands) | Mr. Haberman[826] |
|---|---|
| Gross invoice amount | 108,982 |
| Karpak invoice amount | (17,860) |
| Karkey invoice amount | 91,122 |
| Deduct Down Payment | (17,903) |
| Deduct 6% WHT | (5,467) |
| Liquidated damages | (3,985) |
| Amount payable by Lakhra | 63,767 |
| Paid by Lakhra | (31,118) |
| **Amount still due** | **32,649** |
| Less: WHT due on the Down Payment not already paid | (3,726) |
| **Total unpaid invoices outstanding** | **28,923** |
| Unpaid Karpak fuel invoices | 0 |
| **Total unpaid invoices outstanding** | **28,923** |

*Source:* Haberman, Second Expert Report, para. 3.16

c.  *Mobilization and transport charges*

755. Karkey initially requested in this arbitration the sum of US$12 million for mobilization and transport charges alleged owed to it pursuant to Clause 4.6(b) of the Contract. At the Hearing,

---

[825] This table is an excerpt of the table set out in Haberman, Second Expert Report, ¶ 3.16. The Tribunal notes that Mr. Haberman has correctly not made any deductions for periods when Karkey was not generating at full capacity (*See* Haberman, First Expert Report, ¶ 4.8), which is in line with the Tribunal's decision set forth under heading b.1.4 above.

[826] Haberman, First Expert Report, ¶ 4.8.

Karkey changed its position and submitted that a reasonable approximation of the mobilization and transport charges it is owed under Clause 4.6(b) of the 2009 RSC is US$2,000,000.[827]

756. By way of reminder, Clauses 4.6(a) and 4.6(b) of the 2009 RSC provide as follows:

> [4.6.a] *In the event the Contract is terminated by the BUYER* [Lakhra] *before the Contract designated expiry date, due to the BUYER's convenience, the BUYER shall pay* all Monthly Rental Services Fee to date, *mobilization and transport charges to return the Equipment to SELLER's designated depot and also will be responsible for the exportation of the Equipment from Pakistan, for which time shall be of the essence. Additionally the BUYER shall pay Termination Charges as detailed in Clause-d of this Section. In the event of BUYER's termination for convenience, sixty (60) days written notice period is required, provided, however, that notwithstanding anything to the contrary contained in this contract, the BUYER shall not exercise such termination right until expiry of one (1) year from the Commercial Operation Date.*

> [4.6.b] *In the event the Contract is terminated by SELLER* [Karkey] *before the Contract designated expiry date, due to BUYER* [Lakhra] *default, the BUYER shall pay* all Monthly Rental Services Fee to date, *mobilization and transport charges to return the Equipment to SELLER's designated depot and also will be responsible for the exportation of the aforementioned Equipment from Pakistan, for which time shall be of the essence. Additionally the BUYER shall pay Termination Charges as detailed in the table stated in Clause-d below*." (emphasis added)

757. According to Pakistan, there is in principle no dispute that in circumstances where Karkey properly terminated the 2009 RSC for the uncured default of Lakhra (and where Karkey succeeds on its Contract claims) and where the 2009 RSC is found not to be void, it is entitled to the mobilization and transport charges, as these are not a penalty (as opposed to the Termination Charges provision under the Contract).[828]

758. Considering that the Supreme Court, through its Judgment of 30 March 2012, has *de facto* terminated the Contract (and in any event Karkey terminated the Contract on the same date), Karkey had the right to recover the damages it actually incurred in the mobilization and transport associated with the return from Pakistan of the Vessels related to the Project. The expropriation deprived it of the value of this right.

---

[827] Karkey's Post-Hearing Brief, ¶ 230.

[828] Pakistan's Counter-Memorial, ¶ 1448.

759. Pakistan disputes the amount claimed by Karkey by way of mobilization and transport charges because: (a) in respect of the *Kaya Bey*, Karkey has produced no evidence to support these charges; and (b) in respect of the *Alican Bey*, Karkey is not entitled to those charges because it is already claiming for the value of vessel on the assumption that it is a total loss – therefore it cannot and will not incur such charges.[829]

760. The Tribunal shares Pakistan's views with respect to the *Alican Bey*, and finds that Karkey is not entitled to mobilization and transport charges in this regard, as they are not and will not be incurred.

761. Neither Karkey's original claim for US$12 million for mobilization and transport charges, nor its reduced claim for US$2 million is substantiated by any evidence. The only document that Karkey has produced is a spreadsheet adduced by Mr. Kaczmarek which shows transport costs of the *Kaya Bey* to Dubai as being US$566,000.[830] The Tribunal finds that although this spreadsheet is not accompanied by supporting invoices, the amount seems reasonable for the transport and mobilization of the *Kaya Bey*.

762. In view of the foregoing, the Tribunal finds that Pakistan shall pay Karkey the amount of US$566,000 for the mobilization and transport charges incurred with respect to the *Kaya Bey*.

763. The Tribunal now turns to the analysis of the Claimant's claims for damages related to the (**3**) the *Kaya Bey*; (**4**) *Alican Bey*; (**5**) the *Enis Bey* and the *Iraq*; (**6**) delay damages, (**7**) costs increases; (**8**) wasted costs; and (**9**) the applicable interest rate. A summary of the Tribunal's findings on damages and the application of interest thereon is set forth under Section V(H)(10).

### (3) Damages related to the *Kaya Bey*

764. The Claimant's claim for damages in relation to the *Kaya Bey* comprises two components:

> (i) Alleged physical damage and cost repairs in the sum of approximately US$36 million;[831] and

---

[829] Pakistan's Rejoinder, ¶ 1424.

[830] NAV-229.

[831] Karkey's Opening Slides on Damages, Slide 26 (this slide indicated that these were US$30 million); Tr. Day 8, 2320: 6-10 (Mr. Nickerson stated in his evidence that one labour of US$6million was included, the total was US$36million).

(ii) Alleged lost cash flows under other contracts (*i.e.* lost profits): (i) from 31 March 2012 up to June 2015 (the time when Karkey claims that the vessel should reach full operational capacity) in the sum of approximately US$240 million; and (ii) from July 2015 to December 2015 (the period by which Karkey claims its repair works to have been "delayed") in the sum of approximately US$10 million.

a. *Is Karkey entitled to Cost Repairs of the Kaya Bey?*

765. Karkey submits that it has documented the extensive repairs to the *Kaya Bey* necessitated by its detention in Pakistan. It asserts that Pakistan's criticism of the *Kaya Bey* repair assessment is based on a cursory and unqualified inspection of the Powership by Mr. Waller (Pakistan's industry expert), and unrealistic expectations about what Karkey should have done. While Mr. Waller may be an expert in naval architecture, he is not an expert on the construction and operation of the Powerships Karkey maintains, the engines those ships use, or the rental power market in which they operate.[832]

766. Karkey reject's Pakistan's allegation that Mr. Nickerson's (Karkey's industry expert) assessment of the damage to the *Kaya Bey* is based on supposition and speculation. According to Karkey, Mr. Nickerson's inspection was thorough and he has thoroughly documented extensive damage throughout the *Kaya Bey*, including the hull and marine equipment,[833] fresh water cooling system,[834] main propulsion plant,[835] and power generation plant,[836] among other components.[837] Mr. Nickerson explained his findings in detail in his report and concluded that they would cost between US$37 million and US$47 million to complete. He adds that this amount could increase up to US$68 million.[838] These initial conclusions are supported by the US$16 million incurred to date for partial repairs of the *Kaya Bey* which are now only partially complete.[839]

---

[832] Karkey's Reply, ¶ 1048.

[833] Nickerson, Third Expert Report, ¶¶ 29-53.

[834] Nickerson, Third Expert Report, ¶¶ 70-72.

[835] Nickerson, Third Expert Report, ¶¶ 73-75.

[836] Nickerson, Third Expert Report, ¶¶ 76-116.

[837] Nickerson, Third Expert Report, ¶¶ 28-125.

[838] Nickerson, Third Expert Report, (updated) ¶ 132.

[839] Karkey's Reply, ¶ 1051. *See also* NAV-229. According to Pakistan (*see* footnote 1346 of the Rejoinder) Karkey agreed to produce "*Documents evidencing the servicing and/or repairs to the Kaya Bey carried out by third party contractors and/or OEMs, in any or all of (a) Dubai (in addition to the information already disclosed on 17*

767. According to Karkey, Pakistan's detention prevented the required maintenance and led to accelerated corrosion and decay, which could not reasonably have been avoided by Karkey.[840]

768. Pakistan, on the other hand, submits that Karkey has failed to adduce sufficient evidence to show whether any damage occurred during the period of the *Kaya Bey*'s detention, due to Karkey's failure to establish any sort of baseline against which the present condition of the *Kaya Bey* could be compared against its condition at release by Pakistan.[841]

769. Even where Pakistan agrees that there are repairs that are in fact required (based on the results of the inspection of the vessel in September 2013 by its appointed expert), Karkey has failed to show that these repairs are attributable to (or caused by) any actions of Pakistan in breach of the BIT.[842]

770. Pakistan further submits that Karkey admitted that it has already recovered significant amounts from its insurer, namely US$55 million, in respect of the detention of the Vessels.[843] Mr. Karadeniz expressly confirmed that Karkey believes that this amount would be "*sufficient to cover most, if not all, of the anticipated repairs*", relying on Mr. Nickerson's estimated repair costs of up to "*USD 35 million for the Kaya Bey and USD 25 million for the Alican Bey.*"[844] According to Pakistan, this is relevant to the question of damages. Karkey cannot double recover in respect of the alleged losses associated with its Vessels since the purpose of damages is full reparation, not overly full or double reparation.[845]

---

*September 2014), (b) Basra and/or (c) any other location (if the Kaya Bey is no longer in Basra), together with details of the costs of such work*": *see* Pakistan's Document Request No. 96, Pakistan's Redfern Schedule, Annex 2 to Procedural Order No. 8, dated 24 April 2015. Karkey produced in response five documents – of these, two are a single dry-docking invoice from Drydocks World (R-399 and R-398A (CONFIDENTIAL)). One is an internal report from Karmarine, a subsidiary of Karkey (R-399) and is not evidence of third party contractor servicing or repairs. One document is a record from ABB of a regular turbocharger overhaul carried out in Dubai (R-418). The final document (R-419 (CONFIDENTIAL)) relates to works to the main sea water pump whilst the *Kaya Bey* was in dry-dock.

[840] Karkey's Reply, ¶ 1053.

[841] Pakistan's Rejoinder, ¶ 1080.

[842] Pakistan's Counter-Memorial, ¶ 1483.

[843] Pakistan's Rejoinder, ¶ 1258. Karadeniz, Third Witness Statement, ¶ 59.

[844] Pakistan's Rejoinder, ¶ 1258. Karadeniz, Third Witness Statement, ¶ 59.

[845] Pakistan's Rejoinder, ¶ 1259.

771. The Tribunal finds that Pakistan is liable for any damage that has occurred since the date the *Kaya Bey* was detained by Pakistan and which was caused by Pakistan. It should normally be essential to establish what the condition of the *Kaya Bey* was just before it was detained.

772. The Tribunal notes that Mr. Nickerson summarized his methodology for establishing a baseline of the *Kaya Bey* conditions in his Fourth Report, as follows:

> *In my First Report, I noted that in preparing that report I relied on '[c]onstruction and arrival photographs…to confirm the condition of the vessels post-construction, upon arrival and over the course of the last year.' I noted that these photographs 'provided the baseline against which the current conditions were measured'. In my Second Report, I similarly noted my use of these and other photographs as 'a baseline against which to measure current conditions and forecast likely future events.'* [846]

773. Mr. Nickerson alleges that he was able to assess the baseline condition of the *Kaya Bey* based on, *inter alia*, arrival photographs and on his previous surveys of the Vessel.[847] However, as pointed by Mr. Waller, Mr. Nickerson has not adduced sufficient evidence to substantiate this. In particular, he has failed to produce surveys, reports, or photographic evidence that could adequately substantiate this claim and provide a sufficient baseline against which the current condition of the *Kaya Bey* can be assessed.

774. In response to Pakistan's allegation that Mr. Nickerson's assessment of damage of the *Kaya Bey* was "*based entirely on supposition and speculation*,"[848] Karkey responded that "*Mr. Nickerson's inspection was thorough, his experience is on point and deep, and his damage assessment was supported.*"[849] Yet, the Tribunal notes that Karkey has not adduced adequate evidence to substantiate the level of alleged damage and, most importantly, that these alleged damages were caused by the detention of the *Kaya Bey* by Pakistan.

775. The Tribunal notes that Pakistan admits that the only evidence of any damage during the detention of the *Kaya Bey* relates to one engine (the MAN No.19 Engine). However, Karkey has failed to prove that this damage was caused by Pakistan. The Parties' experts agree that it was caused by water ingress, but Karkey has failed to establish what caused that water ingress or

---

[846] Nickerson, Fourth Expert Report, ¶ 123; Nickerson, First Expert Report, ¶ 11; Nickerson, Second Expert Report, ¶ 36.

[847] Nickerson, Fourth Expert Report, ¶ 122.

[848] Pakistan's Counter-Memorial, ¶ 1482.

[849] Karkey's Reply, ¶ 1049.

suggested how the water ingress resulted from any actions of Pakistan in breach of the BIT. As pointed by Pakistan, if the damage was caused by actions taken by Pakistan, it might be expected that there would be evidence of similar damage to the rest of the engines, but Karkey has not produced any evidence of that.

776.  Mr. Waller considers that it may well have been caused by a failure to cap the exhaust stacks. But even if it was a failure to cap the exhaust stacks, Karkey has not demonstrated that such failure was the responsibility of Pakistan. Mr. Waller has explained in his Second Report the steps that could have been taken to protect the engine systems during any period of lay-up as follows:

> *222. If the engines had been laid up properly and the boilers drained, subject to regular inspection and had been turned over regularly, as they should have been during any period of lay-up, then any issue with water ingress into the engines would have been detected early on before extensive corrosion took place. I note that Mr. Nickerson himself states that 'the lack of rust inhibitors' in the cooling water caused the corrosion. That suggests a failure to use the right resources and equipment to prevent corrosion is the actual cause of this damage.*
>
> *223. Therefore, the fact that the vessel was at anchor, at least for a period during the detention, in itself, would clearly not have prevented these lay-up procedures taking place.*[850]

777.  However, the Tribunal is of the view that the fact that Karkey was not able to provide evidence of a baseline for the *Kaya Bey* condition and to evidence that the damages shown by the vessel were actually caused by its detention is not sufficient to dismiss its claim. When a party, such as Pakistan, has unlawfully created a situation likely to generate damages - and the detention of a vessel in outer anchorage is likely to do - it cannot be exonerated from liability only because the damaged party was not able to evidence that the situation so created caused the expected damages. Without a complete reversal of the burden of proof of the causation, the party whose acts are likely to generate damages must at least establish that it took appropriate measures to avoid or reduce the expected damages. Pakistan did nothing of that sort.

---

[850] Waller, Second Expert Report, ¶¶ 222-223 (footnotes omitted), citing Nickerson, Third Expert Report, ¶ 112.

778. Moreover, Karkey maintains that the immediate cause of the damage to the *Kaya Bey* was its inability to properly maintain the vessel due to (a) lack of electricity; (b) lack of manpower; and (c) a lack of resources.[851]

779. The Tribunal notes that the Parties do not dispute that a lack of maintenance may generate damages and that the obligation to maintain the *Kaya Bey* and other vessels was Karkey's, and not Pakistan's. However, Karkey asserts that the lack of maintenance arose from the conditions of the detention which have allegedly severely limited the amount of maintenance Karkey was able to perform on the Vessels.[852] The Tribunal is inclined to think that it is the case. Indeed, a vessel which is suddenly detained and not released until seven months after the Tribunal renders a decision ordering such release is not expected to be maintained as it would be in the ordinary course of business. This is even more the case when the vessel remains forcibly idled and subjected to inhospitable sea and weather conditions, as it was the case.[853]

780. It has not been seriously denied that Pakistan cut off lifeline power to the Vessels, including the *Kaya Bey*, as from April 2012. Pakistan relies on the fact that Karkey did purchase its own generating facilities at least as early as October 2012, close to the time when NAB issued its "No Objection Certificate," which would have resulted in the release of its vessel should such decision have been implemented. According to Mr. Waller, these were sufficient to provide enough power to maintain the *Kaya Bey*.[854] This is far from certain. It was convincingly explained in Mr. El Suudi's Witness Statement[855] that maintenance requires the performance of the Powerships which have been designed for being connected to the grid and that the small onboard emergency generators cannot meet the internal consumption needs when the powerships are not performing. Moreover, the crew who were deprived of electricity by decisions attributable to Pakistan could be reasonably expected to use the onboard generators for their own benefit rather than for maintenance of the vessel.

781. It is true that there is no evidence that the detention of the *Kaya Bey* prevented Karkey from making use of manpower to lay-up and maintain its vessel, despite Pakistan's request for

---

[851] Karkey's Reply, ¶ 821.

[852] Karkey's Reply, ¶ 822.

[853] *See* El Suudi, Second Witness Statement, ¶ 126.

[854] Waller, Third Expert Report, ¶ 170.

[855] El Suudi, Second Witness Statement, ¶ 126.

disclosure of such evidence.[856] On the contrary, it stems from the evidence on the record that Karkey took a commercial decision to downscale the staff levels by at least 61% on the Vessels. The e-mails between Karkey's finance department and the staff contractor, Orient Power, in the period following the detention of the Vessels contain no mention to Pakistan preventing staff from reaching the Vessels. Instead, Orient Power was asked to provide a costs structure based on a 61% reduction in personnel, as "*during this period without any planned production, we need to reduce workers from both side[s] until next fixed place and plans.*"[857]

782. It can be noted from the above that Karkey actually chose to reduce the staffing level.  However, such decision appears to be reasonable in the circumstances where Pakistan's unlawful decisions had made the Vessels idle. It was a reasonable mitigation of damages and it is likely that Karkey would be criticized if it had not done so.

783. There is no evidence of a lack of supplies/resources. To the contrary, Karkey's claim for approximately US$23 million for wasted costs incurred in maintaining the Vessels in Pakistan includes significant sums for lubricating oil and spare parts. There is no evidence on the record that these supplies did not reach the Vessels or that Pakistan prevented supplies from reaching the Vessels. (*See* wasted costs claim under Section V(H)(8)).

784. Last but not least, the Tribunal is satisfied that Pakistan could not seriously expect Karkey to maintain the vessels after it had shown its determination not to release them, even in breach of an Order of this Tribunal. Karkey had no expectation to recover the Vessels because of Pakistan behaviour and such behaviour is the main cause of their lack of maintenance which generated damages, a fact that it is not seriously disputed.

785. Karkey is entitled to be compensated for such damages. In his third report, Mr. Nickerson explains that the total estimated cost of repairs that would be required to return the *Kaya Bey* to full operations fails in a range between US$37 million and US$47 million. He adds that this amount could increase up to US$68 million.[858]

---

[856] Pakistan's Disclosure Request No. 91.

[857] *See* R-391 (CONFIDENTIAL) (p. 2 of pdf file); *See also* R-395.

[858] Nickerson, Third Expert Report (updated), ¶ 132.

786. Mr. Waller has declared to be unable to comment on Mr. Nickerson's estimate as he finds no evidence sustaining it.[859] As a matter of fact, Mr. Nickerson admitted under cross-examination that he did not check in detail the accuracy of these figures provided to him by Karkey.[860] Likewise, the documents submitted by Karkey in this arbitration do not evidence that repairs for such amounts will actually take place and even less that they actually took place. The Tribunal notes that while Karkey's burden of proof may be relaxed as far as the causation of the damages suffered by the detained vessel (for the reasons set forth at paragraph 777 above), it is not the case as far as the repairs and their cost are concerned.

787. In this respect, it results from Exhibit C-726, a spreadsheet submitted by Karkey summarizing the *Kaya Bey* rehabilitation costs, that the works on the *Kaya Bey* would amount to US$29,820,136, divided in two parts: (i) US$17,492,190 from May 2014 until the vessel starts operating, and (ii) US$12,327,246 from that time until 31 January 2016. The first of these two amounts is close to the amount of US$16.5 million of repair costs "*over the 20 months between the release of the Kaya Bey in May 2014 and December 2015, when it resumes normal operations at full capacity*" estimated by Mr. Kaczmarek.[861] In his estimation, Mr. Kaczmarek includes an amount of US$5.9 million corresponding to a rehabilitation program already planned for 2012 and not resulting from the damages suffered during the detention of the vessel.

788. The Tribunal is satisfied that the damages resulting from the detention must have been repaired between the release of the vessel and its new start of operation. In light of the various statements of the experts and of the documents on the file, the Tribunal is not in a position to assess the amounts of these repairs with certainty. Yet, bearing in mind that it cannot be seriously disputed that repairs were effected before putting the vessel into operation for an amount of US$16.5 million, which includes the amount of US$5.9 million for the rehabilitation program contemplated before the detention and which would have been performed irrespective of the detention, the Tribunal assess the damages to the *Kaya Bey* resulting from its detention to US$10 million.

---

[859] Waller, Third Expert Report, ¶ 9.

[860] Transcript, Day 8, 2407 - 2413.

[861] Kaczmarek, Second Expert Report, Appendix 4, p.15, note 19.

b. *Is Karkey entitled to loss of profits related to the Kaya Bey?*

789. The Tribunal will analyse Karkey's claim for lost cash flows stemming from the detention of the *Kaya Bey* following the expropriation of Karkey's contractual rights on 30 March 2012, and taking into account that the *Kaya Bey* was provisionally released in May 2014.[862]

790. The Tribunal first notes that the Termination Charge under Clause 4.6 of the 2009 RSC does not exclude Karkey's entitlement to the loss of profits Karkey would have generated with its Vessels had they not been retained by Pakistan following termination of the Contract. This is because Clause 4.6 not only provides for the payment of Termination Charges to Karkey upon termination of the contract, but also the return of the Vessels to Karkey. Had Pakistan not detained the Vessels, Karkey would be able to generate revenue with the *Kaya Bey* under other contracts.

791. Karkey claims for lost profits arising out of the detention of the *Kaya Bey* for an amount of US$240.1 million.[863] Pakistan's damages expert, Mr. Haberman, assessed the quantum of this claim as US$91.2 million.[864]

792. The Tribunal analyses the calculation of the lost profits related to the *Kaya Bey* below.

c. *Calculation of the lost profits related to the Kaya Bey*

793. The Tribunal notes that both valuation experts agree that the lost profits stemming from the detention of the *Kaya Bey* are best assessed using the DCF method. Both experts assume that the losses begin in April 2012 following the termination of the RSC 2009, and that the *Kaya Bey* re-enters operations in December 2014, reaching full capacity in July 2015.[865]

794. Despite the fact that there is broad agreement regarding the method of calculation and the period over which damages are suffered, the experts disagree with respect to many of the significant assumptions that underlie the DCF model.

---

[862] The *Kaya Bey* was definitively released on 1 August 2014 only, but always remained under Karkey's control since its provisional release in May 2014.

[863] Karkey's Closing Statement on Damages, Slide 19.

[864] Haberman Opening Presentation, Slide 2.

[865] Kaczmarek, Second Expert Report, ¶ 189. The Tribunal notes that Claimant has updated its request in this regard, and now claims that the *Kaya Bey* was to reach full capacity in December 2015. This issue is analysed further below.

795. As put by Mr. Haberman (Respondent's expert), the starting point for quantifying Karkey's loss is to compare two scenarios, the difference between them representing the measure of loss:

> a) *First, what would have happened had the event which is being complained about not occurred (the "Hypothetical Scenario"); and*

> b) *Secondly, what has actually happened to date and what is expected to happen in the future (the "Actual Scenario").* [866]

796. When using the DCF approach, projected cash flows are brought to the valuation date by discounting each cash flow at a rate commensurate with the expected risk of the cash flows (*i.e.* risk being the likelihood that cash flows differ – whether higher or lower - from those forecast). In the present case, the experts agree that Karkey's future cash flows ought to be discounted to the valuation date using Karkey's estimated weighted average cost of capital ("WACC").

797. The Tribunal will first analyse below (c.1) the appropriate discount rate to be applied in the DCF calculation, which is followed by a decision on (c.2) the appropriate Hypothetical Scenario, and (c.3) the Actual Scenario. The Tribunal then will state its (c.4) conclusion on the lost profits suffered by Karkey in relation to the *Kaya Bey*.

   *(c.1) The Discount Rate: WACC*

798. Mr. Kaczmarek calculates a WACC of 9% for Karkey's Powerships with a valuation date of 30 June 2015.[867] On the other hand, Mr. Haberman uses a WACC of 15 or 18 %, depending on the location of the Powerships, with his valuation date of 31 March 2012.[868]

799. The Tribunal notes that the appropriate discount rate/WACC is determined by reference to various components, namely (i) the risk-free rate, (ii) beta, (iii) equity risk premium, (iv) country risk premium, (v) size and project risk premium, (vi) cost of equity, (vii) post tax cost of debt, (viii) percent of equity, and (ix) percent of debt.[869]

---

[866] Haberman, First Expert Report, ¶ 3.21. *See also* Kaczmarek, First Expert Report, ¶ 125: "*Claimant's losses in this case are equal to the difference between what Claimant's financial performance would have been but for the Measures [...] ("But For Scenario") and Claimant's actual performance ("Actual Scenario").*"

[867] Kaczmarek, Second Expert Report, ¶ 153.

[868] Haberman, Second Expert Report, ¶ 4.6.

[869] Haberman, Second Expert Report, p. 43.

800. A summary of the experts' positions regarding the appropriate discount rate is set forth in the table below:[870]

| Component | Kaczmarek2[871] | Haberman2[872] |
|---|---|---|
| Valuation date | 30 June 2015 | 30 March 2012 |
| Risk Free Rate | 4.31% | 3% |
| Beta | 1.041 | 0.963 |
| Equity Risk Premium | 5.5% | 5% |
| Country Risk Premium | 0 | 7.5%-9% |
| Size and project risk premium | 0 | 5% |
| Cost of Equity | 10.04% | 20.3%-21.8%[873] |
| Post Tax Cost of Debt | 6.5% | 5.6% |
| Percent of Equity | 70% | 75% |
| Percent of Debt | 30% | 25% |
| **WACC** | **8.98%** | **17%-18%** |

*Source:* Haberman, Second Expert Report, p. 43

801. The most significant differences in opinion between the two experts in relation to the components of the WACC are the (c.1.1) valuation date, (c.1.2) country risk premium and (c.1.3) the size and project risk premium, which are analysed below in turn.  For the reasons set forth below, the Tribunal accepts the opinion of Mr. Haberman with respect to the calculation of the discount rate (*i.e.* WACC).

*(c.1.1) Valuation Date*

802. As mentioned by the Tribunal under Section V(H)(1)(c) above, the Tribunal was not convinced by the *ex post* valuation made by Mr. Kaczmarek (the Claimant's expert). The damages due to Karkey are therefore the fair market value/lost cashflows of the expropriated rights, evaluated at the date of the expropriation, *i.e.* 30 March 2012.

---

[870] Haberman, Second Expert Report, p. 43.

[871] Kaczmarek, Second Expert Report, ¶ 153.

[872] Haberman, Second Expert Report, Appendix 4.1.

[873] Based on Mr. Haberman's revised country risk calculation for Lebanon (6%), Ghana and Iraq (7.5%).

803. The Tribunal accepts the DCF calculation prepared by Mr. Haberman in order to determine the market value of the *Kaya Bey*, as well as his explanation that, as its DCF calculation was "*prepared on a monthly basis [he has therefore] discounted cash flows to 31 March 2012 rather than 30 March 2012, thus 31 March* 2012 *is the valuation date I have adopted in my loss calculations.*"[874] The Tribunal notes that the choice of 31 March v. 30 March 2012 has no significant impact on the calculation of damages.

804. Mr. Haberman applied an *ex ante* approach to assess the losses attributable to the detention of the *Kaya Bey*, and therefore only adopted data available at the date of detention.[875]

   *(c.1.2) Country Risk Premium*

805. Mr. Haberman includes a country risk premium of 7.5% (Iraq) to 9% (Pakistan) into his discount rate, bearing in mind that at the date of the expropriation Karkey had vessels deployed in Iraq and in Pakistan only. He then discounts the cash flows under each of the contracts (*i.e.* First and Second Iraq Contract and RSC 2009) at a country specific WACC. Mr. Haberman calculated his country risk premium on the basis of sovereign credit ratings, which according to Mr. Haberman reflect "*a government's willingness and ability to service its debt on time and in full.*"[876] According to Pakistan, this is commonly used by valuers as a basis for calculating country risk premium. Given that Karkey enters into contracts with governments or government owned entities, sovereign credit ratings are directly relevant to Karkey's business.[877]

806. On the other hand, Mr. Kaczmarek is of the view that including a country risk premium is unnecessary because "*the underlying cash flows of the business or asset can be adjusted for country risk.*"[878] He does not therefore apply a country risk premium because he claims that country risk is accounted for in the cash flows by way of insurance payments and that political and legal risks are also covered by bilateral investment treaties. Mr. Kaczmarek states that in April 2011, Karkey purchased a Marine War Risk Policy covering KPS 1 to 6. This policy was in addition to a policy for coverage for the ship's hulls. Coverage under the Marine War Risk

---

[874] Haberman, Second Expert Report, p. 11.

[875] Haberman, Second Expert Report, ¶ 5.1.

[876] Haberman, Second Expert Report, ¶ 4.22.

[877] Haberman, Second Expert Report, ¶ 4.21. Pakistan's Post-Hearing Brief, ¶ 348.

[878] Kaczmarek, First Expert Report, ¶ 204.

Policy included coverage of social risk, political and legal risk. For example, the following elements were included in the policy: [879]

> *1.4 strikes, locked-out workmen, or persons taking part in labour disturbances, riots or civil commotions. [...]*
>
> *1.6 confiscation, appropriation, expropriation, detention or wilful destruction by or under the order of the government (whether civil, military or de facto) or public or local authority of any country.*[880]

807. Mr. Kaczmarek further states that he does not incorporate country risk as a component in the cost of equity because it is included as a cost element in the cash flows.[881]

808. The Tribunal first notes that the inclusion of a country risk premium in investment tribunal's calculations of compensation is an extremely common feature. As noted by the tribunal in *Tidewater v. Venezuela*:

> *The inclusion of a country risk premium is a very common feature of tribunals' calculations of compensation, since, as one tribunal observed 'the fundamental issue of country risk [is] obvious to the least sophisticated businessman'.*[882] *For example, in one recent decision concerning Venezuela, the tribunal adopted a country risk rate of 18%.*[883]

809. Moreover, the Tribunal finds that an insurance policy does not eliminate all social, political and legal risks. Otherwise, as pointed out by Pakistan, investors could disregard any such risks in a host-State when investing, so long as they are able to obtain insurance. Mr. Kaczmarek himself has acknowledged during the Hearing that an insurance policy has its limitations.[884] This includes the fact that damages may surpass the amount covered under the insurance policy, only certain defined risks are covered, and that insurance may be terminated. This is confirmed by the fact that Karkey's insurers cancelled its War Risk Policy due to its alleged failure to disclose, *inter alia*, material facts relating to the Supreme Court proceedings in Pakistan. Karkey subsequently

---

[879] Kaczmarek, First Expert Report, ¶¶ 212-213.

[880] NAV-078, ¶¶ 1.4 and 1.6.

[881] Kaczmarek, First Expert Report, ¶¶ 213-214.

[882] RA-280 (*Tidewater v. Venezuela*, ¶ 187), *see* footnote 280, citing *Himpurna v. PT (Persero)*, ¶ 364.

[883] RA-280 (*Tidewater v. Venezuela*, ¶ 187), *see* footnote 201, citing *Mobil Cerro Negro v. PDVSA*, ¶ 777; *Himpurna* (Indonesia: 19%); *Patuha v PT (Persero)*, ¶ 482 (Indonesia: 21%); *Lemire v Ukraine*, ¶ 274 (18.5%).

[884] Tr. Day 5, 1469:20 - 1471:4.

brought legal proceedings against its insurers in the amount of US$265.5 million, which represented the loss of the Vessels, and agreed to settle for US$55.5 million.[885] Therefore, Karkey's own experience in Pakistan shows that the existence of an insurance policy and/or of other guarantees does not eliminate all country risks.

810. The Tribunal is satisfied with the calculation of Mr. Haberman's country risk, who used Professor Damoradan's estimate of long-term country risk based on the credit rating (published by agencies such as Moody's and Fitch or Standard & Poor) for each country[886], *i.e.* 7.5% for Iraq and 9% for Pakistan.[887]  Although Iraq did not have a credit rating at Mr. Haberman's valuation date, the Tribunal approves his use of a shadow rating provided by the World Bank in 2011 and his further adjustments, which is in line with standard valuation practices.[888]

811. The Tribunal notes that in determining the appropriate risk premium, Mr. Haberman has correctly removed Karkey's Marine War Risk policy from the forecast cash flows to avoid double counting certain of the country risks in his risk calculation.[889]

*(c.1.3) Size and Project Risk Premium*

812. According to Pakistan, in order to reflect the fact that (i) Karkey is in essence a start-up company without an established business model in the temporary floating market, and (ii) to account for Karkey's size, Mr. Haberman applies a size and project risk premium of 5% to his discount rate.[890] Pakistan submits that, because Mr. Kaczmarek does not apply such a premium to his calculations, he significantly understates the risks involved in Karkey's Powership operations.[891]

813. The Tribunal is not convinced by the criticism made by Mr. Kaczmarek of Mr. Haberman's application of a premium to reflect small company and project-specific risks in this case.[892]

---

[885] C-477 (CONFIDENTIAL)

[886] Haberman, First Expert Report, Appendix C, ¶ C.20.

[887] *See* Haberman, Second Expert Report, Appendix 4.1.

[888] *See* Haberman, Second Expert Report, ¶ 4.4. *See also* HAB-047, p. 5 and HAB-031.

[889] *See* Haberman, Second Expert Report, ¶ 4.19.

[890] Pakistan's Post-Hearing Brief, ¶ 354. *See also* Haberman, Second Expert Report, ¶ 4.47.

[891] Pakistan's Post-Hearing Brief, ¶ 354

[892] Kaczmarek, Second Expert Report, ¶¶ 133-145.

814.  The reasons why an additional project risk premium is justified in the present case is summarized in the table below:[893]

| Unproven business model | There are no other firms in the floating power market offering power through self-propelled floating power stations. Compared to power barges, they are more limited in locations where they can be moored and need to be constantly manned, increasing operating costs. |
| This was a new venture | Prior to submitting bids to Iraq and Pakistan to provide rental power, Karkey's experience was exclusively in land based power operations based in Turkey. |
| Inexperience | Karkey had no prior experience of operating floating power stations. |
| No evidence of future success | Each Powership appears to have been constructed for the purpose of a particular contract, and these vessels are still operating under their original contracts. Karkey has not yet been in a position where it has had to procure a new contract for an idle vessel or move its Powership from one contract to another. Other companies that have tried to enter the speculative power rental market, have failed. |
| Limited market | High transport and significant set up costs imply that smaller contracts (e.g. below 100MW) would be uneconomical for Karkey. It may be that, when a Powership is available for a new contract, there will be no contracts available that use sufficient capacity to make the new contract economical to operate. The market is limited further, due to few ports in the world having the direct transmission capacity to import large electrical capacity |

*Source:* Haberman, First Expert Report, Appendix C, para. C.51

815.  In view of the above, and considering that Karkey only entered the market for floating temporary power in 2008, and that on 30 March 2012 (date of expropriation), Karkey had only operated in Iraq (for less than two years), it had limited operational experience on the date of valuation, the Tribunal finds reasonable that Mr. Haberman's included a premium of 5% in his discount factor calculation to account for Karkey's size and the fact that Karkey was not an experienced company in the temporary market at the time.

---

[893] Haberman, First Expert Report, Appendix C, ¶ C.51.

*(c.1.4) Tribunal's Conclusion*

816.  In view of the above, the Tribunal finds Mr. Haberman's calculation of the discount rate or WACC is the most appropriate, and can be summarized as follows (bearing in mind that the relevant contracts to calculate the loss profits regarding the *Kaya Bey* are the Iraq Contracts and the 2009 RSC):[894]

| | Iraq contract | Lebanon contract | Ghana contract | 2009 RSC |
|---|---|---|---|---|
| Default Spread | 5% | 4% | 5% | 6% |
| Volatility factor | 1.5x | 1.5x | 1.5x | 1.5x |
| Country risk premium | 7.5% | 6% | 7.5% | 9% |
| **WACC** | **17%** | **16%** | **17%** | **18%** |

*Source*: Haberman, Second Expert Report, para. 4.4

*(c.2) The But For Scenario*

817.  As stated above, the starting point for quantifying Karkey's loss is to compare two scenarios, the difference between them representing the measure of loss:[895]

-   First, what would have happened had the event which is being complained about not occurred (the "Hypothetical Scenario"); and

-   Second, what has actually happened to date and what is expected to happen in the future (the "Actual Scenario").

818.  A summary of Mr. Haberman's assumptions regarding the Hypothetical Scenario in this case is set forth below:[896]

---

[894] Haberman, Second Expert Report. ¶ 4.4.

[895] Haberman, First Expert Report, ¶ 3.21.

[896] Haberman, Second Expert Report, p. 60.

| Contract | Haberman 2 | | | Source |
|---|---|---|---|---|
| | Iraq I[897] | Iraq II[898] | Pakistan[899] | |
| Duration (months) | 36 | 36 | 60 | *Specified in the contract* |
| Time between contracts (months) | 8 | 8 | 8 | *Calculated* |
| Unit price (US$/kWh) (at 1 May 2012) | 0.0626 (escalated) | 0.0817 (not escalated) | 0.0636[900] (not escalated) | *Per contract* |
| Advance payment (US$million) | 72 | 10.512 | 80 | *Specified in the contract* |
| Average capacity delivered | 82% | 82% | 72% | *Calculated* |
| Guaranteed Availability | 90% | 90% | 93% | *Per contract* |
| Inflation | US$ | US$ | US$ | *US$forecast at 31 March 2012* |
| Withholding tax | n/a[901] | n/a | 6% of advance and monthly fees | *My analysis* |
| Corporation tax | 20% | 20% | 20% | *his analysis* |
| Other taxes | n/a | n/a | n/a | *his analysis* |
| Operating Expenses (US$/kWh) | 0.0257 | 0.0257 | 0.0263 | *Based on actuals* |
| Mobilization and transport cost (US$million) | 1.66 | 1.66 | 1.66 | *Based on disclosed documents* |

---

[897] NAV-023 and NAV-024.

[898] NAV-049.

[899] NAV-046.

[900] This is the rate implicit in the fixed Monthly Rental Services Fee.

[901] Under Iraq I withholding tax is payable by the Buyer however, under Iraq III withholding tax of 2.9% and a one off fee of US$245,280 is payable.

| Site preparation (US$million) | n/a | n/a | 15 | *Contractual terms/Pakistan actuals* |
|---|---|---|---|---|

*Source*: Haberman, Second Expert Report, p. 60

819. For the reasons set forth below, the Tribunal finds that Mr. Haberman's calculation of the Hypothetical Scenario is the most appropriate. The main differences between the experts are addressed below.

### (c.2.1) Contracts Assumed Under the Hypothetical or But for Scenario

820. Mr. Haberman assumes that the *Kaya Bey* would have left Pakistan on 30 March 2012 and would have been available for new contracts from this date. At that time, Karkey had three Powerships operating in Iraq, being KPS 3 and KPS 4 under the First Iraq Contract and KPS 6 under the Second Iraq Contract.[902] At that date, no other contracts had been signed by Karkey and Karkey had no experience of operating under any other contracts, apart from the 2009 RSC.

821. Mr. Haberman considers that the best approach is to model the cash flows that the *Kaya Bey* might have generated under each of these existing contracts, taking into account actual operating data where it existed.

822. The Tribunal approves Mr. Haberman's approach and finds that modelling cash flows based on actual contract terms and using actual operating assumptions provides the most realistic estimate of cash flows that the *Kaya Bey* could have generated.

823. In respect of operations in Iraq, the First Iraq Contract ("Iraq I") was entered into in December 2008 and an addendum was signed on 29 March 2011, which changed the pricing terms. KPS 3 and KPS 4 operated under this contract. A Second Iraq Contract ("Iraq II") was signed on 29 May 2011 for 110 MW, for the *Irem Sultan* (KPS 6).[903] Given that Iraq II followed the payment terms in the Addendum to Iraq I, the Tribunal finds that Mr. Haberman is correct to assume that by 30 March 2012, a new Iraq contract would not have been made under the original payment terms (which were fixed irrespective of the electricity delivered) and that it is thus appropriate to adopt the terms and payment terms under the Addendum.

---

[902] Haberman, Second Expert Report, ¶ 5.2. *See* NAV-023 and NAV-049.

[903] Haberman, Second Expert Report, ¶ 5.6.

824. Therefore, Mr. Haberman has correctly modelled the hypothetical cash flows for the *Kaya Bey* (and also for the *Alican Bey*) based on the existing contracts, as follows:[904]

| Region | Operating vessel | Contract duration | Contract date |
|---|---|---|---|
| Iraq I | KPS 3, KPS 4 | 36 months | 2008 as amended on 29 March 2011 |
| Iraq II | KPS 6 | 36 months | 29 May 2011 |
| Pakistan | KPS 1 and KPS 5 | 60 months | 23 April 2009 |

*Source:* Haberman, Second Expert Report, para. 5.7

### *(c.2.2) Time between Contracts*

825. The Tribunal notes that Karkey does not agree with the assumptions made by Mr. Haberman regarding the time between Contracts. According to Karkey, Mr. Haberman would have conceded during the Hearing that it was reasonable to assume, based on the available evidence, that the *Kaya Bey* would take only one month to redeploy to Iraq (rather than the eight months that he had modelled).[905] However, the Tribunal is not convinced of the existence of such concession which, if undisputable, would not resolve the issue at stake. Indeed, the Tribunal understands that Mr. Haberman expressed a view on the basis of a hypothesis made in the light of an analysis of evidence of October 2012 which are not necessarily representative of what would have occurred immediately after 30 March 2012. The findings in Mr. Haberman's Second Report, based on a thorough analysis of historical data, appear to be more reliable.

826. According to Mr. Haberman's Second Report, given that at 30 March 2012, Karkey had no experience of a contract term ending and another contract commencing, or of a contract being extended, there is no evidence as to how long it would be before the Powerships would be able to start generating profits under an alternative contract. Mr. Haberman made the assumption that Karkey would enter into a new contract for each vessel one month after the 2009 RSC ended. He deals with the risk that this would have taken longer within the project premium in his assessment of the discount rate.[906]

---

[904] Haberman, Second Expert Report, ¶ 5.7.

[905] Claimant's Post-Hearing Brief, ¶ 235 (a). *See* C-050 (CONFIDENTIAL); C-052 (CONFIDENTIAL); Tr. Day 6, 1619:22.

[906] Haberman, Second Expert Report, ¶ 5.8.

827. In his report, Mr. Haberman considered the time taken historically to commence operations after a contract is signed, as a proxy for the time between contracts, that would cover transport time, time to conduct repairs, perform reclassification activities and conduct site preparation for the new contract. To estimate this period, Mr. Haberman has observed the time between the signing of Karkey's existing contracts and commencing operations, which ranged between eight and 22 months, and averaged 17 months:[907]

**Summary of the time between signing contract and commencing operations**

| Contract | Vessel | Date of Contract | Commercial operations date | Number of months |
|---|---|---|---|---|
| Iraq I | Rauf Bey | December 2008 | October 2010 | 22 |
| Iraq I | Dogan Bey | December 2008 | May 2010 | 17 |
| Iraq II | Irem Sultan | 29 May 2011 | January 2012 | 8 |
| Pakistan | Kaya Bey | 23 April 2009 | April 2011 | 18 |
| Pakistan | Alican Bey | 23 April 2009 | April 2011 | 21 |
| **Average** | | | | **17** |

*Source:* Haberman, Second Expert Report, paras. 5.9 – 5.10

828. The Tribunal accepts Mr. Haberman's conclusions in his Second Report and finds that, given the evidence available at the date that the vessels were detained, it is reasonable to consider that there would be an eight-month gap between one contract ending and the next beginning. This is the quickest that Karkey managed to start operations prior to 30 March 2012. The eight-month gap between contracts includes transportation to a dry-docking facility (two months), dry docking (two months), transportation to the new operating site (two months) and a period of delay (two months). This approach is reasonable as it duly accounts for delay and maintenance. As pointed out by Pakistan, Karkey has not yet completed any contractual cycle (whereby its ships have left one contract and moved to another) to provide any sort of precedent.

829. The Tribunal notes that the documents relied upon by Karkey to dispute Mr. Haberman's assumptions are dated from October 2012[908] and do not evidence that Karkey would be able to start operations within the time-frame indicated in those documents. Actually, the four-month

---

[907] Haberman, Second Expert Report, ¶¶ 5.9 and 5.10.

[908] *See* C-050 (CONFIDENTIAL); C-052 (CONFIDENTIAL).

228

delay to the commencement of commercial operations under the Second Iraq Contract suggests that the two-month gap advocated by Karkey is overly optimistic.

830. Based on the above, the Tribunal finds that the eight-month assumed by Mr. Haberman in his Second Report is reasonable.

   *(c.2.3) Unit Price*

831. According to Karkey, Mr. Haberman has conceded during the Hearing that because he had incorrectly calculated the unit price under the Iraq I contract, his criticism that Mr. Kaczmarek had cherry-picked the highest priced contract was wrong.[909]

832. However, the Tribunal notes that Mr. Haberman has not conceded that he had incorrectly calculated the unit price under the Iraq I contract, *i.e.* of 0.6 US$per kWh (as per 2011 Addendum).[910] Mr. Haberman has simply explained that he has used the 0.6 US$ instead of the 0.8 US$per kWh (which was the unit price for the Second Iraq Contract) as we are in a situation "*trying to anticipate what a negotiation might have been like had the ships been released at the end of March 2012. I would suspect that the Party more eager to enter into the Contract would be Karkey rather than Iraq, and so, therefore it might be more likely that the lower price would apply rather than the higher price.*"[911]

833. Based on the above, the Tribunal finds that Mr. Haberman's assumption with respect to the unit price used for the Iraq I contract is the most appropriate.

   *(c.2.4) Site installation costs*

834. According to Karkey, Mr. Haberman has conceded during the Hearing that the site installation costs of US$15 million used in his calculations were too high,[912] without providing any other assessment:

   Q. *[…] And so you want to reduce the losses on the Alican Bey and the Kaya Bey by 31.4 million and 15 million, so that's around 46 million, based upon the idea that the reasonable assumption for site-preparation costs is not – is 15 million.*

---

[909] Karkey's Post-Hearing Brief, ¶ 235 (c).

[910] Haberman, Second Expert Report, ¶ 5.15 (a).

[911] Tr. Day 6, 1670:2-9.

[912] Karkey's Post-Hearing Brief, ¶ 235 (b). *See* Tr. Day 6, 1801:10.

*A. Yes, you are quite right. If the site-preparation costs figure should be less than that, then that adjustment should be lower.*

*Q. Yes. And on reflection, do you think that it might be appropriate to pick a lower figure?*

*A. I think it should be, yes.*[913]

835.  Mr. Haberman has explained in his Second Report that the figure of US$15 million for installation costs was an assumption based on the available evidence.

836.  This estimate was based on the US$30 million costs incurred in preparation of the mooring site for the Powerships in Pakistan.[914] This amount is consistent with Karkey's own estimate as set out in its original proposal to Ghana, which states "*Mobilisation & Demobilisation including infrastructure works US$15,000,000.*"[915]

837.  Mr Haberman has not indicated what would be the amount lower than US$15 million that it would retain after reconsideration. The Tribunal is satisfied, in the light of the  historical data, that it must be higher than the US$5 million accepted by Mr. Kaczmarek for both transport and site preparation, without any indication on the costs for site preparation only.[916] Considering the historical data and the fact that the amount to be deducted from the losses relating to the *Kaya Bey*, as assessed by the Tribunal, will not be spread over the eight-month period Mr. Haberman has assumed between contracts,[917] the Tribunal assesses that amount to US$8 million. Since Mr. Haberman had deducted an amount of US$15 million, an amount of US$7 million will be added to Karkey's loss.

838.  In view of the above, Karkey's request that this US$15 million amount should be reduced is hereby partly granted.

---

[913] *See* Tr. Day 6, 1801:5-15.

[914] Karadeniz, First Witness Statement, ¶ 56.

[915] NAV-132, p. 3 of pdf file.

[916] Kaczmarek, Second Expert Report, ¶ 184.

*(c.2.5) Corporate Tax Rate - Tax Optimization*

839. Karkey submits that the issue of tax optimization can be dealt with quickly and easily using an *ex post* analysis. Mr. Haberman accepts that in the "*ex post* world", Karkey's operations are indeed tax-optimized (such that it pays a Dutch tax rate of 5% on dividends, and an additional estimated 2% in local taxes, for a total of 7% - rather than the Turkish rate of 20% used by Mr. Haberman).[918]

840. According to Mr. Kaczmarek, there are reasons why his damages analysis does not include a deduction for taxes from historical cash flows. Chief among them is that if corporate income taxes are deducted from a damage claim, there is a real risk of double taxation. The payment of a damages award will require the damaged party to record the transaction in its accounting records. That transaction will then form part of the entity's year-end results which will be used to compute the necessary income taxes. If the damages amount were determined on a post-corporate income tax basis, the damaged party may be required to pay taxes on the award twice.[919] Moreover, income taxes are amounts that should actually be paid, not "netted"out on paper through a damages award as Mr. Haberman advocates. In the ordinary course of business, all taxes are physically paid by the tax payer to the taxing authority. If taxes are merely "netted out" in a damages award rather than being physically paid, the specific party that would ordinarily receive the cash ultimately does not. Given the practical problems it creates, the "netting" of taxes from a damages award should be rejected in favor of actual physical tax payments being made in the ordinary course of business.[920]

841. Mr. Kaczmarek also states that in several prior investor-state cases in which corporate tax issues have arisen, tribunals have opted to award damages based on pre-tax calculation.[921]

842. The Tribunal notes that Mr. Haberman have assumed that Karkey pays corporate tax at 20% on its taxable profits. Mr. Haberman has assumed that Karkey will receive a foreign tax credit against its corporation tax in Turkey for the WHT that it suffers in Pakistan (or elsewhere), so that its income is not taxed twice. This is based on the tax note in Karkey's 2013 financial

---

[918] Karkey's Post-Hearing Brief, ¶ 241. *See also* Kaczmarek, Second Expert Report, ¶ 161 (the 2% indicated is an average of the local tax rates in the countries that Karkey operates in).

[919] Kaczmarek, Second Expert Report, ¶¶ 168-169.

[920] Kaczmarek, Second Expert Report, ¶ 171.

[921] Kaczmarek, Second Expert Report, ¶¶ 172-176. *See* NAV-222 to NAV-224.

statements which states: that "*In 2013, corporate tax rate is 20% in Turkey (2012:20%, 2011:20%) [...] Karpower operates in the Netherlands, corporate tax [...] in 2013 is 0%. Karpak operates in Pakistan and corporate tax rate for 2013 is 35% [...] Karpowership Lebanon [...] tax rate for 2013 is 2.35%.*"[922]

843.   Consistent with this statement, Karkey's 2012 financial statements indicate that Karkey has been taxed at a rate of 20% as set out below:[923]

| Karkey's tax charge in 2011 and 2012 | | |
|---|---|---|
| | **2012** | **2011** |
| Income before taxation | 42.11 | 21.57 |
| Expected tax charge at the applicable tax rate | (8.42) | (4.31) |
| Implied tax rate | 20% | 20% |

*Source*: Haberman, First Expert Report, para. 5.37

844.   As pointed by Mr. Haberman, this suggests that Karkey is taxed at 20% on its worldwide income, this in the absence of evidence that the 2009 RSC was structured in such a way that Karkey did not incur tax at this rate on its profits from Pakistan, Mr. Haberman has correctly adopted Karkey's tax rate of 20%. Mr. Haberman has also used this rate in his WACC calculations.[924]

845.   The Tribunal notes that Mr. Kaczmarek has only included tax in his cash flow projections from his valuation date onwards (30 September 2014). He states that "*profits from periods prior to our valuation date are not taxed, as taxes will be owed on any sum awarded by the tribunal. To tax past profits when calculating damages would risk subjecting Karkey to double taxation.*"[925]

846.   The Tribunal agrees with the principle that Karkey could suffer double taxation if a post-tax loss is calculated and the eventual award was to be taxed. However, as pointed by Mr. Haberman, Mr. Kaczmarek's approach to dealing with this matter lacks evidential support. He has not provided any evidence that Karkey would be taxed on any sum awarded by the Tribunal. The tax

---

[922] NAV-201, p. 67 of pdf file.

[923] Haberman, First Expert Report, ¶ 5.37.

[924] Haberman, First Expert Report, ¶ 5.38.

[925] Kaczmarek, First Expert Report, Appendix 4.3, note 16.

treatment of damages awards differs between jurisdictions, are not necessarily taxed and, even when they are, they may not be taxed at the same rate as a company's income.

847. If Karkey were to be awarded an amount equivalent to its pre-tax profits, and then for whatever reason did not have to pay tax on the award (or paid at a lower rate than it would have paid tax on the profits), it would have been overcompensated.

848. The Tribunal also finds that an *ex post* approach is not appropriate in the present case.

849. In view of the above, the Tribunal finds that Mr. Haberman's inclusion of an implied tax rate of 20% is reasonable, and Karkey's loss should be calculated net of all taxes that Karkey would have incurred – both in the historical and the future periods.

### (c.2.6) Retrofitting of turbochargers

850. According to Karkey, Mr. Haberman refuses to take into account the improvement that retrofitting turbochargers (which was reasonably certain to occur for the *Alican Bey* and *Kaya Bey*) would have represented for the generating capacity of those vessels. Prior to the planned rehabilitation, Karkey expected the *Alican Bey* and the *Kaya Bey* to operate in Iraq at capacity factors of 75% and 87%, respectively. Following the completion of the rehabilitation, however, Karkey expected both vessels capacity factor to improve to 90%. As a result, the Powerships would have been able to generate more electricity and more revenue. Of course, the benefit of higher capacity factors comes with an associated capital expenditure requirement. Thus, Mr. Kaczmarek's model incorporates not only the benefits but also the costs of the planned rehabilitation program. In contrast, Mr. Haberman assumes the rehabilitation program does not proceed at all, and thus that the Powerships continue to operate at pre-rehabilitation capacity factors. At the same time, however, Mr. Haberman does not remove the capital expenditure associated with rehabilitation. Karkey concludes that Mr. Haberman incorrectly incorporates the costs of the rehabilitation program, but not the benefits thereof.[926]

851. Mr. Haberman, on the other hand, states that according to Mr. Kaczmarek a generator Rehabilitation Programme was planned from January 2012. However, as explained in Mr. Haberman's Second Report, Mr. Kaczmarek does not explain where he gets this information from and provides no evidence to substantiate the timing of the rehabilitation, or

---

[926] Karkey's Post-Hearing Brief, ¶ 243.

contemporaneous budgets and plans. Neither does he provide adequate evidence of the cost of rehabilitation.[927]

852. The Tribunal accepts the opinion of Mr. Haberman in this regard. Based on the evidence provided at 30 March 2012, it is not possible to form a view as to whether Mr. Kaczmarek's assumptions around the rehabilitation program are appropriate. Accordingly, Mr. Haberman has correctly assumed that the *Kaya Bey* and the *Alican Bey* would not be rehabilitated and have instead assumed that electricity delivered under the Second Iraq Contract would be at a capacity of 74% (of the Powerships' maximum capacity) based on KPS 3 and KPS 4, and based his revenues calculations on this capacity amount.[928]

*(c.2.7) Lost profits shall be calculated until June 2015 or December 2015?*

853. Karkey initially claimed that the *Kaya Bey* would be ready to operate in June 2015, and later claimed that the *Kaya Bey* would only be ready to operate in December 2015.

854. As submitted by Pakistan, the Tribunal finds that Karkey has failed to explain why its claim for lost profits for the *Kaya Bey* has now extended beyond the original June 2015 date (*i.e.* the date that Karkey first suggested would be the date the *Kaya Bey* would be returned to full operations) to December 2015. That delay, based on Mr. Kaczmarek's estimate, has resulted in a US$14 million increase in damages.

855. As there is no evidence to support the suggestion that this delay was caused by the alleged breach of the BIT, the Tribunal finds that Pakistan should not be held liable for further losses.

---

[927] Haberman, Second Expert Report, ¶ 5.33.

[928] *See* Haberman, Second Expert Report, ¶ 5.34.

*(c.2.8) Tribunal's conclusion on the But For Scenario*

856. As a consequence of the above, the Tribunal finds that Mr. Haberman has correctly estimated the cash flows for the *Kaya Bey* under the Hypothetical Scenario in the total of US$91.0 million (Scenario B below), with the exception of his assumption regarding site installation costs.[929]

| US$million | ~~Scenario A~~ | Scenario B |
|---|---|---|
| **Date from** | ~~31 March 2014~~ | **31 March 2012** |
| **Date to** | ~~30 June 2015~~ | **30 June 2015** |
| Pakistan | ~~25.0~~ | 76.5 |
| Iraq I | ~~26.1~~ | 85.3 |
| Iraq II | ~~50.6~~ | 111.3 |
| **Average** | ~~33.9~~ | **91.0** |

*Source:* Haberman, Second Expert Report, para. 5.66

857. As decided by the Tribunal under Section V(H)(3)(c.2.4) above, the amount of US$7,000,000 (regarding site installation costs) shall be added to the amount above calculated by Mr. Haberman. As a consequence, the total of Karkey's loss under the Hypothetical Scenario amounts to US$98 million.

*(c.3) The Actual Scenario*

858. The Tribunal also finds that Mr. Haberman's calculation of the Actual Scenario is the most appropriate, as set forth below.

859. Mr. Haberman has adopted the same cash flow assumptions in his Actual Scenario as Mr. Kaczmarek did in his Second Report, only with the following exceptions:

    i.   He has maintained Karkey's original operating capacity projections, on the basis that any delay after June 2015 is not Pakistan's fault;

---

[929] Haberman, Second Expert Report, ¶ 5.66, p. 76. Scenario A in the table was crossed out by the Tribunal.

ii. With respect to operating costs, Mr. Haberman has updated his operating cost assumptions to 0.0608 US$per kWh up to 31 March 2012 and 0.0344 US$per kWh thereafter;[930]

iii. Mr. Haberman has updated his unit price assumptions in accordance with the revenue actually generated.[931] To calculate this he has taken the actual revenue generated and divided by the capacity delivered. This resulted in an effective unit price of 0.0696 US$per kWh up to 31 March 2012 and 0.0646 US$per kWh thereafter;[932]

iv. Mr. Haberman has updated his transport cost assumption to include actual transport costs of US$566,063.[933] He has divided the transport costs equally between the two months' transport to Dubai in May and June 2014 and January 2015;[934]

v. He has updated his capacity assumptions to 80% throughout the period as opposed to 80% in winter and 76% in the summer months;

vi. Mr. Haberman has excluded the rehabilitation costs. As explained in his First Report (¶ 5.9), he was instructed that these amounts are not recoverable because Karkey has failed to prove that the losses were caused by Pakistan, a point accepted by the Tribunal; and

vii. Mr. Haberman has discounted these cash flows back to his valuation date at his estimate of an appropriate WACC for the Iraq contract, being 17%.[935]

---

[930] NAV-239.

[931] NAV-239.

[932] Revenue earned up to March 2015 was 5.5 million and between April 2015 and 30 June 2015 was 15 million with capacity delivered being 79 million kWh respectively (NAV-239).

[933] Kaczmarek, Second Expert Report, Appendix 4.3.2, note 14.

[934] Kaczmarek, Second Expert Report, Appendix 4.3.2.

[935] Haberman, Second Expert Report, Appendix 4.1.

860. Based on the above, Mr. Haberman estimates that the NPV (Net Present Value) of the *Kaya Bey*'s operations in the Actual Scenario is a loss of US$153,135, as summarized below:[936]

| US$ | Haberman2 | Kaczmarek2 |
|---|---|---|
| *Kaya Bey* Actual Scenario | (153,135) | 4,838,132[937] |

*Source:* Haberman, Second Expert Report, para. 7.13

### (c.4) The Tribunal's Conclusion

861. The Tribunal finds that the above assumptions are reasonable and finds that Mr. Haberman's calculation of the lost profits related to the *Kaya Bey*, as adjusted by the Tribunal, is correctly reflected in the table below, which relates to the period from 31 March 2012 to 30 June 2015:[938]

| | US$million |
|---|---|
| Lost cash flows in the Hypothetical Scenario | US$98.0 (*i.e.* US$91.0 assessed by Mr. Haberman + US$7 million assessed by the Tribunal regarding site installations costs) |
| Lost cash flows in the Actual Scenario | US$0.2[939] |
| **Total loss** | **US$98.2** |

862. In view of the above, the Tribunal finds that Pakistan shall pay Karkey US$98.2 million as lost profits related to the detention of the *Kaya Bey*.

### (4) Damages related to the *Alican Bey*

863. Karkey submits that it is entitled to recover the full amount of damage caused by the detention of the Vessels, and that neither the lost rental proceeds under the Contract, nor the replacement value of the Vessels is sufficient reparation for the harm Karkey has suffered.[940]

---

[936] Haberman, Second Expert Report, ¶ 7.13. Mr. Haberman's calculations is set out in Appendix 7.1 of his 2nd Report.

[937] Kaczmarek, Second Expert Report, Appendix 4.3.2 (future cash flows of US$10,609,381 less a historical loss of US$5,771,249).

[938] Haberman, Second Expert Report, ¶ 12.9, pp. 155-156, adjusted by the Tribunal regarding site installations costs.

[939] US$153,135 rounded up.

[940] Karkey's Reply, ¶ 1015.

864. According to Karkey, the *Alican Bey* is an operating asset that should be valued based on its reasonably certain future cash flows. Pakistan's argument that fair market value is equivalent to replacement cost disregards the nature of Karkey's business.[941]

865. Before the Hearing, Karkey claimed damages related to the *Alican Bey* of US$457.2 million, consisting of:

  - US$320 million for the alleged <u>fair market value</u> of the *Alican Bey* (described as the sum of <u>future</u> cash flows as of 30 June 2015);[942] and

  - US$137 million for the alleged <u>historical</u> lost cash flows from 31 March 2015 up to 30 June 2015.[943]

866. The Tribunal notes that in Karkey's closing statement on damages at the Hearing, Karkey presented its revised loss related to the *Alican Bey* at US$445.7 million (pre-interest and as of 30 June 2015), as follows:[944]

| Table 3 - Alican Bey Expropriation | | 445.7 |
|---|---|---|
| Loss in Kaczmarek II | 457.2 | |
| Time to redeploy Alican Bey to Iraq – 1 month | 0.0 | |
| Sri Lanka contract, replaced with New Country contract (50 months) | -11.5 | |
| Unit price | 0.0 | |

*Source*: Kaczmarek, Second Expert Report, p.9

867. Karkey explained that the adjustment above is because Mr. Kaczmarek had initially calculated some of the losses related to the *Alican Bey* on the basis of a fictional ten-year contract with Sri Lanka and that now Karkey considers that the *Alican Bey* would have gone to Iraq, which requires an adjustment of US$11.5 million.[945]

---

[941] Karkey's Reply, ¶ 1031.

[942] Kaczmarek, Second Expert Report, ¶ 224(i).

[943] Kaczmarek, Second Expert Report, Table 21, p. 87.

[944] CX-009, Karkey Closing Statement, Part IV Damages, p. 31. For "Loss in Kaczmarek II", *see* table 2 of Kaczmarek, Second Expert Report, p. 9.

[945] *See* Tr. Day 10, 2898:14 - 2899:12.

868. On the other hand, Pakistan submits that if the Tribunal decides to award Karkey compensation in relation to the *Alican Bey*, Karkey is in principle only entitled to the following:[946]

- Restitution of the *Alican Bey*;

- If the Tribunal does not wish to grant restitution, the correct fair market value of the *Alican Bey*, which is in fact the replacement cost of the *Alican Bey* of US$120 million; and

- Any lost profits until March 2018 when a new vessel will be operational.

869. According to Pakistan, the appropriate remedy in relation to the *Kaya Bey* would be restitution together with any costs of repairs and legally recoverable profits. Although an injured party may specify what form reparation for an internationally wrongful act should take, its preference is not binding and the legal consequences of an internationally wrongful act are not for the injured party to stipulate or define. The Tribunal may also order restitution by a given deadline and, in the event of non-compliance, require monetary compensation of a specified amount.[947]

870. Pakistan further submits that, if the Tribunal does not award restitution, it is relevant to the Tribunal's assessment of damages that Karkey does not seek restitution and is instead seeking exaggerated compensation. Also, if the Tribunal finds that Karkey is due compensation for the fair market value of the *Alican Bey*, then legal title to the *Alican Bey* should be transferred to Pakistan. This was proposed in Pakistan's Rejoinder and was agreed by Karkey at the Hearing.[948]

871. For the reasons set forth below, the Tribunal finds that reparation of the damages suffered as a consequence of the detention of the *Alican Bey* shall be equivalent to (a) the *Alican Bey*'s fair market value based on its replacement cost, plus (b) the lost profits Karkey would have earned with the *Alican Bey* until a new replacement vessel could be operational.

   a. *The Fair Market Value of the Alican Bey*

872. The Tribunal first notes that according to Article 36 of the ILC Articles:

---

[946] Pakistan's Post-Hearing Brief, ¶ 380.

[947] Pakistan's Post-Hearing Brief, ¶ 381.

[948] Pakistan's Post-Hearing Brief, ¶ 382.

> *(1) The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, <u>insofar as such damage is not made good by restitution</u>.*
>
> *(2) The compensation shall cover any financially assessable damage including loss of profits insofar as it is established.*[949]

873. The Commentary on Article 36 of the ILC Articles also provides that compensation reflecting the capital value of property taken as the result of an internationally wrongful act is generally assessed on the basis of the "fair market value" of the property lost. However, the method used to assess "fair market value" depends on the nature of the asset concerned. When the property in question is freely traded on an open market, value is more readily determined. In such cases, the choice and application of asset-based valuation methods based on market data and the physical properties of the assets is relatively unproblematic.[950]

874. According to Karkey, the fair market value of the *Alican Bey* is determined by reference to future lost cash flows, because the *Alican Bey* is not an asset but an enterprise and it is therefore due the "enterprise value" of the vessel.

875. The Tribunal notes that, as stated by Mr. Waller (Pakistan's industry expert), although Mr. Waller is not aware of any similar vessel to the *Alican Bey* being available on the open market, there is nothing unique about the technology or plant used in the *Alican Bey*. There is no patented technology or any other aspect which would make its replacement problematic.

876. Even Mr. Nickerson (Karkey's industry expert) has stated that he would determine the value of the *Alican Bey* on the basis of its replacement cost. Mr. Nickerson has estimated the approximate value of the *Alican Bey* to be US$115-120 million.[951] It is worth noting that Mr. Waller (Pakistan's industry expert) also agreed with Mr. Nickerson's analysis that the replacement cost of the *Alican Bey* is approximately US$115-120 million.[952]

---

[949] CA-144, p. 69 of pdf file (emphasis added).

[950] CA-144, pp. 73-74 of pdf file, under ¶ 22.

[951] Nickerson, First Expert Report, ¶ 95.

[952] Waller, Second Expert Report, ¶ 261.

877. The Tribunal finds that the amount claimed by Karkey in relation to the *Alican Bey* is exaggerated and does not correspond to what a willing buyer would pay for it. Indeed, the total amount requested by Karkey for compensation regarding the detention of the *Alican Bey* (*i.e.* US$445 million) would be enough to purchase <u>three</u> new identical Vessels and potentially generate <u>three</u> times the revenue of the *Alican Bey*.[953] Mr. Kaczmarek's estimate of the fair market value of the *Alican Bey* is not acceptable. It represents more than the amount paid by APR for the entire power rental business of GE, which included assets with a total generating capacity that was <u>five</u> times the generating capacity of the *Alican Bey*.[954]

878. In view of the above, the Tribunal finds that the fair market value of the *Alican Bey* is its replacement cost evaluated at US$120 million.

879. As a consequence, Pakistan shall pay Karkey the amount of US$120 million and Karkey shall transfer its legal title to the *Alican Bey* to Pakistan within 60 days from the date of payment of this amount of US$120 million.[955]

   b. *Detention Costs: Lost Profits until Replacement*

880. The Tribunal finds that Karkey is also entitled to the lost profits it was prevented from earning as a consequence of the detention of the *Alican Bey* by Pakistan.

881. However, such lost profits are not to be calculated from the detention date (30 March 2012) until the end of its operating life (*i.e.* 2031) as claimed by Karkey. This is because, as the *Alican Bey* can be replaced, the date when replacement is possible should be the limit to calculate Karkey's lost cash flows. Therefore, the lost profits in the period up to the time when the *Alican Bey* can be replaced, assessed on a DCF basis, is the most appropriate manner of calculating such lost profits.

882. In this regard, the Tribunal approves and adheres to Mr. Haberman's DCF calculation of the lost profits of the *Alican Bey*. Mr. Haberman models the cash flows that the *Alican Bey* might have generated under new contracts after termination of the 2009 RSC, using an *ex ante* approach, which has already been addressed by the Tribunal under Section V(H)(3) above.

---

[953] R-304; *See also* Tr. Day 5, 1283:18 - 1284:3.

[954] Tr. Day 5, 1283:18 - 1284:3; R-303; R-304.

[955] Pakistan's Post-Hearing Brief, ¶ 382. *See* Tr. Day 5, 1377:10-13.

883.  Mr. Waller (Pakistan's industry expert) has estimated that it would take approximately 18 months for a replacement vessel of a similar specification to the *Alican Bey* to be commissioned.[956] Based on this information, Mr. Haberman has considered in his DCF calculation that Karkey could reasonably commission a replacement vessel for the *Alican Bey* within 18 months from the date of this award. He then estimated this award would be rendered in August 2016, and calculated that the replacement of the *Alican Bey* could to be done by March 2018.

884.  The Tribunal has difficulties understanding why it would take 18 months from the date of this award for Karkey to commission a replacement vessel for the *Alican Bey.* Since the award is rendered in August 2017, the Tribunal has no doubt that the replacement of the *Alican Bey* might take place by March 2018, as contemplated by Mr. Haberman. Consequently, the Tribunal will retain the date of March 2018 as the replacement date of the *Alican Bey* which it finds to be realistic.

885.  The Tribunal accepts Mr. Haberman's Scenarios B and C calculations, as summarized below:[957]

| US$million | Scenario A | Scenario B | Scenario C |
|---|---|---|---|
| **Date from** | **12 April 2014** | **31 March 2012** | **1 August 2016** |
| **Date to** | **1 August 2016** | **1 August 2016** | **1 March 2018** |
| Pakistan | 20.5 | 37.3 | 7.2 |
| Iraq I | 28.5 | 55.7 | 8.8 |
| Iraq II | 37.0 | 67.6 | 17.9 |
| **Average** | **28.7** | **53.5** | **11.3** |

*Source*: Haberman, Second Expert Report, para. 5.66

886.  In view of the above, Karkey is entitled to the total amount of Scenarios B plus C (*i.e.* from 31 March 2012 to 1 March 2018), *i.e.* a proxy for the actual replacement date, which is US$64.8 million.

---

[956] Waller, Second Expert Report, ¶ 264.

[957] Haberman, Second Expert Report, ¶ 5.66.

**(5) Other Detained Vessels: *Enis Bey* and the *Iraq***

a. *Enis Bey*

887. Karkey requests the replacement cost of the *Enis Bey*, the fuel tanker that served as a support vessel in Pakistan and was also detained there, and which is assumed to be lost. Mr. Kaczmarek estimated the replacement cost of the *Enis Bey* to be US$4 million.[958]

888. Mr. Haberman, Pakistan's expert, calculated that the Claimant's damages for to the loss of the *Enis Bey* are within the range of US$2-3 million, as per Mr. Waller's estimation.[959]

889. The Tribunal notes that Karkey has stated in its Reply that the *Enis Bey* is actually owed by Karpak, not by Karkey.[960] As stated under Section V(H)(2)(b.1.1) above, the Tribunal finds that Karkey is not entitled as a matter of international law to make a direct claim in relation to Karpak's rights, as Karkey does not have standing to assert claims based on the host-State's treatment of the contracts and assets of the company in which it holds shares.

890. In view of the above, Karkey's claims in relation to the *Enis Bey* is dismissed.

b. *Iraq*

891. Karkey submits that the loss related to the *Iraq*, the other support vessel retained in Pakistan, should be calculated taking into account that the *Iraq* was to be converted into a power barge in 2014 (as the hull for KPS 2) according to Karkey's fleet expansion plans. Therefore, the loss of the *Iraq* is reflected separately under Karkey's claim related to the "*Delay to Karkey's Vessels Construction Program.*"[961]

892. In order to assess the losses related to the *Iraq*, Mr. Kaczmarek (Karkey's expert) has construed a But For Scenario in which the *Iraq* is converted to a Powership and commences operations under a new contract in March 2014. In actuality (Actual Scenario), the construction program is

---

[958] Karkey's Memorial, ¶ 638. *See* Kaczmarek, Second Expert Report, ¶¶ 195-196.

[959] Haberman, First Expert Report, ¶ 9.22.

[960] Karkey's Reply, ¶ 604.

[961] Karkey's Memorial, ¶ 638.

delayed, and the *Iraq* does not begin operating under a new contract until January 2017. The difference between these two scenarios yields lost cash flows of US$113 million.[962]

893. Mr. Haberman and Pakistan, on the other hand, submit that Mr. Kaczmarek's assumptions for calculating the loss related to the *Iraq* are flawed. According to Mr. Haberman, the appropriate approach is to value the *Iraq* at its replacement cost. Based on Mr. Waller's expert evidence,[963] Mr. Haberman value the *Iraq* at US$2 million.[964]

894. As pointed by Mr. Haberman, the Tribunal notes that Karkey has provided no evidence that it planned to turn the *Iraq* into a Power barge, prior to the date of expropriation. To support this claim, Mr. Kaczmarek relies on an undated presentation to the African Development Bank, which categorizes KPS 2 as "Powerships Under Construction".[965] As the *Iraq* would have been in Pakistan at the date of this presentation, *Iraq* could not have formed the base of a vessel already under construction. Moreover, Mr. Kaczmarek has provided no explanation as to why the *Iraq* would no longer be required as a support vessel and therefore would not need to be replaced if it were to be converted into KPS 2. Even if the *Iraq* were to form the basis of KPS 2, Karkey appears to have made no attempt to mitigate its loss through procuring an additional vessel at a cost of approximately US$2 million.

895. Moreover, Mr. Kaczmarek accepted during the Hearing that no willing buyer would pay nearly US$120 million for a US$2 million barge.[966]

896. In view of the foregoing, the Tribunal finds that the appropriate manner of valuating the *Iraq* it to consider its replacement cost. Mr. Waller's and Mr. Haberman's valuation of the *Iraq* at US$2 million seems reasonable. Accordingly, Pakistan shall pay Karkey the amount of US$2 million for Karkey's losses related to the detention of the *Iraq* in Pakistan and Karkey shall transfer its legal title to the *Iraq* to Pakistan within 60 days from the date of payment of this amount of US$2 million.

---

[962] Kaczmarek, Second Expert Report, ¶ 197.

[963] Waller, Second Expert Report, ¶ 268. Mr. Nickerson (Karkey's industry expert) opined that the value was US$3.5 million (*see* Nickerson, Second Expert Report, ¶ 21).

[964] Haberman, Second Expert Report, ¶¶ 8.7 and 8.9.

[965] NAV-021.

[966] Tr. Day 5, 1388:20-22.

### (6) Delay Damages

897. Karkey's delay damages claim comprises three categories, namely alleged delays to its (a) Construction Program, (b) Rehabilitation Program, and (c) Geothermal Project, which are analysed below in turn.

#### a.  The Construction Program

(a.1) Has Pakistan's breach to the BIT caused delays to the Claimant's Projects due to financial constraints?

898. According to Karkey, as a result of the Measures[967] and the financial difficulties that they created, Karkey has suffered damages from delays in the construction and deployment of six other Powerships in its fleet and planned fleet. Of these vessels, two Powerships have been deployed to Lebanon, but were delayed from their originally planned timetable. The remaining four vessels have not been deployed and are currently in different stages of construction and planning.[968]

899. Pakistan, on the other hand, submits that Karkey has failed to show that but for Pakistan's alleged breaches of the BIT it would not have suffered these losses. Karkey has also failed to show that such damage is not too remote and speculative.[969]

900. Pakistan submits that Karkey's claim is based on its contention that Pakistan's alleged breaches resulted in the financing restrictions on Karkey that then caused delay to the projects it claims it was planning. Karkey does not get anywhere close to proving these financing restrictions. Karkey has produced only four documents in order to establish a causal link between Pakistan's detention of the Vessels and the impact on Karkey's planned projects, but they do not support Karkey's

---

[967] As noted at paragraph 220, supra, "Measures" is defined by Karkey at paragraph 610 of its Memorial: *"[…] the injuries suffered by Karkey were caused by the internationally wrongful acts of Pakistan (the 'Measures'), which include, inter alia: Lakhra's failure to comply with the terms of the Contract (including its obligations to pay Rental Service Fees, to cover confirmation charges, to pay for fuel payments, and to pay termination charges and expenses upon termination of the Contract on 30 March 2012); Pakistan's failure to honor the Sovereign Guarantee; the Supreme Court's arbitrary and unfounded presumption that Karkey participated in corruption; the denial of justice committed by the Supreme Court in purporting to invalidate the Contract on the basis of nothing more than a presumption of wrongdoing, which was contrary to the evidence before the Court; NAB's investigation of Karkey, its arbitrary demands for payment from Karkey, and its commencement of criminal proceedings against Karkey; Pakistan's detention and expropriation of Karkey's ships; Pakistan's harassment of Karkey and its personnel, including through actions by Lakhra, NAB, and the Sindh High Court in connection with proceedings before the latter court."*

[968] Karkey's Memorial, ¶ 642.

[969] Pakistan's Post-Hearing Brief, ¶ 422.

claim. These are the two Yapip Kredi term sheets and two Board resolutions by Karkey concerning decisions not to proceed with certain hydroelectric projects. According to Pakistan:[970]

- These term sheets[971] merely show that more onerous terms were imposed between two dates. They do not show that they were imposed as a result of the detention of the Vessels and, in fact, the second term sheet states that the amendments were negotiated at Karkey's request;[972] and

- The board minutes[973] refer to projects that do not form part of Karkey's consequential losses. Moreover, the board minutes post-date Pakistan's alleged breaches by a year and were even produced after Karkey's claim against Pakistan was registered with the ICSID. Importantly, they do not mention why the steps being proposed by the board are being taken.

901. The Tribunal notes that Mr. Haberman (Pakistan's expert) has accepted during the Hearing that the loss of revenue under the RSC Contract had a substantial impact on Karkey's operating income, and agreed that such impact was approximately 60% of Karkey's operating income.[974] Mr. Haberman has also accepted that for a company with Karkey's business model, it could reasonably be expected that operating income would be reinvested into growth, such as ship-building.[975]

902. The Tribunal finds reasonable the account given at the Hearing by Mr. Colak, Karkey's Chief Financial Officer. He detailed the negative impact of Pakistan's breaches of the BIT on Karkey's relationship with its lenders, and explained that the drastic loss of assets via the detention of the Vessels, as well as its loss of revenue under the RSC, severely impacted its ability to provide security for financing:

> *At the time, the Pakistani assets was about one-third of our total assets, and the cash flow kept coming from Pakistan was almost half of our revenues, and the amount the*

---

[970] Pakistan's Post-Hearing Brief, ¶¶ 427-428.

[971] C-498 (CONFIDENTIAL); C-499 (CONFIDENTIAL).

[972] Pakistan's Post-Hearing Brief, ¶ 428(a). *See* C-498 (CONFIDENTIAL).

[973] NAV-99; NAV-213. *See also* HAB-98.

[974] Tr. Day 6, 1806:22 - 1808:3.

[975] Tr. Day 6, 1811:17 - 1812:3.

*Pakistan assets were half of our equity at that time and ratio, so making an impairment on those assets means that we are losing half our equity and one-third of our all assets, and that it was a very bad impact financially for our group actually.*[976]

903. In order to demonstrate Karkey's financial problems after Pakistan's breach of the BIT, the Tribunal is satisfied with the example provided by Karkey in comparing the two Yapip Kredi term sheets, one pre-dating the expropriation of the Contract and one post-dating the expropriation.

904. The first term sheet, dated 11 May 2011, allowed Karkey to invest up to US$115 million annually to construct up to two Powerships that were not under contract plus an unlimited amount on Powerships under contract.[977]

905. The second term sheet, dated 2 January 2013 (*i.e.* after expropriation and detention of the Vessels by Pakistan), was from the same bank and had more limited financing conditions.[978] It is reasonable to consider, as alleged by Karkey, that these limited conditions forbade Karkey from pursuing any investment other than completion of a single Powership as alleged by Karkey, which at that time was under the binding contract with the government of Lebanon.[979] Such terms also required extensive personal guarantees and mortgages on all assets and properties of Karkey and its shareholders.[980]

906. It is also worth noting that since the release of the *Kaya Bey*, Karkey has been able to salvage some of its financing relationships and secure additional financing. As put by Mr. Colak, "the restrictions were imposed because of the increased risk from Pakistan's detention of the Vessels, and now have been relaxed somewhat because the *Kaya Bey* has been released."[981] The Tribunal is satisfied that the causal link described by Mr. Colak is plausible. Apart from release of the *Kaya Bey*, the other criteria material to the lender's financing decisions remained constant during this period. The only relevant change was the partial release of Karkey's assets by Pakistan.

---

[976] Tr. Day 6, 1844:12-20.

[977] C-499 (CONFIDENTIAL).

[978] C-498 (CONFIDENTIAL).

[979] Colak, Second Witness Statement, ¶¶ 30, 34.

[980] Colak, Second Witness Statement, ¶ 30. *See* C-498 (CONFIDENTIAL).

[981] Colak, Second Witness Statement, ¶ 31.

907. The Tribunal concludes that Pakistan's breach of the BIT did have an impact on Karkey's projects due to the financial constraints it caused on Karkey.

*(a.2) Damages calculation*

908. Mr. Kaczmarek's Report calculates the damages caused by the delays to the construction of the six delayed Karkey's Powerships (*i.e.* KPS 2, KPS 7, KPS 9, KPS 10, KPS 11 and KPS 12) in four steps. First, it projects the cash flows that would have been generated by each vessel in the But For Scenario. Second, it projects the cash flows generated by each vessel under the Actual Scenario. Third, it brings each set of cash flows to present value as of a valuation date by discounting future cash flows and bringing forward historical cash flows at Karkey's WACC. Fourth, it subtracts the value concluded under the Actual Scenario from the value concluded in the But For Scenario. The difference is equal to the loss suffered by Karkey as a result of delays in its vessel construction program, which amount to a decrease in value of the vessels of US$325.4 million.[982] Mr. Kaczmarek, in his Second Report, updated the amount of the damages allegedly suffered by Karkey due to the delay in the Construction Program to US$428.2 million (he has considered that the construction and deployment timelines for KPS 10, KPS 11, KPS 12 and KPS 2 have slipped further, resulting in additional delay damages).[983]

909. Karkey further submits that at the Hearing, Pakistan complained that Mr. Kaczmarek had not modelled Karkey's construction program delay damages on the basis of the contracts under which the vessels ultimately commenced operating.[984]  In response to that complaint, and in light of Mr. Haberman's concession in his Second Report that "*prima facie there may have been a period of approximately 15 months when no new vessels could be constructed*," Karkey has prepared the sensitivity analysis shown in the table below.  That analysis (which excludes KPS 2[985]) demonstrates the conservative nature of Karkey's construction delay claim.  Excluding KPS 2, that claim is US$309,000,000 (*see* the "Original Claim" column). Recalculated on the bases that Pakistan suggests (or that its expert concedes) may be reasonable (*i.e.*, using actual contracts,

---

[982] Karkey's Memorial, ¶ 643.

[983] Kaczmarek, Second Expert Report, ¶ 227, Table 24.

[984] Tr. Day 5, 1479–1480.

[985] Tr. Day 10, 2904:7.

and a 15-month delay period), that claim is actually higher by an amount between US$87,000,000 and US$100,000,000.[986]

910.  The sensitivity analysis in the table that follows models (1) the period of delay which each ship actually experienced (based on the expected operation date[987] compared with the actual operation date, and earnings under the contract under which it eventually commenced operations),[988] indicated in the section labelled "Actual Delay Under Actual Contracts;" and (2) 15 months of delay for each vessel (which, as noted, Pakistan's expert concedes is the possible period of delay), again using the terms of the contract under which it eventually commenced operations.[989]

| US$ millions | | 15 Month Delay Under Actual Contracts | Actual Delay Under Actual Contracts | |
| Vessel | Original Claim* | | Months Delay | Damages |
|---|---|---|---|---|
| KPS 7 | 66.7 | 65.5 | 2 | 8.7 |
| KPS 9 | 21.0 | 94.6 | 3 | 18.9 |
| KPS 10 | 125.3 | 133.8 | 24 | 214.1 |
| KPS 11 | 71.9 | 53.8 | 33 | 118.4 |
| KPS 12 | 23.7 | 49.1 | 15 | 49.1 |
| Total | 308.6 | 396.9 | | 409.3 |

*See Table 24 of Second Kaczmarek Report.

*Source:* Karkey's Post-Hearing Brief, para. 247

911.  According to Karkey, the sensitivity analysis clearly demonstrates the untenable nature of Pakistan's complaints — Pakistan cannot maintain that Karkey's construction delay damages claim is unreasonable when it would be even higher if calculated on the basis that Pakistan suggests.[990]

---

[986] Karkey's Post-Hearing Brief, ¶ 246.

[987] *I.e.*, the expected operation dates included in Mr. Kaczmarek's original analysis, based on Mr. Karadeniz's evidence. *See* Kaczmarek, Second Expert Report, ¶ 227, Table 24.

[988] For commencement dates, *see* NAV-094; C-717; C-718. As KPS 12 has not yet commenced operations, the "New Country" contract is used. Earnings are calculated on the basis of monthly earnings before interest, taxes, depreciation and amortization ("EBITDA"), a common proxy for cash flow. The assumptions used (installed capacity, capacity factors, and projected operating costs) are specific to each ship, and are drawn from Kaczmarek, Second Expert Report, Appendix 4.2. This calculation of damages differs from the calculation of loss that Mr. Kaczmarek originally undertook for the construction delay claim, which had calculated the reduction in value of the vessels based on lost profits. EBITDA differs in that it does not take into account, for example, capital expenditure, taxation on future revenue, or interest on historical cash flows. However, although it is not an "*apples to apples*" comparison (since the premise for the original claim was based on lost profits), EBIDTA can validly be used as a reasonableness test.

[989] Karkey's Post-Hearing Brief, ¶ 247.

[990] Karkey's Post-Hearing Brief, ¶ 247.

912. Pakistan submits that Karkey, in its closing statement, downwardly revised its claim for the Powership Construction Programme by US$116 million, as a result of removing the clearly untenable claim for damages for delay to the conversion of the *Iraq* (KPS 2), based as it was on an absurd valuation of that deck barge – with an accepted replacement cost of US$2 million – as being US$119 million.[991] This retreat followed Mr. Kaczmarek's cross-examination in which he accepted that no willing buyer would pay nearly US$120 million for a US$2 million barge.[992]

913. According to Pakistan, even with this adjustment, the claim for the alleged delays to the Powership Construction Programme is premised on the same flawed DCF calculations in respect of the various Vessels that have resulted in an absurd valuation for the *Alican Bey*.[993]

914. Mr. Haberman, Pakistan's damages expert, states that the maximum loss that could be attributable to Pakistan under this heading is US$11.5 million.[994] A summary of his conclusions is set forth in the table below:[995]

| Description | Amount, US$ | Reference |
|---|---|---|
| Loss calculated by Mr Kaczmarek | 428,156,739 | Table 24, Kaczmarek2[996] |
| Substitution of the Libya contract for the Lebanon contract for KPS 7 | (58,637,871) | Appendix 9.1.1 |
| Removal of loss calculated as relating to KPS 2, 10, 11 and 12 | (340,383,969) | Appendix 9.2 |
| Removal of the loss calculated as related to the New Country contract in KPS 7 and KPS 9 | (17,636,934) | Appendices 9.1.2 to 9.1.6[997] |
| **Remaining loss** | **11,497,965** | |

*Source:* Haberman, Second Expert Report, para. 9.53

---

[991] Pakistan submits that it is not clear why Karkey has only reduced its claim by US$116 million and not the US$119 million originally claimed.

[992] Pakistan's Post-Hearing Brief, ¶ 424.

[993] Pakistan's Post-Hearing Brief, ¶¶ 425-426.

[994] Haberman, Second Expert Report, ¶ 9.61.

[995] Haberman, Second Expert Report, ¶ 9.53.

[996] According to Mr. Haberman, Table 24 of Kaczmarek, Second Expert Report does not cast and so he has used figures in this table (to the nearest US$) as the basis of his calculation.

[997] This is the sum of US$5,362,552 and US$12,274,381 in Haberman, Second Expert Report, Appendix 9.1.2.

915. The Tribunal addresses below each of the reductions made by Mr. Haberman to Mr. Kaczmarek's calculation.

*(a.2.1) Substitution of the Libya contract for the Lebanon contract for KPS 7*

916. On the basis that the contract with Libya does not exist, and KPS 7 has since been deployed to Lebanon, the Tribunal finds that Mr. Haberman has correctly assumed that in the But For Scenario KPS 7 would have been deployed to Lebanon along with KPS 9, in place of KPS 11.[998]

917. The Libya "contract" utilized by Mr. Kaczmarek has terms that are distinctly more favourable than those of the Lebanon contract, such as unit price of 8.5 c/KWh, rather than 5.95 c/KWh in the Lebanon contract.[999]

918. If the Lebanon contract is substituted in place of the Libya contract in Mr. Kaczmarek's calculations, this reduces the loss suffered in relation to the KPS 7 to US$8,071,989, an 88% decrease in the loss calculated by Mr. Kaczmarek in relation to KPS 7.[1000]

919. The Tribunal accepts Mr. Haberman's conclusions above with respect to the substitution of the Libya contract for the Lebanon contract for KPS 7, thus reducing Mr. Kaczmarek's calculations in the amount of US$58,637,871, as indicated in the table under paragraph 914 above.

*(a.2.2) Removal of the loss calculated related to the New Country contract in KPS 7 and 9*

920. Mr. Kaczmarek has designed a hybrid "New Country" contract which, as pointed by Mr. Haberman, is based on the average or median of the terms included in Karkey's existing contracts, along with "letter of intent" and "pending offers" made by Karkey.

921. However, the Tribunal finds that the inclusion of the "letters of intent" and "pending offers" in this analysis may be misleading, as these are offers made by Karkey which have not materialized into contracts. The reason why these offers have not been converted into contracts are not known – it could be that the terms proposed by Karkey were unrealistic – and so the inclusion of these

---

[998] Haberman, Second Expert Report, ¶ 9.42. Mr. Haberman notes that figure 19 of Kaczmarek, First Expert Report shows KPS 11 as being in Karkey's "*construction pipeline*" at 20 March 2012. Therefore, he has assumed that KPS 7, as it is not included in this pipeline, would have been completed prior to this date, and so would have been used in preference to KPS 11.

[999] Kaczmarek, Second Expert Report, Appendix 4.2.

[1000] Appendix 9.1.1 of Haberman, Second Expert Report. This is based on Kaczmarek, Second Expert Report, Appendix 4.5.

options may skew the terms of Mr. Kaczmarek's New Country contract. As a consequence, the assumption that Karkey would have been able to obtain sufficient contracts to enable all of its Powerships to operate at capacity once completed appears to be optimistic given the small number of contracts obtained by Karkey over the period since it stated in the Powership market.[1001]

922.  The Tribunal accepts Mr. Haberman's conclusions above with respect to the removal of loss calculated as relating to KPS 7 and 9 regarding the New Country contract, thus reducing Mr. Kaczmarek's calculations in the amount of US$17,636,934, as indicated in the table under paragraph 914 above.

*(a.2.3) Removal of loss calculated as relating to KPS 2, 10, 11 and 12*

923.  The Tribunal first notes that Mr. Kaczmarek has accepted deleting the losses related to KPS 2.

924.  With respect to KPS 10 and 11, as pointed by Mr. Haberman,[1002] a new contract has been signed to provide electricity to Ghana.[1003] It is likely that KPS 10 and 11 will be deployed there. On the basis of this new contract, therefore, any loss that has been calculated by Mr. Kaczmarek in relation to KPS 10 and 11 as part of the claim for consequential loss should not be claimable, as it does not reflect the scenario that exists.

925.  With respect to KPS 12, the Tribunal finds that Karkey/Mr. Kaczmarek have not demonstrated that a contract would have existed for this vessel to be deployed once construction had been completed and the projected cash flows is based on a theoretical New Country contract. Without a specific contract to fulfil, any loss incurred in relation to KPS 12 is speculative. Therefore, the Tribunal finds that no consequential loss can be said to have been incurred by Karkey in relation to KPS 12.

926.  The Tribunal accepts Mr. Haberman's conclusions above with respect to the removal of loss calculated as relating to KPS 2, 10, 11 and 12, thus reducing Mr. Kaczmarek's calculations in the amount of US$340,383,969, as indicated in the table under paragraph 914 above.

---

[1001] *See* Haberman, Second Expert Report, ¶¶ 9.37 to 9.39.

[1002] Haberman, Second Expert Report, ¶¶ 9.46-9.47.

[1003] HAB-69 and Kaczmarek, Second Expert Report, ¶ 58 Table 10.

*(a.2.4) Tribunal's Conclusion*

927. In view of the foregoing, the Tribunal finds that Karkey's losses related to the Delay of the Construction Program totals US$11,497,965, as summarized by Mr. Haberman in the table set out at paragraph 914 above.

b. *The Rehabilitation Program*

928. Karkey claims US$44.5 million related to its delayed Rehabilitation Program.

929. According to Karkey, in January 2012 it established a program to rehabilitate all of the Wartsila 12V generators to the vessels KPS 3 (*Dogan Bey*) and KPS 4 (*Rauf Bey*) which were employed in Iraq ("Rehabilitation Program"). In 2011 two Wartsila 12V generators of the *Rauf Bey* had been retrofitted with ABB Turbochargers resulting in an approximate 25 percent increase in capacity relative to the old engines. This unexpected boost in efficiency prompted Karkey to establish a program to similarly retrofit all the other generators used by Karkey in Iraq.[1004]

930. Karkey submits that, as a result of the Measures,[1005] Karkey had difficulties obtaining financing to execute the Rehabilitation Program and was compelled to suspend it. Mr. Kaczmarek's Report calculates Karkey's losses due to the inability to implement the Rehabilitation Program by examining hourly reports showing capacity of KPS 3's and KPS 4's generators. In particular, Mr. Kaczmarek compares the average monthly capacity of the rehabilitated engines with the average monthly capacity of generators awaiting the rehabilitation. Mr. Kaczmarek's Report considered that the eligible generators of KPS 3 and KPS 4 "*would have increased capacity factors in Iraq from 75 percent each to 80 percent for KPS 3 and 90 percent for KPS 4.*" That additional capacity in each Powership would have provided additional electricity demanded by Iraq and consistent with the Iraqi contracts. The difference between the actual production

---

[1004] Karkey's Memorial, ¶ 650.

[1005] By way of reminder, Karkey defined "Measures" at paragraph 610 of its Updated Memorial as follows: "*[…] the injuries suffered by Karkey were caused by the internationally wrongful acts of Pakistan (the 'Measures'), which include, inter alia: Lakhra's failure to comply with the terms of the Contract (including its obligations to pay Rental Service Fees, to cover confirmation charges, to pay for fuel payments, and to pay termination charges and expenses upon termination of the Contract on 30 March 2012). Pakistan's failure to honor the Sovereign Guarantee; the Supreme Court's arbitrary and unfounded presumption that Karkey participated in corruption; the denial of justice committed by the Supreme Court in purporting to invalidate the Contract on the basis of nothing more than a presumption of wrongdoing, which was contrary to the evidence before the Court; NAB's investigation of Karkey, its arbitrary demands for payment from Karkey, and its commencement of criminal proceedings against Karkey; Pakistan's detention and expropriation of Karkey's ships; Pakistan's harassment of Karkey and its personnel, including through actions by Lakhra, NAB, and the Sindh High Court in connection with proceedings before the latter court.*"

multiplied by the hours of operations, and the production if the two vessels had been retrofitted multiplied by the same number of hours, equals the lost production. This figure, multiplied by the prevailing contractual rates each year is equal to the lost incremental revenue related to the delayed Rehabilitation Program, which as of January 2014 totalled US$44.5 million.[1006]

931. Pakistan submits that there is no evidence that it was Karkey's intention to rely on revenue from the Vessels in Pakistan to fund its Rehabilitation Program, or that this program was suspended as a result of the alleged breaches of the BIT, as also alleged by Mr. Karadeniz in his witness statement.[1007] There is also no evidence that Karkey was unable to obtain alternative financing.[1008]

932. Mr. Haberman states that he set out the evidence that he would expect to be provided in order for the claim for interruption to the Rehabilitation Program to be substantiated. He then submits that the following documents are missing:[1009]

- Contemporaneous financial plans or forecasts in support of the Rehabilitation Program;

- Evidence that Karkey intended to rely on revenue from the Powerships in Pakistan to finance the Rehabilitation Program; or

- Evidence demonstrating that Karkey was unable to mitigate its losses by finding alternative financing for the Rehabilitation Program.

933. As mentioned under Section V(H)(6)(a.1) above with respect to delays to the Construction Program, the Tribunal finds reasonable the account given at the Hearing by Mr. Colak, Karkey's Chief Financial Officer, detailing the negative impact of Pakistan's breaches of the BIT on Karkey's relationship with its lenders and explaining that the drastic loss of assets via the detention of the Vessels, as well as its loss of revenue under the RSC severely impacted its ability to provide security for financing. Therefore, the Tribunal is satisfied that, provided Karkey proves that it has suffered the losses arising out of the interruption of its Rehabilitation Program, Pakistan should compensate them.

---

[1006] Karkey's Memorial, ¶ 651. *See also* Kaczmarek, First Expert Report, ¶¶ 259-268. See also Kaczmarek, Second Expert Report, ¶ 229.

[1007] Karadeniz, Third Witness Statement, ¶¶ 104-105.

[1008] Pakistan's Post-Hearing Brief, ¶ 432(b).

[1009] Haberman, Second Expert Report, ¶ 9.108.

934. The Tribunal notes that Mr. Kaczmarek's calculation measures the incremental revenue lost due to the delay in the Rehabilitation Program over the period of July 2012 to December 2013. He relies on two estimates:

- The lost electricity production caused by the delay; and

- A rate (unit price) that would be applied to this lost electricity production to give the revenue lost.

935. Mr. Kaczmarek estimates lost electricity production based on the following formula:[1010]

*Electricity Production (MW) x Capacity Factor (%) x Contract Availability (90%) x Hours in a year (8,760 hours)*

936. Mr. Kaczmarek applies a rate (in US$ per kWh) to the difference between Production with Rehabilitation Program and Benchmark Production to come to his assessment of lost revenue to Karkey, as follows:[1011]

- US$44.5 million under the assumption that Karkey owns 100% of KPS 3 and KPS 4; and

- US$8.9 million under the assumption that Karkey owns 20% of KPS 3 and KPS 4.

937. However, Mr. Kaczmarek provides two lost revenue values for the Rehabilitation Program as a result of the change in ownership of KPS 3 and KPS 4 during the period under review.[1012] Mr. Kaczmarek states that, prior to April 2013, 80% of the profits from KPS 3 and KPS 4 were paid to a subsidiary ("KPS MI") that was not affiliated to Karkey.[1013] From April 2013, however, there was a change in ownership of KPS 3 and KPS 4 to a 100% owned subsidiary of Karkey.[1014]

938. As decided by the Tribunal under Section V(H)(2)(b.1.1) above, when the entity suffering direct loss is not Karkey - whether it be KPS MI up to April 2013 or Karpowership Iraq thereafter -

---

[1010] Kaczmarek, First Expert Report, ¶ 266.

[1011] Kaczmarek, First Expert Report, ¶ 266, Table 36.

[1012] Kaczmarek, First Expert Report, ¶ 268.

[1013] Kaczmarek, First Expert Report, ¶ 268.

[1014] Ownership changed to Karpowership Iraq, a 100% owned subsidiary of Karpowership International B.V., which is itself 100% owned by Karkey (*See* Kaczmarek, First Expert Report, ¶ 268). *See* NAV-092.

Karkey does not have standing to make claims in this arbitration on their behalf. Therefore, Karkey's claim under this heading is dismissed.

### c. *The Geothermal Project in Turkey*

939.   Karkey claims US$178,400,164 in relation to its delayed Geothermal Project in Turkey.

940.   According to Karkey, on 25 November 2008, Karkey won a tender for operational rights to access the largest auctioned geothermal reserves in Turkey. On 24 December 2008, Karkey signed an agreement with Turkey's Mineral Resources and Exploration Administration ("MTA") for subterranean rights until April 2039 ("Geothermal Project"). Karkey received financing from several banks, and used the funds to finance the initial exploration and drilling. As of early 2012, Karkey projected achieving completion of development of the reserves by 2015 ("Original Projection").[1015]

941.   Karkey submits that, as a result of the Measures, supplier negotiations were put on hold and the Geothermal Project delayed.[1016] Due to the delays caused by the Measures, a new project plan, approved by the remaining banks, was prepared in January 2013, which projected completion of the development of the project by 2020 ("Revised Projection").[1017] Since the fourth quarter of 2013, the Geothermal Project has been proceeding in accordance with the Revised Projection.[1018] However, it was not until June 2014, following the release of the *Kaya Bey*, that Karkey finally was able to secure bank financing to continue the project.[1019]

942.   Pakistan counters that there is no evidence showing that the actions taken by Pakistan caused negotiations with suppliers to be put on hold and/or that the delay to the Geothermal Project occurred as a result of Pakistan's actions, as alleged by Mr. Karadeniz in his written evidence.[1020]

943.   The Tribunal reiterates its finding that Pakistan's expropriation of Karkey's contract rights in the RSC Contract and the detention of the Vessels had a negative impact on Karkey's relationship with its lenders, and caused drastic loss of assets via the detention of the Vessels. However, the

---

[1015] Karkey's Memorial, ¶ 644.

[1016] Karadeniz, First Witness Statement, ¶ 102.

[1017] Kaczmarek, First Expert Report, ¶ 251.

[1018] Kaczmarek, First Expert Report, ¶ 251.

[1019] Karadeniz, First Witness Statement, ¶ 251. Karkey's Memorial, ¶ 645.

[1020] Pakistan's Post-Hearing Brief, ¶ 432(a). Karadeniz, First Witness Statement, ¶ 102.

Claimant has failed to demonstrate that the financial difficulties suffered by Karkey as a consequence of Pakistan's breaches of the BIT was the cause of the delays to the Geothermal Project in Turkey.

944. The Tribunal also notes that, as pointed by Mr. Haberman, Mr. Kaczmarek's approach to valuing the alleged consequential loss from delays to the Geothermal Project is not only unsubstantiated, but also technically flawed and inconsistent with source information disclosed in these proceedings.[1021]

945. In view of the foregoing, the Tribunal dismisses Karkey's claim for alleged damages arising of delays in its Geothermal Project in Turkey.

### (7) Costs increases

946. Karkey submits that, as a result of the Measures, the cost increases incurred by Karkey include (a) increased insurance costs, (b) increased costs at the shipyard, and (c) penalties that Karkey had to pay to Lebanon.[1022] These claims are analysed below in turn.

   a.  *Increase in Karkey's insurance premium*

947. Karkey claims US$7.8 million as a result of increased insurance costs allegedly caused by Pakistan's Measures.[1023]

948. According to Karkey, in 2011, Karkey was covered by an insurance program for the primary risks to its six operating vessels (including the *Iraq* – KPS 2). The policies included: (1) General Coverage – for marine and operational risks, and (2) Protection and Indemnity War Risks and Strikes ("War Risks").[1024]

949. Karkey submits that, subsequent to the Measures, the War Risks insurer cancelled the policy for the year 2012/2013 as of the end of March 2012. Although Karkey secured a new policy on 31 August 2012, the new policy was more expensive – representing, as explained in Mr. Kaczmarek's Report, a US$1.6 million annual increase or a 50% increase over the policy that

---

[1021] Haberman, Second Expert Report, ¶ 9.104.

[1022] Karkey's Memorial, ¶ 652.

[1023] Kaczmarek, Second Expert Report, ¶¶ 230-231.

[1024] Karkey's Memorial, ¶ 653.

was in effect before March 2012, and the cancellation of a no claims bonus of 25% for Karkey, which totalled an additional increase in costs to Karkey of US$543,668 a year. In addition, under the new policy Karkey's assets enjoy significant less coverage – for example, Karkey now bears the risk of detainment, as it was not possible for Karkey to replace the War Risk coverage for the vessels in Iraq and Pakistan.[1025]

950. Mr. Kaczmarek's Second Report explains that the losses from increased costs of insurance of US$5,140,854 related to KPS 1 through KPS 6 and the losses from increased cost of insurance of US$2,611,616 for KPS 7 and KPS 9 total US$7.8 million.[1026]

951. According to Pakistan, it was Karkey's own behaviour, namely its failure to disclose material facts relating to the Supreme Court proceedings and a past corruption conviction, that caused the insurers to cancel the War Risks Policy.[1027] Pakistan submits that Karkey's acceptance in its Reply that it did not disclose these material facts and risks is material. It means that the only real issue is whether Karkey was under a duty to disclose those facts, as the insurers clearly considered Karkey to be.[1028]

952. The Tribunal notes that by letter of 20 August 2012 from Talbot,[1029] the lead underwriter on the Marine Risks Insurance Policy issued to Karkey for 2012/2013 for vessels KPS 1 to 6, Talbot highlighted that by the time it "*scratched the slip for the 2012/2013 Policy on 5 April 2012*", Karkey was aware that:[1030]

- The Pakistan Supreme Court had rendered the Judgment declaring the 2009 RSC to be void *ab initio*;

- Karkey which was in dispute with Lakhra, had served a series of notices of default and had terminated the 2009 RSC on 30 March 2012;

---

[1025] Karkey's Memorial, ¶ 654.

[1026] Kaczmarek, Second Expert Report, ¶¶ 230-231. *See* table 7 of Karkey's Closing Presentation on Damages.

[1027] Pakistan's Rejoinder, ¶ 1243.

[1028] Pakistan's Rejoinder, ¶ 1247.

[1029] HAB-96.

[1030] HAB-96, p. 7 of pdf file.

- The NAB had summoned Karkey's local representative to appear before it as part of a corruption inquiry; and

- The NAB had directed a Caution Notice to be served on Karkey's vessels moored off Karachi.

953. The letter further provides that:

> *these matters were self-evidently material to a Marine War underwriter providing cover in respect of political risks* [...] <u>*However, none of these matters were disclosed to Talbot prior to inception of the 2012/2013 Policy*</u> [...] <u>*Had there been full disclosure*</u> *and a fair presentation of the risk,* <u>*the Insurers would not have written the 2012/2013 Policy in relation to the Pakistan Vessels at all*</u> <u>*or, alternatively, on the terms on which they did write it.*</u> *Consequently, in light of the non-disclosures set out above, the Insurers hereby inform your clients that they are avoiding the cover under the 2012/2013 Policy in respect of the Pakistan Vessels.*[1031]

954. The Tribunal notes that, although Karkey had the duty to disclose such issues, the fact remains that these issues occurred and were the reason of the insurers' decision. The Tribunal finds that Pakistan's actions (*i.e.* expropriation of Karkey's contractual rights and detention of the vessels) were the reason why the insurance policy was cancelled in the first place.

955. As a consequence, Pakistan is liable to pay Karkey the increased insurance costs it incurred as a result of Pakistan's breach of the BIT.

956. However, the calculation presented by Mr. Kaczmarek shall be adjusted for the reasons pointed out by Mr. Haberman and summarized below.

957. Mr. Kaczmarek's calculation is based on a comparison of the terms of insurance offered for KPS 1 to KPS 6 under an insurance policy from Marsh Limited for the period of 8 April 2011 to 7 April 2012 (the "April 2011 policy") and later policies for these and other vessels. There are three elements to Mr. Kaczmarek's calculation that were criticized by Mr. Haberman and are analysed below in turn, namely (i) the additional insurance cost for KPS 1 to KPS 6 and the *Enis Bey* after April 2012: (ii) the loss of Karkey's no claims bonus; and (iii) the additional insurance cost for KPS 7 and KPS 9.

---

[1031] HAB-96, pp. 7-8 of pdf file (emphasis added).

(a.i) The additional insurance cost for KPS 1 to KPS 6 and the *Enis Bey* after April 2012

958.  Mr. Kaczmarek compares the annual insurance premium under the April 2011 policy to the weighted average of the terms offered on three insurance policies covering the same vessels for periods after 31 August 2012. The insurance policies for the period post 31 August 2012 provides cover for a lower total sum insured, so Mr. Kaczmarek calculates the premium as a percentage of the (lower) sum insured and then applies that percentage to the higher sum insured under the April 2011 policy. The difference between the two provides Mr. Kaczmarek's calculation of the annual loss, which he prorates to calculate a loss for the period of 1 September 2012 through 30 June 2015 in his Second Report.[1032]

959.  The Tribunal notes that, although Mr. Haberman states that he is not able to verify the calculation made by Mr. Kaczmarek in this regard, he considers that the approach adopted by Mr. Kaczmarek appears to be reasonable.

960.  Mr. Haberman, however, notes that Mr. Kaczmarek's calculations include figures for KPS 21 (*Enis Bey*). That vessel is not insured under the policies referenced in Mr. Kaczmarek's Second Report, and the source of Mr. Kaczmarek's figures for the *Enis Bey* are unknown.[1033] The Tribunal finds that the figures related to KPS 21 should not be included in this calculation.

961.  In view of the foregoing, the Tribunal retains as a basis for calculation Mr. Kaczmarek's calculation of the increased costs for KPS 1 to KPS 6 (*i.e.* US$5,140,854[1034]). However, this figure includes the *Enis Bey* and the "*no claims bonus*", to which Karkey is not entitled, and should consequently be reduced to US$4,599,786.[1035] The reasons for the exclusion of the "*no claims bonus*" is set forth below.

---

[1032] *See* Kaczmarek, First Expert Report, ¶¶ 270-282; Kaczmarek, Second Expert Report, ¶¶ 230-231.

[1033] Haberman, Second Expert Report, ¶ 10.14.

[1034] *See* Kaczmarek, First Expert Report, ¶ 231.

[1035] Haberman, Second Expert Report, ¶ 10.46, note 560.

(a.ii) No Claims Bonus

962. Mr. Kaczmarek includes in his calculation a no claims bonus of US$543,668 that he states Karkey lost as a result of his cancellation of the April 2011 policy (NAV-168) at 25% of the premium on that policy.[1036]

963. As noted by Mr. Haberman, page 3 of the policy[1037] gives the no claims bonus as 22.5% and not 25%. Also, there is no evidence to suggest that this bonus was lost. The letter cancelling the policy states that no premium payment had been received from Karkey and the replacement policy from August 2012[1038] provides for the same 22.5% no claims bonus.

964. Based on the above, the Tribunal finds that the Claimant has failed to establish that Karkey has suffered any loss related to the no claim bonus and any amount claimed in this regard is dismissed.

(a.iii) Increased costs for KPS 7 and KPS 9

965. Mr. Kaczmarek estimates additional insurance costs in respect of KPS 7 and KPS 9 of US$2,611,616.

966. However, the Tribunal notes that the insurance contracts with respect to KPS 7 and KPS 9, submitted as NAV-166 and NAV-167, list that the insured parties in this regard are Karpower International B.V. and its subsidiary Karpowership Company Limited. As the Tribunal has decided above, Karkey does not have standing to make claims in this arbitration on behalf of its subsidiaries.

967. In view of the above, the Claimant's claim for the additional insurance costs in respect of KPS 7 and KPS 9 is dismissed.

---

[1036] Kaczmarek, First Expert Report, ¶ 275.

[1037] NAV-168.

[1038] NAV-169.

(a.iv) Tribunal's conclusion on increased insurance costs

968. In view of the foregoing, the Tribunal is satisfied with Mr. Kaczmarek's calculation of the increased costs for KPS 1 to KPS 6, but as reduced to a total of US$4,599,786.[1039]

   b.  *Increase in Shipping Yard Costs*

969. According to Karkey, on 5 January 2012, Karpowership, a wholly owned subsidiary of Karkey, entered into an agreement with SEDEF for the repair and conversion into floating power plants of KPS 7, 9, 10 and 11.[1040] Karkey submits that rather than converting the vessels simultaneously as planned in accordance with such agreement, SEDEF only agreed to complete the conversion of KPS 7 and KPS 9, and halted the of KPS 10 and KPS 11. In addition, works on KPS 7 and KPS 9 were delayed, as a result of Karkey's financing difficulties caused by the Measures.[1041]

970. Karkey sustains that these delays resulted in additional costs incurred by SEDEF, which were passed on to Karkey and paid by Karkey pursuant to invoices issued by SEDEF between August 2012 and August 2013. The total additional payments made by Karkey were US$12.59 million.[1042]

971. Pakistan submits that Karkey is not entitled to these costs as the entity named on the invoices in question was Karpowership Company Ltd. Karkey has produced no evidence whatsoever to show that the actions of Pakistan contributed in any way to the US$12.5 million in fees to the shipyards building the powerships.[1043]

972. A Release Protocol was signed between Karpowership Company Ltd and SEDEF in August 2013 and reads, *inter alia*, as follows:

> *[…] 1. The Contractor's* [SEDEF's] *Works for the conversion and repair of KPS 9 and KPS 7 were delayed because of the Owner's delay in Owner's Supply and the Owner's Works* <u>*as a result of the Owner's*</u> [Karpowership] <u>*dispute with Pakistan*</u> *as detailed in the Preamble. Therefore,* <u>*additional costs were incurred by the Contractor, including overtime work by the Contractor's employees and subcontractors*</u>.

---

[1039] Haberman, Second Expert Report, ¶ 10.46, note 560.

[1040] NAV-093.

[1041] Karkey's Memorial, ¶ 656.

[1042] Karkey's Memorial, ¶ 657.

[1043] Pakistan's Rejoinder, ¶ 1263.

> *2. The additional costs incurred by the Contractor, are as follows:*
> *For conversion of KPS 9- USD 7,569,026.46*
> *For conversion of KPS 7-USD 5,016, 775.14*
>
> *These additional cost amounts were included in the invoices issued by the*
> *Contractor in Annex 1.*
>
> *3. The Owner agreed to reimburse the additional costs incurred by the*
> *Contractor, and the payment of the above stated amounts were duly made by*
> *the Owner and received by the Contractor.*[…][1044]

973.    The Release Protocol states that the above costs include overtime work incurred, although it is not clear why overtime was required. Given that the conversion program was halted, it seems surprising that incremental overtime costs have been incurred.

974.    More importantly, the "additional costs" referred to by SEDEF above were paid by Karpowership as part of invoices issued to Karpowership (and not Karkey) between August 2012 and August 2013.

975.    As the Tribunal has decided above, Karkey does not have standing to make claims in this arbitration on behalf of its subsidiaries, reason why the claim under this heading is hereby dismissed.

  c.  *Delay Penalties in Lebanon*

976.    Karkey submits that because the Measures delayed the construction of vessels KPS 7 and 9, they were not deployed within 15 days of the contractually obligated Commercial Operation Date ("Cure Period") under Karkey's contract in Lebanon. Karpowership was therefore required to pay a stipulated penalty of US$1,000 per day per MW of capacity or US$82,150 per day (82.15 MW x 1,000 US $/MW). The penalty period spanned from June to September 2012 for a total of 69 days at which time KPS 9 started operations in Lebanon. The total penalty amounted to US$5.7 million (US$82,150 x 69 days).[1045]

977.    Pakistan maintains that there is no evidence that the Measures caused any delay to the delivery of the *Orhan Bey* (KPS 7). Karkey agreed to produce documents evidencing that the Measures were the direct cause of the delay to the construction of the vessel, and hence the alleged penalty

---

[1044] NAV-093 (emphasis added).

[1045] Karkey's Memorial, ¶ 658.

charges under the Lebanon contract. In any event, the contract was with Karpower, not with Karkey. Again, Karkey is not entitled to recover any such penalties.[1046]

978. As pointed out by Mr. Haberman, there was a loan finance in place for KPS 7 and 9, and it is not clear why Karpowership Company Ltd.'s failure to meet the Commercial Operation Date can be due to the actions of Pakistan.

979. In any event, the damages claimed under this heading were incurred by Karpowership (not Karkey). As the Tribunal has decided above, Karkey does not have standing to make claims in this arbitration on behalf of its subsidiaries, which is the reason why the amounts claimed under this heading is hereby dismissed.

### (8) Wasted Costs

980. Karkey claims US$23.9 million in wasted costs allegedly incurred in maintaining the *Kaya Bey* and *Alican Bey* during their detention period,[1047] which are objected by Pakistan.[1048]

981. According to Karkey, the essence of Mr. Haberman's complaint regarding Karkey's wasted costs claim in the amount of US$23.9 million is that it is based on trial balances. This complaint is unreasonable given that (1) trial balances are output from Karkey's SAP accounting system, which is audited by a reputable international accounting firm;[1049] and (2) the only way that Mr. Haberman's complaint could be addressed would be to undertake the unreasonably onerous task of reviewing hundreds of thousands of pages of invoices.  As Mr. Kaczmarek explained, this would effectively entail a technical and financial audit that would take at least a year.[1050]

982. The Tribunal first notes that in order to succeed in a wasted cost claim of this magnitude, Karkey must demonstrate that such costs were incurred, paid and related to the project.

983. Considering the allegedly high number of invoices involved in this claim, the Tribunal did not expect Karkey to produce all of them. However, Karkey was expected at least to provide the

---

[1046] Pakistan's Rejoinder, ¶ 1265.

[1047] *See* Karkey's Closing Statement on Damages (CX-009), table 6, slide 30. Kaczmarek, First Expert Report, ¶ 148; Kaczmarek, Second Expert Report, ¶ 221.

[1048] Pakistan's Rejoinder, ¶ 1036(d). *See also* Haberman, First Expert Report, ¶ 7.1 to 7.9; Haberman, Second Expert Report ¶¶ 7.14-7.115.

[1049] Tr. Day 6, 1839:3–8 ("*All the books are audited annually by PriceWaterhouse*").

[1050] Tr. Day 5, 1499:19. Karkey's Post-Hearing Brief, ¶ 259.

results of an inspection of a sample of supporting documents to these trial balances relied on by Mr. Kaczmarek, such as invoices, purchase orders, payment records, material usage records, payroll records, etc. The Tribunal relies upon Mr. Haberman's explanation that, in response to request 65 under Procedural Order No. 8, Karkey has provided time sheets and billing rates for cleaners, welders, fitters, a fabricator and a translator in Karkey and Karpak. However, there is no further description on the timesheets and he was not able to reconcile such amount to the amounts in Mr. Kaczmarek's wasted cost analysis.[1051]

984. The Tribunal finds that Mr. Kaczmarek has provided no transparency as to how he has arrived at his numbers. In his Appendix 6,[1052] there is a table setting out a summary of the amount he includes in the wasted costs claim, which contains no further narrative as to why these costs have been included, what vessel they relate to and how he has ultimately arrived at these figures.

985. As concluded by Mr. Haberman, it is apparent from Mr. Kaczmarek's analysis, that he has either made no attempt to verify the validity of the numbers put forward in the trial balances provided by Karkey and Karpak or that he has not disclosed this analysis.[1053]

986. In view of the above, the Tribunal finds that the Claimant has failed to demonstrate that the amount claimed under this heading has been duly incurred as a result of Pakistan's breach of the BIT.

### (9) Interest Rate

987. According to Karkey, the most appropriate rate of interest is that proposed by Pakistan and agreed by the Parties in the RSC for delayed payments in the event of a "Dispute," which is 12%.[1054] This rate is particularly appropriate concerning the damages that relate to Pakistan's specific contractual obligations (namely, the Termination Charge, the transport and mobilization costs under Clause 4.6(b) of the RSC, and unpaid invoices), since a 12% interest rate for those damages

---

[1051] Kaczmarek, Second Expert Report, Appendix 6.

[1052] Kaczmarek, Second Expert Report, Appendix 6.

[1053] Haberman, Second Expert Report, ¶ 7.28.

[1054] *See* C-010 (CONFIDENTIAL), Clause 4.5(i) ("*Upon the resolution of the Dispute, any amounts determined to be owing to BUYER, which have been paid to SELLER shall be paid to BUYER together with interest charges based upon Delayed Payment Interest Rate from the date the payment under the applicable invoice was made through the date of repayment*"). The term "Dispute" is broadly defined as "*any and all disputes or disagreements of any kind whatsoever between SELLER and BUYER in connection with or arising out of this Contract.*"

is required by the terms of the RSC.[1055] The same rate also should apply to the remainder of Karkey's damages.[1056]

988. If the Tribunal were to disagree that the "Delayed Payment" rate should be used, or were to conclude that it should only be used for part of Karkey's damages, the appropriate rate would be one that reflects Pakistan's cost of borrowing. Mr. Kaczmarek has calculated this to be 8.9%, and Mr. Haberman does not appear to disagree with how Mr. Kaczmarek arrived at the figure of 8.9% (although he disagrees this is the appropriate rate).  Such rate takes into account the fact that Karkey in effect has been rendered an unwilling lender to Pakistan.  This should guide the Tribunal's consideration of an appropriate interest rate (rather than Karkey's cost of borrowing (7%), which Mr. Haberman advocates,[1057] but which Pakistan itself does not appear to agree is appropriate).[1058]

989. According to Pakistan, the "investments alternative" approach is the most appropriate in this case. This was endorsed most recently by the tribunal in *Yukos*. Pakistan submits that in line with the authorities referred to in *Yukos*, the applicable rate ought to be a rate based on the 10-year US Treasury bond rates as was applied in *Yukos*.[1059]

990. Moreover, Mr. Haberman (Pakistan's expert) has determined an interest rate (*i.e.* cost of debt) for Karkey of 7%. In his opinion, this rate better reflects the interest rate Karkey would have benefited from had the alleged breach not occurred. According to Mr. Haberman, interest should be charged at this rate, on a compound annual basis, on any damages awarded to Karkey on historical losses.[1060]

---

[1055] Notably, the sovereign guarantee that Pakistan provided in connection with the RSC (C-011 (CONFIDENTIAL)) covers interest payments with its broad wording in Clause 1.1(iii) ("*all present and future financial obligations of the BUYER to the SELLER in respect of the Monthly Rental Services Fees and the Termination Charges payable by the BUYER in terms of the Rental Services Contract*" (emphasis added)).

[1056] *See* Karkey's Reply, ¶¶ 1080–83. Karkey's Post-Hearing Brief, ¶ 260.

[1057] *See*, Haberman, Second Expert Report, ¶ 11.6.

[1058] Karkey's Post-Hearing Brief, ¶ 261.

[1059] *See* Pakistan's Rejoinder, ¶ 1288; Pakistan's Counter-Memorial, ¶ 1581 and footnote 1841 which reads: "*As was applied in Yukos …*(CA-205), ¶ *1685*". Paragraph 1685 of the *Yukos* Award reads as follows: "*The Tribunal, in the exercise of its discretion, has concluded that it would be appropriate to award to Claimants interest on a rate based on ten-year US Treasury bond rates.*"

[1060] Haberman, Second Expert Report, ¶ 11.6.

991. Karkey counters that the Tribunal should *not* apply the "investments alternative" rate that Pakistan argues for in extremely brief terms (but which is not supported by Mr. Haberman).[1061] The sole basis that Pakistan advances for the use of a US Treasury bond rate as an "investments alternative" is that it was applied in *Yukos*.[1062] Without more, this is neither a sound nor adequate basis for the Tribunal to apply the same rate here. The award in *Yukos* turned on the particular facts and circumstances of that case.[1063]  It is wholly insufficient for Pakistan simply to point to the fact that the *Yukos* tribunal applied a US Treasury bond rate, as a purported justification for having such rate apply in the present case.[1064]

992. The Tribunal notes that neither the BIT nor the ILC Articles on State Responsibility provide specific rules regarding how interest should be determined. As stated by the *Yukos* Tribunal, "*the practice of past tribunals is varied and inconsistent and does not provide clear guidance. Thus, as is well established, the Tribunal has a wide margin of discretion to determine the rate of interest applicable and whether it should be simple or compound.*"[1065]

993. Clause 4.5(h) and (i) of the RSC provides as follows:[1066]

> *(h) Any disputed amounts not agreed mutually by the PARTIES shall be paid and the PARTIES may resolve the Dispute through the dispute resolution process as defined later in the Contract.*
>
> *(i) Upon the resolution of the Dispute, any amounts determined to be owing to BUYER, which have been paid to SELLER shall be paid to BUYER <u>together with interest charges based upon Delayed Payment Interest Rate from the date the payment under the applicable </u>invoice was made through the date of repayment.*

994. Moreover, the terms "Dispute" and "Delayed Payment Interest Rate" are defined in the Contract as follows:[1067]

---

[1061] *See, e.g.*, Pakistan's Counter-Memorial, ¶ 1581; Pakistan's Rejoinder, ¶ 1288.

[1062] Pakistan's Counter-Memorial, ¶ 1581; Pakistan's Rejoinder, ¶ 1288.

[1063] CA-205, *Yukos*, ¶ 1681 ("The Tribunal has concluded however that this method should also be rejected.  It is not an appropriate basis for the assessment of the damages <u>in this case.  There is no evidence that Claimants had to borrow money because they were not compensated at the time of the expropriation</u>") (emphasis added).

[1064] Karkey's Post-Hearing Brief, ¶ 262.

[1065] CA-205, *Yukos*, ¶ 1678.

[1066] *See* C-010 (CONFIDENTIAL).

[1067] *See* C-010 (CONFIDENTIAL), p. 5.

> *'Delayed Payment Interest Rate' – shall mean 1% per month on the unpaid balance, which shall be calculated on a Daily basis, and payable in equivalent Pak Rupees converted by applying the exchange rate parity of Rupee and US Dollar prevailing on the date of invoice. For the purpose of this section TT (Telegraphic Transfer) and OD (Over Draft) selling rate of National Bank of Pakistan at the close of Business Day shall apply.*

> *'Dispute' – means any and all disputes or disagreements of any kind whatsoever between SELLER and BUYER in connection with or arising out of this Contract.*

995. The Tribunal notes that Mr. Haberman states that the 12% rate in Karkey's rental service agreement relates to "Delayed Payment Interest". He further states that this is a specific contractually agreed rate that may be relevant to late payment of unpaid rental invoices, but does not have wider application to Karkey's lost cash flows claim.[1068]

996. After considering the Parties' arguments in this regard and based on the contractual provisions above, the Tribunal finds that the applicable interest rates for damages related to the expropriation of contractual rights (*i.e.* Termination Charges, unpaid invoices and mobilization costs) shall be 12%[1069] and shall apply as of the date of the expropriation, *i.e.* 30 March 2012.

997. Although the contractual 12% applies to late payments under the Contract, it has nothing to do with the rate Karkey could have benefited from with additional cash flows had the alleged breach not occurred.

998. As noted by Mr. Haberman, any damages awarded to Karkey should put it in the position it would have been in if the breach of the BIT had not occurred. In 2012, Karkey was in a net debt position and therefore any additional cash flow Karkey would have had in 2012 would have lowered net debt, thus reducing (*i.e.* making a saving on) the interest due on Karkey's borrowings. The appropriate interest rate should reflect the saving Karkey would have made on its borrowings.[1070] The Tribunal finds that, as set out in Appendix O of Mr. Haberman's 1st Report, the interest rate determined by Mr. Haberman (*i.e.* cost of debt) in the amount of 7% is the most appropriate as this rate reflects the interest rate Karkey would have benefited from had the breach not occurred.

---

[1068] Haberman, First Expert Report, Appendix C "Discount Rate", ¶ C.83.

[1069] As this is the rate used in the RSC Contract as a "Delayed Payment Interest Rate" for late payments between the Buyer and the Seller.

[1070] Haberman, Second Expert Report, ¶ 11.5.

999. Therefore, for damages related to the retention of the Vessels, including lost cash flows, a 7% interest rate shall apply as of the date of the expropriation, *i.e.* 30 March 2012.  Considering that it is not possible to determine the date when Karkey incurred the total of the repair costs concerning the *Kaya Bey*, which were incurred as of 15 May 2014 (*i.e.* upon the provisional release of the vessel), a 7% interest rate shall apply on the amount of the *Kaya Bey* repair costs as of 15 May 2014.

1000. The interest awarded shall be compounded on a yearly basis, which the Tribunal finds is in line with the majority of the decisions in investor-state expropriation cases and which is used by the damages experts of both Parties[1071] and will run until the date of full payment.

### (10)   Summary of the Amounts due to Karkey and Application of Interest

1001. Pursuant to the Tribunal's decision under Section V(H)(1 to 9) above, the Tribunal summarizes below the amounts due to Karkey by Pakistan, and decides on the application of the interest rate determined above.

1002. The Tribunal summarizes below the amounts due to Karkey by Pakistan along with interest to be compounded annually:

| | Description | Amount | Interest |
|---|---|---|---|
| 1 | Termination Charges | US$149,802,431 | Plus interest of 12% as of 30 March 2012 until the date of full payment |
| 2 | Outstanding Unpaid Invoices | US$28,923,000 | Plus interest of 12% as of 30 March 2012 until the date of full payment |
| 3 | Mobilization and transport charges incurred with respect to the *Kaya Bey* | US$566,000 | Plus interest of 12% as of 30 March 2012 until the date of full payment |

---

[1071] *See* CA-221, *Oko Pankki Oyj (formerly called OKO Osuuspankkien Keskuspankki OYJ), VTB Bank (Deutschland) AG (formerly called Ost-West Handelsbank AG) and Sampo Bank PLC v. Republic of Estonia*, (ICSID Case No. ARB/04/6), Award, 19 November 2007 ¶ 349: "*This discretionary approach to the award of compound interest under international law may now represent a form of 'jurisprudence constante' in ICSID awards. A recent study of 45 ICSID arbitrations resulting in 14 awards of compensation demonstrates that, of the latter, 8 ordered compound interest, 3 simple interest, and 1 no interest (the remaining 2 did not disclose whether compound or simple interest ordered.*)" *See also* Kaczmarek, First Expert Report, ¶ 308 and Haberman, Second Expert Report, ¶ 11.6.

| | | | |
|---|---|---|---|
| 4 | Cost repairs of the *Kaya Bey* | US$10 million | Plus interest of 7% as of 15 May 2014 until the date of full payment |
| 5 | Lost profits stemming from the detention of the *Kaya Bey* (which relates to the period from 31 March 2012 to 30 June 2015) | US$98.2 million | Plus interest of 7% as of 30 March 2012 until the date of full payment |
| 6 | Cost of Replacement of *Alican Bey* | US$120 million | Plus interest of 7% as of 30 March 2012 until the date of full payment |
| 7 | Lost profits stemming from the detention of the *Alican Bey* (which relates to the period from 31 March 2012 to 1 March 2018) | US$64.8 million | Plus interest of 7% as of 30 March 2012 until the date of full payment |
| 8 | Cost of Replacement of the *Enis Bey* | Nil | |
| 9 | Replacement cost of the *Iraq* | US$2 million | Plus interest of 7% as of 30 March 2012 until the date of full payment |
| 10 | Delay of the Construction Program | US$11,497,965 | Plus interest of 7% as of 30 March 2012 until the date of full payment |
| 11 | The Rehabilitation Program | Nil | |
| 12 | The Geothermal Project | Nil | |
| 13 | Increase in Karkey's Insurance Premium | US$4,599,786 | Plus interest of 7% as of 30 March 2012until the date of full payment |
| 14 | *Increase in Shipping Yard Costs* | Nil | |
| 15 | *Delay Penalties in Lebanon* | Nil | |
| 16 | Wasted Costs | Nil | |

I.    Pakistan's Counterclaims: Does the Tribunal have Jurisdiction to hear the Counterclaims?

1003. Pakistan submits that Art. 46 of the ICSID Convention provides for the admissibility of counterclaims in the following terms:

> *[e]xcept as the parties agree otherwise, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counterclaims arising directly out of the subject matter of the dispute provided that they are within the scope of consent of the parties and are otherwise within the jurisdiction of the Centre.*[1072]

1004. According to Pakistan, the tribunal in *Metal-Tech v. Uzbekistan* found that there are therefore two conditions which must be met for an ICSID tribunal to have jurisdiction over a counterclaim:

> *(i) the counterclaim must be within the jurisdiction of the Centre, which includes the requirement of consent, and*
>
> *(ii) It must 'aris[e] directly out of the subject-matter of the dispute', the second requirement also being known as 'connectedness' requirement.*[1073]

1005. In the event the Tribunal finds (contrary to Pakistan's position) that it does have jurisdiction over Karkey's affirmative claims, each of these requirements would be satisfied with respect to the Counterclaim.[1074]

1006. Pakistan submits that the conditions for the jurisdiction of the Centre are found in Article 25 of the ICSID Convention. These conditions include "*the existence of a legal dispute and of an investment, nationality, and consent.*"[1075] In addition, as noted by the tribunal in *Goetz v. Burundi [II]*:

> *When the States Parties to a BIT contingently consent,* inter alia, *to ICSID jurisdiction, the consent component of Article 46 of the Washington Convention is* ipso facto *imported into any ICSID arbitration which an investor then elects to pursue.*[1076]

---

[1072] Pakistan's Counter-Memorial, ¶ 1606.

[1073] Pakistan's Counter-Memorial, ¶ 1607 quoting RA-134 *Metal-Tech*, ¶ 407.

[1074] Pakistan's Counter-Memorial, ¶ 1608.

[1075] RA-134, *Metal-Tech*, ¶ 408.

[1076] RA-068, *Goetz v. Burundi*, ¶ 279.

1007. Based on the above, Pakistan submits that by electing to pursue this arbitration, Karkey has *ipso facto* consented to counterclaims "*arising directly out of the subject matter of the dispute*", and the fact that the BIT does not make any express reference to counterclaims is irrelevant.[1077]

1008. Moreover, the Counterclaim arises out of the same contract as Karkey's alleged investment. Pakistan contends that in the event that (contrary to Pakistan's position) the Tribunal finds that Karkey has an "investment" for the purposes of the BIT, the Counterclaim therefore falls within the broad language of Article VII(1) of the BIT, which applies to "*[d]isputes between one of the Parties and an investor of the other Party, in connection with his investment*".[1078]

1009. Pakistan concludes that the Parties have thus consented to potential counterclaims, which are within the jurisdiction of the Centre. The first two requirements in Article 46 of the ICSID Convention (as set-out in *Metal-Tech v. Uzbekistan*) is therefore satisfied.[1079]

1010. Karkey objects to the Tribunal's jurisdiction over Pakistan's counterclaims. According to Karkey, the issue of consent is critical and counterclaims are only permissible where there has been an explicit manifestation of consent by both parties. Where the relevant consent by the Respondent is expressed in a BIT, and the claimant's consent in an acceptance of the Respondent's offer in the BIT to arbitrate, the possibility of counterclaims must be articulated in the relevant BIT's dispute resolution clause.[1080]

1011. The Tribunal finds that, as stated by the tribunal in *Roussalis v. Romania*, "*the first issue which the Tribunal has to determine is whether – and irrespective of the particular counterclaims advanced in these proceedings by the Respondent – the Parties consented to have the State's counterclaims arbitrated.*"[1081] The *Roussalis* tribunal stressed that, in the context of a BIT dispute, the issue of consent is determined by reference to the scope of consent in the relevant BIT.[1082]

---

[1077] Pakistan's Counter-Memorial, ¶ 1611. *See also* Pakistan's Post-Hearing Brief, ¶ 480.

[1078] Pakistan's Counter-Memorial, ¶ 1612.

[1079] Pakistan's Counter-Memorial, ¶ 1613.

[1080] Karkey's Reply, ¶ 1088.

[1081] CA-314, *Spyridon Roussalis v. Romania* (ICSID Case No. ARB/06/1), Award, 7 December 2011 ("*Roussalis v. Romania*"), ¶ 864.

[1082] CA-314, *Roussalis v. Romania*, ¶ 866.

1012. The Tribunal finds that the text of the BIT is decisive in determining its jurisdiction over the counterclaims. In the present case, however, there is no provision in the BIT that contemplates the possibility of counterclaims.[1083] Article VII of the BIT provides, *inter alia*, as follows:

> *1. Disputes <u>between one of the Parties and an investor of the other Party</u>, in connection with the investment, <u>shall be notified in writing</u>, including a detailed information<u>, by the investor to the recipient Party of the investment.</u> As far as possible, the investor and the concerned Party shall endeavor to settle these disputes by consultations and negotiations in good faith.*
>
> *2. If these disputes cannot be settled in this way within six months following the date of the written notification mentioned in paragraph 1, the dispute can be submitted, <u>as the investor may choose,</u> to (a) the international Centre for Settlement of Investment Disputes (ICSID) set up by the 'Convention on Settlement of Investment Disputes Between States and Nationals of other States' (in case both Parties become signatories of this Convention.)[1084]*

1013. References to the "investor" highlighted above in the dispute resolution clause of the BIT means that the BIT is intended to enable arbitration only at the initiative of the investor. The BIT imposes no obligation on investors, only on the Contracting State.

1014. The BIT contains no particular or general language that would enable the Tribunal to conclude, if interpreted in accordance with the Vienna Convention on the Law of Treaties,[1085] that the arbitral agreement between Pakistan and Karkey includes consent by Karkey to the submission of counterclaims by Pakistan.

1015. The *Goetz v. Burundi II* award relied on by Pakistan is the only ICSID award that has ever adopted the *ipso facto* consent theory advanced by Pakistan in this case.[1086] Like this Tribunal, most ICSID tribunals have not found the theory of *ipso facto* consent to be sufficient to conclude that an investor's consent to ICSID counterclaims is automatic.[1087]

---

[1083] C-001.

[1084] C-001 (emphasis added).

[1085] RA-005, VCLT, Art. 31(1): "*A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"

[1086] RA-068, *Goetz v. Burundi II*, ¶ 279.

[1087] *See* CA-314, *Roussalis v. Romania*, ¶¶ 868-77 (analyzing the language of the BIT and denying jurisdiction over the Respondent's counterclaims); CA-321, *Saluka Investments BV v. Czech Republic*, UNCITRAL, Decision on Jurisdiction over the Czech Republic's Counterclaim, 7 May 2004; CA-124, *Sergei Paushok et al. v. Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 28 April 2011.

1016. In view of the foregoing, the Tribunal finds that it does not have jurisdiction to decide Pakistan's counterclaims in this arbitration.

## VI. COSTS

A.  Summary of the Parties' Positions

### (1) Summary of the Claimant's Position

a.  *Applicable Rules and Principles*

1017. Karkey submits that ICSID Arbitration Rule 28 grants the Tribunal discretion to decide whether costs relating to any part of the proceedings "*shall be borne entirely or in a particular share by one of the parties*."[1088] Article 6I(2) of the ICSID Convention, for its part, empowers the Tribunal to "*decide how and by whom the expenses [incurred by the parties], the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid*."[1089]

1018. According to Karkey, the foregoing provisions confer wide discretion on the Tribunal to allocate costs. In exercising such discretion in this proceeding, the Tribunal should take into account (1) Pakistan's multiple and egregious violations of the BIT; (2) Pakistan's bad faith and dilatory arbitration tactics; (3) Pakistan's assertion of meritless and untimely jurisdictional objections.[1090]

*(a.1) Pakistan's Egregious Breaches of the BIT Warrant an Award of Costs to Karkey*

1019. According to Karkey, the starting point, general principle, and growing trend in investment arbitration is for tribunals to award costs to the prevailing party, applying the rule that "the costs follow the event". Awarding costs to the prevailing party is consistent with the general damages principles articulated in the *Chorzow Factory* case, which require that the injured party be restored to the position in which it would have been, had the breach not occurred. Pursuant to

---

[1088] ICSID Arbitration Rules, Rule 28. The Tribunal's decision on costs must be included in the Tribunal's award. ICSID Arbitration Rules, Rule 47(1)(j) ("*The award shall be in writing and shall contain…any decision of the Tribunal regarding the cost of the proceeding*").

[1089] Karkey's Submission on Costs, ¶ 4.

[1090] Karkey's Submission on Costs, ¶ 5.

this principle, the Tribunal should award Karkey its costs and fees in the event that Karkey were to prevail on one or more of its BIT claims.[1091]

1020. An award of costs to the prevailing party is particularly appropriate where the breach at issue constituted an "egregious" violation of the applicable BIT. Examples of such violations have included denials of due process and uncompensated expropriations.[1092]

1021. Contrary to Pakistan's claims, neither the language of the BIT nor the prevailing practice among ICSID tribunals require an equal allocation of costs. To the contrary, here the BIT is silent on costs. In such circumstances, an increasing number of tribunals are applying the "costs follow the event" approach, and thus award costs to the prevailing party.[1093]

1022. Karkey rejects Pakistan's allegation that a majority of ICSID tribunals have ordered that parties should bear their own costs. According to Karkey, this statement, which is based on a reference to a 2010 award rather than empirical data or any sort, improperly marks: (i) that this "majority" is very slight at best; (ii) that there has been a marked trend in recent years in favor of awarding costs to the prevailing party; and (iii) that there is no consensus that an order that each party bear its own costs is an appropriate or established practice.[1094]

1023. Karkey submits that in the present case, where Pakistan has committed multiple and egregious violations of the BIT, has failed to collaborate in the efficient conduct of the arbitration, and has lodged a series of time-consuming and meritless jurisdictional objections, Karkey should be awarded its costs.[1095]

*(a.2) Pakistan's bad faith and dilatory arbitration tactics*

1024. Karkey submits that the Tribunal's discretion to award costs includes the discretion to take into account the Parties' conduct during the proceedings. Pakistan has engaged in dilatory and

---

[1091] Karkey's Submission on Costs, ¶ 6.

[1092] Karkey's Submission on Costs, ¶ 7.

[1093] Karkey's Reply Submission on Costs, ¶ 1.

[1094] Karkey's Reply Submission on Costs, ¶ 5.

[1095] Karkey's Reply Submission on Costs, ¶ 6.

obstructive procedural tactics from the very institution of the case through the Hearing, and should be appropriately penalized through an award of costs to Karkey.[1096]

1025. In summary, according to Karkey, the following "*dilatory and obstructive procedural tactics*" should be taken into account by the Tribunal:

- Pakistan refused to participate in the initial stages of this arbitral proceedings, causing substantial delay;[1097]

- Pakistan initiated parallel proceedings against Karkey in the Sindh High Court, in violation of Article 26 of the ICSID Convention;[1098]

- Pakistan disregarded the Tribunal's Provisional Measures Decision;[1099]

- Pakistan improperly reversed its position on counterclaims;[1100]

- Pakistan made repeated and unfounded applications for document production, while failing to comply with its own disclosure obligations;[1101]

- Pakistan's dilatory and defamatory applications to introduce alleged "New Evidence";[1102]

- Pakistan failed to timely obtain visas for its witnesses to attend the Hearing;[1103] and

- After the Hearing had already commenced, Pakistan decided not to call Karkey's expert witness Mr. Jerome Grand d'Esnon for oral testimony.[1104]

---

[1096] Karkey's Submission on Costs, ¶¶ 27-28.

[1097] Karkey's Submission on Costs, ¶¶ 29-32.

[1098] Karkey's Submission on Costs, ¶ 33.

[1099] Karkey's Submission on Costs, ¶¶ 34-35.

[1100] Karkey's Submission on Costs, ¶ 36.

[1101] Karkey's Submission on Costs, ¶¶ 37-43.

[1102] Karkey's Submission on Costs, ¶¶ 44-49.

[1103] Karkey's Submission on Costs, ¶¶ 50-51.

[1104] Karkey's Submission on Costs, ¶ 52.

*(a.3) Pakistan's assertion of meritless and untimely jurisdictional objections*

1026. According to Karkey, it should also be awarded the full amount of its costs and expenses because it was required to defend against meritless and shifting objections to jurisdiction, which considerably increased the costs and complexity of the arbitral proceedings.[1105]

1027. For instance, Pakistan asserted three meritless objections to the legality of Karkey's investment, despite having (a) previously endorsed and encouraged that investment; (b) cleared Karkey of any wrongdoing under Pakistan's anti-corruption statute, the NAO, and (c) continued until the present day to defend the legality of that investment in ongoing proceedings before the Supreme Court in Pakistan.[1106]

1028. From the very beginning of the arbitral proceedings, Pakistan has advanced the completely frivolous and untenable jurisdictional objection that Karkey did not make any "investment". More remarkably still, Pakistan continued to advance that same objection – despite its manifest lack of merit – even after the Tribunal had issued its Provisional Measures decision, in which it had found *prima facie* that an investment did exist. The fact that Karkey found itself forced through the arbitration to defend against this patently unsustainable argument further increased Karkey's legal costs, and thus constitutes an additional basis for the Tribunal to grant fees and costs to Karkey.[1107]

   b. *Karkey's costs*

1029. According to Karkey, it has incurred the total of US$22,268,943.76 in fees and expenses. The amount includes fees and expenses of four law firms and multiple experts over the course of four years, as well as the time and effort of Karkey's officers and legal team, starting from the lead-up to the time Karkey sent Pakistan a written notification of dispute and request for friendly consultations, dated 19 May 2012.[1108]

1030. Pursuant to Ms. Ayse Nazli Dereli Oba's (Karkey's Legal Director) Supplemental Declaration of 8 June 2016, Karkey's fees and expenses are broken down as follows:[1109]

---

[1105] Karkey's Submission on Costs, ¶ 17.

[1106] Karkey's Submission on Costs, ¶ 18.

[1107] Karkey's Submission on Costs, ¶ 21.

[1108] Karkey's Submission on Costs, ¶ 53.

[1109] Ayse Nazli Dereli Oba's Supplemental Declaration of 8 June 2016, p. 1.

| Karkey's Total Costs and Expenses | |
|---|---|
| **Cost or Expense** | **Amount (US$)** |
| ICSID Fees | 750,000.00 |
| Arnold & Porter LLP | 12,559,526.08 |
| Baker & McKenzie | 1,949,256.59 |
| Hassan Kaunain Nafees | 1,267,402.00 |
| Bird & Bird | 1,223,349.36 |
| Power Barge Corporation (Dave Nickerson, Industry Expert) | 325,505.84 |
| Navigant Consulting (Damages Experts) | 1,499,289.91 |
| AKT Law Office (Maritime law specialists) | 1,591.24 |
| Sami Zafar & Co. (Pakistani Law Expert) | 464,809.00 |
| Akinci Law Firm (Advice on Treaty Interpretation) | 6,500.00 |
| Carbonnier Lamaze Rasle & Associates (Jerome Grand d'Esnon, Procurement Expert) | 163,575.41 |
| Travel and Accommodations for S. Zafar (Pakistani Law Expert) | 23,306.12 |
| Mansoor Ahmad Khan & Co. (Expert Advice on Pakistani Law) | 73,738.00 |
| Mr. Justice S. Ahmad Sarwana (Expert Advice on Pakistani Law) | 3,520.00 |
| Travel and Accommodations for A. Hassan (Local Counsel in Pakistan) | 57,352.57 |
| Travel and accommodations for Karkey personnel | 100,221.64 |
| In-house time incurred by Karkey officials O. Karadeniz (Karkey CEO), N. Dereli Oba (Karkey Legal Director), and Y. El Suudi (Karkey Energy Trade Director) | 1,800,000.00 |
| **Total:** | **US$22,268,943.76** |

*Source:* Ayse Nazli Dereli Oba's Supplemental Declaration of 8 June 2016, p. 1

1031. The figures provided in the above table for Arnold & Porter, Baker & McKenzie, and Hassan Kaunain Nafees include amounts already invoiced as well as amounts to be invoiced and paid upon the successful outcome of the arbitration as provided in the applicable confidential retainer agreements.[1110]

---

[1110] Ayse Nazli Dereli Oba's declaration of 31 May 2016, footnote 1.

1032. Ms. Ayse Nazli Dereli Oba stated that the table above includes an entry for estimated costs incurred in connection with time spent by Karkey in-house personnel on this case. The estimates of the number of hours spent by each Karkey officer is based on an average of two hours a day dedicated solely to this matter, and multiplied by the 300 working days in a year, for four years, for a total of 2400 hours per person.[1111] She assigned an hourly value of US$250 for these in-house services. [1112]

### c. *Karkey asserts its costs were reasonable*

1033. Karkey submits that the legal fees it incurred are reasonable in light of prevailing conditions in the legal market. Karkey contends that these fees are also reasonable in light of the length and complexity of this case, which was exacerbated by Pakistan's misconduct, including: (i) the fact that Pakistan improperly caused delays; (ii) its refusal to release Karkey's Vessels or to comply with the Tribunal's Decision on Provisional Measures; (iii) its unwarranted applications for additional document production; (iv) its attempts to introduce evidence after the close of the written phase; (v) its shifting theories of the case; and (vi) its unsubstantiated and defamatory corruption theories.[1113]

1034. The complexity of the issues in the case, including multiple questions of Pakistani law and procedure, the specialized nature of the power ship market, and the substantial damages resulting from Pakistan's breach of the BIT, necessitated the retention of expert witnesses in these fields. In addition, Pakistan's introduction of allegations of violations of "international procurement norms" in its Counter-Memorial required Karkey to retain international procurement expert, Mr. Jerome Grand d'Esnon. The fees and expenses associated with Karkey's retention of these experts were reasonable, especially in light of the multiple and varied theories of jurisdiction and quantum advanced by Pakistan in this case.[1114]

1035. According to Karkey, when considered in proportion to the amount at stake in this arbitration, Karkey's legal fees and expenses are reasonable.[1115]

---

[1111] Ayse Nazli Dereli Oba's declaration of 31 May 2016, ¶ 2.

[1112] Ayse Nazli Dereli Oba's declaration of 31 May 2016, ¶ 3.

[1113] Karkey's Submission on Costs, ¶ 54.

[1114] Karkey's Submission on Costs, ¶ 55.

[1115] Karkey's Submission on Costs, ¶ 56.

1036. In addition to the counsel and expert fees and expenses that Karkey incurred, Karkey also seeks compensation for the opportunity costs and expenses resulting from the intensive involvement of Karkey's own employees and officers in the case. As detailed in the declaration of Ms. Ayse Nazli Dereli Oba, the time spent on tasks specific to these proceedings significantly diverted in-house resources. The internal costs claimed by Karkey relate exclusively to the prosecution of these proceedings, and are benchmarked against average rates for Turkish law firms. Those amounts are reasonable in light of the hours and energy required by Karkey's executive team and legal team over the course of this four-year proceeding.[1116]

   d.  *Karkey submits that Pakistan has offered no evidence that its costs are reasonable*

1037. Karkey rejects Pakistan's argument that Karkey should bear Pakistan's legal fees if the Tribunal were to decide to award costs based on relative success. Karkey submits that even if such were the case, however, Pakistan would still be required to prove the reasonableness of its fees and costs, and here it offers no evidence to support any claim of reasonableness.[1117]

1038. According to Karkey, whereas Karkey has accompanied its request for fees with declarations from each law firm involved and a description of the fees that those attorneys incurred, Pakistan has failed to provide any explanation at all of its fees, beyond a line-item schedule. Such schedule includes over US$11 million in fees for Pakistan's international arbitration counsel, Allen & Overy LLP, for only two years of representation (February 2014 to April 2016), whereas Karkey's international arbitration counsel, Arnold & Porter, incurred only US$12.6 million in fees despite conducting more than an entire additional year of work. While the Tribunal has not asked for a detailed explanation of fees incurred by either party, Pakistan's failure to provide any data on how many attorneys worked on the matter during those two years, what type of work they did, or what rates they charged, renders it impossible to gauge the reasonableness of those fees.[1118]

---

[1116] Karkey's Submission on Costs, ¶ 57.

[1117] Karkey's Reply Submission on Costs, ¶ 29.

[1118] Karkey's Reply Submission on Costs, ¶ 30.

e.  *Karkey's Request for Relief regarding Costs*

1039. Karkey requests that the Tribunal grant an award of costs directing that Pakistan reimburse Karkey for the following costs:[1119]

a. Karkey's portion of the Centre's administrative fees and expenses in the amount of US$750,000; and

b. the total costs incurred by Karkey in fees and expenses (including attorney's fees and expenses) in the amount of US$22,268,943.76.[1120]

**(2) Summary of the Respondent's Position**

a.  *Applicable Rules and Principles*

1040. Pakistan submits that the Pakistan-Turkey BIT provides in its Article VIII(7) that "*[e]xpenses incurred by the Chairman, the other arbitrators, and other costs of the proceedings shall be paid for equally by the Parties. The tribunal may, however, at its discretion, decide that a higher proportion of the costs to be paid by one of the Parties.*"[1121] Following the general rules of interpretation of treaties as set out in Article 31 of the Vienna Convention, the ordinary meaning of "other costs of the proceedings" would naturally include any and all charges associated with ICSID's administration of the arbitration. Accordingly, it is clear that Article VIII(7) of the Treaty is addressing the Procedural Costs[1122] of the arbitration. Unless a tribunal believes there is good reason to decide otherwise, the Treaty requires equal sharing of Procedural Costs between the Parties.[1123]

1041. In view of the above, Pakistan submits that the Procedural Costs of this arbitration should be shared equally between Karkey and Pakistan.[1124]

---

[1119] Karkey's Reply Submission on Costs, ¶ 31.

[1120] The Tribunal notes that the amount of US$22,268,943.76 already includes the US$750,000 asked under a. above.

[1121] C-001, Article VIII(7).

[1122] Pakistan defines Procedural Costs as to include the tribunal's fees and expenses and the expenses associated with ICSID administration of the arbitration (including charges for the hearing facilities and court reporter, for example).

[1123] Pakistan's Submission on Costs, ¶¶ 9-11.

[1124] Pakistan's Submission on Costs, ¶ 19.

1042. Pakistan submits, however, that the BIT is silent on the allocation of <u>the Parties Costs</u> (such as legal fees, experts' fees and other costs related to the proceedings). In summary, according to Pakistan, ICSID tribunals have taken two approaches to cost allocation:[1125]

- Each party bears its own costs, regardless of which party prevails; or

- "costs follow the event", meaning that the tribunal shifts the costs in whole or in part to the non-prevailing party.

1043. Pakistan sustains that the majority of ICSID tribunals have adopted the first approach and required each party to bear its own costs, regardless of whether the Claimant or the Respondent was successful. Although tribunals have on occasion adopted this approach without providing any specific reasons, several tribunals have explained that each party should bear its own costs because the relevant case involved complex factual and legal issues, and there were no special circumstances necessitating a different method of cost allocation.[1126]

1044. In some more recent cases, ICSID tribunals have departed from the traditional approach of requiring each party to bear its own costs and have shifted the costs in whole or part to the non-prevailing party. Pakistan submits that this practice is far from generally accepted and has been justified by tribunals in light of the existence of special reasons or circumstances.[1127] In those cases where tribunals have ordered costs against the non-prevailing party, they have typically held that cost allocation should reflect the degree of success of the prevailing party. In other words, even under the "costs follow the event" order, it is extremely rare for the non-prevailing party to bear the entire burden of all costs and fees.[1128]

1045. Pakistan submits that, having regard to the circumstances of this case, including the nature and complexity of the questions raised by both Parties, each Party should bear its own costs regardless

---

[1125] Pakistan's Submission on Costs, ¶ 13.

[1126] Pakistan's Submission on Costs, ¶ 15.

[1127] Pakistan's Submission on Costs, ¶ 16.

[1128] Pakistan's Submission on Costs, ¶ 17.

of which Party ultimately prevails.[1129] Whatever the outcome of the dispute, Pakistan has raised a number of reasonable and meritorious arguments on issues which are far from clear-out.[1130]

1046. In the alternative, Pakistan submits that the costs should reflect the relative success of the Parties and their reasonableness.[1131] When analysing the reasonableness of Karkey's costs, the Tribunal is invited to consider the following factors:

- Karkey's claims were inconsistent and lacked focus resulting in unnecessary costs;[1132]

- Pakistan has sought to minimize the costs of proceedings;[1133]

- Karkey opposed to the appointment of Mr. Waller without cause;[1134]

- Karkey caused unnecessary expenditure of time and resources during document production;[1135] and

- Karkey introduced unnecessary and irrelevant expert evidence.[1136]

   b. *Pakistan's Costs*

1047. Pakistan's cost schedule, which breaks down the legal fees and other costs claimed, reads as follows:[1137]

| I. Allen & Overy LLP legal fees | GBP |
|---|---|
| **A. Billed fees**<br>10 February 2014 to 21 April 2016 | |
| Total fees billed | £ 7,528,442.55 |
| **B. Unbilled fees**<br>22 April 2016 to 8 June 2016 | |

---

[1129] Pakistan's Submission on Costs, ¶ 21.

[1130] Pakistan's Submission on Costs, ¶ 22.

[1131] Pakistan's Submission on Costs, ¶ 27. Pakistan's Reply Submission on Costs, ¶ 16.

[1132] Pakistan's Submission on Costs, ¶¶ 35-38.

[1133] Pakistan's Submission on Costs, ¶ 39.

[1134] Pakistan's Submission on Costs, ¶¶ 40-47.

[1135] Pakistan's Submission on Costs, ¶¶ 48-49.

[1136] Pakistan's Submission on Costs, ¶¶ 51-52.

[1137] Pakistan's Updated Cost Schedule (8 June 2016).

| Total unbilled fees | £ 236,039.50 |
|---|---|

| Total Allen & Overy LLP legal fees | £ 7,764,482.05 |
|---|---|

| II. Costs and disbursements incurred in conducting the arbitration | GBP |
|---|---|
| **A. Allen & Overy LLP disbursements** | |
| Airfares and other travel expenses | 109,230.25 |
| Hotels, food and subsistence* | 32,613.09 |
| Incidental expenses | 5,489.99 |
| Printing, copying and know how charges | 132,004.73 |
| Courier charges | 6,103.37 |
| Court fees | 74.00 |
| Telephone charges | 497.35 |
| Technology hosting fees and online services | 15,463.14 |
| **Total** | **£ 301,475.92** |
| **B. External professional services** | |
| Bond Solon Training Ltd | 4,475.00 |
| Gedik & Eraksoy | 12,564.17 |
| Haberman Ilett LLP | 858,271.80 |
| Luqmani Thompson & Partners | 8,580.00 |
| Pilgrims Group Limited | 5,031.91 |
| Waller Marine Inc | 516,553.71 |
| **Total** | **£ 1,405,476.59** |
| **C. Document management and translation charges** | |
| Capita Translation and Interpreting Limited | 25,483.17 |
| City Docs Limited | 3,159.55 |
| City Docs Solutions Ltd | 22,032.38 |
| EPIQ Systems Limited | 4,110.07 |
| Millnet Limited | 4,327.38 |
| Transperfect Translations Ltd | 1,567.52 |
| Unified Outcome Based Outsourcing | 466.50 |
| **Total** | **£ 61,146.57** |
| **D. Costs incurred and paid directly by Pakistan**\*\* | |
| **i) Legal fees of Berwin Leighton Paisner**\*\*\* | |
| Legal fees - Berwin Leighton Paisner, 12 September 2013 to 15 April 2014 | 225,493.80 |
| **ii) Client, witness and legal expert travel and related expenses** | |
| Travel and related expenses for attendance at the Hearing and various meetings with legal counsel. (Pk Rs. 8,340,020.00) | 54,710.53 |
| **iii) Fees of Mr Justice Fazal Karim** | |

284

| | |
|---|---|
| Experts' legal services (Pk Rs. 3,500,000.00) | 22,960.00 |
| **Total** | **£ 303,164.33** |
| | |
| **E. ICSID fees advanced by Pakistan****** | |
| ICSID fees $150,000, paid September 2013 | 102,960.00 |
| ICSID fees $250,000, paid April 2014 | 171,600.00 |
| ICSID fees $350,000, paid February 2016 | 240,240.00 |
| **Total** | **£ 514,800.00** |
| | |
| **F. Pakistan's 50% share of the costs of the Joint Hearing Bundle******* | 22,333.31 |
| Amount owed by Pakistan for preparation of the Joint Hearing Bundle $32,536.87 | |
| **Total** | **£ 22,333.31** |
| | |
| **Total disbursements** | **£ 2,608,396.72** |
| | |
| **Grand total Parts I and II** | **£ 10,372,878.77** |

\* Inclusive of hearing accommodation and attendance expenses incurred for client representatives, and factual and expert witnesses, where invoiced through Allen & Overy LLP.

\*\* Paid directly by Pakistan, not invoiced via Allen & Overy LLP.

\*\*\* Dates of first and last fee remittances.

\*\*\*\* Pakistan acknowledges the Interim Financial Statement as of May 23, 2016, which shows an available balance of US$412,976.26 against Pakistan's Advance. In producing this Costs Schedule, Pakistan has assumed that the available balance will reduce as the Tribunal drafts the Award and that, once the Final Financial Statement is drawn up, any remaining available balance will be dealt with by the Tribunal at its discretion.

\*\*\*\*\* On 7 June 2016, after discussions between the parties, Pakistan agreed to pay this sum to Karkey (in accordance with Procedural Order No. 13bis). We note that GBP499.32 (representing the total expenses incurred directly by Pakistan in producing the Joint Hearing Bundle) has been removed from Pakistan's printing and copying charges, above, on the basis that it has been accounted for in the sum of GBP 22.333.31.

Financial Times exchange rate used Pk Rs to GBP 0.00656 as at 20.05.16.
Financial Times exchange rate used US$to GBP 0.68640 at at 20.05.16.

*Source:* Pakistan's Updated Cost Schedule (8 June 2016)

### c. *Comments to Karkey's alleged Costs*

1048. Pakistan submits that, although the Tribunal requested a simple list of the costs incurred by each party, Karkey has chosen to provide a detailed breakdown of the costs that it incurred in these proceedings. A review of Karkey's costs clearly demonstrates that they are unreasonable and excessive in several respects, for the five reasons summarized below.[1138]

1049. First, Karkey incurred significantly more costs and expenses than Pakistan in these proceedings. The material difference between the amounts incurred by each party indicates that Karkey's costs

---

[1138] Pakistan's Reply Submission on Costs, ¶ 89.

were not reasonably or necessarily incurred. In the present case, Karkey is claiming almost US$7 million more in fees than Pakistan.[1139]

1050. Second, Karkey has instructed six law firms (Arnold & Porter, Baker & McKenzie, Hassan Kaunain Nafees, Bird & Bird, AKT Law Office and Akinci Law Firm) to act for it, or advise it, in these proceedings. Instructing several teams of lawyers in this manner over the course of several years would necessarily result in inefficiencies as well as unnecessary duplication of work, and inevitably contributed to Karkey's inflated costs.[1140]

1051. Third, the detailed breakdowns of costs provided by Karkey's counsel indicate that a disproportionate amount of the work in these proceedings was done by the most senior members of each team. In fact, the breakdown of legal fees provided by Baker & McKenzie, Bird & Bird and Hassan Kaunain Nafees shows that the most senior member of each legal team billed the most hours. This is a manifestly inefficient and costly manner to manage a case.[1141]

1052. Fourth, Karkey has also sought to recover US$1.2 million in respect of costs allegedly incurred by Mr. Karadeniz and Mr. El Suudi "*in connection with time spent…on this case*." Pakistan objects to these claims for the following reasons:[1142]

-   Pakistan does not accept that the estimated two hours a day, for 300 days a year, for four years, allegedly spent by Mr. Karadeniz and Mr. El Suudi in this arbitration is reasonable, in light of the roles of these individuals (who are not in-house counsel), and the activities Karkey claims they performed; and

-   As the two individuals concerned were the CEO and Energy Trade Director of Karkey, these costs actually represent management time. Such costs are generally not recoverable as they are regarded as part of the normal cost of running a business enterprise, rather than the recoverable costs of the winning party. It is not disputed that management time may have been spent on these proceedings; however, directors, officers, or employees of a company should not need to be paid additional sums in order to give evidence on behalf of their company and/or do other work in relation to

---

[1139] Pakistan's Reply Submission on Costs, ¶¶ 90-91.

[1140] Pakistan's Reply Submission on Costs, ¶ 92.

[1141] Pakistan's Reply Submission on Costs, ¶ 93.

[1142] Pakistan's Reply Submission on Costs, ¶ 94.

the arbitration. This falls within the scope of their responsibilities. Pakistan has also incurred significant management time in these proceedings, but has not claimed these costs.

1053. Fifth, Karkey appears to be operating under a contingency fee arrangement. Although contingency fee arrangements are permissible in the US, they are not an accepted feature of the arbitral landscape and indeed are prohibited in most civil law systems. While there is a debate as to how such arrangements should be treated in international arbitration, Pakistan submits that there are two key principles to be borne in mind:

- Costs are only recoverable if the successful party is actually obliged to pay them to their legal representatives; and

- Only costs that are reasonably incurred in close connection with the conduct of the arbitration proceedings are recoverable from the unsuccessful party. As costs incurred under a contingency fee arrangement are not charged to the customer, the control and attention usually exercised by a customer over sums invoiced to him is absent. The reasonableness of costs incurred under a contingency fee agreement should be placed under greater scrutiny.

1054. Pakistan therefore objects to Karkey's attempts to recover costs which Karkey itself has not incurred or otherwise agreed to pay to its legal counsel in this arbitration.[1143]

   d. *Pakistan rejects Karkey's allegations of bad faith and procedural misconduct*

1055. In summary, Pakistan rejects Karkey's allegations that Pakistan has acted in bad faith and engaged in procedural misconduct.

1056. Pakistan denies that the conduct upon which Karkey relies was in any way improper or that it establishes the requisite intent for a finding of bad faith. Regardless of the outcome of these proceedings, Pakistan maintains that its actions in relation to Karkey's RPP in Pakistan were taken in good faith.[1144]

1057. Pakistan also denies Karkey's allegations that Pakistan engaged in procedural misconduct. Karkey fails to explain how any of its alleged grievances have led to additional costs being

---

[1143] Pakistan's Reply Submission on Costs, ¶ 96.

[1144] Pakistan's Reply Submission on Costs, ¶¶ 19-41.

incurred. Karkey also ignores that Pakistan, in addition to defending itself against claims which concern the exercise of its sovereign right to determine and apply its own law, has in fact made good faith efforts to anticipate and resolve issues and streamline these proceedings (for example, by proposing the Parties agree upon a list of issues and submit skeleton arguments in advance of the Hearing). Pakistan requests the Tribunal to assess Pakistan's conduct not as Karkey would have it, but in an objective and measured way.[1145]

   e.   *Pakistan's Request for Relief regarding Costs*

1058. Pakistan requests the Tribunal to order that:[1146]

   i.   *The Procedural Costs of this arbitration (i.e. the fees advanced to ICSID) be paid equally by the parties; and*

   ii.  *Each party bears its own costs (Parties' Costs) regardless of which party ultimately prevails;*

   *or*

   iii. *'costs follow the event', with due regard to each parties' relative success in the arbitration as well as the reasonableness of the costs incurred; and*

   iv.  *Any interest be applied at such reasonable commercial rate as the Tribunal thinks fit, from the date on which such costs were incurred to the date of payment.*

B.   The Tribunal's Decision on Costs

   a.   *Applicable Rules and Principles:*

1059. The Parties disagree on the applicable principle/approach for allocation of costs. Karkey submits that the Tribunal should apply the "costs follow the event" approach, and Pakistan claims that each party should be ordered to claim its own costs. The Parties agree, however, that Article 61(2) of the ICSID Convention gives the Tribunal wide discretion to allocate the arbitration costs between the Parties. Article 61(2) of the ICSID Convention reads as follows:

   *the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of*

---

[1145] *See* Pakistan's Reply Submission on Costs, ¶¶ 49-88.

[1146] Pakistan's Reply Submission on Costs, ¶¶ 97.

> *the Tribunal and the charges for the use of the facilities of the Centre shall*
> *be paid. Such decision shall form part of the award.*

1060. Applying the broad discretion conferred by Article 61(2), the Tribunal finds that the "costs follow the event" approach is the most appropriate in the present case. As pointed by Karkey, awarding costs to the prevailing party is consistent with the general damages principle articulated in the *Chorzow Factory* case, which require that the injured party be restored to the position in which it would have been, had the breach not occurred. The Tribunal also notes that investment tribunals are increasingly favouring the "cost follows the event approach".[1147]

1061. Moreover, while Pakistan claims that Article VIII(7) of the BIT[1148] sets a default rule that the Parties should bear equally their <u>Procedural Costs</u> (which Pakistan defines as to include the tribunal's fees and expenses and expenses associated with ICSID's administration of the arbitration), the Tribunal finds that Article VIII(7) is not applicable to this case. This is because Article VIII of the BIT governs disputes between the two State Parties signatories of the BIT (*i.e.* disputes between Turkey and Pakistan) only. Article VII of the BIT, which governs disputes between a State Party and an investor from the other State Party, does not contain a similar provision.[1149]

1062. Moreover, when applying the "cost follow the event" approach, the Tribunal will not only consider the fact that Karkey was the successful party in this arbitration in terms of claims, but will also take into account the conduct of Pakistan during the proceedings and the reasonableness of Karkey's costs, as set forth below.

   b.   *The conduct of Pakistan in these proceedings*

1063. For the reasons set forth below, the Tribunal finds that Pakistan did not cooperate in good faith in the arbitral proceedings and such behaviour must be taken into account by the Tribunal in the allocation of costs.

1064. First, Pakistan engaged in dilatory tactics throughout these proceedings. For instance, at the beginning of the arbitration:

---

[1147] *See* CA-350, Matthew Hodgson, Counting the Costs of Investment Treaty Arbitration, Global Arbitration Review (published online on 24 March 2014), p. 8 of pdf file.

[1148] *See* C-001, p. 9.

[1149] *See* C-001, Article VII, pp. 6-7.

- On 10 April 2013, Pakistan failed to file its Observations in Response to Karkey's Request for Provisional Measures in complete disregard of the deadlines set by the Tribunal. Instead it <u>waited nearly six months</u> before filing its Observations only on 30 September 2013;

- On 7 August 2013, Pakistan sought a 15-day extension to respond to ICSID's request to confirm its availability for the First Session and Hearing on Provisional Measures."[1150] The Tribunal granted the extension but "*underscore[d]*" "*that it remains reluctant to postpone the first session and hearing on provisional measures*;"[1151]

- On 19 August 2013, Pakistan requested and was granted an extension of its deadline for its Observations on Karkey's Request for Provisional Measures Request until 29 September 2013 — nearly six months after the original due date for Pakistan's submission, and <u>eight full months after Karkey submitted its urgent request for provisional measures;</u>[1152]

- On 22 August 2013, Pakistan requested that the Tribunal "extend the time [for the First Session] at least for one month period from 16-09-2013," in order for Pakistan to engage a law firm.[1153] The Tribunal rejected Pakistan's request.[1154]

1065. Also, it took <u>seven months</u> for Pakistan to comply with the Tribunal's Decision on Provisional Measures, dated 16 October 2013. The Decision on Provisional Measures directed Pakistan to "*take all steps necessary to allow the vessel [Kaya Bey], to depart into international waters and reach, before 1 November 2013, the dry dock in Dubai.*"[1155] It also included an order to Pakistan to grant "*all authorization and clearance required for the vessel's departure*", including clearances from NAB, as well as "*any other action necessary or required to allow the vessel to depart lawfully into international waters*".[1156] However, Pakistan did not release the *Kaya Bey*

---

[1150] Letter from Pakistan to ICSID (7 August 2013).

[1151] Letter from the Tribunal to the Parties (9 August 2013).

[1152] Letter from Pakistan to the Tribunal (19 August 2013) (seeking an extension "at least for one month").

[1153] Letter from Pakistan to the Tribunal (22 August 2013).

[1154] Letter from the Tribunal to the Parties (22 August 2013)

[1155] Provisional Measures Decision, ¶ 187(a).

[1156] Provisional Measures Decision, ¶ 187(c).

within the deadline determined by the Tribunal. Instead, and in direct defiance of the Decision on Provisional Measures, NAB appeared in the admiralty proceedings before the Sindh Court to oppose Lakhra's application for a modification of the arrest order on the *Kaya Bey* that would have permitted the Vessel to leave Pakistan.[1157] Moreover, NAB requested that Karkey be required to post a bank guarantee in the amount of US$128 million as a condition for the Vessel's release.[1158] In these ICSID proceedings, Pakistan asked the Tribunal to revise its Decision to require such security, but the Tribunal refused, observing that it had "*already expressed its position very clearly…and expect[ed] its Decision to be complied with by the Parties.*"[1159] Even in face of this renewed directive from the Tribunal, Pakistan failed to authorize the release of the *Kaya Bey* for seven months. The Tribunal finds that the delays caused by Pakistan in this regard were unjustified and are taken into account in this decision on costs.

1066. Moreover, Pakistan requested the introduction of additional evidence only at the end of these proceedings causing unnecessary disruption and expenses, in an attempt to uncover evidence to substantiate alleged "red flags" or suspicions of corruption.

1067. For instance, it sought to introduce evidence of redacted copies of documents it claimed to have seen when meeting with a Lebanese individual who wished to sell the alleged evidence to Pakistan.[1160] It attempted to support this application with a witness statement and notes from its own counsel, but admitted that it could not authenticate the documents or even the signatures on the documents its counsel claimed to have seen.[1161] Mr. Nahas, the individual who allegedly approached Pakistan with the alleged "new evidence", has apparently disappeared, and Pakistan's own counsel admitted that Mr. Nahas had ignored Pakistan's request and the Tribunal's order that he appear at the Hearing.[1162] There was nothing on the record that established the existence of the documents Pakistan's counsel claimed to have seen. The notes from its counsel that Pakistan introduced suggested that Pakistan's counsel had its own doubts about the authenticity of the purported claims, and revealed that they had merely filed the

---

[1157] *See* R-031.

[1158] C-128; Letter from Pakistan to the Tribunal (4 November 2013); Letter from Karkey to the Tribunal (13 November 2013), p. 2.

[1159] Tribunal's correspondence of 25 November 2013.

[1160] *See* Tr. Day 2, 500:17-18.

[1161] Tr. Day 2, 343:19 - 344:12; R-424, ¶ 10-12.

[1162] Tr. Day 2, 13:15-19.

application as a "hook" to resurrect the previously unsuccessful application for restoration of the back-up tapes.[1163]

1068. In addition, Pakistan conducted a raid of the home of Karkey's former country representative, Mr. Zulqarnain, and sought to introduce the testimony of a NAB officer concerning documents he claimed to have seen during that raid.[1164] This application was made only three weeks before the Hearing, and months after Pakistan's 29 October 2015 Rejoinder. The Tribunal denied Pakistan's last-minute application, and declared the evidence inadmissible.[1165]

1069. Second, Pakistan also made the Tribunal spend a large part of the Hearing on unfounded and suspicions arguments of corruption.

1070. At the Hearing, Pakistan raised a series of additional applications in relation to the alleged documents that Mr. Nahas purportedly had offered to sell to Pakistan. Insisting that Karkey must be in contact with Mr. Nahas, Pakistan demanded that Karkey produce *"[t]he mobile phone records of Mr. Orhan Remzi, Mr. Osman Murat, Mr. Nuri Dogan Karadeniz, Ms. Atacik and Mr. El Suudi from 11 to 15 December 2015;"* and that Karkey produce *"[a]ll email and other communications by or among any employee, consultant, or affiliate of Karkey (whether on Karkey or an internet email account) with or relating to Mr. Tannous, Mr. Nahas, and/or Mr. Raja Ali Babar Zulqarnain."*[1166] Yet, Pakistan itself admitted that its request for phone records and emails *"may not reveal [...] evidence of anything."*[1167]

1071. Pakistan coupled its demand for these records with a request that the Tribunal *"[i]invit[e] Pakistan to commence proceedings under Article 1469 of the French Code of Civil Procedure [in French court]"* in an attempt to obtain copies of the documents its counsel claimed to have seen which it believed, but could not verify, were in the possession of one of Mr. Nahas's associates in France.[1168] Pakistan admitted that the discovery process in France *"typically take[s]*

---

[1163] *See* R-424, ¶¶ 5(c), 10-12, 13(b)(i).

[1164] *See* Pakistan's Application to Submit New Evidence (8 February 2016).

[1165] Letter from the Tribunal to the Parties (10 February 2016), p. 2.

[1166] RX-001, Pakistan's Opening Presentation, Slides 161–66; Tr. Day 2, 356:17–357:7; 362:12–16; 363:6–11.

[1167] Tr. Day 2, 362:17–18.

[1168] RX-001, Pakistan's Opening Presentation, Slides 161–66; Tr. Day 2, 363:16–365:6.

*a few weeks.*[1169] The Tribunal denied this application,[1170] which would have delayed the proceedings.

1072. There were long discussions at the Hearing about the confirmed letter of credit, when in fact no letter of credit at all was issued.

1073. In view of the above, considering that Karkey was the winning party in this arbitration coupled with the fact that Pakistan seemed to be trying to delay and disrupt these proceedings, the Tribunal finds that Pakistan shall contribute to Karkey's reasonable arbitration costs, as set out below.

1074. However, when assessing such contribution, the Tribunal must also take into consideration that part of Karkey's costs were undertaken with no final success as while Karkey was asking for more than US$1,400,000,000 in damages it is awarded less than US$500,000,000, *i.e.* less than 40% of the amount of its claims. There is no reason for Pakistan to fully contribute to costs that were undertaken in vain. This is particularly justified when some of Karkey's costs includes a contingency fee. Considering this fact and Pakistan's lack of cooperation in the proceedings, the Tribunal decides that Pakistan will bear 50% of Karkey's reasonable costs and will bear its own costs. This finding applies as well to the advances paid to ICSID, and Pakistan will have to reimburse to Karkey 50% of Karkey's share of the ICSID fees eventually paid by Karkey.

   c. *Were Karkey's costs reasonable?*

1075. Karkey submits that it has incurred the total of <u>US$22,268,943.76</u> in this arbitration. Pursuant to Ms. Ayse Nazli Dereli Oba's (Karkey's Legal Director) Supplemental Declaration of 8 June 2016, Karkey's fees and expenses are broken down as follows:[1171]

| Karkey's Total Costs and Expenses | |
|---|---|
| **Cost or Expense** | **Amount (US$)** |
| ICSID Fees | 750,000.00 |
| Arnold & Porter LLP | 12,559,526.08 |
| Baker & McKenzie | 1,949,256.59 |
| Hassan Kaunain Nafees | 1,267,402.00 |

---

[1169] Tr. Day 2, 364:17–19.

[1170] Tr. Day 2, 500:21–501:4.

[1171] Ayse Nazli Dereli Oba's Supplemental Declaration of 8 June 2016, p. 1.

| | |
|---|---|
| Bird & Bird | 1,223,349.36 |
| Power Barge Corporation (Dave Nickerson, Industry Expert) | 325,505.84 |
| Navigant Consulting (Damages Experts) | 1,499,289.91 |
| AKT Law Office (Maritime law specialists) | 1,591.24 |
| Sami Zafar & Co. (Pakistani Law Expert) | 464,809.00 |
| Akinci Law   Firm   (Advice on   Treaty Interpretation) | 6,500.00 |
| Carbonnier Lamaze Rasle & Associates (Jerome Grand d'Esnon, Procurement Expert) | 163,575.41 |
| Travel and Accommodations for S. Zafar (Pakistani Law Expert) | 23,306.12 |
| Mansoor Ahmad Khan & Co. (Expert Advice on Pakistani Law) | 73,738.00 |
| Mr. Justice S. Ahmad Sarwana (Expert Advice on Pakistani Law) | 3,520.00 |
| Travel and Accommodations for A. Hassan (Local Counsel in Pakistan) | 57,352.57 |
| Travel and accommodations for Karkey Personnel | 100,221.64 |
| In-house time incurred by Karkey officials O. Karadeniz (Karkey CEO), N. Dereli Oba (Karkey Legal Director), and Y. El Suudi (Karkey Energy Trade Director) | 1,800,000.00 |
| **Total:** | **US$22,268,943.76** |

*Source:* Ayse Nazli Dereli Oba's Supplemental Declaration of 8 June 2016, p. 1

1076.  The Tribunal notes that Karkey's arbitration costs (*i.e.* US$22,268,943.76) are significantly higher than those incurred by Pakistan (*i.e.* £10,372,878.77 or approximately US$13,432,505.2). Even though the parties are free to choose their lawyers (including the number of their lawyers) and incur such expenses as they deem fit, they cannot expect the non-prevailing party to pay for this choice. Therefore, only Karkey's reasonable expenses must be reimbursed. The Tribunal is satisfied that, in view of the characteristics of the case, Karkey need not to have utilised six law firms and could have been efficiently represented and advised without spending more than US$20,000,000 (excluding the ICSID fees). Consequently, Pakistan will be condemned to pay 50% of that amount to Karkey *i.e.* US$10,000,000.

d.   *The Tribunal's Conclusion*

1077.   The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in US$):[1172]

| Arbitrators' fees and expenses | 870,951.27 |
| --- | --- |
| Mr. Yves Derains | 443,708.73 |
| Sir David A.O. Edward | 154,555.58 |
| Dr. Horacio A. Grigera Naón | 272,686.96 |
| ICSID's administrative fees | 170,000 |
| Direct expenses (estimated)[1173] | 176,589.40 |
| **Total** | **1,217,540.67** |

1078.   The above costs have been paid out of the advances made by the Parties in equal parts.[1174] As a result, each Party's share of the costs of arbitration amounts to US$608,770.34.

1079.   For the reasons set out above, Pakistan shall bear the costs of the arbitration, including Karkey's reasonable legal fees and expenses in the amount of US$10,000,000 as well as 50 % of Karkey's portion of the costs of the arbitration, as set out above in the amount of US$ 304,385.17.

1080.   The Tribunal notes that Karkey has not requested the application of interest on such amounts.

## VII.   AWARD

1081.   For the foregoing reasons, the Arbitral Tribunal unanimously:

    (i)       DECLARES that it has jurisdiction over Karkey's claims;

    (ii)      DECLARES that Pakistan has expropriated Karkey's investment in Pakistan and breached its obligation under Article III the BIT;

---

[1172] The ICSID Secretariat will provide the parties with a detailed Financial Statement of the case account once all invoices are received and the account is final.

[1173] This amount includes estimated charges relating to the dispatch of this Award (courier, printing and copying).

[1174] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

(iii)    DECLARES that Pakistan has violated Karkey's right to the free transfer of its investment in breach of Article IV of the BIT;

(iv)    ORDERS Pakistan to pay Karkey for termination charges the amount of US$149,802,431, plus interest of 12% compounded annually as of 30 March 2012 until the date of full payment;

(v)    ORDERS Pakistan to pay Karkey for outstanding unpaid invoices the amount of US$28,923,000, plus interest of 12% compounded annually as of 30 March 2012 until the date of full payment;

(vi)    ORDERS Pakistan to pay Karkey for mobilization and transport charges with respect to the *Kaya Bey* the amount of US$566,000, plus interest of 12% compounded annually as of 30 March 2012 until the date of full payment;

(vii)    ORDERS Pakistan to pay Karkey for repair costs of the *Kaya Bey* the amount of US$10,000,000, plus interest of 7% compounded annually as of 15 May 2014 until the date of full payment;

(viii)    ORDERS Pakistan to pay Karkey for lost profits stemming from the detention of the *Kaya Bey* (which relates to the period from 31 March 2012 to 30 June 2015) the amount of US$98.2 million, plus interest of 7% compounded annually as of 30 March 2012 until the date of full payment;

(ix)    ORDERS Pakistan to pay Karkey for the cost of replacement of the *Alican Bey* the amount of US$120 million, plus interest of 7% compounded annually as of 30 March 2012 until the date of full payment. As a consequence, the Tribunal ORDERS Karkey to transfer its legal title to the *Alican Bey* to Pakistan within 60 days from the date of payment of this amount of US$120 million plus interest;

(x)    ORDERS Pakistan to pay Karkey for lost profits stemming from the detention of the *Alican Bey* (which relates to the period from 31 March 2012 to 1 March 2018) the amount of US$64.8 million, plus interest of 7% compounded annually as of 30 March 2012 until the date of full payment;

(xi)    ORDERS Pakistan to pay Karkey for the cost of replacement of the *Iraq* the amount of US$2 million, plus interest of 7% compounded annually as of 30 March 2012 until

the date of full payment. As a consequence, the Tribunal ORDERS Karkey to transfer its legal title to the *Iraq* to Pakistan within 60 days from the date of payment of this amount of US$2 million plus interest;

(xii)    ORDERS Pakistan to pay Karkey for the delay to the Construction Program the amount of US$11,497,965, plus interest of 7% compounded annually as of 30 March 2012 until the date of full payment;

(xiii)   ORDERS Pakistan to pay Karkey for the increase in Karkey's insurance premium the amount of US$4,599,786, plus interest of 7% compounded annually as of 30 March 2012 until the date of full payment;

(xiv)   DECLINES jurisdiction over Pakistan's counterclaims;

(xv)    ORDERS Pakistan to pay Karkey the amount of US$10,000,000 as contribution to Karkey's legal costs and expenses;

(xvi)   ORDERS Pakistan to pay Karkey US$304,385.17 as reimbursement for 50% of Karkey's share of the costs of the arbitration;

(xvii)  DISMISSES all other claims brought by the Parties in this arbitration.

_____
Sir David A.O. Edward
Arbitrator

Date: 31/07/2017


_____
Dr. Horacio A. Grigera Naón
Arbitrator

Date: 07/20/17


_____
Mr. Yves Derains
President of the Tribunal

Date: 08/08/2017